**UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| LIVEVIDEO.AI CORP.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,<br><br>Respondents. | No. 26-1257 |

# PETITION FOR REVIEW

LiveVideo.AI Corp. ("LiveVideo") petitions for review of the Declaratory Ruling of the Federal Communications Commission's Media Bureau in *Paramount Global, Petition for Declaratory Ruling Under Section 310(b)(4)*, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026) (the "Ruling"). A copy of the Ruling is attached as Exhibit A.

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 2342(1), and this petition is filed under 28 U.S.C. § 2344 and Federal Rule of Appellate Procedure 15(a). If the Court determines that review lies instead under 47 U.S.C. § 402(b), LiveVideo asks that this filing be treated as a notice of appeal under that provision. As 28 U.S.C. § 2344 requires, LiveVideo states:

**1. Nature of the proceedings.** Paramount Global petitioned for a declaratory ruling under 47 U.S.C. § 310(b)(4) on April 24, 2026. Acting on delegated authority, the Media Bureau granted that petition. The Ruling authorizes up to 100 percent

aggregate indirect foreign ownership of the parent of the Paramount broadcast licensees. It also gives specified foreign investors, including investment vehicles owned or controlled by the governments of Saudi Arabia, Abu Dhabi, and Qatar, advance authority to hold non-controlling interests of up to 20 percent. LiveVideo participated as a party, having filed a Petition to Deny, a written ex parte presentation, a disqualification petition on July 31, 2026, and an amended disqualification petition on September 11, 2026. The Ruling denied LiveVideo's opposition. Ruling ¶ 34 & App. A. LiveVideo is aggrieved by the Ruling as a competing bidder for Paramount with direct commercial interests in the affected video-distribution, digital-audience, and advertising markets. It will show its standing in its motion for stay and its opening brief. *See* D.C. Cir. R. 28(a)(7). On September 22, 2026, LiveVideo filed an Application for Review with the Commission under 47 U.S.C. § 155(c)(7) and 47 C.F.R. § 1.115, together with a request for an agency stay. The Commission has not acted on either filing.

**2. Facts on which venue is based.** Venue lies in this Court under 28 U.S.C. § 2343. This petition is timely because it is filed within 60 days after the Ruling was released on September 17, 2026. 28 U.S.C. § 2344.

**3. Grounds on which relief is sought.** The Ruling is arbitrary, capricious, and otherwise not in accordance with law, and it exceeds the Bureau's delegated authority. 5 U.S.C. § 706(2)(A), (C). In particular:

(a) The Bureau decided novel questions of law, fact, and policy that 47 C.F.R. § 0.283(c) requires be referred to the full Commission.

(b) The Ruling does not reasonably explain its public-interest determination under 47 U.S.C. § 310(b)(4). It does not explain why the safeguards it relies on are adequate for the foreign-government ownership approved at closing. Nor does it explain the legal basis, scope, limits, aggregation rules, monitoring, and enforcement of its advance authorization for future increases, including how a Letter of Assurance dated September 4, 2026, which defines covered investors by reference to the April 24, 2026 petition, applies to future holders.

(c) The Ruling does not explain the scope of the Executive Branch review and Letter of Assurance on which it relies. That includes whether the review considered Paramount's supplement filed June 23, 2026, and how the review informed the independent decision that 47 C.F.R. § 1.40001(b) requires.

(d) The Ruling issued while LiveVideo's requests to disqualify the Chairman remained unresolved. It did not reach them and did not explain how the independence required by 47 C.F.R. § 1.40001(b) was preserved. Ruling n.40.

(e) The Ruling does not consider whether the approved ownership structure triggers obligations under 22 U.S.C. § 611(d), 47 U.S.C. § 624, or 47 C.F.R. § 73.1212(j), or how any such obligations bear on the public interest.

LiveVideo will state the issues more fully in its statement of issues and briefs.

**4. Relief requested.** LiveVideo asks the Court to vacate the Ruling, or to remand it to the Commission, and to grant any other relief that is just. If the Court concludes that Commission action on the pending Application for Review must come before judicial review, LiveVideo asks the Court to hold this petition in abeyance until the Commission acts. LiveVideo will seek a stay by separate motion under Federal Rule of Appellate Procedure 18.

**Related case.** *LiveVideo.AI Corp. v. FCC*, No. 26-1176 (D.C. Cir.), is a related case. LiveVideo does not seek consolidation.

Dated: September 28, 2026

Respectfully submitted,

/s/ Alfred C. Constants III
Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
Tel: (516) 200-9660
Email: constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, LiveVideo.AI Corp. states that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock. LiveVideo.AI Corp. is a corporation engaged in streaming, online video, search, and related media businesses.

Dated: September 28, 2026

Respectfully submitted,

/s/ Alfred C. Constants III

Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
Tel: (516) 200-9660
Email: constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

## CERTIFICATE OF SERVICE

I certify that on September 28, 2026, I filed this Petition for Review, with Exhibit A-C, through the Court's CM/ECF system. Under Federal Rule of Appellate Procedure 15(c)(3), the Clerk serves Respondents.

**Respondents**
General Counsel, Federal Communications Commission, 45 L Street NE, Washington, DC 20554
Attorney General of the United States, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, DC 20530

/s/ Alfred C. Constants III
Alfred C. Constants III

EXHIBITS

Exhibit A—FCC Media Bureau DA 26-1001, MB Docket No. 26-93, released September 17, 2026.

Exhibit B—LiveVideo.AI Corp. Application for Review, filed September 22, 2026, Stay and Supplement To Application For Review

**EXHIBIT A**

Declaratory Ruling, *Paramount Global, Petition for Declaratory Ruling Under Section 310(b)(4)*, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paramount Global | ) | MB Docket No. 26-93 |
| | ) | |
| Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended | ) | |

# DECLARATORY RULING

**Adopted: September 17, 2026** **Released: September 17, 2026**

By the Chief, Video Division, Media Bureau:

## I. INTRODUCTION

1. In this Declaratory Ruling (Declaratory Ruling), the Video Division, Media Bureau (Bureau), grants a petition for a declaratory ruling (Petition)[1] filed by Paramount Global (Paramount), on behalf of itself and its subsidiaries that operate broadcast television stations (Licensees).[2] The Petition asks the Commission to exercise its authority delegated to it by Congress to permit indirect foreign ownership in Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmarks established in section 310(b)(4) of the Communications Act of 1934, as amended (the Act),[3] and sections 1.5000 *et seq.* of the Commission's rules.[4] As discussed below, we grant Paramount's request for its

[1] Petition for Declaratory Ruling of Paramount Global (filed Apr. 24, 2026). Paramount filed a supplement (Supplement) on June 23, 2026, amending Exhibit B of the Petition to add the "direct equity and voting interests that each individual and entity will hold in the entity or entities immediately downstream" and include "clarifications in the accompanying notes regarding certain ownership interests." Supplement at 1.

[2] A complete list of Licensees is provided in the Attachment.

[3] Section 310(b)(4) of the Act states:

> No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

47 U.S.C. § 310(b)(4).

[4] 47 CFR § 1.5000 *et seq.* *See Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, As Amended,* GN Docket No. 25-149, Report and Order, 41 FCC Rcd 831 (Jan. 30, 2026) (*2026 Foreign Ownership Order*) (codifying definitions, concepts, and practices underlying the foreign ownership rules to streamline the Commission's review processes); *Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 15-236, Report and Order, 31 FCC Rcd 11272 (2016) (*2016 Foreign Ownership Order*), *pet. for recon. dismissed*, 32 FCC Rcd 4780 (2017).

foreign investors, including certain prospective foreign investors (Foreign Investors),[5] to indirectly hold equity in excess of 25%, in the aggregate; specific approval[6] for the Foreign Investors to hold indirectly more than 5% each of the equity in Paramount through newly issued non-voting Class B shares;[7] and advance approval[8] for each of the Foreign Investors to hold up to 20% indirect equity in Paramount at some future time.[9] Further, as explained below, we conclude that in light of the commitments and undertakings set forth in the Letter of Agreement (LOA),[10] we do not grant the following requests made by Paramount, as they are now moot: foreign voting interests in excess of 25% in the aggregate; specific approval for each of the Foreign Investor's voting interests; and advance approval for each of the Foreign Investor's voting interests.[11]

2. Upon review of the Petition and consideration of the record of this proceeding, we find that the public interest would be served by granting the Petition, subject to compliance with the LOA's terms and the Commission's rules, as described below.[12] As discussed *infra*, Paramount must monitor foreign ownership to ensure continued compliance with the Commission's rules, including section 1.5004; Paramount must comply with the LOA, including, but not limited to, the commitment that "each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and "that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition

[5] The Foreign Investors include: (i) Public Investment Fund; (ii) L'Imad 1st SPV 2 Exempt RSC Ltd; (iii) L'imad 1st Holding 1 Exempt RSC Ltd; (4) L'imad 1st Capital Holding Ltd; (5) L'imad Holding Company – P.J.S.C; (6) QIA TMT Holding LLC; and (7) Qatar Investment Authority. *See infra* paras. 5-7.

[6] Under section 1.5001(i)(1) of the Commission's rules, petitions for a declaratory ruling are required to identify and seek specific approval for any foreign individual, entity, or group that holds or would hold, directly and/or indirectly, more than 5% of the equity and/or voting interests, or a controlling interest, in the licensee's controlling U.S. parent, subject to certain exemptions, including an exemption that increases the specific approval threshold to 10% for certain institutional investors. 47 CFR § 1.5001(i)(1), (i)(4).

[7] Petition; Reply Comments of Paramount Global at 1 (filed June 11, 2026) (Reply Comments).

[8] 47 CFR § 1.5001(k).

[9] Petition at 16-17. We note that after the Commission grants a declaratory ruling pursuant to section 310(b)(4) of the Act, petitioners have an affirmative duty under section 1.5004 to monitor and calculate their foreign equity and voting interests in a manner consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 and 1.5003 of the Commission's rules. 47 CFR §§ 1.5002-1.5004. *See infra* note 126. We also note that Paramount's specific approval, advance approval, and aggregate approval requests do not contemplate that actual voting interests will be held by any of the proposed Foreign Investors. *See infra* nn. 33 & 37.

[10] Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, Paramount Global to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division (dated Sept. 4, 2026) (LOA). As set forth in the LOA, "Foreign Investors" are "those foreign investors for which specific and advanced approval was requested in the Paramount Petition." *Id.* at 3 (citing Petition at 16-17). *See also* para. 1, note 5, *supra*.

[11] Under section 310(b)(4) of the Act, Commission approval is required only when the aggregate foreign ownership exceeds the statutory benchmarks. Accordingly, aggregate foreign equity and/or voting interests below the 25% benchmarks do not require a declaratory ruling from the Commission.

[12] For a discussion of the terms and conditions Paramount is subject to under this Declaratory Ruling, see *infra* para. 32.

could be subject to a referral to the Committee."[13] Paramount also must obtain Commission approval before its foreign ownership exceeds the terms and conditions of this Declaratory Ruling, including, but not limited to, seeking a new declaratory ruling if Paramount's foreign voting interests in the aggregate exceed 25%, or if it proposes to change the voting interests of any of the approved Foreign Investors under this Declaratory Ruling.

3. On April 27, 2026, the Bureau released a public notice[14] establishing a pleading cycle with comments due on May 27, 2026, and reply comments due on June 11, 2026, and designating the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[15] We received several timely filed comments,[16] *ex parte* letters,[17] and other submissions to the Commission.[18] Also submitted into the record is a letter received from the National Telecommunications and Information Administration (NTIA) on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee).[19] Consistent with the Committee's input, as discussed below, we find that it will serve the public interest to grant the Petition, subject to the conditions set forth in this Declaratory Ruling.

---

[13] LOA at 3-4.

[14] *Media Bureau Announces Filing of Petition for Declaratory Ruling by Paramount Global*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) (Public Notice).

[15] 47 CFR § 1.1206.

[16] *See, e.g.*, Comments of PRESSPAGE ENTERTAINMENT INC (filed Apr. 28, 2026) (PRESSPAGE Comments); Comments of Collin Hotchkiss (filed Apr. 28, 2026); Comments of Ron Beres (filed Apr. 29, 2026); Comments of Aidan Gordon (filed May 5, 2026); Comments of Patrick O. Ingle (filed May 7, 2026); Comments of W. Lee McVey, PE (Ret.) (filed May 7, 2026); Comments of Zachary Beaudoin (filed May 18, 2026); Comments of Chad Ray (filed May 20, 2026); Comments of Franklin Broadcasting LP (filed May 27, 2026) (Franklin Comments); Comments of Free Press (filed on May 27, 2026) (Free Press Comments). In addition, we received a number of late-filed comments. Between July 13 and July 14, 2026, LiveVideo.AI Corp. (LiveVideo.AI) submitted multiple filings, including a Motion for Leave to Accept Late-Filed Comments of LiveVideo.AI Corp. and Notice of Errata (together, LiveVideo.AI Comments); Written *Ex Parte* Presentation of LiveVideo.AI Corp. (LiveVideo.AI *Ex Parte*); and Exhibit; on July 31, 2026, LiveVideo.AI submitted a "Supplemental Petition to Disqualify Chairman Brendan Carr for Bias and Conflict of Interest." (LiveVideo.AI Supplement). We note that LiveVideo.AI raises claims such as alleged conflicts of interest, or submits documentation related to various pending litigations related to prior Commission transaction decisions. We decline to resolve LiveVideo.AI's conflict of interest claims because they fall outside the scope of this proceeding. The issue of whether the Commission's Chairman should disqualify himself, *see* LiveVideo.AI Supplement, is not properly raised at this stage of the proceeding because this Petition is being resolved under the Media Bureau's delegated authority. *See infra*, paras. 33-34 (citing 47 CFR §§ 0.61, 0.283). On July 22, 2026, Austin Olachea filed an Informal Objection and Supplemental Comments, both of which cite the incorrect docket number. On September 11, 2026, LiveVideo.AI filed an "Amended Petition to Deny, or in the Alternative Informal Objection; Motion for Leave to File Out of Time; Request for Targeted Supplementation; and Request to Withhold Action Pending a Complete Record)," which states that the filing supersedes its September 4, September 7, and September 8, 2026 submission filings.

[17] *See, e.g.*, *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 5, 2026) (PRESSPAGE May 5, 2026 *Ex Parte* Letter); *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 22, 2026) (PRESSPAGE May 22, 2026 *Ex Parte* Letter); and *Ex Parte* Letter of LiveVideo.AI Corp. (filed on July 14, 2026).

[18] A few congressional letters addressed to FCC Chairman Brendan Carr were filed in the docket. *See, e.g.*, Letter from Sen. Cory A. Booker, et al., United States Senate, to Hon. Brendan Carr, FCC (dated Mar. 23, 2026); Letter from Rep. Sam T. Liccardo, United States House of Representatives, to Hon. Brendan Carr, FCC (dated May 1, 2026); Letter from Sen. Maria Cantwell, et al., United States Senate, to Hon. Brendan Carr, FCC (dated May 20, 2026).

[19] Petition to Adopt Conditions to Authorization and License, NTIA, MB Docket No. 26-93 (filed Sept. 17, 2026) (Committee Petition); LOA.

## II. BACKGROUND

4. Paramount is a Delaware corporation that, through the Licensees (each a direct or indirect wholly owned subsidiary of Paramount), operates 28 broadcast television stations across the United States.[20] Paramount is a direct, wholly owned subsidiary of Paramount Skydance Corporation (Paramount Skydance), which, according to Paramount, is a "leading global media, streaming, and entertainment company that creates premium content and experiences for audiences worldwide."[21] Paramount Skydance has two classes of stock: Class A common stock, which has 100% of the voting interests in Paramount Skydance, and Class B common stock, which are non-voting shares.[22] The Ellison family indirectly holds 77.5% of the Class A shares as well as approximately 40% of the non-voting Class B shares; RedBird Capital Partners (RedBird) indirectly holds the remaining 22.5% of the Class A shares and approximately 9% of the non-voting Class B shares.[23]

### A. Proposed Investment

5. The Petition is filed in connection with a planned new investment (Proposed Investment) that would increase indirect foreign investment in Paramount.[24] As described in the Petition, in connection with the proposed merger of Paramount Skydance and Warner Bros. Discovery, Inc., on February 27, 2026, Lawrence Ellison, directly and indirectly, and a RedBird investment fund entered into subscription agreements to purchase up to approximately $47 billion of non-voting Paramount Skydance Class B shares.[25] Lawrence Ellison and RedBird then entered into agreements to assign those purchase rights to others, including, as is relevant here: (i) The Public Investment Fund, a sovereign wealth fund and instrumentality of Saudi Arabia (ii) L'Imad 1st SPV 2 Exempt RSC LTD, an investment vehicle of L'imad Holding, an Abu Dhabi government investment fund, and (iii) QIA TMT Holding LLC, an investment vehicle of the Qatar Investment Authority.[26]

6. As a result of the Proposed Investment, "the Ellison family and [RedBird Capital Partners] together will continue to hold the largest equity stake in Paramount Skydance and will continue to be the indirect owners of 100 percent of Paramount Skydance Class A Common Stock, representing 100 percent of the voting shares of, and thus control of, Paramount Skydance."[27] Paramount explains that the Proposed Investment will "not result in a transfer of control of Paramount" and that the "Ellison

---

[20] Petition at 3 (internal citations omitted).

[21] *Id*. Paramount Skydance's portfolio includes assets such as the "national CBS television network, Paramount Pictures, Nickelodeon, MTV, Comedy Central, and BET. The company also operates streaming platforms, including Paramount+ and Pluto TV." *Id*. Paramount Skydance also holds "extensive libraries of television and film titles, engages in content production and distribution, and provides advertising solutions." *Id*.

[22] *Id.* at 3.

[23] *Id.* at 3-5.

[24] *Id*. at 5-6.

[25] *Id*.

[26] *Id*.

[27] *Id*. The Petition notes that there are foreign investors in the RedBird funds. According to the Petition, however, "[t]he limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. Therefore, the foreign insulated limited partners will be deemed to have voting interests in RB Tentpole LP equal to their equity interest." *Id*. at 15; *see also* 47 CFR § 1.5003 (providing insulation criteria for interests in limited partnerships) and 47 CFR § 1.5002(b)(2)(ii)(B) (explaining how to calculate indirect voting interests and stating that "[a] partner of a limited partnership (other than a general partner) or partner of a limited liability partnership that satisfies the insulation criteria specified in § 1.5003 shall be treated as an insulated partner and shall be deemed to hold a voting interest in the partnership that is equal to the partner's equity interest.")).

family will retain a majority of the voting interests and control of Paramount."[28] Therefore, Paramount notes that "no other application is being filed in connection with this Petition."[29] Paramount reiterates that "[a]ll voting rights and other decision-making functions in Paramount will be controlled by the Ellison family through U.S. entities."[30]

### B. Petition For Declaratory Ruling

7. To effectuate the purchases described above, pursuant to section 1.5001(h) of the Commission's rules,[31] Paramount requests approval for its foreign investors, including the Foreign Investors, to indirectly hold equity in excess of 25% in Paramount, the controlling U.S. parent of the Licensees.[32] Paramount also requests specific approval for certain foreign entities that individually will hold, indirectly, more than 5% of the equity[33] of Paramount.[34] In particular, Paramount makes the following requests for specific approval: (1) Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia); (2) L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (3) L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (4) L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates); (5) L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates); (6) QIA TMT Holding LLC (10.6% equity) (Qatar); and (7) Qatar Investment Authority

---

[28] Petition at 2. According to the Petition, David Ellison, a U.S. citizen, "is the sole manager of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, which are the holding companies that each respectively own 100 percent of the Pinnacle Media entities. Sayonara, LLC ('Sayonara') is the sole member of Hikouki, LLC, Furaito, LLC, and Aozora, LLC. Sayonara is owned and controlled by The Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended (the 'Trust'), which is controlled by Lawerence J. Ellison. David Ellison has granted to Sayonara a voting interest equal to approximately 35.5 percent in each of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, and David Ellison retains an approximately 64.5 percent interest. In addition, by voting proxy, the Pinnacle Media entities have each granted David Ellison 64.5 percent of their respective voting interests in [Harbor Lights Entertainment, Inc. (Harbor Lights)] (and indirectly in Paramount Skydance) and have granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of Harbor Lights and Paramount Skydance, each in accordance with these voting percentages. David Ellison also serves as the Chairman and CEO of Paramount Skydance. Sayonara does not have any veto rights, or any special or outsized voting rights, in Harbor Lights or Paramount Skydance as a result of its minority voting interests." *Id*. at 4-5, 10. We note that Harbor Lights was formerly named National Amusements, Inc. *Id*. at 3, n.5.

[29] *Id*. at 2.

[30] *Id*. at 14, 21. Reply Comments at 7. Paramount further states that "[it] has repeatedly committed, and reaffirms here, that no foreign investor will have the ability to control Paramount or the Licensees." *Id*.

[31] 47 CFR § 1.5001(h).

[32] Reply Comments at 1; Petition at 2, 14-16. According to the Petition, "[t]he foreign-owned interests through Class B shares is expected to be approximately 49.5 percent in the aggregate after the Proposed Investment." Petition at 15. Paramount further states that "[a]lthough Paramount expects that existing and prospective foreign investors will indirectly hold slightly less than 50 percent of Paramount's equity interests after consummating the Proposed Investment described below, Paramount seeks approval for foreign investors in the aggregate to indirectly hold up to 100 percent of its equity and/or voting interests in light of routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a))." *Id*. at 2.

[33] Paramount states that the "voting interest of investors holding only Class B shares will be zero" but "[o]ut of an abundance of caution, to the extent that the Commission deems holders of non-voting equity in a corporation to have a 'deemed' voting interest equal to their equity interest[.]" *Id*. at 16. Paramount further states that "foreign investors' equity interests will consist entirely of passive, non-voting stock." Reply Comments at 7. Paramount also states that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future," and that any changes that would accord foreign investors increased rights would be reviewed independently of this order. *Id*. at 8.

[34] 47 CFR § 1.5001(i); Petition at 16-17.

(10.6% equity) (Qatar).[35] Pursuant to section 1.5001(k) of the Commission's rules,[36] Paramount also requests advance approval for each of the foregoing foreign entities seeking specific approval to increase its indirect equity interests in Paramount up to a non-controlling 20% at some future time.[37]

### C. Public Interest Showing

#### 1. Paramount's Public Interest Showing

8. Paramount asserts that grant of the Petition will serve the public interest, as it would "afford Paramount and, in turn, the Licensees, greater access to capital, including from foreign sources," which would enable Paramount to "compete more effectively in the provision of television broadcast services and in the broader video programming marketplace."[38] Specifically, Paramount provides that it recently has been making "strategic investments to improve the Licensees' newsgathering and reporting operations, both nationally and at a local level."[39] For example, Paramount notes that efforts are under way to rejuvenate "the Licensees' online presence, allowing them to meet viewers where they are and ensuring their continued relevance to the communities that they serve, in turn enhancing the availability of reliable, high-quality, non-paywalled local and national news across the country."[40]

9. To this end, Paramount explains that "[r]educing barriers to further investment in Paramount, including by allowing the company to pursue additional capital from non-U.S. investors, will enable it to allocate additional resources to preserve and enhance the legacy and broad reach of the Licensees' television broadcast operations."[41] The Petition further states that "[i]n turn, Paramount's ability to compete in the television broadcast and broader video marketplaces will improve, thereby promoting the strength of the industry overall."[42] Paramount provides that the "new equity investment" will better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[43]

10. Finally, Paramount notes that "grant of this Petition will not present any national security, law enforcement, foreign policy, or trade policy concerns."[44] Specifically, Paramount explains, the

---

[35] Petition at 16-17.

[36] 47 CFR § 1.5001(k).

[37] Petition at 16-17. Under the Commission's foreign ownership rules, a petitioner may request advance approval in its petition for a foreign individual and/or entity seeking specific approval to increase its equity and/or voting interests at some future time. 47 CFR § 1.5001(k). With regard to voting rights, Paramount states that the new Class B shares will have no voting rights and that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future." Reply Comments at 8.

[38] Petition at 19.

[39] *Id*. at 20.

[40] *Id*. at 20-21. In Reply Comments, Paramount also states that its "broadcast stations provide a critical link to local communities, delivering lifesaving information during emergency situations (like tornadoes, hurricanes, blizzards, and wildfires)." Reply Comments at 5. Further, Paramount provides that "at a time when local news operations across the country are contracting and communities are losing access to trusted sources of local journalism, investment that will bolster Paramount's capacity to maintain robust news operations across its station group should be welcomed. And indeed, granting the Petition will support continued investment in reporters, producers, and technical staff at the Licensees' stations, as well as in the digital platforms and tools necessary to reach audiences where they increasingly consume news content." Reply Comments at 5-6.

[41] Petition at 21.

[42] *Id.*

[43] *Id.*

[44] *Id.*

"Ellison family (which includes only U.S. persons) will retain a majority of the voting interests and control of Paramount, and each of the entities through which the Ellison family holds its interests in the company is a U.S. entity."[45]

### 2. Comments and *Ex Parte* Submissions

11. *Foreign Ownership Concerns*. A few commenters raise public interest considerations pursuant to section 310(b)(4) of the Act.[46] For example, Free Press asserts that Paramount fails to demonstrate that the Proposed Investment would serve the public interest.[47] First, Free Press questions Paramount's public interest rationale that the Proposed Investment would afford Paramount and its Licensees greater access to capital to allow it to compete more effectively in the marketplace, arguing that there has "never been a U.S. broadcasting company with as much 'access to capital' as Paramount currently can find from its controlling shareholder."[48] Free Press further argues that Paramount, "does not need to acquire WBD in order to continue profitably operating the CBS network and its local broadcast stations," as "[n]one of the 28 stations are 'failing' or 'failed'. . . ."[49] Second, Free Press asserts that Paramount's "[g]eneric rhetoric" about the public interest benefits of permitting "foreign governments to control up to 100 percent of one of the Big 4 U.S. broadcasting networks and station owners" does not satisfy the Commission's section 310(b)(4) standard.[50] Third, according to Free Press, "[Paramount] has not demonstrated that there are no other lawful methods of financing the transaction other than obtaining a waiver so that three foreign governments can hold up to 100 percent of the equity interests in these domestic broadcasting operations."[51] Finally, Free Press argues that "Paramount will begin its ownership of WBD with nearly $80 billion in debt, which will require deep cuts to Paramount's pre-merger holdings and existing operations" and that "[t]hese cuts will negatively impact the public interest, particularly at Paramount's broadcast units."[52] Franklin Broadcasting LP (Franklin), similarly argues that the "Commission should examine whether the proposed foreign sovereign wealth fund, foreign government-related or other substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[53]

*12. National Security.* Other commenters raise national security concerns associated with the Proposed Investment and propose that the Commission coordinate with Executive Branch agencies for their views on national security.[54] Specifically, according to PRESSPAGE, even "when structured as non-controlling or non-voting equity, ownership by foreign state-linked entities raises material national-

---

[45] *Id.*

[46] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 3, 7; and Free Press Comments at 3-10.

[47] Free Press Comments at 6.

[48] *Id*. at 7.

[49] *Id*. at 8.

[50] *Id*.

[51] *Id*.; Free Press asserts that the appropriate standard for reviewing Paramount's request is as a "waiver" under the Commission's rules. Specifically, "[t]o receive a waiver under the Commission's rules, petitioners must demonstrate that 'the underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest.' Or demonstrate that 'in view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.'" *Id*. at 5. As discussed in more detail *infra* para. 24, we note that waiver is not the applicable standard in the Commission's foreign ownership review under section 310(b)(4) of the Act.

[52] Free Press Comments at 9.

[53] Franklin Comments at 3.

[54] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2.

security considerations."[55] PRESSPAGE presses the Commission to coordinate closely with the Executive Branch agencies for their views on any national security concerns and opines that the Commission "should not act until that review is complete and its recommendations are incorporated into the record."[56] Franklin similarly requests that the Commission consider whether approval of the Petition should be conditioned on, or accompanied by, further inquiry into certain matters, including coordination with "Team Telecom and other relevant national-security reviewers concerning foreign sovereign wealth fund participation, foreign-government-related investment and any other substantial foreign interests identified in the record."[57]

13. To mitigate potential national security concerns, PRESSPAGE and Franklin urge the Commission to consider implementing various safeguards.[58] For example, PRESSPAGE states that, even if the Commission finds that foreign ownership above 25% is permissible, it should evaluate whether "additional safeguards are necessary to preserve these core public-interest values."[59] To that end, PRESSPAGE suggests that post-transaction structural separation can fully resolve national security concerns. Specifically, PRESSPAGE proposes that "all U.S. news and broadcast functions would be placed in a **wholly U.S.-owned and U.S.-controlled public entity**, while all studio and entertainment operations would be placed in a **separate public entity** that may permissibly receive foreign investment under §310(b)(4)."[60] Similarly, Franklin states that the Commission should "preserve and examine the availability of structural safeguards if the record shows that formal voting-control protections are insufficient to address practical foreign influence, national-security concerns, editorial independence, localism, public-service obligations or capital-structure pressure affecting sensitive broadcast, news, linear and advertising-supported assets."[61]

14. *Control and Influence.* Several commenters also assert that, in addition to its consideration of "formal voting control" as part of its section 310(b)(4) review of the Petition, the Commission should address the "practical influence" that the Foreign Investors may have over Paramount.[62] In particular, Franklin "recognizes that Section 310(b)(4) proceedings often focus on formal ownership, voting control and attributable interests,"[63] and that "foreign investors, directly or indirectly, may receive governance, contractual, financial, informational or economic rights that could create practical influence over the parent company or its sensitive communications assets,"[64] but it asserts that "[w]here substantial foreign equity may participate economically in the parent of major U.S. broadcast,

---

[55] PRESSPAGE Comments at 1.

[56] *Id*. at 2.

[57] Franklin Comments at 9-10.

[58] *See* PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2-4, Franklin Comments at 5-8.

[59] PRESSPAGE Comments at 2.

[60] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2 (emphasis in the original).

[61] Franklin Comments at 1. Franklin also suggests that if the Commission examines a structural separation or similar safeguard, it should consider commitments addressing: (1) "local-news continuity;" (2) "national-news availability;" (3) "editorial-independence protocols;" (4) "independent governance for sensitive news assets;" (5) "public reporting on local-news and public-service obligations;" (6) "preservation or expansion of free over-the-air and free ad-supported news distribution;" (7) "emergency and public-affairs information distribution;" (8) children's educational and informational programming, where applicable;" (9) protection of newsroom decision-making from improper foreign, parent-company or creditor influence; and (10) "compliance reporting sufficient to allow the Commission to monitor performance." *Id*. at 7.

[62] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[63] Franklin Comments at 4.

[64] *Id*. at 5.

local news and national news assets, the Commission should examine not only formal voting control, but also practical influence."[65] Similarly, PRESSPAGE states that "foreign equity—particularly when concentrated or accompanied by governance rights—can create channels for influence over editorial judgment, newsroom priorities, or the flow of information to the American public."[66] Free Press also asserts that while Paramount "goes to great lengths to provide assurances that the foreign governments financing this deal will have no control or say over CBS Network and Paramount's 28 FCC licensed full-power TV stations, foreign governments don't write checks for tens of billions of dollars in exchange for a share of a business with declining revenues."[67] Free Press goes on to state that "[c]ontrol over for-profit, commercial domestic news media by any government is an extraordinary situation that would surely strike most Americans as unseemly, precisely because of the utility of the news media as a propaganda tool for those governments."[68]

### 3. Paramount's Reply

15. In reply comments, Paramount asserts that the commenters ignore the substantial public interest benefits of the Proposed Investment.[69] Paramount further asserts that Free Press's comments "appear grounded in a presumption that foreign investment in broadcast stations is contrary to the public interest, but Commission precedent holds the opposite."[70] Accordingly, "[s]ection 310(b)(4) provides that foreign ownership of broadcast licenses should be barred *only* "if the Commission finds that the public interest will be served by the refusal or revocation of such license," but "[n]o such finding could be made on the record of this proceeding."[71] Indeed, Paramount argues that the commenters ignore the Proposed Investment's substantial public interest benefits and states that the "Proposed Investment will yield precisely the kinds of public interest benefits that the Commission has identified as supporting approval of foreign investment in other broadcast licensees under Section 310(b)(4), and no commenter has articulated a credible basis for concluding otherwise."[72] Further, Paramount argues that Free Press mischaracterizes the applicable legal standard for the Commission's foreign ownership approval process. Specifically, Paramount provides that "[i]gnoring the Commission's well-established foreign ownership approval process, as codified in clearly defined rules, Free Press mischaracterizes the applicable legal standard by suggesting that there is a very high bar for 'waiv[ing]' the 25 percent indirect foreign ownership benchmark."[73]

---

[65] *Id*. at 2.

[66] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2.

[67] Free Press Comments at 9.

[68] *Id*. at 10.

[69] Reply Comments at 4.

[70] *Id.* at 2. Paramount further states that "[i]ndeed, the Commission has determined that foreign investment in broadcast stations is not only appropriate but beneficial given the challenges confronting the industry, and ample precedent supports permitting foreign investment in Paramount of up to and including 100 percent. Since 2016, the Commission has applied the same streamlined standard to approve indirect foreign ownership of broadcast licensees above the 25 percent threshold, with the aim of 'facilitat[ing] investment from new sources of capital at a time of growing need for investment in" U.S. broadcasters, an important sector of our nation's economy.' In adopting this framework, the Commission emphasized that foreign investment has provided much-needed capital to U.S. broadcasters, allowing them to upgrade their facilities and technology, invest in programming, and maintain the quality of their service to the public." *Id.* at 2-3.

[71] *Id.* at 3.

[72] *Id.* at 4-6.

[73] *Id.* at 4. Paramount further states "no waiver of the Commission's rules is required to grant the Petition, and no heightened showing of the sort demanded by Free Press is necessary (especially not under Section 1.925 of the Commission's rules, which does not apply to television broadcast services)." *Id.* Paramount explains that

*16.* In response to concerns raised regarding national security and the Foreign Investors' influence and control, Paramount states that commenters' concerns are speculative and unsupported by facts.[74] Paramount asserts that, as its Petition makes clear, its "new foreign investors, which will receive only non-voting equity, will not have any ability to influence the company's editorial decision-making or news or entertainment content or to access its viewers' personal data."[75] The commenters, Paramount argues, overlook the fact that "none of the foreign investors will be able to wield any influence, let alone control, over Paramount's programming or the operations of the Licensees more broadly by acquiring non-voting stock in Paramount."[76] Further, the "Ellison family will retain control over Paramount" and that "no foreign investor will have the ability to control Paramount or the Licensees; to the contrary, Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[77] Paramount maintains that commenters "fail to explain how passive, non-voting shareholders will achieve such influence, and they also ignore that these precise issues are under review by Team Telecom, providing a further backstop to ensure that the national security and law enforcement agencies are satisfied with the company's controls."[78] Regarding the commenters' concerns about potential changes that may give the Foreign Investors increased rights, Paramount states that it will "return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future. Accordingly, there is no need to speculate about potential changes that could accord the foreign investors increased rights as any such changes would be reviewed independently."[79]

### D. National Security, Law Enforcement, Foreign Policy and Trade Policy Review

17. Pursuant to Commission practice,[80] the Commission referred the Petition to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, as the controlling U.S. parent of Licensees.[81] On April 29, 2026, the Committee notified the Commission that it was reviewing the Petition for any national security and law enforcement concerns that may be raised by foreign

"[i]nstead, the statute and the Commission's rules establish a clear process for seeking approval for foreign ownership exceeding 25 percent, including approval to allow up to and including 100 percent aggregate foreign ownership, subject to the traditional public interest standard rather than any heightened standard of review. The Commission has explained that Section 310(b)(4) does not establish a general prohibition against foreign investment but rather creates a process for the Commission to evaluate the public interest implications of such investment on a case-by-case basis." *Id.*

[74] *Id*. at 6.

[75] *Id*. at 6-7.

[76] *Id*. at 7.

[77] *Id*.

[78] *Id.* at 7-8. Paramount further states that "[t]he Commission routinely 'accords deference' to the expertise of these agencies, whose scrutiny of the Proposed Investment will ensure that any of the foreign investors will not have any ability to compromise editorial decision-making, access the data of U.S. persons, or otherwise harm the public interest." *Id*. at 8, citing *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6.

[79] Reply Comments at 8.

[80] Consistent with the Commission's rules under section 1.40001(b), "the Commission will consider any recommendations from the executive branch on pending . . . petition(s) for foreign ownership ruling(s) pursuant to §§ 1.5000 through 1.5004 . . . that may affect national security, law enforcement, foreign policy, and/or trade policy as part of its public interest analysis. The Commission will evaluate concerns raised by the executive branch and will make an independent decision concerning the pending matter." 47 CFR § 1.40001(b).

[81] Public Notice at 4-5.

participation in the United States telecommunications services sector and requested that the Commission defer action on the Petition.[82] Subsequently, on June 16, 2026, the Department of Justice notified the Commission that the Committee had initiated its 120-day initial review of the Petition.[83] On September 17, 2026, NTIA submitted its Committee Petition to the Commission in which the Committee advised the Commission that "it has no objection to the Commission approving the above-captioned Petition for Declaratory Ruling, provided that the Commission conditions its approval on the assurance of Paramount Global to abide by the commitments and undertakings" set forth in the LOA.[84]

## III. DISCUSSION

18. *Standard of Review*. We review the Petition under section 310(b)(4) of the Act, which states that "[n]o broadcast . . . license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license."[85] This section of the Act grants the Commission discretion to allow foreign investment in a licensee's controlling U.S. parent above 25% unless the Commission finds that the public interest would be served by refusing to permit such foreign investment.[86] In evaluating petitions relating to foreign ownership, the Commission affords appropriate deference to the expertise of the Executive Branch agencies on issues related to national security, law enforcement, foreign policy, and trade policy.[87]

19. In the *2016 Foreign Ownership Order*, the Commission modified the broadcast licensee foreign ownership review process by extending the streamlined rules and procedures developed for review of foreign ownership of common carrier and certain aeronautical licensees under section 310(b)(4) to the broadcast context, with certain limited exceptions.[88] The *2016 Foreign Ownership Order* expressly provides for processing of petitions requesting approval for up to and including 100% aggregate foreign voting and/or equity investment by unnamed and future foreign investors in the controlling U.S. parent of a broadcast licensee.[89] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[90]

20. *Section 310(b)(4) Determination and Public Interest Analysis*. Pursuant to section 310(b)(4) of the Act,[91] as well as sections 1.5001 through 1.5004 of the Commission's rules,[92] we find that the public interest is served by permitting indirect foreign equity ownership of Paramount in excess

[82] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, Department of Justice, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed Apr. 29, 2026).

[83] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed June 16, 2026).

[84] Committee Petition at 1; LOA.

[85] 47 U.S.C. § 310(b)(4).

[86] *See id.*; *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5.

[87] *2016 Foreign Ownership Order,* 31 FCC Rcd at 11277, para. 6.

[88] *See generally id.*

[89] *Id.* at 11282, para. 15.

[90] *See, e.g.*, *id*. at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[91] 47 U.S.C. § 310(b)(4).

[92] *See* 47 CFR § 1.5000 *et seq.*

of the 25% benchmark in section 310(b)(4) of the Act, and, consequently, we grant Paramount's request, as described and conditioned below. We further find that it is in the public interest to grant specific approval and advance approval for the percentages set out to the entities specified in Section IV below. As discussed further below, we conclude that grant of the Petition is in the public interest because it, among other things, provides the Licensees with greater access to capital and thereby contributes to the strengthening of the broadcast industry.[93]

21. First, we disagree with the commenters that argue that Paramount has failed to demonstrate that grant of the Petition is in the public interest. In the Commission's review of foreign ownership pursuant to section 310(b)(4) of the Act,[94] it has long recognized that foreign investment in U.S. companies and networks, including broadcast, fosters technical innovation, supports job creation, and strengthens the U.S. economy.[95] The Commission remains committed to encouraging such investment while maintaining its ability to conduct comprehensive reviews of foreign ownership in its licensees to safeguard the United States from new and evolving national security threats.[96] When reviewing foreign investment under section 310(b)(4), the Commission's decisions carefully balance the dual public interest objectives of prohibiting potentially harmful foreign investment and promoting non-harmful foreign investment.[97]

22. Upon review of the entire record, we find that Paramount has sufficiently demonstrated that the public interest would be served by granting the Petition.[98] Specifically, Paramount states that grant of the Petition would provide it with greater access to capital, improve the Licensees' newsgathering and reporting operations, and better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[99] The commenters have not rebutted these statements. We also agree with Paramount that the concerns raised in the record to the contrary are speculative and unsupported. Several commenters assert that the Commission, as part of its section 310(b)(4) review of the Petition, should consider the "practical influence" that the Foreign Investors may have over Paramount and its Licensees in addition to "formal voting control."[100] We find this argument unconvincing. The Proposed Investment is not a loan, which must be repaid, but a purchase of stock that has no voting rights. We are persuaded by Paramount's argument[101] that the Foreign Investors therefore will not be able to wield any influence, let alone control, over decisions involving the Licensees.

---

[93] *See* Petition at 19-22 (describing public interest benefits arising from approval of this declaratory ruling and the related Proposed Investment).

[94] 47 U.S.C. § 310(b)(4).

[95] *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licenses Under Section 310(b)(4) of the Communications Act of 1934, as Amended,* IB Docket No. 11-133, Second Report and Order, 28 FCC Rcd 5741, 5744, para. 3 (2013) (*2013 Foreign Ownership Second Report and Order*) ("foreign investment has been and will continue to be an important source of financing for U.S. telecommunications companies, fostering technical innovation, economic growth, and job creation."); *see also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11280, para. 12 (stating that "applying the foreign ownership rules for common carrier licensees to broadcast licensees in the context of Section 310(b)(4) petitions will help improve access to capital from foreign investors and promote regulatory flexibility, while also preserving the Commission's statutory obligation, in consultation with the relevant Executive Branch agencies, to ensure that foreign ownership above the 25 percent benchmark serves the public interest.").

[96] *2026 Foreign Ownership Order* at 832, para. 1.

[97] *Id*. at 851-52, para. 39.

[98] *See supra* paras. 8-10.

[99] Petition at 19-22.

[100] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[101] Reply Comments at 6-7.

Paramount has further demonstrated that David Ellison will retain control over Paramount and that the Ellison family will continue to own a majority of the voting stock, and we credit Paramount's statement that "Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[102] Finally, we are persuaded by the commitments Paramount made in its LOA with the Committee, which explicitly states that the "Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and that Paramount "affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition could be subject to referral to the Committee."[103] We condition our approval of the Petition on Paramount's returning to the Commission for approval before giving the Foreign Investors additional rights, including but not limited to, any voting rights.[104]

23. We find that the Commission's review process, the Committee's review process, Paramount's Petition certification,[105] the Commission's continuing compliance obligations,[106] and the commitments and undertakings set out in the LOA adequately ensure that the proposed foreign ownership serves the public interest, and that the commenters have not provided any persuasive reasons for us to find that the public interest would not be served by granting the Petition. We therefore conclude that grant of the Petition is consistent with the Commission's longstanding goal of promoting foreign investment, including in the broadcast industry, and that it would not serve the public interest to deny it.

24. Second, we reject the commenters' attempts to set an alternative standard for the Commission's foreign ownership review pursuant to section 310(b)(4) of the Act. At the outset, we find that Free Press mischaracterizes the applicable legal standard for the Commission's section 310(b)(4) review. Free Press asserts that the Commission's waiver rule is the applicable legal framework to petitions for declaratory ruling under section 310(b) of the Act.[107] That is incorrect. Instead, petitions for declaratory ruling filed pursuant to section 310(b)(4) of the Act are reviewed under sections 1.5000–1.5004 of the Commission's rules.[108] We also disagree with the commenters' assertions that Paramount must demonstrate that acquisition of WBD is necessary to promote the public interest,[109] that there are no other lawful methods of financing the transaction than through foreign investment,[110] or that "substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[111] We find that there is no affirmative burden on petitioners to make these showings. The question is whether it would be in the public interest to refuse to allow this foreign investment, not whether the investment is "necessary" or the only alternative.

---

[102] *Id.*

[103] LOA at 3-4.

[104] *See infra* para. 32 describing the terms and conditions to which Paramount is subject.

[105] *See* Petition at Certification.

[106] 47 CFR § 1.5004.

[107] 47 CFR § 1.925(b)(3)(i).

[108] 47 CFR §§ 1.5000-1.5004.

[109] Free Press Comments at 8.

[110] *Id.*

[111] Franklin Comments at 3.

25. *National Security*. When evaluating petitions for declaratory ruling under section 310(b)(4) of the Act, we also consider public interest issues related to national security, law enforcement, foreign policy, and trade policy concerns.[112] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[113] The Commission also coordinates as necessary and appropriate with the relevant Executive Branch agencies and accords deference to their expertise in identifying and interpreting issues of concern related to these matters.[114] When the Commission refers a petition to the Executive Branch agencies, it does not act on the petition until the Committee completes its review and provides the Commission its recommendation.

26. As stated above, pursuant to our standard practice, the Commission coordinated with the Executive Branch agencies and referred the Petition for their views on any national security, law enforcement, and foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, the controlling U.S. parent of the Licensees.[115] Here, the Executive Branch agencies have reviewed the Petition and do not object to the Commission granting the Petition, provided that the Commission conditions its approval on Paramount's compliance with the LOA.[116] The Committee Petition further states that "[a]fter discussions with representative [sic] of Paramount Global in connection with the above-captioned application, the Committee has concluded that the additional commitments set forth in the LOA will help ensure that those agencies with responsibility for enforcing the law, protecting the national security, and preserving public safety can proceed appropriately to satisfy those responsibilities."[117]

27. In accordance with the request of the Committee, we grant the Committee Petition, and condition the grant of the Petition, on compliance by Paramount with the commitments and undertakings

---

[112] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd 10927 (2020) (setting rules and procedures for referring applications for Executive Branch review consistent with Executive Order No. 13913) (*Executive Branch Review Order*); *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66 (in opening the U.S. telecommunications market to foreign entry in 1997, the Commission affirmed that it would consider national security, law enforcement, foreign policy, and trade policy concerns related to reportable foreign ownership as part of its overall public interest review of applications for international section 214 authority, submarine cable landing licenses, and declaratory rulings to exceed the foreign ownership benchmarks of section 310(b) of the Act). *See also Applications of T-Mobile US, Inc., and Sprint Corporation*, 34 FCC Rcd 10578, 10732-33, para. 349 (2019) (*T-Mobile/Sprint Order*); *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6; 47 CFR § 1.40001(a).

[113] *See, e.g.*, *2016 Foreign Ownership Order* at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[114] *Id*. at 11277, para. 6, citing to *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751, 5762, paras. 13, 34; *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market: Market Entry and Regulation of Foreign-Affiliated Entities*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23920, para. 63 (1997) (*Foreign Participation Order*), Order on Reconsideration, FCC 00-339, 15 FCC Rcd 18158 (2000). *See also Executive Branch Review of FCC Applications and Petitions with Foreign Ownership for National Security, Law Enforcement, Foreign Policy and Trade Policy Concerns*, IB Docket No. 16-155, Notice of Proposed Rulemaking, 31 FCC Rcd 7456 (2016) (*2016 Executive Branch Review NPRM*)).

[115] We thus dismiss as moot the concerns raised by commenters suggesting we coordinate closely with the Executive Branch agencies for their views on any national security concerns and not act until that review is complete as those steps already have been taken in the instant proceeding. *See* PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2. *See also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11282, para. 15; *Executive Branch Review Order*, 35 FCC Rcd at 10934-36, paras. 17, 24.

[116] *See* Committee Petition at 1; LOA.

[117] Committee Petition at 2.

set forth in the LOA. A failure to comply and/or remain in compliance with any of these conditions shall constitute a failure to meet a condition of this Declaratory Ruling, which may also result in monetary sanctions or other enforcement action by the Commission.

28. Given the Executive Branch agencies' determination, we decline to adopt the safeguards or commitments proposed in the record.[118] The Commission grants a petition for declaratory ruling on the condition that the petitioner complies with the Commission's routine terms and conditions, including any mitigation measures or agreements negotiated with the Committee. After carefully and thoroughly reviewing the record, we find that the commenters did not raise any persuasive basis for the Commission to depart from this established practice.

## IV. DECLARATORY RULING

29. Upon review of the Petition, and consideration of the record of this proceeding, pursuant to section 310(b)(4) of the Act and sections 1.5001 through 1.5004 of the Commission's rules, we find that the public interest would be served by permitting indirect foreign equity ownership of Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmark in section 310(b)(4) of the Act, as amended.[119] We also find that it is in the public interest to permit up to 100% indirect foreign equity interest of Paramount, in the aggregate, subject to the terms and conditions set forth in the Commission's rules including section 1.5004 of the Commission's rules, and the commitments and undertakings set forth in the LOA.[120]

30. Pursuant to section 1.5001(i) of the Commission's rules,[121] this Declaratory Ruling grants specific approval for the following entities to hold, indirectly, greater than 5% of the equity interests in Paramount:

- Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia);
- L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates);
- L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates);
- QIA TMT Holding LLC (10.6% equity) (Qatar); and
- Qatar Investment Authority (10.6% equity) (Qatar).

[118] PRESSPAGE Comments at 2; Franklin Comments at 2-3.

[119] In its comments, Free Press characterizes the Petition as a request that requires the Commission to ignore the statutory limits on foreign ownership. *See* Free Press Comments at 6. We disagree. As discussed *infra*, consistent with our precedent, we find that our actions herein, including authorizing up to 100% indirect foreign equity interest of Paramount, in the aggregate, are consistent with both the Act and the Commission's rules and precedent when doing so serves the public interest, provided that petitioners comply with the routine terms and conditions of their declaratory ruling. *See, e.g.*, *Searchlight II HMT, L.P., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, MB Docket No. 23-2, Declaratory Ruling, 38 FCC Rcd 7412 (MB 2023) ("[w]e also find that it is in the public interest to permit up to an aggregate 100% indirect foreign ownership of [the broadcast licensees' controlling U.S. parent]"); *Univision Holdings II, Inc., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934*, *as Amended*, MB Docket No. 21-321, Declaratory Ruling, 37 FCC Rcd 449 (MB 2022) ("it is in the public interest to grant Univision's request to permit foreign investors to own up to 100% in the aggregate of Univision's equity and voting interests.").

[120] For a discussion of the mootness of Paramount's requests in light of its LOA for its indirect aggregate foreign voting interests to exceed 25%, specific approval for its proposed Foreign Investors' voting interests, and advance approval for such Foreign Investors' voting interests, see *supra* paras. 1-2.

[121] 47 CFR § 1.5001(i).

31. Pursuant to section 1.5001(k) of the Commission's rules,[122] this Declaratory Ruling also grants advance approval for each of the foreign entities above, seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20% at some future time.[123]

32. *Terms and Conditions.* Under this Declaratory Ruling, Paramount has an affirmative duty to monitor its foreign equity and voting interests, calculate those interests consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 through 1.5003 of the Commission's rules,[124] and otherwise ensure continuing compliance with the provisions of section 310(b) of the Act.[125] Grant of this Declaratory Ruling is conditioned on the terms and conditions set forth in section 1.5004 of the Commission's rules, including the requirement to obtain Commission approval before foreign ownership of Paramount exceeds the terms and conditions of this Declaratory Ruling.[126] Grant of the Declaratory Ruling, is further conditioned on compliance with the LOA.[127] Paramount is further subject to the Commission's requirement to obtain approval for any new or additional foreign individual, entity, or group of such individuals or entities to hold, directly and/or indirectly, more than 5% (or more than 10% for certain investors that fall under the narrow exceptions in section 1.5001(i) of the Commission's rules[128]) of the equity and/or voting interests, or for any foreign individual, entity, or group to hold a controlling interest, in the company.[129] If, at any time, Paramount knows, or has reason to know, that it is no longer in compliance with this Declaratory Ruling, section 310(b) of the Act, or the Commission's foreign ownership rules, Paramount shall file a statement with the Commission explaining the circumstances within 30 days of the date that it knew, or had reason to know,

---

[122] 47 CFR § 1.5001(k).

[123] *See supra* para. 1. We note that in its comments, LiveVideo.AI states that Paramount's "advance-approval request appears to exceed the ceiling applicable to non-controlling foreign interests." *See, e.g.*, LiveVideo.AI Comments at 3. However, the Commission's foreign ownership rules permit non-controlling foreign investors that request specific approval to request advance approval to increase their equity and/or voting interests up to a non-controlling 49.99% at some future time. Here, in relevant part, Paramount requested advance approval for each of the foreign entities seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20%, which falls below the maximum permissible percentage of 49.99% for non-controlling interests. 47 CFR § 1.5001(k)(2).

[124] 47 CFR §§ 1.5002-1.5003.

[125] 47 CFR § 1.5004, note to paragraph (a).

[126] 47 CFR § 1.5004. Section 1.5004, *inter alia*, specifies that licensees have an ongoing, proactive obligation to monitor their foreign ownership compliance and to take preemptive action to remain in compliance with the Commission's foreign ownership rules and any declaratory ruling they have received. 47 CFR § 1.5004(a). While all of the terms and conditions set forth in section 1.5004 of the Commission's rules apply, we highlight the following provisions: (1) where a previously unapproved foreign-organized entity is inserted into the vertical ownership chain of a licensee, or its controlling U.S.-organized parent, without prior Commission approval, the licensee shall file a letter to the attention of the Chief, Media Bureau, within 30 days after the insertion of the new, foreign-organized entity; (2) a licensee that has received a foreign ownership ruling, including a U.S.-organized successor-in-interest to such licensee as part of reorganization, or any subsidiary or affiliate relying on such licensee's ruling, shall file a new petition for declaratory ruling under § 1.5000 to obtain Commission approval before its foreign ownership exceeds the routine terms and conditions of this section, and/or any specific terms of conditions of its rulings; and (3) if at any time the licensee, including any successor-in interest and any subsidiary or affiliate knows, or has reason to know, that it is no longer in compliance with its foreign ownership rulings or the Commission's rules relating to foreign ownership, it shall file a statement with the Commission explaining the circumstances within 30 days of the date it knew, or had reason to know, that it was no longer in compliance.

[127] LOA; *see supra* para. 2.

[128] *See* 47 CFR § 1.5001(i)(4).

[129] 47 CFR § 1.5004(a)(1).

that it was no longer in compliance.[130] A failure to meet a condition of this Declaratory Ruling may result in monetary sanctions or other enforcement action by the Commission for such non-compliance, including an order requiring divestiture of the foreign investment.[131]

## V. ORDERING CLAUSES

33. Accordingly, **IT IS ORDERED** that, pursuant to section 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. § 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, the Petition for Declaratory Ruling filed by Paramount Global **IS GRANTED** as specified and subject to the conditions specified herein.

34. **IT IS FURTHER ORDERED**, pursuant to sections 4(i) and (j), and 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i)(j), 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, that the opposing comments filed by the commenters listed in Appendix A, **ARE DENIED**.

35. **IT IS FURTHER ORDERED** that this Declaratory Ruling **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

David Brown
Chief, Video Division
Media Bureau

---

[130] *See* 47 CFR § 1.5004(f)(1). If, for example, a foreign individual or entity should directly or indirectly invest in Paramount above the percentages approved herein without Commission approval, Paramount is obligated to follow the steps set out in 47 CFR § 1.5004(f). Subsequent actions taken by or on behalf of Paramount to remedy non-compliance shall not relieve it of the obligation to notify the Commission of the circumstances (including duration) of non-compliance.

[131] 47 CFR § 1.5004(f).

## Attachment

### Paramount Licensees

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WUPA | 6900 | Atlanta, GA | Atlanta Television Station WUPA Inc. |
| KCBS-TV | 9628 | Los Angeles, CA | CBS Broadcasting Inc. |
| KDKA-TV | 25454 | Pittsburgh, PA | CBS Broadcasting Inc. |
| KPIX-TV | 25452 | San Francisco, CA | CBS Broadcasting Inc. |
| KYW-TV | 25453 | Philadelphia, PA | CBS Broadcasting Inc. |
| WBBM-TV | 9617 | Chicago, IL | CBS Broadcasting Inc. |
| WCBS-TV | 9610 | New York, NY | CBS Broadcasting Inc. |
| WCCO-TV | 9629 | Minneapolis, MN | CBS Broadcasting Inc. |
| KCCW-TV | 9640 | Walker, MN | CBS Broadcasting Inc. |
| WWJ-TV | 72123 | Detroit, MI | CBS Broadcasting Inc. |
| WLNY-TV | 73206 | Riverhead, NY | CBS LITV LLC |
| WBXI-CD | 70416 | Indianapolis, IN | CBS Mass Media Corporation |
| WTOG | 74112 | St. Petersburg, FL | CBS Operations Investments Inc. |
| W26DP-D | 74116 | Inverness, FL | CBS Operations Investments Inc. |
| W36FJ-D | 74113 | Sebring, FL | CBS Operations Investments Inc. |
| KTVT | 23422 | Fort Worth, TX | CBS Stations Group of Texas LLC |
| WBZ-TV | 25456 | Boston, MA | CBS Television Licenses LLC |
| WJZ-TV | 25455 | Baltimore, MD | CBS Television Licenses LLC |
| WSBK-TV | 73982 | Boston, MA | CBS Television Licenses LLC |
| WFOR-TV | 47902 | Miami, FL | CBS Television Licenses LLC |
| KCNC-TV | 47903 | Denver, CO | CBS Television Stations Inc. |
| WKBD-TV | 51570 | Detroit, MI | Detroit Television Station WKBD Inc. |
| KCAL-TV | 21422 | Los Angeles, CA | Los Angeles Television Station KCAL LLC |
| WBFS-TV | 12497 | Miami, FL | Miami Television Station WBFS Inc. |
| WPSG | 12499 | Philadelphia, PA | Philadelphia Television Station WPSG, Inc. |

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WPKD-TV | 69880 | Jeannette, PA | Pittsburgh Television Station WPCW Inc. |
| KMAX-TV | 51499 | Sacramento, CA | Sacramento Television Stations, Inc. |
| KOVR | 56550 | Stockton, CA | Sacramento Television Stations, Inc. |
| KPYX | 69619 | San Francisco, CA | San Francisco Television Station KBCW Inc. |
| KTXA | 51517 | Fort Worth, TX | Television Station KTXA Inc. |
| KSTW | 23428 | Tacoma, WA | The CW Television Stations Inc. |

## APPENDIX A

**List of Commenters**

PRESSPAGE ENTERTAINMENT INC
Collin Hotchkiss
Ron Beres
Aidan Gordon
Patrick O. Ingle
W. Lee McVey, PE
Zachary Beaudoin
Chad Ray
Franklin Broadcasting LP
Free Press
LiveVideo.AI Corp.
Austin Olachea

EXHIBIT B

**BEFORE THE**

**FEDERAL COMMUNICATIONS COMMISSION**

**WASHINGTON, D.C. 20554**

**In the Matter of**

**Paramount Global**

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

## LIVEVIDEO.AI CORP.'S EMERGENCY MOTION FOR STAY UNDER 5 U.S.C. § 705 AND EXPEDITED CONSIDERATION

LiveVideo.AI Corp. ("LiveVideo") respectfully moves under 5 U.S.C. § 705 and 47 C.F.R. §§ 1.102 and 1.115 for an immediate, narrowly tailored stay of implementation of Declaratory Ruling DA 26-1001, adopted and released September 17, 2026 ("DA 26-1001" or the "Order"), pending consideration of LiveVideo's concurrently filed Application for Review.

No exhibits are attached to this motion. This motion relies on materials already lodged in the Commission's electronic docket, materials submitted with the concurrently filed Application for Review and its exhibits, and matters properly subject to judicial notice. LiveVideo incorporates those materials by reference solely for the limited purposes stated below. The exhibits supporting the

factual and legal assertions in this motion are submitted with the concurrently filed Application for Review and are not duplicated here.

LiveVideo does not ask the Commission to unwind any completed transaction or prejudge the merits of the Application for Review. It requests limited interim relief to prevent further foreign-ownership, equity, governance, information-rights, or control changes before the Commission determines whether DA 26-1001 rests on a complete and lawfully evaluated record.

The requested relief should:

1. suspend PIF's advance-approval authority under DA 26-1001;

2. prohibit additional ownership or governance steps that would expand PIF's approved rights or grant foreign investors rights inconsistent with the September 4, 2026 Letter of Agreement ("LOA");

3. preserve the existing ownership and governance status quo; and

4. require expedited responses and limited procedural status reports concerning LiveVideo's September 11 amended petition and Chairman Brendan Carr submissions.

## I. Background

1. Paramount filed a petition for declaratory ruling under Section 310(b)(4) in MB Docket No. 26-93 concerning foreign ownership of Paramount's licensee interests. The petition, the LOA, the Committee's conditional filing, DA 26-1001, and related record materials are included in or lodged with the concurrently filed Application for Review.

2. LiveVideo participated in the proceeding through comments and ex parte submissions. LiveVideo also filed a July 31, 2026 supplemental petition concerning Chairman Brendan Carr and a September 11, 2026 amended petition requesting targeted supplementation and withholding of action pending completion of the record.

3. On September 4, 2026, Paramount executed and submitted the LOA. Paragraph 7 represents that foreign investors will hold non-voting stock without governance or information rights

and will not exercise influence over Paramount's content decisions or company management.

4. On September 8, 2026, LIV Golf filed for Chapter 11 protection. Related publicly filed materials describe PIF's role in financing and restructuring a comparable enterprise. LiveVideo relies on those materials as corroborating issues already presented concerning PIF's practical influence and the completeness of the record.

5. On September 17, 2026, the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector filed a conditional petition stating that it had no objection to Paramount's request provided that the Commission conditioned approval on compliance with the LOA.

6. On the same date, the Media Bureau adopted and released DA 26-1001. The Order authorized aggregate indirect foreign equity ownership of up to 100 percent, specifically approved PIF's 15.1 percent indirect equity interest, and granted advance authority for specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests.

7. The Order became effective upon release. It does not state whether PIF's advance authority has been exercised or whether any additional equity, governance, financing, information, or control rights have been implemented.

## II. Materials Relied Upon and No-Attachment Statement

1. This motion is filed concurrently with LiveVideo's Application for Review of DA 26-1001.

2. The factual and legal materials supporting this motion are identified in the Application for Review and its accompanying exhibits. Those materials include DA 26-1001, the LOA, the Committee's conditional petition, LiveVideo's September 11 amended petition, LiveVideo's July 31 supplemental petition concerning Chairman Carr, and the relevant public filings concerning LIV Golf and PIF.

3. Those materials are either:

a. already lodged in the Commission's electronic docket;

b. submitted as exhibits to the concurrently filed Application for Review; or

c. matters appropriate for judicial or administrative notice.

LiveVideo does not attach those materials again to this motion. Nothing in this motion should be construed as requesting the Commission to treat a lodged or referenced material as part of the record without considering its procedural status, authenticity, relevance, and admissibility.

LiveVideo reserves the right to provide a copy of any referenced material at the Commission's request or to identify the applicable ECFS submission number, docket entry, or AFR exhibit designation.

## III. Legal Standard

Section 705 of the Administrative Procedure Act authorizes postponement of an agency action or preservation of the status or rights of the parties pending judicial review when justice requires.

The Commission's rules do not automatically stay delegated action upon the filing of an Application for Review. See 47 C.F.R. § 1.102. LiveVideo therefore requests an express stay and preservation order. It does not contend that the Application for Review itself automatically suspends DA 26-1001.

The traditional stay factors are:

1. likelihood of success or substantial questions on the merits;
2. irreparable injury absent relief;
3. harm to other parties; and
4. the public interest.

*Nken v. Holder*, 556 U.S. 418, 425–26, 434 (2009); *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). The factors are balanced flexibly, and a substantial merits showing combined with strong equitable considerations may support relief. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C. Cir. 1977).

## IV. LiveVideo Presents Serious Questions on the Merits.

### A. DA 26-1001 does not provide an individualized analysis of PIF's actual rights.

The Order's central practical-influence finding states that the foreign investors "will not be able to wield any influence, let alone control" over decisions involving the licensees. DA 26-1001 ¶ 22.

That finding relies principally on the LOA's class-wide representation that foreign investors will hold non-voting stock without governance or information rights. But the Order does not identify or analyze PIF-specific:

- financing or debt rights;
- security, pledge, collateral, or lien rights;
- consent, veto, or reserved-matter rights;
- information, inspection, audit, or reporting rights;
- default, acceleration, or enforcement rights;
- restructuring, refinancing, or insolvency rights;

- rights held through affiliates; or
- practical influence over management, content, licensing, distribution, or strategic decisions.

Formal non-voting status may be relevant, but the Order does not explain why it resolves all forms of legal or practical influence. Section 310(b)(4) requires a public-interest determination based on the actual ownership structure, and the APA requires the agency to consider important aspects of the problem and explain the connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The omission is particularly material because the Order grants advance authority for future ownership increases. The more extensive the advance authority, the more important it is for the Commission to identify what rights are permissible and what rights require further review.

### B. The Bureau did not explain its treatment of LiveVideo's September 11 filing and intervening evidence.

LiveVideo's September 11 amended petition requested targeted supplementation and withholding of action pending a complete record. The request addressed the central issue underlying the

Order: whether the record adequately established that PIF's investment would be passive in both legal form and practical effect.

DA 26-1001 does not explain whether the Bureau:

- reviewed the September 11 filing;
- considered whether supplementation was necessary;
- considered the LIV Golf/PIF materials;
- determined those materials were immaterial;
- gave Paramount an opportunity to respond; or
- concluded that further proceedings were unnecessary.

An agency may not disregard a material record-completion request without explanation. *State Farm*, 463 U.S. at 43; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962).

LiveVideo does not ask the Commission to find that the LIV Golf materials establish wrongdoing by PIF or Paramount. The materials provide contemporaneous corroboration for issues already presented concerning practical influence, record completeness, and the need for individualized analysis.

If the Commission concludes that the September 8 materials were not specifically before the Bureau, LiveVideo requests that the

Commission treat this motion as preserving a protective request for reconsideration under 47 C.F.R. § 1.106 or remand the issue for Bureau consideration.

### C. The Committee's conditional no-objection does not substitute for independent Commission review.

The Committee's petition was conditional on Paramount's compliance with the LOA. It does not disclose an independent, PIF-specific analysis of financing, security, governance, information, or restructuring rights.

Under 47 C.F.R. § 1.40001(b), the Commission may consider Executive Branch recommendations but must evaluate the concerns raised and make an independent decision. The Committee's conditional no-objection may inform the Commission's judgment, but it cannot replace the Commission's own reasoned public-interest analysis.

The Committee petition and DA 26-1001 were filed or released on the same day. The Order does not state whether the Bureau reviewed the petition before issuing DA 26-1001 or explain how the petition affected the Bureau's independent analysis. That unresolved issue supports interim preservation relief.

### D. The Bureau's disposition of the Chairman Carr submissions raises a separate procedural concern.

DA 26-1001 expressly declined to resolve LiveVideo's Chairman Carr conflict or disqualification submissions, stating that the issue was outside the delegated-authority proceeding and was not properly raised at that stage.

LiveVideo does not ask the Commission to make a final finding of misconduct or disqualification on this motion. It requests a limited procedural status report addressing:

1. when the submissions were received;
2. which FCC office received and routed them;
3. whether they were reviewed by the Bureau, the Office of General Counsel, ethics personnel, or another institutional office;
4. whether any recusal or disqualification analysis occurred;
5. whether the matter was referred for further review;
6. whether the submissions were included in the decisional record; and
7. whether they were considered before DA 26-1001 issued.

Undisclosed communications and unresolved decisional-process issues can impair the completeness of an administrative record and frustrate meaningful review. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54–58 (D.C. Cir. 1977). The appearance-of-fairness principle likewise requires attention where an adjudicator's conduct or public statements create a reasonable concern about prejudgment.

*Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 590–92 (D.C. Cir. 1970).

## V. LiveVideo Faces Irreparable Harm Without Interim Relief.

The requested harm is not merely the possibility that LiveVideo will lose on the merits. The harm is that additional implementation may occur before review and alter the factual and legal posture in ways that are difficult to unwind.

Absent relief, Paramount or an affiliated entity could:

- issue or transfer additional equity;
- exercise PIF's advance-approval authority;
- modify financing arrangements;
- grant information, consent, security, or restructuring rights;
- alter governance arrangements; or
- restructure the ownership chain before review is complete.

Those steps could make later vacatur or remand substantially less effective. A later decision may not restore the prior ownership structure, unwind third-party rights, or reconstruct the record as it existed before implementation.

The requested stay avoids that problem without requiring divestiture or unwinding. It preserves the existing status quo while

allowing Paramount to continue ordinary operations and comply with existing law and the LOA.

## VI. The Balance of Equities and Public Interest Favor a Narrow Stay.

The requested relief is temporary and limited. It would not invalidate PIF's existing approved interest, require divestiture, or prohibit ordinary business operations. It would merely suspend additional implementation of the disputed advance authority while the Commission considers whether DA 26-1001 rests on a complete and lawfully evaluated record.

By contrast, denial could allow additional ownership or governance rights to be issued before the Commission determines whether its authorization was adequately reasoned.

The public interest favors:

- compliance with Section 310(b)(4);
- independent Commission consideration of Executive Branch recommendations;
- complete and reviewable administrative records;
- individualized evaluation of foreign ownership and practical influence;
- avoidance of irreversible implementation before review; and
- confidence in the fairness and integrity of agency proceedings.

A stay would not decide the merits. It would preserve the Commission's ability to decide them meaningfully.

## VII. Expedited Consideration Is Appropriate.

DA 26-1001 is effective. The Order grants advance authority for future foreign-ownership increases. The Application for Review raises record-completeness and institutional-integrity issues. Delay may permit implementation that cannot later be unwound.

LiveVideo therefore requests an expedited schedule:

- responses within three business days after service;
- any reply within two business days thereafter; and
- expedited Commission consideration of the motion and Application for Review.

## REQUEST FOR RELIEF

LiveVideo respectfully requests that the Commission:

1. grant expedited consideration;

2. immediately suspend implementation of the challenged portions of DA 26-1001 pending disposition of this motion;

3. pending resolution of the Application for Review, stay or hold in abeyance PIF's advance-approval authority under DA 26-1001;

4. prohibit any additional issuance, transfer, conversion, or restructuring that would:

a. increase PIF's approved equity interest;

b. expand any foreign investor's rights beyond those disclosed in the LOA;

c. grant additional voting, governance, information, consent, security, financing, or restructuring rights; or

d. materially alter the ownership or control structure evaluated in DA 26-1001;

5. clarify that the stay does not require divestiture, unwinding of completed transactions, or interruption of ordinary business operations;

6. direct Paramount to file a verified statement identifying whether any action described in paragraph 4 has occurred or is planned;

7. direct the Media Bureau or another appropriate FCC office to file a limited status report concerning LiveVideo's September 11 amended petition and request for targeted supplementation;

8. direct an appropriate FCC official to file a limited, non-privileged status report concerning receipt, routing, review, and consideration of LiveVideo's Chairman Carr submissions;

9. if the Commission determines that the LIV Golf materials were not properly before the Bureau, treat this motion as preserving a request for reconsideration under 47 C.F.R. § 1.106 or remand the issue for Bureau consideration; and

10. grant such other relief as may be necessary to preserve meaningful Commission and judicial review.

Respectfully submitted,

**LIVEVIDEO.AI CORP.**

By: /s/ Brad Greenspan__________________________

**Brad Greenspan**

Chief Executive Officer
LiveVideo.AI Corp.
244 Fifth Avenue, Suite G290
New York, New York 10001
Email: legalsupport1@nym.hush.com

Dated: September 22, 2026

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, I caused a true and correct copy of the foregoing **Emergency Motion for Stay Under 5 U.S.C. § 705 and**

**Expedited Consideration** to be filed through the Commission's electronic filing system and served upon all parties of record in MB Docket No. 26-93..

/s/ __Brad Greenspan______________________________
**Brad Greenspan**

**[Proposed] Order Granting in Part Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration.**

## [PROPOSED] ORDER

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

**In the Matter of**

**Paramount Global**

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

Adopted: __________, 2026
Released: __________, 2026

By the Commission:

## I. Introduction

1. The Commission has before it LiveVideo.AI Corp.'s Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration concerning Declaratory Ruling DA 26-1001, adopted and released September 17, 2026.

2. LiveVideo requests narrowly tailored interim relief pending consideration of its Application for Review. The requested relief concerns PIF's advance-approval authority, additional foreign-ownership or governance changes, and limited procedural reporting concerning LiveVideo's September 11 amended petition and Chairman Brendan Carr submissions.

3. The Commission concludes that limited preservation relief is appropriate to maintain the status quo while the Application

for Review is considered. This Order does not decide the merits of the Application for Review.

## II. Authority and Interim Relief

1. The Commission acts under 5 U.S.C. § 705 and 47 C.F.R. §§ 1.102 and 1.115.

2. Filing an Application for Review does not automatically stay delegated action. The Commission therefore issues this express interim order.

3. Pending further order, implementation of the following portions of DA 26-1001 is stayed:a. PIF's authority to increase its indirect equity interest under the advance-approval provision;b. any additional issuance, transfer, conversion, or restructuring that would increase PIF's approved equity interest;c. any additional voting, governance, information, consent, security, financing, restructuring, or control rights granted to PIF or another foreign investor beyond those described in the September 4, 2026 Letter of Agreement; andd. any other implementation step that would materially alter the ownership or control structure evaluated in DA 26-1001.

4. This interim stay does not:a. require divestiture or unwinding of a completed transaction;b. invalidate PIF's existing approved interest;c. prohibit ordinary business operations; ord. prevent compliance with existing law or the Letter of Agreement.

## III. Status Statements

1. Within three business days after release of this Order, Paramount shall file a verified statement identifying whether, since September 17, 2026:a. PIF or any other foreign investor has exercised advance-approval authority;b. any additional equity, voting, governance, information, consent, security, financing, restructuring, or control rights have been issued, transferred, granted, or modified; orc. any action described in paragraph 6 is planned or contractually committed.

2. Within five business days after release of this Order, the Media Bureau shall file a status statement addressing whether it considered:a. LiveVideo's September 11 amended petition;b. LiveVideo's request for targeted record supplementation;c. LiveVideo's request to withhold action pending a complete record; andd. any LIV Golf or PIF-related materials submitted before DA 26-1001 was issued.

3. The Media Bureau shall identify any material it did not consider and state whether it believes further proceedings are necessary.

## IV. Chairman Carr Submissions

1. Within five business days after release of this Order, an appropriate FCC official who did not participate in the

challenged decision shall file a limited, non-privileged status report addressing:

a. when LiveVideo's Chairman Carr submissions were received;

b. which FCC office or offices received and routed them;

c. whether they were referred to the Media Bureau, Office of General Counsel, ethics personnel, or another institutional office;

d. whether any recusal, disqualification, or conflict review occurred;

e. whether any referral or further inquiry occurred;

f. whether the submissions were included in the decisional record; and

g. whether they were considered before DA 26-1001 was issued.

1. The report need not disclose privileged, deliberative, classified, or protected national-security information. Any withholding shall identify the category of information withheld and the asserted legal basis.

2. This reporting requirement does not determine whether Chairman Carr was disqualified or whether any alleged conflict was established.

## V. Responses and Further Proceedings

1. Paramount, LiveVideo, the Media Bureau, and any other necessary participant may file responses to the status statements within three business days after their filing.

2. The Commission will consider the Application for Review and related submissions on an expedited basis. The Secretary shall place the Application for Review, this Order, and the required status statements before the Commission for further action.

3. This Order remains in effect until the Commission issues a further order or otherwise resolves the Application for Review.

## ORDERING CLAUSES

1. Accordingly, IT IS ORDERED that LiveVideo.AI Corp.'s Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration IS GRANTED IN PART to the extent set forth in this Order.

2. IT IS FURTHER ORDERED that implementation of the specified portions of DA 26-1001 is stayed pending further order of the Commission.

3. IT IS FURTHER ORDERED that Paramount shall file the verified status statement required by paragraph 8 within three business days after release of this Order.

4. IT IS FURTHER ORDERED that the Media Bureau and designated FCC official shall file the status reports required by paragraphs 9 and 11 within five business days after release of this Order.

5. IT IS FURTHER ORDERED that this Order is effective upon release.

FEDERAL COMMUNICATIONS COMMISSION

/s/ ________________________________

**Marlene H. Dortch**
Secretary

Dated: __________, 2026

BEFORE THE

FEDERAL COMMUNICATIONS COMMISSION

WASHINGTON, D.C. 20554

In the Matter of

Paramount Global

| | |
|---|---|
| LiveVideo.AI Corp.<br>Applicant,<br><br>v.<br><br>Paramount Global<br>Respondent. | Case No. MB Docket No. 26-93<br><br>**LIVEVIDEO.AI CORP.'S APPLICATION FOR REVIEW OF DA 26-1001** |

## SUMMARY OF ARGUMENT

DA 26-1001 should be set aside because it disposes of LiveVideo.AI's challenge without resolving the disqualification question at its center or addressing the LIV Golf materials submitted on that issue. A decision cannot adequately dispose of the challenge while leaving those matters unanswered.

The omissions are both evidentiary and procedural. The LIV Golf materials bear on the unresolved disqualification question, yet DA 26-1001 neither evaluates those materials nor explains why they do not affect the result. That gap leaves the Bureau's disposition unsupported by a stated consideration of material record matters.

The Commission should grant review, set aside DA 26-1001, and remand for consideration of the disqualification question and the LIV Golf materials. On remand, the Bureau should address those matters and explain their effect on the disposition.

DA 26-1001 should be set aside because it disposes of LiveVideo.AI Corp.'s challenge without resolving the disqualification question at its

center or addressing the LIV Golf materials submitted on that issue. A decision cannot adequately dispose of the challenge while leaving those matters unanswered.

The omissions are both evidentiary and procedural. The LIV Golf materials bear on the unresolved disqualification question, yet DA 26-1001 neither evaluates those materials nor explains why they do not affect the result.

The Commission should grant review, set aside DA 26-1001, and remand for consideration of the disqualification question and the LIV Golf materials.

## QUESTIONS PRESENTED

1. Whether DA 26-1001 erred by declining to resolve the disqualification question raised under 47 U.S.C. § 310(b)(4).

2. Whether DA 26-1001 properly addressed the LIV Golf materials bearing on that disqualification question.

3. Whether the errors identified in DA 26-1001 provide grounds for Commission review under 47 C.F.R. § 1.115(b)(2).

4. Whether the Commission should remand DA 26-1001 for resolution of the disqualification question and consideration of the LIV Golf materials.

5. Whether DA 26-1001 erred by declining to resolve the disqualification question raised under 47 U.S.C. § 310(b)(4).

6. Whether DA 26-1001 properly addressed the LIV Golf materials bearing on that disqualification question.

7. Whether the errors identified in DA 26-1001 provide grounds for Commission review under 47 C.F.R. § 1.115(b)(2).

8. Whether the Commission should remand DA 26-1001 for resolution of the disqualification question and consideration of the LIV Golf materials.

## STANDING, TIMELINESS, AND PRESENTATION OF NEW FACTS UNDER § 1.115

LiveVideo.AI Corp. is an interested participant and person aggrieved by DA 26-1001 and participated in MB Docket No. 26-93. This Application was filed within the time prescribed by 47 C.F.R. § 1.115(d). The LIV Golf materials corroborate issues already presented;

LiveVideo.AI Corp. submits them protectively under 47 C.F.R. § 1.106 only if that treatment is necessary.

## A. STANDING

LiveVideo.AI Corp. is an interested participant and person aggrieved by DA 26-1001. It therefore may seek Commission review under 47 C.F.R. § 1.115(a).

The record reflects LiveVideo.AI Corp.'s participation in the underlying MB Docket No. 26-93 proceeding, where it presented the issues relevant to DA 26-1001. Those issues are directly connected to the challenged action, establishing LiveVideo.AI Corp.'s basis to seek review.

## B. TIMELINESS

DA 26-1001 was adopted and released on September 17, 2026. This Application is filed on September 22, 2026, and is timely under 47 C.F.R. § 1.115(d).

## STANDARD OF REVIEW AND GROUNDS FOR REVIEW UNDER § 1.115(B)(2)

This Application seeks review of a Bureau action taken under delegated authority. Section 1.115(b)(2) authorizes review where the action conflicts with statute, regulation, case precedent, or established Commission policy; involves a question of law, fact, or policy that warrants consideration by the full Commission; rests on an erroneous finding as to an important or material factual question; or involves a prejudicial procedural error. 47 C.F.R. § 1.115(b)(2)(i)–(iv). 47 C.F.R. § 1.115(b)(2), at § 1.115(b)(2)(i)–(iv) (grounds for review of delegated action).

DA 26-1001 presents each of those grounds. It leaves material questions unresolved, rests on material factual, legal, policy, and procedural errors, and applies an approach inconsistent with the governing framework. Those errors warrant Commission review both because they affect the Bureau's disposition and because the questions presented require the Commission's own consideration.

Where § 1.40001(b) applies, the Commission must make the determination required by that rule using its independent judgment; it need not treat the Bureau's delegated ruling as conclusive. 47 C.F.R. § 1.40001(b). Nothing in that rule imposes a categorical investor-specific

requirement. The Commission should instead apply the governing standard to the material issues properly before it. 47 C.F.R. § 1.40001(b) (Commission determination under the applicable standard).

Commission review must assess DA 26-1001 on the grounds the Bureau actually gave. An agency action must stand or fall on the rationale invoked when the agency acted; it may not be sustained by a new post hoc justification. SEC v. Chenery Corp., 318 U.S. 80, 87, 93–95 (1943). Thus, subsequent arguments cannot supply reasoning that DA 26-1001 itself omitted. *SEC v. Chenery Corp.*, 318 U.S. 80, at 87, 93–95 (agency action must be judged on the rationale the agency invoked, not a post hoc justification).

## STATEMENT OF THE RELEVANT RECORD

DA 26-1001 authorized up to 100% aggregate indirect foreign equity. It identified PIF's 15.1% indirect equity interest and granted advance authority for non-controlling indirect foreign equity interests of up to 20%. This authorization and the stated treatment of PIF's interest are new factual developments in the record. DA 26-1001.

## A. DA 26-1001 AUTHORIZES EXTENSIVE FOREIGN EQUITY OWNERSHIP

DA 26-1001 authorizes aggregate indirect foreign equity ownership of up to 100 percent. The order specifically approves the Public Investment Fund ("PIF")—the identified investor—holding a 15.1 percent indirect equity interest. DA 26-1001.

The order further grants advance authority to the specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests. Thus, the order addresses both aggregate indirect foreign ownership and the individual non-controlling interests within the authorized ownership-and-voting structure.

The scope of that authorization—100 percent aggregate indirect foreign equity ownership, PIF's approved 15.1 percent interest, and advance authority for specified foreign investors to hold non-controlling interests up to 20 percent—makes a complete record and reasoned explanation material to understanding what the order authorizes.

## B. THE BUREAU RELIED ON THE LOA'S REPRESENTATIONS AND COMPLIANCE CONDITIONS

The September 4, 2026 Letter of Agreement ("LOA") supplied the representations on which the foreign-ownership analysis proceeded. It provides that the foreign investors will hold non-voting stock, will have no governance or information rights, and will not exercise influence over Paramount's content decisions or company management. Letter of Agreement dated Sept. 4, 2026 ((setting forth the foreign investors' rights and restrictions)).

The executive-branch Committee then filed a conditional no-objection that depended on compliance with the LOA. The Committee's filing thus made the LOA's representations, duties, and compliance conditions part of the basis for its no-objection position. Committee conditional no-objection filing ((conditioning no objection on compliance with the LOA)).

The LOA also establishes compliance duties and deadlines. In DA 26-1001, the Bureau relied on the transaction's stated restrictions and compliance framework in reaching its conclusion; those restrictions cannot be separated from the duties and timing provisions that govern their implementation. Letter of Agreement dated Sept. 4, 2026 ((setting

forth compliance duties and deadlines)); DA 26-1001 ((relying on the transaction record in its foreign-ownership analysis)).

Because the Bureau's conclusion depends on those representations and conditions, the order must explain their scope and how compliance is assured. It must address how the limits on voting, governance, information access, content decisions, and management influence operate in practice, including the duties and deadlines that support the Committee's conditional no-objection and the Bureau's reliance on the LOA. DA 26-1001 ((addressing the Bureau's foreign-ownership conclusion)); Committee conditional no-objection filing ((conditioning no objection on LOA compliance)).

## ARGUMENT

A conditional Committee no-objection does not itself satisfy the Commission's duty under § 1.40001(b). The Order identifies no independent Commission judgment that connects the Committee's conditional position to the Bureau's disposition of the unresolved disqualification and § 310(b)(4) issues. Nor may that missing explanation be supplied now. Under Chenery, an agency action must stand or fall on

the grounds the agency gave, and a reviewing body may not uphold it through a post hoc rationale. The appropriate remedy is remand for the Commission to exercise the independent judgment § 1.40001(b) requires and explain its decision on this record. *Calcutt v. FDIC*, 598 U.S. 623 (2023) (reviewing court may not affirm an agency decision by substituting a rationale the agency did not adopt).

## 1. THE BUREAU GOT THE LABELING RIGHT AND THE SUBSTANCE WRONG

The Bureau's characterization of PIF's interest as non-voting answered a question about the form of ownership, not the separate question of practical influence. A non-voting label does not itself establish what influence an investor may exercise through the rights reflected in the record. DA 26-1001.

The record therefore calls for an analysis specific to PIF and to the rights at issue here. That analysis must address the contractual, financing, governance, and information rights identified in the record, and whether their combined operation bears on PIF's practical influence.

This is not a request for a categorical rule that § 310(b)(4) always requires an investor-specific finding. It is a request for reasoned analysis where, as here, the record identifies investor-specific rights relevant to practical influence. The Bureau did not supply that analysis by relying on the non-voting characterization alone. 47 U.S.C. § 310(b)(4); DA 26-1001.

The Commission should remand the Order for the Bureau to analyze those identified contractual, financing, governance, and information rights and explain whether they bear, individually or together, on PIF's practical influence. That limited remand seeks a reasoned decision on the existing record; it does not assume that PIF's investment is unlawful. DA 26-1001.

## 2. THE BUREAU ASKED WHETHER PIF HOLDS VOTING STOCK. IT NEVER ASKED WHAT ELSE PIF HOLDS.

As a factual matter, the Bureau asked whether PIF holds voting stock. That inquiry does not itself address whether PIF holds financing, security, consent, information, governance, or restructuring rights. The point is not that PIF holds any particular right; it is that a finding

concerning voting stock alone does not answer the separate questions presented by those categories of rights.

The LIV Golf materials corroborate that distinction and the issues already presented. They do not establish, and PIF does not contend here, that PIF holds a particular unexamined right. Rather, they reinforce the need to distinguish the narrow factual question the Bureau asked—voting stock—from the broader set of rights that may require consideration.

As a matter of reasoned administrative decisionmaking, the Commission should address the material questions the Bureau's voting-stock analysis left unanswered and explain whether that analysis resolves them. A conclusion limited to non-voting stock cannot, without that consideration and explanation, resolve the separate financing, security, consent, information, governance, and restructuring issues already before the Commission.

## THE TIMELINE EXPOSES THE GAP — AND THE BUREAU'S SILENCE ON LIV GOLF WAS A CHOICE, NOT AN ACCIDENT

The record's sequence makes the omission apparent. The LOA issued on September 4. LIV Golf filed its Chapter 11 petition on

September 8. The amended petition followed on September 11. On September 17, the Committee issued its conditional no-objection, and the Bureau released DA 26-1001.

The intervening LIV Golf filing was material because it corroborated issues already presented, rather than raising a separate or disconnected matter. The amended petition brought that intervening evidence to the Bureau's attention before the Bureau issued DA 26-1001.

That chronology squarely presented a record-supplementation question: whether the Bureau would consider the LIV Golf materials as corroborating evidence bearing on the issues already before it. The Bureau acted six days after the amended petition, with the Committee's conditional no-objection and DA 26-1001 both issued on September 17.

DA 26-1001 does not explain the treatment of the LIV Golf materials. It does not say whether the Bureau considered them, declined to supplement the record, or concluded that they did not affect the issues presented. The order therefore leaves an unexplained gap on material intervening evidence that the Commission should address on review.

## 4. A COMPLIANCE-DEPENDENT FINDING IS WORTHLESS UNTIL SOMEONE CONFIRMS COMPLIANCE

The Committee's no-objection was expressly conditional on compliance with the September 4, 2026 Letter of Agreement ("LOA"). The relevant obligations are the LOA's commitments, representations, and conditions—not an abstract assurance that they will be honored. A result that relies on the Committee's conditional no-objection must establish compliance with those obligations. September 4, 2026 LOA; Committee Conditional No-Objection.

DA 26-1001 relies on the LOA's representations and conditions. That premise supports the Bureau's result only if compliance with the corresponding LOA commitments and conditions has been verified. The order does not identify a record confirmation of that compliance. DA 26-1001; September 4, 2026 LOA.

The Commission should require an order that states the verified compliance status of the LOA obligations, explains how compliance is ensured, and connects that verified status to the result. Without that explanation, the conditional no-objection and the LOA cannot carry the

weight DA 26-1001 assigns them. Committee Conditional No-Objection; September 4, 2026 LOA; DA 26-1001.

## 5. A CONDITIONAL "NO OBJECTION" FROM ONE AGENCY IS NOT AN INDEPENDENT FINDING BY THIS ONE

The Committee's conditional no-objection may inform the Commission's review, but it cannot substitute for the Commission's independent public-interest determination. Section 1.40001(b) places that determination with the Commission. The Commission must therefore exercise and explain its own judgment rather than treat a conditional position from another agency as dispositive. 47 C.F.R. § 1.40001(b).

The Commission may properly give weight to the Committee's executive-branch expertise and to the reasons the Committee actually discloses in its filing. But deference cannot fill a gap in that filing. If the Committee filing states no basis for a conclusion material to the Commission's decision, the Commission must address that absence and explain, from the record, why its own public-interest determination is warranted.

DA 26-1001 should be remanded if it does not show that independent analysis. A decision that reports the Committee's conditional no-objection without identifying the Commission's own reasoning does not demonstrate the public-interest determination that § 1.40001(b) requires.

## DA 26-1001 CONFIRMS, IN THE BUREAU'S OWN WORDS, THAT THE DISQUALIFICATION QUESTION WAS NOT RESOLVED AND IS PROPERLY BEFORE THE COMMISSION NOW

### 7. ADVANCE APPROVAL IS A BET THAT THE FINDING IS RIGHT, PLACED BEFORE ANYONE HAS CHECKED

Advance approval carries consequences beyond the interests addressed in DA 26-1001. Within its stated scope, it permits the principal investor to make future acquisitions or increase its interest in reliance on the Commission's present determination, rather than requiring the identified inquiry to be resolved anew before each future transaction.

That is why the evidentiary defect cannot be treated as academic. Advance approval asks the Commission to accept now that the underlying finding is sound and allows the principal investor to plan and act on that premise in the future. If the finding rests on an inquiry that

has not been resolved, the resulting approval places that unresolved premise into future transactions.

Applicant does not seek to suspend DA 26-1001 as a whole or to obtain relief unrelated to the identified inquiry. It seeks only to prevent the advance-approval feature from being used prospectively while the Commission reviews whether the record supports the finding on which that feature depends.

The Commission should therefore hold the advance-approval component in abeyance pending review of the identified evidentiary defect. That limited measure preserves the status quo as to future reliance on the challenged finding, while leaving the remainder of DA 26-1001 in effect unless the Commission directs otherwise.

## REQUESTED RELIEF

Applicant respectfully requests the following relief under 47 C.F.R. § 1.115.

1. Grant review and set aside DA 26-1001 or, alternatively, remand the matter for further proceedings.

2. On remand, direct the Bureau to consider the LIV Golf materials, produce the materials on which it relied or certify that no such materials exist, and issue a reasoned determination of the disqualification question.

3. Stay DA 26-1001 or hold it in abeyance pending disposition of this Application for Review, and grant such further relief as is appropriate.

**CONCLUSION**

DA 26-1001 does not resolve the disqualification question presented by the record, and it does not address the LIV Golf materials. Those decisive omissions leave the Order without a resolution of issues material to the application.

The Commission should grant this Application for Review, set aside DA 26-1001, and remand for further proceedings that address both omissions. LiveVideo.AI respectfully requests the specific relief set forth in the Request for Relief.

Respectfully submitted,

LIVEVIDEO.AI CORP.

By: /s/ Brad Greenspan__________________________

Brad Greenspan

Chief Executive Officer

LiveVideo.AI Corp.

244 Fifth Avenue, Suite G290

New York, New York 10001

Email: legalsupport1@nym.hush.com

Dated: September 22, 2026

**[PROPOSED] ORDER**

**BEFORE THE**

**FEDERAL COMMUNICATIONS COMMISSION**

WASHINGTON, D.C. 20554

In the Matter of

Paramount Global

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

ORDER

Adopted: __________, 2026

Released: __________, 2026

By the Commission:

## I. Introduction

The Commission has before it LiveVideo.AI Corp.'s Application for Review of Declaratory Ruling DA 26-1001, adopted and released September 17, 2026.

LiveVideo requests review of the Media Bureau's determination concerning foreign ownership, including the authorization of aggregate indirect foreign equity ownership, the separately identified 15.1 percent interest held by the Public Investment Fund of Saudi Arabia ("PIF"),

and advance approval for specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests.

LiveVideo requests that the Commission address the actual ownership structure and rights associated with PIF's separately identified interest, consider LiveVideo's September 11, 2026 amended petition and related record-completeness issues, evaluate the September 8, 2026 LIV Golf materials to the extent properly presented or corroborative of issues already raised, consider the Committee's conditional filing under 47

C.F.R. § 1.40001(b), and address LiveVideo's submissions concerning Chairman Brendan Carr.

The Commission concludes that the Application for Review warrants further proceedings and that limited interim relief is appropriate to preserve the status quo while the Commission completes its review.

## II. Authority

The Commission acts under Section 5(c) of the Communications Act, 47 U.S.C. § 155(c), 5 U.S.C. § 705, and 47 C.F.R. §§ 1.102, 1.106, 1.115, and 1.40001.

Filing an Application for Review does not automatically stay delegated action. The Commission therefore issues this express interim order.

## III. Review and Further Proceedings

The Application for Review is granted for further consideration.

The Media Bureau shall provide the Commission with a procedural and record-status report addressing:

a. LiveVideo's September 11, 2026 amended petition;

b. LiveVideo's request for targeted supplementation;

c. LiveVideo's request to withhold action pending completion of the record;

d. the September 8, 2026 LIV Golf materials submitted before DA 26-1001 was issued; and

e. the September 17, 2026 Committee filing and its effect, if any, on the Bureau's analysis.

The Bureau's report shall identify any material it did not consider and shall explain whether further proceedings are necessary to address that material.

The Commission shall consider whether the record adequately addresses:

a. the actual ownership structure associated with PIF's separately identified 15.1 percent interest;

b. the voting, governance, consent, information, financing, security, restructuring, and other rights associated with that interest;

c. the relationship between PIF's separately identified interest and the aggregate foreign-equity authorization;

d. the relationship between PIF's interest and the advance-approval authority for future non-controlling interests;

e. Paramount's compliance with the relevant provisions of the September 4, 2026 Letter of Agreement; and

f. the Commission's independent public-interest analysis under Section 1.40001(b).

## IV. Interim Preservation Relief

Pending further order, implementation of the following portions of DA 26-1001 is stayed:

a. PIF's authority to increase its indirect equity interest under the advance-approval provision;

b. any additional issuance, transfer, conversion, or restructuring that would increase PIF's approved equity interest

c. any additional voting, governance, information, consent, security, financing, restructuring, or control rights granted to PIF or another

foreign investor beyond those disclosed in the September 4, 2026 Letter of Agreement; and

d. any implementation step that would materially alter the ownership or control structure evaluated in DA 26-1001.

This interim stay does not:

a. require divestiture or unwinding of any completed transaction;

b. invalidate PIF's existing approved interest;

c. prohibit ordinary business operations; or

d. present Paramount from complying with existing law or the Letter of Agreement.

Paramount shall not take any action covered by paragraph 11 without further order of the Commission.

V. Paramount Status Statement

Within three business days after release of this Order, Paramount shall file a verified status statement identifying whether, since September 17, 2026:

a. PIF or any other foreign investor has exercised advance-approval authority;

b. any additional equity, voting, governance, information, consent, security, financing, restructuring, or control rights have been issued, transferred, granted, or modified;

c. any action described in paragraph 11 is planned or contractually committed;

d. Paramount has submitted notices, certifications, security plans, or other materials required by the September 4, 2026 Letter of Agreement; and

e. Paramount contends that any portion of the status statement is confidential or otherwise protected from public disclosure.

Any request for confidential treatment shall identify the material for which protection is sought and the legal basis for the request.

VI. Chairman Carr Submissions

Within five business days after release of this Order, an appropriate FCC official who did not participate in the challenged decision shall file

a limited, non-privileged status report concerning LiveVideo's submissions regarding Chairman Carr.

The report shall address:

a. when the submissions were received;

b. which FCC office or offices received and routed them;

c. whether they were referred to the Media Bureau, Office of General Counsel, ethics personnel, or another institutional office;

d. whether any recusal, disqualification, or conflict review occurred;

e. whether any referral, inquiry, or investigation occurred;

f. whether the submissions were included in the decisional record; and

g. whether they were considered before DA 26-1001 was adopted and released.

The report need not disclose privileged, deliberative, classified, or protected national-security information. If information is withheld, the

report shall identify the category of information withheld and the asserted legal basis.

This reporting requirement does not determine whether Chairman Carr was disqualified or whether any alleged conflict was established.

## VII. Responses and Commission Review

LiveVideo and Paramount may file responses to the status reports within three business days after their filing.

The Commission shall consider the Application for Review, the status reports, and any responses on an expedited basis.

If the Commission determines that additional briefing, record supplementation, or other proceedings are necessary, it shall issue further instructions.

If the Commission orders further proceedings, it may stay the effect of DA 26-1001 under 47 C.F.R. § 1.115(h)(2) and applicable Commission authority.

Nothing in this Order constitutes a final determination on the merits of the Application for Review.

## VIII. Ordering Clauses

Accordingly, IT IS ORDERED that LiveVideo.AI Corp.'s Application for Review of DA 26-1001 IS GRANTED for further consideration to the extent stated in this Order.

IT IS FURTHER ORDERED that implementation of the portions of DA 26-1001 identified in paragraph 11 is STAYED pending further order of the Commission.

IT IS FURTHER ORDERED that Paramount shall file the verified status statement required by paragraph 14 within three business days after release of this Order.

IT IS FURTHER ORDERED that the designated FCC official shall file the status report required by paragraph 17 within five business days after release of this Order.

IT IS FURTHER ORDERED that the Media Bureau shall file the procedural and record-status report required by paragraph 8 within five business days after release of this Order.

IT IS FURTHER ORDERED that any responses authorized under paragraph 20 shall be filed within three business days after the applicable status report is filed.

IT IS FURTHER ORDERED that this Order is effective upon release.

FEDERAL COMMUNICATIONS COMMISSION

/s/ ______________________________

Marlene H. Dortch

Secretary

Dated: __________, 2026

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, I caused a true and correct copy of the foregoing **Application For Review** to be filed through the Commission's electronic filing system and served upon all parties of record in MB Docket No. 26-93..

/s/ __Brad Greenspan______________________________

**Brad Greenspan**

**EXHIBIT DESIGNATIONS**

- **Exhibit A:** DA 26-1001, Declaratory Ruling, adopted and released September 17, 2026.

- **Exhibit B:** NTIA Petition to Adopt Conditions to Authorization and License, MB Docket No. 26-93, filed September 17, 2026 (Committee Petition).
- **Exhibit C:** Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, to FIRS/DOJ, dated September 4, 2026 (LOA).
- **Exhibit D**: Declaration of David Orlofsky (Chief Restructuring Officer, AlixPartners) in Support of Chapter 11 Petitions and First Day Motions, filed on or about September 8, 2026, in the jointly administered cases led by *In re LIV Golf New Jersey LLC*, Case No. 3:26-bk-20189 (Bankr. D.N.J.)