**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| LIVEVIDEO.AI CORP.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION<br><br>and UNITED STATES OF AMERICA,<br><br>Respondents. | No. 26-1257 |

*On Petition for Review of a Declaratory Ruling of the Media Bureau, Federal Communications Commission, DA 26-1001, MB Docket No. 26-93 (rel. Sept. 17, 2026)*

**EMERGENCY MOTION UNDER FEDERAL RULE OF APPELLATE PROCEDURE 18(a) FOR AN ADMINISTRATIVE STAY, A STAY PENDING REVIEW, AND EXPEDITED CONSIDERATION**

**ACTION REQUESTED BY 5:00 P.M. ON FRIDAY, OCTOBER 2, 2026, AND, IN ANY EVENT, BEFORE THE OCTOBER 5 RECORD DATE AND ANTICIPATED OCTOBER 6, 2026 CLOSING**

LiveVideo.AI Corp. ("LiveVideo") respectfully moves under Federal Rule of Appellate Procedure 18(a), D.C. Circuit Rules 18 and 27(e), 5 U.S.C. § 705, and 28 U.S.C. § 1651(a) for an immediate administrative stay, a narrowly tailored stay

pending review, and expedited consideration concerning Declaratory Ruling, *Paramount Global*, DA 26-1001, MB Docket No. 26-93 (Media Bur. rel. Sept. 17, 2026) (the “Ruling”) (Ex. 1).

This motion concerns only DA 26-1001. It is separate from FCC Order 25-43 and D.C. Circuit Case No. 26-1176. It does not seek to add DA 26-1001 to Case No. 26-1176, consolidate the proceedings, or incorporate allegations or evidence from that matter.

LiveVideo requests the following relief:

(1) An immediate administrative stay of the Ruling while the Court considers this motion, entered by 5:00 p.m. on Friday, October 2, 2026, or, alternatively, an administrative stay limited to paragraphs 29 and 31 of the Ruling.

(2) A stay pending review, limited to Respondents’ issuance, approval, certification, recognition, or other agency action that materially implements the Ruling by creating or materially enlarging new legal rights concerning foreign ownership, voting, governance, financing, information, data access, control, or comparable interests.

(3) Alternatively, a stay limited to the advance approvals in paragraph 31 and to the aggregate authority in paragraph 29 insofar as that authority would permit aggregate foreign equity above the 49.5 percent

structure addressed in the Ruling. See Ruling n.32 (Ex. 1); Paramount Pet. at 14–15 (Ex. 6); Ex. 16.

(4) An order requiring Respondents to file a prompt status report identifying the current status of LiveVideo's agency-level stay request and Application for Review, and identifying any agency-dependent implementation action taken or authorized under the Ruling while this motion is pending.

(5) Expedited consideration, with a response deadline and reply deadline set by the Court, and referral to the panel assigned to motions in related Case No. 26-1176 if the Court deems referral appropriate.

(6) If the Court determines that review is premature because Commission action on the Application for Review is required, abeyance or dismissal without prejudice rather than dismissal with prejudice.

The requested relief is narrow and runs only against Respondents' operation and implementation of the Ruling. It binds no private party. It does not unwind the 2025 Paramount-Skydance transaction, disturb existing ownership, alter contracts or ordinary operations, invalidate or modify the September 4, 2026 Letter of Agreement, compel a particular agency decision, require discovery, or decide the merits.

## EMERGENCY SUMMARY

On September 17, 2026, the Media Bureau issued the Ruling concerning foreign ownership of the entity that is expected to own CBS News, CNN, and other broadcast assets. Subject to the official order and record, the Ruling authorizes up to 100 percent aggregate indirect foreign equity, recognizes a reported 15.1 percent indirect interest associated with Saudi Arabia's Public Investment Fund ("PIF"), and grants specified foreign investors advance approval to hold noncontrolling interests of up to 20 percent. Ruling ¶¶ 29–31.

The Ruling relies in part on a September 4, 2026 Letter of Agreement filed by NTIA in MB Docket No. 26-93 on September 17, 2026 (ECFS No. 26110076883) (Ex. 5). The Letter of Agreement contains provisions concerning compliance monitoring, closing notices, security plans, modifications, enforcement, and termination. The agreement assigns significant monitoring functions to the Compliance Monitoring Agency and permits specified changes concerning monitoring agencies and corporate structure. The FCC is not the agreement's principal compliance administrator, and the foreign investors are not identified as signatories.

The central merits question is not whether Executive Branch participation is categorically unlawful. It is whether the FCC adequately explained how reliance

on an externally administered and potentially modifiable agreement satisfied the Commission's independent public-interest obligation under 47 U.S.C. § 310(b)(4).

LiveVideo filed an Application for Review on September 22, 2026, under ECFS Submission No. 26110077749 (Ex. 2). It filed a separate agency-level emergency stay request on the same date under ECFS Submission No. 26110077743 (Ex. 3) and supplemented its filings on September 28, 2026, under ECFS Submission No. 26110078556 (Ex. 4).

The FCC has not granted, denied, or otherwise disposed of those filings on the current record. LiveVideo does not treat the filings as denied or constructively denied. *See* Ex. 13.

On September 30, 2026, the Northern District of California dissolved the prior restriction on closing. ECF No. 266 at 4 (Ex. 8). The companies subsequently announced an anticipated October 6, 2026 closing, with a closing-contingent October 5 record date. Exs. 12, 15. Those developments create a concrete need for prompt preservation of meaningful review, while the requested relief remains limited to agency action and does not regulate the private parties.

## CIRCUIT RULE 27(e) STATEMENT

Counsel notified the Clerk's Office on September 29, 2026, that LiveVideo intended to file this emergency motion.

On October 1, 2026, counsel notified counsel for the Commission and the United States of the motion, the requested relief, and the request for expedited consideration.

LiveVideo also gave written notice through its Notice of Material Developments filed and served in Case No. 26-1176 on September 30, 2026 (Doc. #2195746).

Action is requested by 5:00 p.m. on Friday, October 2, 2026, because the record date is scheduled for October 5, 2026, contingent on closing, and the companies have announced an anticipated October 6, 2026 closing. The motion could not have been filed earlier in its present form because the prior order restricting closing remained in effect until September 30, 2026. ECF No. 266 at 4 (Ex. 8).

## ARGUMENT

### I. The Court should preserve meaningful review before new rights vest under the Ruling

LiveVideo recognizes that an application for review is a condition precedent to judicial review of delegated action. 47 U.S.C. § 155(c)(7). This Court has ordinarily required completion of the Commission's review process before reaching the merits of delegated Bureau action. *Int'l Telecard Ass'n v. FCC*, 166 F.3d 387, 388 (D.C. Cir. 1999) (per curiam); *Richman Bros. Records, Inc. v. FCC*,

124 F.3d 1302, 1303 (D.C. Cir. 1997); *BellSouth Corp. v. FCC*, 17 F.3d 1487, 1490 (D.C. Cir. 1994).

LiveVideo does not ask the Court to bypass that process or decide the Application for Review in the first instance. It preserves its position that the Ruling is final agency action because it consummated the Bureau's decisionmaking, became effective upon release, and authorizes present and future ownership interests. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

If the Court concludes that Commission action must precede merits review, LiveVideo requests abeyance or dismissal without prejudice. But the possibility that review may ultimately be premature does not eliminate the Court's ability to preserve the practical availability of review.

The All Writs Act permits relief "necessary or appropriate in aid of" prospective jurisdiction. 28 U.S.C. § 1651(a). It does not independently create jurisdiction, but it permits a court to prevent action that would frustrate future review. *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 9–10 (1942); *FTC v. Dean Foods Co.*, 384 U.S. 597, 603–05 (1966).

Section 705 similarly authorizes postponement of agency action where necessary to prevent irreparable injury pending review. 5 U.S.C. § 705. The Court may also preserve the practical availability of relief through abeyance rather than dismissing a premature petition with prejudice.

At a minimum, the Court should enter a short administrative stay while it considers the motion. An administrative stay would preserve the status quo and provide the Court time to determine whether further interim relief is appropriate. It would not decide the merits or require the Court to resolve all jurisdictional questions immediately.

**II. LiveVideo sought agency relief first, and the Commission has not acted**

Rule 18(a) ordinarily requires a movant to seek relief from the agency before moving in this Court. LiveVideo satisfied that requirement.

On September 22, 2026, LiveVideo filed its Application for Review under ECFS Submission No. 26110077749 (Ex. 2) and a separate emergency agency-level stay request under ECFS Submission No. 26110077743 (Ex. 3). It filed a supplement on September 28, 2026, under ECFS Submission No. 26110078556 (Ex. 4). LiveVideo's petition for review is docketed in this Court at Doc. #2195519 (filed September 28, 2026).

The Application for Review does not automatically stay the Ruling. *See* 47 C.F.R. § 1.115(h). The Commission may stay delegated action in its discretion, but the record does not establish that it has done so. *See* 47 C.F.R. § 1.102(b)(1), (b)(3).

The current record also does not establish that the Commission has granted, denied, set a schedule for, or otherwise disposed of the agency-level stay request or

Application for Review. LiveVideo therefore does not characterize either filing as denied or constructively denied. *See* Ex. 13.

The timing is critical. The Ruling authorizes new foreign-ownership interests and advance approvals. The private parties have announced an anticipated October 6 closing and a closing-contingent October 5 record date. Exs. 12, 15. If Respondents take agency-dependent action under the Ruling before the Commission or Court can act, new legal and reliance interests may vest before reviewability and legality are resolved.

LiveVideo does not ask the Court to direct the Commission to reach a particular result. It asks only for a temporary agency-directed preservation order and a prompt status report identifying the current status of the agency proceedings and any implementation action within Respondents' control.

**III. LiveVideo presents serious merits questions**

The Ruling raises substantial questions under Section 310(b)(4), the Administrative Procedure Act, and the Commission's delegation and foreign-ownership rules.

An agency acts arbitrarily and capriciously if it fails to consider an important aspect of the problem or fails to articulate a rational connection between the facts found and the choice made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency's action must be upheld, if at all, on

the grounds the agency itself invoked. *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

### A. The Ruling does not adequately explain the FCC's independent judgment

Section 310(b)(4) assigns the public-interest determination to the Commission. The Commission's rule permits consideration of Executive Branch concerns but requires the Commission to make an independent decision concerning the pending matter. 47 C.F.R. § 1.40001(b).

The Ruling relies substantially on the Executive Branch review and the Letter of Agreement. Ruling ¶¶ 2, 22–23, 26–28; Exs. 5, 9. But it does not adequately explain how the FCC independently evaluated:

i. the reported PIF interest;

ii. the interests associated with Abu Dhabi and Qatar;

iii. the aggregate foreign-equity authorization;

iv. the advance approval for future noncontrolling interests;

v. the practical rights associated with those interests; or

vi. the adequacy and enforceability of the safeguards.

The question is not whether Executive Branch expertise deserves respect. It does. See *China Telecom (Americas) Corp. v. FCC*, 57 F.4th 256 (D.C. Cir. 2022).

The question is whether the FCC independently exercised the judgment Congress assigned to it and explained the factual and legal basis for doing so.

### B. The Ruling does not explain how the Letter of Agreement operates as a Commission safeguard

The Letter of Agreement assigns important compliance functions to the Compliance Monitoring Agency. It provides for closing notice, post-closing security plans, agency review of those plans, modifications addressing agency concerns, and potential enforcement recommendations. Ex. 5 ¶¶ 2, 4–5, 11–12.

The Letter of Agreement does not, on its face, establish that:

a. the security plans must be filed with the FCC;

b. the FCC must approve the plans;

c. objections or non-objections must be filed with the FCC;

d. all compliance reports or breach findings must be referred to the FCC;

e. material modifications require Commission approval; or

f. termination of the agreement automatically triggers Commission review.

The Letter of Agreement also permits specified updates concerning monitoring agencies, ownership, mergers, acquisitions, and corporate structure. Ex. 5 ¶¶ 9–10, 16. The FCC did not adequately explain how those provisions interact

with the authorization in DA 26-1001 or what Commission-controlled protections remain if the agreement is modified or terminated.

LiveVideo does not contend that the Letter of Agreement is categorically invalid. The narrower argument is that the FCC could not treat an externally administered, modifiable, and potentially terminable arrangement as the operative safeguard without explaining how the Commission retained meaningful legal and practical control over the authorization.

**C. The advance authorization is insufficiently explained**

The Ruling grants specified investors advance authority to hold or increase noncontrolling interests up to 20 percent and permits aggregate foreign equity of up to 100 percent. Ruling ¶¶ 29, 31.

The Ruling does not adequately explain:

(1) which future holders and affiliates are covered;

(2) how foreign interests will be aggregated;

(3) how transferees and successor entities are treated;

(4) what approval or notice requirements apply to later increases;

(5) what monitoring occurs before and after an increase;

(6) how the Letter of Agreement applies to future holders; or

(7) what legal consequences follow if a future increase changes practical influence.

The issue is not whether foreign equity above a particular percentage is automatically unlawful. The issue is whether the FCC explained the legal basis, limits, safeguards, and monitoring structure for the prospective authority it granted.

**D. The Ruling does not adequately address practical influence**

The Bureau relied heavily on the nonvoting character of the proposed interests and the absence of specified governance or information rights. Ruling ¶ 22; Ex. 5 ¶ 7.

Those facts may be relevant, but nonvoting status does not necessarily resolve the significance of other rights or arrangements involving financing, information access, governance, restructuring, contractual obligations, affiliates, or practical influence.

The Ruling should have explained why the safeguards addressed the full range of material concerns presented in the record and why the three approved foreign-government investment vehicles, considered together, did not require additional analysis concerning aggregation or common influence.

**E. The Ruling does not explain the treatment of material record submissions**

The record included ownership supplements and other materials bearing on the identity of the investors, the ownership chains, and the safeguards relied upon by the Bureau. *See* Exs. 6, 7; Ruling n.1.

The Ruling cites certain materials but does not adequately explain whether and how they were considered by the FCC or the Executive Branch reviewers. The timing of those submissions does not itself establish misconduct or establish what the reviewers considered. It does, however, create a record-completeness and explanation issue.

An agency must address important record evidence and explain its treatment sufficiently to permit meaningful judicial review. *State Farm*, 463 U.S. at 43.

**F. The delegated-authority issue requires explanation**

LiveVideo preserves the question whether this matter presented a novel question of law, fact, or policy requiring referral to the Commission under 47 C.F.R. § 0.283(c).

The Ruling combines:

(1) a broad Section 310(b)(4) authorization;

(2) advance approval for future foreign ownership;

(3) foreign-government investment vehicles;

(4) practical-influence concerns;

(5) Executive Branch review; and

(6) an externally administered Letter of Agreement.

LiveVideo does not ask the Court to assume that the Bureau lacked authority. The question is whether the Bureau explained why this combination of

issues could be resolved under existing precedents and guidelines without Commission-level consideration.

On the day the Ruling issued, Commissioner Anna M. Gomez stated:

> The FCC just let some of the most repressive governments in the world indirectly control nearly all of a combined Paramount-Warner Bros. An investment this large in one of America's biggest media companies doesn't just buy equity, it secures influence over what gets said and what gets made. That's why I called for this new and novel issue to go to a full Commission vote given what's at stake. Instead, the FCC snuck this ruling out as a staff-level decision, with no public vote and no accountability for a call of this magnitude.

Statement of Commissioner Anna M. Gomez (Sept. 17, 2026), quoted in Matthew Keys, *FCC's Media Bureau Approves Foreign Bankrolling of Paramount-WBD Merger*, The Desk (Sept. 17, 2026) (Ex. 16). The Ruling does not explain why 47 C.F.R. § 0.283(c) did not require Commission-level action on that question.

If the issue should first be addressed by the agency, the proper remedy is explanation, referral, remand, or abeyance—not dismissal with prejudice.

### G. The unresolved disqualification request reinforces the need for preservation

LiveVideo filed a Supplemental Petition to Disqualify Chairman Brendan Carr in the relevant FCC dockets (filed July 31, 2026; ECFS No. 26110069211 (MB Docket No. 24-275); ECFS No. 26110069210 (MB Docket No. 26-93)) (Ex.

14). The filing requested disqualification, disclosure or certification of relevant ethics records, and a stay of further action.

LiveVideo relies on that filing only to establish its existence, contents, and requested relief. It does not ask the Court to treat the allegations in that filing as established facts. It also does not assert that Chairman Carr participated in DA 26-1001 absent proof in the official record.

The Ruling declined to address the disqualification request because the matter was being resolved under delegated Media Bureau authority. Ruling n.16. That explanation raises a procedural question because the request concerned the Commission's leadership, supervision, organization, and the agency's treatment of the underlying foreign-ownership proceeding.

The appropriate relief at this stage is not a judicial determination of disqualification. It is preservation of the status quo while the Commission identifies the status of the request and the role, if any, of the Chairman or his office in the proceeding.

**IV. Closing and implementation create a concrete preservation concern**

LiveVideo does not rely on speculation alone. The record identifies several concrete developments:

(1) The prior restriction on closing was dissolved on September 30, 2026. ECF No. 266 at 4 (Ex. 8).

(2) The parties announced an anticipated October 6, 2026 closing, subject to customary conditions. Ex. 15.

(3) Paramount identified an October 5 record date contingent on closing. Ex. 12.

(4) The Ruling provides for ownership interests and advance approvals that could be used in connection with the contemplated transaction. Ruling ¶¶ 29–31.

(5) The principal safeguards relied upon by the Bureau include post-closing processes that begin only after closing and may involve review by entities other than the FCC. Ex. 5 ¶¶ 2, 4, 14.

These facts support a narrow preservation order. They do not justify unwinding the transaction, regulating private parties, or assuming that every identified event will occur.

If new foreign-ownership rights vest before agency or judicial review, later vacatur or remand may not fully restore the prior position. The Court could face new ownership, financing, contractual, governance, or reliance arrangements involving parties that are not before the Court.

The harm is therefore not merely economic. It is the potential loss of meaningful review before the challenged agency authorization becomes embedded in a completed transaction and related ownership structure.

*Wisconsin Gas* requires irreparable injury to be certain, great, actual, and imminent rather than speculative. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). LiveVideo accordingly requests only a narrow administrative stay and agency-directed preservation relief tied to new implementation action within Respondents' control.

**V. The balance of harms favors a narrow agency-only stay**

The proposed stay would bind Respondents only. It would not bind Paramount, PIF, Warner Bros. Discovery, or any other private party.

It would not:

(1) unwind the 2025 Paramount-Skydance transaction;

(2) disturb existing ownership;

(3) terminate or modify contracts;

(4) alter ordinary operations;

(5) invalidate or modify the Letter of Agreement;

(6) require divestiture or restructuring;

(7) compel the FCC to approve or deny an application;

(8) require discovery;

(9) expand the record; or

(10) decide the merits.

The proposed order would prevent only new agency action that materially implements DA 26-1001 by creating or materially enlarging new legal rights concerning foreign ownership, voting, governance, financing, information, data access, control, or comparable interests.

That narrow restraint imposes less harm than allowing new agency-created rights to vest before the Court can determine whether the Ruling is reviewable and lawful.

## VI. The public interest favors reasoned agency decisionmaking and meaningful review

When the government is the opposing party, the balance of harms and public interest substantially overlap. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public interest favors:

(1) compliance with Section 310(b)(4);

(2) independent FCC judgment;

(3) reasoned agency decisionmaking;

(4) complete and reliable administrative records;

(5) lawful exercise of delegated authority;

(6) preservation of effective judicial review; and

(7) avoidance of irreversible implementation before threshold issues are resolved.

A stay would leave the Letter of Agreement and Executive Branch review in place. It would not prevent national-security agencies from performing their functions. It would simply prevent new FCC action from materially implementing the Ruling while the Court considers whether the agency adequately explained the authorization and whether the Commission's review process must occur first.

**VII. Scope and duration of requested relief**

The requested administrative stay should:

(1) apply only to Respondents;

(2) prevent only new agency action materially implementing DA 26-1001;

(3) preserve completed transactions, existing ownership, contracts, ordinary operations, and existing legal obligations;

(4) leave the Letter of Agreement in place;

(5) not require divestiture, unwinding, restructuring, discovery, or merits adjudication; and

(6) remain in effect pending further order of the Court or disposition of this motion.

If the Court grants a stay pending review, LiveVideo requests that it remain in effect until 14 days after the Commission acts on the Application for Review and the identified disqualification request, unless the Court orders otherwise.

In the alternative, LiveVideo requests a stay limited to paragraph 31 of the Ruling and to paragraph 29 insofar as it authorizes aggregate foreign equity above the 49.5 percent structure addressed in the order.

## CONCLUSION

LiveVideo respectfully requests that the Court:

(1) Enter an immediate administrative stay by 5:00 p.m. on Friday, October 2, 2026, pending further order of the Court or disposition of this motion.

(2) Limit the stay to Respondents' issuance, approval, certification, recognition, or other agency action that materially implements DA 26-1001 by creating or materially enlarging new legal rights concerning foreign ownership, voting, governance, financing, information, data access, control, or comparable interests.

(3) Grant a stay pending review on the same agency-only terms, or alternatively stay paragraph 31 and paragraph 29 to the extent it authorizes aggregate foreign equity above the 49.5 percent structure addressed in the Ruling.

(4) Direct Respondents to file a prompt status report identifying the current status of LiveVideo's agency-level stay request and Application for

Review and identifying any agency-dependent implementation action taken or authorized under the Ruling.

(5) Set an expedited briefing schedule, with the response and reply deadlines established by the Court.

(6) Refer the motion to the panel assigned to motions in Case No. 26-1176 if the Court deems referral appropriate.

(7) If the Court determines that review is premature because Commission action on the Application for Review is required, hold the petition in abeyance or dismiss it without prejudice.

(8) Grant such other relief as the Court deems just and proper.

Dated: October 1, 2026

Respectfully submitted,

/s/ Alfred C. Constants III
Alfred C. Constants III
Constants Law Offices, LLC
115 Forest Avenue, Unit 331
Locust Valley, New York 11560
(516) 200-9660
constantslaw49@gmail.com
*Counsel for Petitioner LiveVideo.AI Corp.*

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| LIVEVIDEO.AI CORP.,<br><br>Petitioner,<br><br>v.<br><br>FEDERAL COMMUNICATIONS COMMISSION<br><br>and UNITED STATES OF AMERICA,<br><br>Respondents. | No. 26-1257 |

*On Petition for Review of a Declaratory Ruling of the Media Bureau,*
*Federal Communications Commission, DA 26-1001, MB Docket No. 26-93*
*(rel. Sept. 17, 2026)*

**[PROPOSED] ORDER**

Upon consideration of Petitioner's Emergency Motion for an Administrative Stay, a Stay Pending Review, and Expedited Consideration, the responses, and the record, it is

ORDERED that Respondents shall file any response by [date]; and it is

FURTHER ORDERED that Petitioner may file any reply by [date]; and it is

FURTHER ORDERED that, pending further order of the Court, Respondents shall not issue, approve, certify, or give operative legal effect to any new agency authorization or comparable agency action that materially implements the advance-authorization provisions of DA 26-1001 and creates or enlarges a new legal interest in foreign ownership, voting, governance, control, or related rights; and it is

FURTHER ORDERED that this Order binds only Respondents and does not regulate any private party, unwind a completed transaction, alter existing ownership or contractual rights, restrict ordinary operations, or modify the September 4, 2026 Letter of Agreement; and it is

FURTHER ORDERED that this Order does not require the Commission to reach a particular merits result, decide the Application for Review by a date certain, or conduct discovery or record supplementation; and it is

FURTHER ORDERED that, if the Court determines that judicial review is premature, the matter may be held in abeyance or dismissed without prejudice.

*Per Curiam*

FOR THE COURT:
Clifton B. Cislak, Clerk

By: ______________________
Deputy Clerk

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(g)(1), I certify that this motion complies with the type-volume limitation of Rule 27(d)(2)(A) because, excluding the parts exempted by Rule 32(f), it contains 3,821 words.

This motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)–(6) because it was prepared in a proportionally spaced typeface using 14-point Times New Roman.

Dated: October 1, 2026

/s/ Alfred C. Constants III
Alfred C. Constants III

## CERTIFICATE OF SERVICE

I certify that on October 1, 2026, I filed this Emergency Motion for an Administrative Stay, a Stay Pending Review, and Expedited Consideration through the Court’s CM/ECF system, which will send notice of filing to all registered CM/ECF users. I further certify that I served a copy on each party admitted to participate in MB Docket No. 26-93, by electronic mail and first-class mail, and that I transmitted courtesy copies to the General Counsel of the Federal Communications Commission and to the Attorney General of the United States.

Dated: October 1, 2026

/s/ Alfred C. Constants III

Alfred C. Constants III

## ADDENDUM

(D.C. Cir. R. 18(a)(4), 27(a)(4))

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner LiveVideo.AI Corp. states that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A. Parties and Amici. Petitioner is LiveVideo.AI Corp. Respondents are the Federal Communications Commission and the United States of America. No intervenors or amici have appeared in this Court.

B. Ruling Under Review. The ruling under review is Declaratory Ruling, *Paramount Global*, MB Docket No. 26-93, DA 26-1001 (Media Bur. rel. Sept. 17, 2026).

C. Related Cases. The related proceeding is *LiveVideo.AI Corp. v. FCC*, No. 26-1176 (D.C. Cir.), involving FCC Order 25-43 in MB Docket No. 24-275. LiveVideo does not seek consolidation and does not incorporate allegations or evidence from that proceeding.

A related district-court proceeding is *California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.). ECF Nos. 266, 267 (Ex. 8).

Dated: October 1, 2026

/s/ Alfred C. Constants III
Alfred C. Constants III

## DECLARATION OF ALFRED C. CONSTANTS III

I, Alfred C. Constants III, declare as follows:

1. I am counsel for Petitioner LiveVideo.AI Corp. I make this declaration based on personal knowledge and on records maintained in the ordinary course of this matter.

2. The exhibits submitted with the motion are true and correct copies of the documents identified in the exhibit index, obtained from the sources identified there.

3. LiveVideo filed its Application for Review of DA 26-1001 on September 22, 2026, under ECFS Submission No. 26110077749.

4. LiveVideo filed a separate agency-level emergency stay request on September 22, 2026, under ECFS Submission No. 26110077743.

5. LiveVideo filed a supplement on September 28, 2026, under ECFS Submission No. 26110078556.

6. Based on a review of the FCC docket materials available as of 10:01 a.m. on October 1, 2026 (Ex. 13), I have not located an FCC order granting, denying, or otherwise disposing of LiveVideo’s Application for Review or agency-level stay request.

7. The September 4, 2026 Letter of Agreement was filed by NTIA in MB Docket No. 26-93 on September 17, 2026, under ECFS Submission No. 26110076883.

8. The documents submitted with the motion are offered for the limited purposes stated in the motion and exhibit index. LiveVideo does not offer party pleadings, press reports, congressional letters, or the disqualification petition for the truth of disputed factual allegations.

9. The records concerning the anticipated October 6, 2026 closing and the October 5, 2026 record date are submitted to establish the statements made in the official corporate and court records. LiveVideo does not ask the Court to assume that the closing will occur or that every announced event will take place.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 1, 2026.

/s/ Alfred C. Constants III
Alfred C. Constants III

## INDEX OF EXHIBITS

Exhibit 1 — DA 26-1001, Declaratory Ruling, *Paramount Global*, MB Docket No. 26-93, released September 17, 2026.

Exhibit 2 — LiveVideo Application for Review, filed September 22, 2026, ECFS Submission No. 26110077749.

Exhibit 3 — LiveVideo Emergency Request for Agency-Level Stay, filed September 22, 2026, ECFS Submission No. 26110077743.

Exhibit 4 — LiveVideo Supplement, filed September 28, 2026, ECFS Submission No. 26110078556.

Exhibit 5 — September 4, 2026 Letter of Agreement, filed by NTIA on September 17, 2026, ECFS Submission No. 26110076883.

Exhibit 6 — Paramount Petition for Declaratory Ruling, dated April 24, 2026, and filed April 27, 2026. ECFS No. 104272462615916.

Exhibit 7 — Paramount supplement concerning investor ownership chains, filed June 23, 2026. ECFS No. 26109885351; see Ruling n.1.

Exhibit 8 — Orders and consent decree in *California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.), including ECF Nos. 170, 266, and 267.

Exhibit 9 — NTIA or Committee filing transmitting the conditional no-objection to the FCC. (NTIA, Petition to Adopt Conditions to Authorization and License, filed September 17, 2026, on behalf of the Committee; see Ruling ¶ 17 & n.19).

Exhibit 10 — Relevant congressional correspondence, offered only to establish the fact of filing and the statements made. (Letters dated March 23, May 20, and June 18, 2026; see Ruling n.18).

Exhibit 11 — Paramount Skydance Corp. Form 10-Q for the quarter ended June 30, 2026, relevant excerpts. SEC Accession No. 0002041610-26-000054.

Exhibit 12 — Paramount Skydance Corp. Form 8-K filed September 25, 2026, relevant excerpts. SEC Accession No. 0001104659-26-111034.

Exhibit 13 — FCC ECFS, Proceeding 26-93 History Report (generated October 1, 2026), reflecting docket status as of the ECFS search conducted at 10:01 a.m., October 1, 2026.

Exhibit 14 — LiveVideo Supplemental Petition to Disqualify Chairman Brendan Carr, offered only to establish its filing, contents, and requested relief. Filed July 31, 2026; ECFS No. 26110069211 (MB Docket No. 24-275); ECFS No. 26110069210 (MB Docket No. 26-93).

Exhibit 15 — Joint press release of Paramount Skydance Corp. and Warner Bros. Discovery, Inc., announcing an anticipated October 6, 2026 closing, issued September 30, 2026, as posted on the Warner Bros. Discovery investor-relations website.

Exhibit 16 — Matthew Keys, "FCC's Media Bureau Approves Foreign Bankrolling of Paramount-WBD Merger," The Desk (Sept. 17, 2026) (quoting Statement of Commissioner Anna M. Gomez), offered only to establish the statement made.

# EXHIBIT 1

DA 26-1001, Declaratory Ruling, Paramount Global, MB Docket No. 26-93
(Media Bur. rel. Sept. 17, 2026).

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paramount Global | ) | MB Docket No. 26-93 |
| | ) | |
| Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended | ) ) ) | |

**DECLARATORY RULING**

**Adopted: September 17, 2026** **Released: September 17, 2026**

By the Chief, Video Division, Media Bureau:

## I. INTRODUCTION

1. In this Declaratory Ruling (Declaratory Ruling), the Video Division, Media Bureau (Bureau), grants a petition for a declaratory ruling (Petition)[1] filed by Paramount Global (Paramount), on behalf of itself and its subsidiaries that operate broadcast television stations (Licensees).[2] The Petition asks the Commission to exercise its authority delegated to it by Congress to permit indirect foreign ownership in Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmarks established in section 310(b)(4) of the Communications Act of 1934, as amended (the Act),[3] and sections 1.5000 *et seq.* of the Commission's rules.[4] As discussed below, we grant Paramount's request for its

[1] Petition for Declaratory Ruling of Paramount Global (filed Apr. 24, 2026). Paramount filed a supplement (Supplement) on June 23, 2026, amending Exhibit B of the Petition to add the "direct equity and voting interests that each individual and entity will hold in the entity or entities immediately downstream" and include "clarifications in the accompanying notes regarding certain ownership interests." Supplement at 1.

[2] A complete list of Licensees is provided in the Attachment.

[3] Section 310(b)(4) of the Act states:

> No broadcast or common carrier or aeronautical en route or aeronautical fixed radio station license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

47 U.S.C. § 310(b)(4).

[4] 47 CFR § 1.5000 *et seq.* *See Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, As Amended,* GN Docket No. 25-149, Report and Order, 41 FCC Rcd 831 (Jan. 30, 2026) (*2026 Foreign Ownership Order*) (codifying definitions, concepts, and practices underlying the foreign ownership rules to streamline the Commission's review processes); *Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 15-236, Report and Order, 31 FCC Rcd 11272 (2016) (*2016 Foreign Ownership Order*), *pet. for recon. dismissed*, 32 FCC Rcd 4780 (2017).

foreign investors, including certain prospective foreign investors (Foreign Investors),[5] to indirectly hold equity in excess of 25%, in the aggregate; specific approval[6] for the Foreign Investors to hold indirectly more than 5% each of the equity in Paramount through newly issued non-voting Class B shares;[7] and advance approval[8] for each of the Foreign Investors to hold up to 20% indirect equity in Paramount at some future time.[9] Further, as explained below, we conclude that in light of the commitments and undertakings set forth in the Letter of Agreement (LOA),[10] we do not grant the following requests made by Paramount, as they are now moot: foreign voting interests in excess of 25% in the aggregate; specific approval for each of the Foreign Investor's voting interests; and advance approval for each of the Foreign Investor's voting interests.[11]

2. Upon review of the Petition and consideration of the record of this proceeding, we find that the public interest would be served by granting the Petition, subject to compliance with the LOA's terms and the Commission's rules, as described below.[12] As discussed *infra*, Paramount must monitor foreign ownership to ensure continued compliance with the Commission's rules, including section 1.5004; Paramount must comply with the LOA, including, but not limited to, the commitment that "each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and "that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition

---

[5] The Foreign Investors include: (i) Public Investment Fund; (ii) L'Imad 1st SPV 2 Exempt RSC Ltd; (iii) L'imad 1st Holding 1 Exempt RSC Ltd; (4) L'imad 1st Capital Holding Ltd; (5) L'imad Holding Company – P.J.S.C; (6) QIA TMT Holding LLC; and (7) Qatar Investment Authority. *See infra* paras. 5-7.

[6] Under section 1.5001(i)(1) of the Commission's rules, petitions for a declaratory ruling are required to identify and seek specific approval for any foreign individual, entity, or group that holds or would hold, directly and/or indirectly, more than 5% of the equity and/or voting interests, or a controlling interest, in the licensee's controlling U.S. parent, subject to certain exemptions, including an exemption that increases the specific approval threshold to 10% for certain institutional investors. 47 CFR § 1.5001(i)(1), (i)(4).

[7] Petition; Reply Comments of Paramount Global at 1 (filed June 11, 2026) (Reply Comments).

[8] 47 CFR § 1.5001(k).

[9] Petition at 16-17. We note that after the Commission grants a declaratory ruling pursuant to section 310(b)(4) of the Act, petitioners have an affirmative duty under section 1.5004 to monitor and calculate their foreign equity and voting interests in a manner consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 and 1.5003 of the Commission's rules. 47 CFR §§ 1.5002-1.5004. *See infra* note 126. We also note that Paramount's specific approval, advance approval, and aggregate approval requests do not contemplate that actual voting interests will be held by any of the proposed Foreign Investors. *See infra* nn. 33 & 37.

[10] Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, Paramount Global to Chief, Foreign Investment Review Section (FIRS) and Deputy Chief, Compliance and Enforcement (FIRS), on behalf of the Assistant Attorney General for National Security, United States Department of Justice, National Security Division (dated Sept. 4, 2026) (LOA). As set forth in the LOA, "Foreign Investors" are "those foreign investors for which specific and advanced approval was requested in the Paramount Petition." *Id.* at 3 (citing Petition at 16-17). *See also* para. 1, note 5, *supra*.

[11] Under section 310(b)(4) of the Act, Commission approval is required only when the aggregate foreign ownership exceeds the statutory benchmarks. Accordingly, aggregate foreign equity and/or voting interests below the 25% benchmarks do not require a declaratory ruling from the Commission.

[12] For a discussion of the terms and conditions Paramount is subject to under this Declaratory Ruling, see *infra* para. 32.

could be subject to a referral to the Committee."[13] Paramount also must obtain Commission approval before its foreign ownership exceeds the terms and conditions of this Declaratory Ruling, including, but not limited to, seeking a new declaratory ruling if Paramount's foreign voting interests in the aggregate exceed 25%, or if it proposes to change the voting interests of any of the approved Foreign Investors under this Declaratory Ruling.

3. On April 27, 2026, the Bureau released a public notice[14] establishing a pleading cycle with comments due on May 27, 2026, and reply comments due on June 11, 2026, and designating the proceeding as "permit-but-disclose" in accordance with the Commission's *ex parte* rules.[15] We received several timely filed comments,[16] *ex parte* letters,[17] and other submissions to the Commission.[18] Also submitted into the record is a letter received from the National Telecommunications and Information Administration (NTIA) on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee).[19] Consistent with the Committee's input, as discussed below, we find that it will serve the public interest to grant the Petition, subject to the conditions set forth in this Declaratory Ruling.

---

[13] LOA at 3-4.

[14] *Media Bureau Announces Filing of Petition for Declaratory Ruling by Paramount Global*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) (Public Notice).

[15] 47 CFR § 1.1206.

[16] *See, e.g.*, Comments of PRESSPAGE ENTERTAINMENT INC (filed Apr. 28, 2026) (PRESSPAGE Comments); Comments of Collin Hotchkiss (filed Apr. 28, 2026); Comments of Ron Beres (filed Apr. 29, 2026); Comments of Aidan Gordon (filed May 5, 2026); Comments of Patrick O. Ingle (filed May 7, 2026); Comments of W. Lee McVey, PE (Ret.) (filed May 7, 2026); Comments of Zachary Beaudoin (filed May 18, 2026); Comments of Chad Ray (filed May 20, 2026); Comments of Franklin Broadcasting LP (filed May 27, 2026) (Franklin Comments); Comments of Free Press (filed on May 27, 2026) (Free Press Comments). In addition, we received a number of late-filed comments. Between July 13 and July 14, 2026, LiveVideo.AI Corp. (LiveVideo.AI) submitted multiple filings, including a Motion for Leave to Accept Late-Filed Comments of LiveVideo.AI Corp. and Notice of Errata (together, LiveVideo.AI Comments); Written *Ex Parte* Presentation of LiveVideo.AI Corp. (LiveVideo.AI *Ex Parte*); and Exhibit; on July 31, 2026, LiveVideo.AI submitted a "Supplemental Petition to Disqualify Chairman Brendan Carr for Bias and Conflict of Interest." (LiveVideo.AI Supplement). We note that LiveVideo.AI raises claims such as alleged conflicts of interest, or submits documentation related to various pending litigations related to prior Commission transaction decisions. We decline to resolve LiveVideo.AI's conflict of interest claims because they fall outside the scope of this proceeding. The issue of whether the Commission's Chairman should disqualify himself, *see* LiveVideo.AI Supplement, is not properly raised at this stage of the proceeding because this Petition is being resolved under the Media Bureau's delegated authority. *See infra*, paras. 33-34 (citing 47 CFR §§ 0.61, 0.283). On July 22, 2026, Austin Olachea filed an Informal Objection and Supplemental Comments, both of which cite the incorrect docket number. On September 11, 2026, LiveVideo.AI filed an "Amended Petition to Deny, or in the Alternative Informal Objection; Motion for Leave to File Out of Time; Request for Targeted Supplementation; and Request to Withhold Action Pending a Complete Record)," which states that the filing supersedes its September 4, September 7, and September 8, 2026 submission filings.

[17] *See, e.g.*, *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 5, 2026) (PRESSPAGE May 5, 2026 *Ex Parte* Letter); *Ex Parte* Letter of PRESSPAGE ENTERTAINMENT INC (filed on May 22, 2026) (PRESSPAGE May 22, 2026 *Ex Parte* Letter); and *Ex Parte* Letter of LiveVideo.AI Corp. (filed on July 14, 2026).

[18] A few congressional letters addressed to FCC Chairman Brendan Carr were filed in the docket. *See, e.g.*, Letter from Sen. Cory A. Booker, et al., United States Senate, to Hon. Brendan Carr, FCC (dated Mar. 23, 2026); Letter from Rep. Sam T. Liccardo, United States House of Representatives, to Hon. Brendan Carr, FCC (dated May 1, 2026); Letter from Sen. Maria Cantwell, et al., United States Senate, to Hon. Brendan Carr, FCC (dated May 20, 2026).

[19] Petition to Adopt Conditions to Authorization and License, NTIA, MB Docket No. 26-93 (filed Sept. 17, 2026) (Committee Petition); LOA.

## II. BACKGROUND

4. Paramount is a Delaware corporation that, through the Licensees (each a direct or indirect wholly owned subsidiary of Paramount), operates 28 broadcast television stations across the United States.[20] Paramount is a direct, wholly owned subsidiary of Paramount Skydance Corporation (Paramount Skydance), which, according to Paramount, is a "leading global media, streaming, and entertainment company that creates premium content and experiences for audiences worldwide."[21] Paramount Skydance has two classes of stock: Class A common stock, which has 100% of the voting interests in Paramount Skydance, and Class B common stock, which are non-voting shares.[22] The Ellison family indirectly holds 77.5% of the Class A shares as well as approximately 40% of the non-voting Class B shares; RedBird Capital Partners (RedBird) indirectly holds the remaining 22.5% of the Class A shares and approximately 9% of the non-voting Class B shares.[23]

### A. Proposed Investment

5. The Petition is filed in connection with a planned new investment (Proposed Investment) that would increase indirect foreign investment in Paramount.[24] As described in the Petition, in connection with the proposed merger of Paramount Skydance and Warner Bros. Discovery, Inc., on February 27, 2026, Lawrence Ellison, directly and indirectly, and a RedBird investment fund entered into subscription agreements to purchase up to approximately $47 billion of non-voting Paramount Skydance Class B shares.[25] Lawrence Ellison and RedBird then entered into agreements to assign those purchase rights to others, including, as is relevant here: (i) The Public Investment Fund, a sovereign wealth fund and instrumentality of Saudi Arabia (ii) L'Imad 1st SPV 2 Exempt RSC LTD, an investment vehicle of L'imad Holding, an Abu Dhabi government investment fund, and (iii) QIA TMT Holding LLC, an investment vehicle of the Qatar Investment Authority.[26]

6. As a result of the Proposed Investment, "the Ellison family and [RedBird Capital Partners] together will continue to hold the largest equity stake in Paramount Skydance and will continue to be the indirect owners of 100 percent of Paramount Skydance Class A Common Stock, representing 100 percent of the voting shares of, and thus control of, Paramount Skydance."[27] Paramount explains that the Proposed Investment will "not result in a transfer of control of Paramount" and that the "Ellison

[20] Petition at 3 (internal citations omitted).

[21] *Id*. Paramount Skydance's portfolio includes assets such as the "national CBS television network, Paramount Pictures, Nickelodeon, MTV, Comedy Central, and BET. The company also operates streaming platforms, including Paramount+ and Pluto TV." *Id*. Paramount Skydance also holds "extensive libraries of television and film titles, engages in content production and distribution, and provides advertising solutions." *Id*.

[22] *Id.* at 3.

[23] *Id.* at 3-5.

[24] *Id*. at 5-6.

[25] *Id*.

[26] *Id*.

[27] *Id*. The Petition notes that there are foreign investors in the RedBird funds. According to the Petition, however, "[t]he limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. Therefore, the foreign insulated limited partners will be deemed to have voting interests in RB Tentpole LP equal to their equity interest." *Id*. at 15; *see also* 47 CFR § 1.5003 (providing insulation criteria for interests in limited partnerships) and 47 CFR § 1.5002(b)(2)(ii)(B) (explaining how to calculate indirect voting interests and stating that "[a] partner of a limited partnership (other than a general partner) or partner of a limited liability partnership that satisfies the insulation criteria specified in § 1.5003 shall be treated as an insulated partner and shall be deemed to hold a voting interest in the partnership that is equal to the partner's equity interest.")).

family will retain a majority of the voting interests and control of Paramount."[28] Therefore, Paramount notes that "no other application is being filed in connection with this Petition."[29] Paramount reiterates that "[a]ll voting rights and other decision-making functions in Paramount will be controlled by the Ellison family through U.S. entities."[30]

### B. Petition For Declaratory Ruling

7. To effectuate the purchases described above, pursuant to section 1.5001(h) of the Commission's rules,[31] Paramount requests approval for its foreign investors, including the Foreign Investors, to indirectly hold equity in excess of 25% in Paramount, the controlling U.S. parent of the Licensees.[32] Paramount also requests specific approval for certain foreign entities that individually will hold, indirectly, more than 5% of the equity[33] of Paramount.[34] In particular, Paramount makes the following requests for specific approval: (1) Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia); (2) L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (3) L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates); (4) L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates); (5) L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates); (6) QIA TMT Holding LLC (10.6% equity) (Qatar); and (7) Qatar Investment Authority

[28] Petition at 2. According to the Petition, David Ellison, a U.S. citizen, "is the sole manager of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, which are the holding companies that each respectively own 100 percent of the Pinnacle Media entities. Sayonara, LLC ('Sayonara') is the sole member of Hikouki, LLC, Furaito, LLC, and Aozora, LLC. Sayonara is owned and controlled by The Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended (the 'Trust'), which is controlled by Lawerence J. Ellison. David Ellison has granted to Sayonara a voting interest equal to approximately 35.5 percent in each of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, and David Ellison retains an approximately 64.5 percent interest. In addition, by voting proxy, the Pinnacle Media entities have each granted David Ellison 64.5 percent of their respective voting interests in [Harbor Lights Entertainment, Inc. (Harbor Lights)] (and indirectly in Paramount Skydance) and have granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of Harbor Lights and Paramount Skydance, each in accordance with these voting percentages. David Ellison also serves as the Chairman and CEO of Paramount Skydance. Sayonara does not have any veto rights, or any special or outsized voting rights, in Harbor Lights or Paramount Skydance as a result of its minority voting interests." *Id*. at 4-5, 10. We note that Harbor Lights was formerly named National Amusements, Inc. *Id*. at 3, n.5.

[29] *Id*. at 2.

[30] *Id*. at 14, 21. Reply Comments at 7. Paramount further states that "[it] has repeatedly committed, and reaffirms here, that no foreign investor will have the ability to control Paramount or the Licensees." *Id*.

[31] 47 CFR § 1.5001(h).

[32] Reply Comments at 1; Petition at 2, 14-16. According to the Petition, "[t]he foreign-owned interests through Class B shares is expected to be approximately 49.5 percent in the aggregate after the Proposed Investment." Petition at 15. Paramount further states that "[a]lthough Paramount expects that existing and prospective foreign investors will indirectly hold slightly less than 50 percent of Paramount's equity interests after consummating the Proposed Investment described below, Paramount seeks approval for foreign investors in the aggregate to indirectly hold up to 100 percent of its equity and/or voting interests in light of routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a))." *Id*. at 2.

[33] Paramount states that the "voting interest of investors holding only Class B shares will be zero" but "[o]ut of an abundance of caution, to the extent that the Commission deems holders of non-voting equity in a corporation to have a 'deemed' voting interest equal to their equity interest[.]" *Id*. at 16. Paramount further states that "foreign investors' equity interests will consist entirely of passive, non-voting stock." Reply Comments at 7. Paramount also states that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future," and that any changes that would accord foreign investors increased rights would be reviewed independently of this order. *Id*. at 8.

[34] 47 CFR § 1.5001(i); Petition at 16-17.

(10.6% equity) (Qatar).[35] Pursuant to section 1.5001(k) of the Commission's rules,[36] Paramount also requests advance approval for each of the foregoing foreign entities seeking specific approval to increase its indirect equity interests in Paramount up to a non-controlling 20% at some future time.[37]

### C. Public Interest Showing

#### 1. Paramount's Public Interest Showing

8. Paramount asserts that grant of the Petition will serve the public interest, as it would "afford Paramount and, in turn, the Licensees, greater access to capital, including from foreign sources," which would enable Paramount to "compete more effectively in the provision of television broadcast services and in the broader video programming marketplace."[38] Specifically, Paramount provides that it recently has been making "strategic investments to improve the Licensees' newsgathering and reporting operations, both nationally and at a local level."[39] For example, Paramount notes that efforts are under way to rejuvenate "the Licensees' online presence, allowing them to meet viewers where they are and ensuring their continued relevance to the communities that they serve, in turn enhancing the availability of reliable, high-quality, non-paywalled local and national news across the country."[40]

9. To this end, Paramount explains that "[r]educing barriers to further investment in Paramount, including by allowing the company to pursue additional capital from non-U.S. investors, will enable it to allocate additional resources to preserve and enhance the legacy and broad reach of the Licensees' television broadcast operations."[41] The Petition further states that "[i]n turn, Paramount's ability to compete in the television broadcast and broader video marketplaces will improve, thereby promoting the strength of the industry overall."[42] Paramount provides that the "new equity investment" will better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[43]

10. Finally, Paramount notes that "grant of this Petition will not present any national security, law enforcement, foreign policy, or trade policy concerns."[44] Specifically, Paramount explains, the

---

[35] Petition at 16-17.

[36] 47 CFR § 1.5001(k).

[37] Petition at 16-17. Under the Commission's foreign ownership rules, a petitioner may request advance approval in its petition for a foreign individual and/or entity seeking specific approval to increase its equity and/or voting interests at some future time. 47 CFR § 1.5001(k). With regard to voting rights, Paramount states that the new Class B shares will have no voting rights and that it "will return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future." Reply Comments at 8.

[38] Petition at 19.

[39] *Id*. at 20.

[40] *Id*. at 20-21. In Reply Comments, Paramount also states that its "broadcast stations provide a critical link to local communities, delivering lifesaving information during emergency situations (like tornadoes, hurricanes, blizzards, and wildfires)." Reply Comments at 5. Further, Paramount provides that "at a time when local news operations across the country are contracting and communities are losing access to trusted sources of local journalism, investment that will bolster Paramount's capacity to maintain robust news operations across its station group should be welcomed. And indeed, granting the Petition will support continued investment in reporters, producers, and technical staff at the Licensees' stations, as well as in the digital platforms and tools necessary to reach audiences where they increasingly consume news content." Reply Comments at 5-6.

[41] Petition at 21.

[42] *Id.*

[43] *Id.*

[44] *Id.*

"Ellison family (which includes only U.S. persons) will retain a majority of the voting interests and control of Paramount, and each of the entities through which the Ellison family holds its interests in the company is a U.S. entity."[45]

### 2. Comments and *Ex Parte* Submissions

11. *Foreign Ownership Concerns*. A few commenters raise public interest considerations pursuant to section 310(b)(4) of the Act.[46] For example, Free Press asserts that Paramount fails to demonstrate that the Proposed Investment would serve the public interest.[47] First, Free Press questions Paramount's public interest rationale that the Proposed Investment would afford Paramount and its Licensees greater access to capital to allow it to compete more effectively in the marketplace, arguing that there has "never been a U.S. broadcasting company with as much 'access to capital' as Paramount currently can find from its controlling shareholder."[48] Free Press further argues that Paramount, "does not need to acquire WBD in order to continue profitably operating the CBS network and its local broadcast stations," as "[n]one of the 28 stations are 'failing' or 'failed'. . . ."[49] Second, Free Press asserts that Paramount's "[g]eneric rhetoric" about the public interest benefits of permitting "foreign governments to control up to 100 percent of one of the Big 4 U.S. broadcasting networks and station owners" does not satisfy the Commission's section 310(b)(4) standard.[50] Third, according to Free Press, "[Paramount] has not demonstrated that there are no other lawful methods of financing the transaction other than obtaining a waiver so that three foreign governments can hold up to 100 percent of the equity interests in these domestic broadcasting operations."[51] Finally, Free Press argues that "Paramount will begin its ownership of WBD with nearly $80 billion in debt, which will require deep cuts to Paramount's pre-merger holdings and existing operations" and that "[t]hese cuts will negatively impact the public interest, particularly at Paramount's broadcast units."[52] Franklin Broadcasting LP (Franklin), similarly argues that the "Commission should examine whether the proposed foreign sovereign wealth fund, foreign government-related or other substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[53]

*12.* *National Security.* Other commenters raise national security concerns associated with the Proposed Investment and propose that the Commission coordinate with Executive Branch agencies for their views on national security.[54] Specifically, according to PRESSPAGE, even "when structured as non-controlling or non-voting equity, ownership by foreign state-linked entities raises material national-

[45] *Id.*

[46] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 3, 7; and Free Press Comments at 3-10.

[47] Free Press Comments at 6.

[48] *Id*. at 7.

[49] *Id*. at 8.

[50] *Id*.

[51] *Id*.; Free Press asserts that the appropriate standard for reviewing Paramount's request is as a "waiver" under the Commission's rules. Specifically, "[t]o receive a waiver under the Commission's rules, petitioners must demonstrate that 'the underlying purpose of the rule(s) would not be served or would be frustrated by application to the instant case, and that a grant of the requested waiver would be in the public interest.' Or demonstrate that 'in view of unique or unusual factual circumstances of the instant case, application of the rule(s) would be inequitable, unduly burdensome or contrary to the public interest, or the applicant has no reasonable alternative.'" *Id*. at 5. As discussed in more detail *infra* para. 24, we note that waiver is not the applicable standard in the Commission's foreign ownership review under section 310(b)(4) of the Act.

[52] Free Press Comments at 9.

[53] Franklin Comments at 3.

[54] *See, e.g.*, PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2.

security considerations."[55] PRESSPAGE presses the Commission to coordinate closely with the Executive Branch agencies for their views on any national security concerns and opines that the Commission "should not act until that review is complete and its recommendations are incorporated into the record."[56] Franklin similarly requests that the Commission consider whether approval of the Petition should be conditioned on, or accompanied by, further inquiry into certain matters, including coordination with "Team Telecom and other relevant national-security reviewers concerning foreign sovereign wealth fund participation, foreign-government-related investment and any other substantial foreign interests identified in the record."[57]

13. To mitigate potential national security concerns, PRESSPAGE and Franklin urge the Commission to consider implementing various safeguards.[58] For example, PRESSPAGE states that, even if the Commission finds that foreign ownership above 25% is permissible, it should evaluate whether "additional safeguards are necessary to preserve these core public-interest values."[59] To that end, PRESSPAGE suggests that post-transaction structural separation can fully resolve national security concerns. Specifically, PRESSPAGE proposes that "all U.S. news and broadcast functions would be placed in a **wholly U.S.-owned and U.S.-controlled public entity**, while all studio and entertainment operations would be placed in a **separate public entity** that may permissibly receive foreign investment under §310(b)(4)."[60] Similarly, Franklin states that the Commission should "preserve and examine the availability of structural safeguards if the record shows that formal voting-control protections are insufficient to address practical foreign influence, national-security concerns, editorial independence, localism, public-service obligations or capital-structure pressure affecting sensitive broadcast, news, linear and advertising-supported assets."[61]

14. *Control and Influence.* Several commenters also assert that, in addition to its consideration of "formal voting control" as part of its section 310(b)(4) review of the Petition, the Commission should address the "practical influence" that the Foreign Investors may have over Paramount.[62] In particular, Franklin "recognizes that Section 310(b)(4) proceedings often focus on formal ownership, voting control and attributable interests,"[63] and that "foreign investors, directly or indirectly, may receive governance, contractual, financial, informational or economic rights that could create practical influence over the parent company or its sensitive communications assets,"[64] but it asserts that "[w]here substantial foreign equity may participate economically in the parent of major U.S. broadcast,

---

[55] PRESSPAGE Comments at 1.

[56] *Id*. at 2.

[57] Franklin Comments at 9-10.

[58] *See* PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2-4, Franklin Comments at 5-8.

[59] PRESSPAGE Comments at 2.

[60] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2 (emphasis in the original).

[61] Franklin Comments at 1. Franklin also suggests that if the Commission examines a structural separation or similar safeguard, it should consider commitments addressing: (1) "local-news continuity;" (2) "national-news availability;" (3) "editorial-independence protocols;" (4) "independent governance for sensitive news assets;" (5) "public reporting on local-news and public-service obligations;" (6) "preservation or expansion of free over-the-air and free ad-supported news distribution;" (7) "emergency and public-affairs information distribution;" (8) children's educational and informational programming, where applicable;" (9) protection of newsroom decision-making from improper foreign, parent-company or creditor influence; and (10) "compliance reporting sufficient to allow the Commission to monitor performance." *Id*. at 7.

[62] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[63] Franklin Comments at 4.

[64] *Id*. at 5.

local news and national news assets, the Commission should examine not only formal voting control, but also practical influence."[65] Similarly, PRESSPAGE states that "foreign equity—particularly when concentrated or accompanied by governance rights—can create channels for influence over editorial judgment, newsroom priorities, or the flow of information to the American public."[66] Free Press also asserts that while Paramount "goes to great lengths to provide assurances that the foreign governments financing this deal will have no control or say over CBS Network and Paramount's 28 FCC licensed full-power TV stations, foreign governments don't write checks for tens of billions of dollars in exchange for a share of a business with declining revenues."[67] Free Press goes on to state that "[c]ontrol over for-profit, commercial domestic news media by any government is an extraordinary situation that would surely strike most Americans as unseemly, precisely because of the utility of the news media as a propaganda tool for those governments."[68]

### 3. Paramount's Reply

15. In reply comments, Paramount asserts that the commenters ignore the substantial public interest benefits of the Proposed Investment.[69] Paramount further asserts that Free Press's comments "appear grounded in a presumption that foreign investment in broadcast stations is contrary to the public interest, but Commission precedent holds the opposite."[70] Accordingly, "[s]ection 310(b)(4) provides that foreign ownership of broadcast licenses should be barred *only* "if the Commission finds that the public interest will be served by the refusal or revocation of such license," but "[n]o such finding could be made on the record of this proceeding."[71] Indeed, Paramount argues that the commenters ignore the Proposed Investment's substantial public interest benefits and states that the "Proposed Investment will yield precisely the kinds of public interest benefits that the Commission has identified as supporting approval of foreign investment in other broadcast licensees under Section 310(b)(4), and no commenter has articulated a credible basis for concluding otherwise."[72] Further, Paramount argues that Free Press mischaracterizes the applicable legal standard for the Commission's foreign ownership approval process. Specifically, Paramount provides that "[i]gnoring the Commission's well-established foreign ownership approval process, as codified in clearly defined rules, Free Press mischaracterizes the applicable legal standard by suggesting that there is a very high bar for 'waiv[ing]' the 25 percent indirect foreign ownership benchmark."[73]

---

[65] *Id*. at 2.

[66] PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2.

[67] Free Press Comments at 9.

[68] *Id*. at 10.

[69] Reply Comments at 4.

[70] *Id.* at 2. Paramount further states that "[i]ndeed, the Commission has determined that foreign investment in broadcast stations is not only appropriate but beneficial given the challenges confronting the industry, and ample precedent supports permitting foreign investment in Paramount of up to and including 100 percent. Since 2016, the Commission has applied the same streamlined standard to approve indirect foreign ownership of broadcast licensees above the 25 percent threshold, with the aim of 'facilitat[ing] investment from new sources of capital at a time of growing need for investment in" U.S. broadcasters, an important sector of our nation's economy.' In adopting this framework, the Commission emphasized that foreign investment has provided much-needed capital to U.S. broadcasters, allowing them to upgrade their facilities and technology, invest in programming, and maintain the quality of their service to the public." *Id.* at 2-3.

[71] *Id.* at 3.

[72] *Id.* at 4-6.

[73] *Id.* at 4. Paramount further states "no waiver of the Commission's rules is required to grant the Petition, and no heightened showing of the sort demanded by Free Press is necessary (especially not under Section 1.925 of the Commission's rules, which does not apply to television broadcast services)." *Id.* Paramount explains that

*16.* In response to concerns raised regarding national security and the Foreign Investors' influence and control, Paramount states that commenters' concerns are speculative and unsupported by facts.[74] Paramount asserts that, as its Petition makes clear, its "new foreign investors, which will receive only non-voting equity, will not have any ability to influence the company's editorial decision-making or news or entertainment content or to access its viewers' personal data."[75] The commenters, Paramount argues, overlook the fact that "none of the foreign investors will be able to wield any influence, let alone control, over Paramount's programming or the operations of the Licensees more broadly by acquiring non-voting stock in Paramount."[76] Further, the "Ellison family will retain control over Paramount" and that "no foreign investor will have the ability to control Paramount or the Licensees; to the contrary, Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[77] Paramount maintains that commenters "fail to explain how passive, non-voting shareholders will achieve such influence, and they also ignore that these precise issues are under review by Team Telecom, providing a further backstop to ensure that the national security and law enforcement agencies are satisfied with the company's controls."[78] Regarding the commenters' concerns about potential changes that may give the Foreign Investors increased rights, Paramount states that it will "return to the Commission in the event Paramount proposes to effectuate any changes in governance rights in the company that would result in an attributable interest or active governance role being held by any foreign investor in the future. Accordingly, there is no need to speculate about potential changes that could accord the foreign investors increased rights as any such changes would be reviewed independently."[79]

### D. National Security, Law Enforcement, Foreign Policy and Trade Policy Review

17. Pursuant to Commission practice,[80] the Commission referred the Petition to the relevant Executive Branch agencies for their views on any national security, law enforcement, foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, as the controlling U.S. parent of Licensees.[81] On April 29, 2026, the Committee notified the Commission that it was reviewing the Petition for any national security and law enforcement concerns that may be raised by foreign

---

"[i]nstead, the statute and the Commission's rules establish a clear process for seeking approval for foreign ownership exceeding 25 percent, including approval to allow up to and including 100 percent aggregate foreign ownership, subject to the traditional public interest standard rather than any heightened standard of review. The Commission has explained that Section 310(b)(4) does not establish a general prohibition against foreign investment but rather creates a process for the Commission to evaluate the public interest implications of such investment on a case-by-case basis." *Id.*

[74] *Id*. at 6.

[75] *Id*. at 6-7.

[76] *Id*. at 7.

[77] *Id*.

[78] *Id.* at 7-8. Paramount further states that "[t]he Commission routinely 'accords deference' to the expertise of these agencies, whose scrutiny of the Proposed Investment will ensure that any of the foreign investors will not have any ability to compromise editorial decision-making, access the data of U.S. persons, or otherwise harm the public interest." *Id*. at 8, citing *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6.

[79] Reply Comments at 8.

[80] Consistent with the Commission's rules under section 1.40001(b), "the Commission will consider any recommendations from the executive branch on pending . . . petition(s) for foreign ownership ruling(s) pursuant to §§ 1.5000 through 1.5004 . . . that may affect national security, law enforcement, foreign policy, and/or trade policy as part of its public interest analysis. The Commission will evaluate concerns raised by the executive branch and will make an independent decision concerning the pending matter." 47 CFR § 1.40001(b).

[81] Public Notice at 4-5.

participation in the United States telecommunications services sector and requested that the Commission defer action on the Petition.[82] Subsequently, on June 16, 2026, the Department of Justice notified the Commission that the Committee had initiated its 120-day initial review of the Petition.[83] On September 17, 2026, NTIA submitted its Committee Petition to the Commission in which the Committee advised the Commission that "it has no objection to the Commission approving the above-captioned Petition for Declaratory Ruling, provided that the Commission conditions its approval on the assurance of Paramount Global to abide by the commitments and undertakings" set forth in the LOA.[84]

## III. DISCUSSION

18. *Standard of Review*. We review the Petition under section 310(b)(4) of the Act, which states that "[n]o broadcast . . . license shall be granted to or held by . . . any corporation directly or indirectly controlled by any other corporation of which more than one-fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license."[85] This section of the Act grants the Commission discretion to allow foreign investment in a licensee's controlling U.S. parent above 25% unless the Commission finds that the public interest would be served by refusing to permit such foreign investment.[86] In evaluating petitions relating to foreign ownership, the Commission affords appropriate deference to the expertise of the Executive Branch agencies on issues related to national security, law enforcement, foreign policy, and trade policy.[87]

19. In the *2016 Foreign Ownership Order*, the Commission modified the broadcast licensee foreign ownership review process by extending the streamlined rules and procedures developed for review of foreign ownership of common carrier and certain aeronautical licensees under section 310(b)(4) to the broadcast context, with certain limited exceptions.[88] The *2016 Foreign Ownership Order* expressly provides for processing of petitions requesting approval for up to and including 100% aggregate foreign voting and/or equity investment by unnamed and future foreign investors in the controlling U.S. parent of a broadcast licensee.[89] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[90]

20. *Section 310(b)(4) Determination and Public Interest Analysis*. Pursuant to section 310(b)(4) of the Act,[91] as well as sections 1.5001 through 1.5004 of the Commission's rules,[92] we find that the public interest is served by permitting indirect foreign equity ownership of Paramount in excess

---

[82] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, Department of Justice, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed Apr. 29, 2026).

[83] Letter from Jessica Campbell, Attorney Advisor, Foreign Investment Review Section, National Security Division, DOJ, to Marlene H. Dortch, Secretary, FCC, MB Docket No. 26-93 (filed June 16, 2026).

[84] Committee Petition at 1; LOA.

[85] 47 U.S.C. § 310(b)(4).

[86] *See id.*; *2016 Foreign Ownership Order*, 31 FCC Rcd at 11276, para. 5.

[87] *2016 Foreign Ownership Order,* 31 FCC Rcd at 11277, para. 6.

[88] *See generally id.*

[89] *Id.* at 11282, para. 15.

[90] *See, e.g.*, *id*. at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[91] 47 U.S.C. § 310(b)(4).

[92] *See* 47 CFR § 1.5000 *et seq.*

of the 25% benchmark in section 310(b)(4) of the Act, and, consequently, we grant Paramount's request, as described and conditioned below. We further find that it is in the public interest to grant specific approval and advance approval for the percentages set out to the entities specified in Section IV below. As discussed further below, we conclude that grant of the Petition is in the public interest because it, among other things, provides the Licensees with greater access to capital and thereby contributes to the strengthening of the broadcast industry.[93]

21. First, we disagree with the commenters that argue that Paramount has failed to demonstrate that grant of the Petition is in the public interest. In the Commission's review of foreign ownership pursuant to section 310(b)(4) of the Act,[94] it has long recognized that foreign investment in U.S. companies and networks, including broadcast, fosters technical innovation, supports job creation, and strengthens the U.S. economy.[95] The Commission remains committed to encouraging such investment while maintaining its ability to conduct comprehensive reviews of foreign ownership in its licensees to safeguard the United States from new and evolving national security threats.[96] When reviewing foreign investment under section 310(b)(4), the Commission's decisions carefully balance the dual public interest objectives of prohibiting potentially harmful foreign investment and promoting non-harmful foreign investment.[97]

22. Upon review of the entire record, we find that Paramount has sufficiently demonstrated that the public interest would be served by granting the Petition.[98] Specifically, Paramount states that grant of the Petition would provide it with greater access to capital, improve the Licensees' newsgathering and reporting operations, and better position the company to "weather continuing challenges facing broadcasters and operators of linear pay-television networks."[99] The commenters have not rebutted these statements. We also agree with Paramount that the concerns raised in the record to the contrary are speculative and unsupported. Several commenters assert that the Commission, as part of its section 310(b)(4) review of the Petition, should consider the "practical influence" that the Foreign Investors may have over Paramount and its Licensees in addition to "formal voting control."[100] We find this argument unconvincing. The Proposed Investment is not a loan, which must be repaid, but a purchase of stock that has no voting rights. We are persuaded by Paramount's argument[101] that the Foreign Investors therefore will not be able to wield any influence, let alone control, over decisions involving the Licensees.

---

[93] *See* Petition at 19-22 (describing public interest benefits arising from approval of this declaratory ruling and the related Proposed Investment).

[94] 47 U.S.C. § 310(b)(4).

[95] *Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licenses Under Section 310(b)(4) of the Communications Act of 1934, as Amended,* IB Docket No. 11-133, Second Report and Order, 28 FCC Rcd 5741, 5744, para. 3 (2013) (*2013 Foreign Ownership Second Report and Order*) ("foreign investment has been and will continue to be an important source of financing for U.S. telecommunications companies, fostering technical innovation, economic growth, and job creation."); *see also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11280, para. 12 (stating that "applying the foreign ownership rules for common carrier licensees to broadcast licensees in the context of Section 310(b)(4) petitions will help improve access to capital from foreign investors and promote regulatory flexibility, while also preserving the Commission's statutory obligation, in consultation with the relevant Executive Branch agencies, to ensure that foreign ownership above the 25 percent benchmark serves the public interest.").

[96] *2026 Foreign Ownership Order* at 832, para. 1.

[97] *Id*. at 851-52, para. 39.

[98] *See supra* paras. 8-10.

[99] Petition at 19-22.

[100] *See, e.g.*, Franklin Comments at 2; PRESSPAGE May 5, 2026 *Ex Parte* Letter at 2; Free Press Comments at 9-10; LiveVideo.AI *Ex Parte* at 3.

[101] Reply Comments at 6-7.

Paramount has further demonstrated that David Ellison will retain control over Paramount and that the Ellison family will continue to own a majority of the voting stock, and we credit Paramount's statement that "Paramount will ensure that there will be no interference with the editorial or decision-making policies of its broadcast stations (or CBS News or any other facets of Paramount news and entertainment programming)."[102] Finally, we are persuaded by the commitments Paramount made in its LOA with the Committee, which explicitly states that the "Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data" and that Paramount "affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that [sic] such new petition could be subject to referral to the Committee."[103] We condition our approval of the Petition on Paramount's returning to the Commission for approval before giving the Foreign Investors additional rights, including but not limited to, any voting rights.[104]

23. We find that the Commission's review process, the Committee's review process, Paramount's Petition certification,[105] the Commission's continuing compliance obligations,[106] and the commitments and undertakings set out in the LOA adequately ensure that the proposed foreign ownership serves the public interest, and that the commenters have not provided any persuasive reasons for us to find that the public interest would not be served by granting the Petition. We therefore conclude that grant of the Petition is consistent with the Commission's longstanding goal of promoting foreign investment, including in the broadcast industry, and that it would not serve the public interest to deny it.

24. Second, we reject the commenters' attempts to set an alternative standard for the Commission's foreign ownership review pursuant to section 310(b)(4) of the Act. At the outset, we find that Free Press mischaracterizes the applicable legal standard for the Commission's section 310(b)(4) review. Free Press asserts that the Commission's waiver rule is the applicable legal framework to petitions for declaratory ruling under section 310(b) of the Act.[107] That is incorrect. Instead, petitions for declaratory ruling filed pursuant to section 310(b)(4) of the Act are reviewed under sections 1.5000–1.5004 of the Commission's rules.[108] We also disagree with the commenters' assertions that Paramount must demonstrate that acquisition of WBD is necessary to promote the public interest,[109] that there are no other lawful methods of financing the transaction than through foreign investment,[110] or that "substantial foreign capital participation identified in the record is necessary to consummate the transaction or preserve broadcast and news operations."[111] We find that there is no affirmative burden on petitioners to make these showings. The question is whether it would be in the public interest to refuse to allow this foreign investment, not whether the investment is "necessary" or the only alternative.

---

[102] *Id.*

[103] LOA at 3-4.

[104] *See infra* para. 32 describing the terms and conditions to which Paramount is subject.

[105] *See* Petition at Certification.

[106] 47 CFR § 1.5004.

[107] 47 CFR § 1.925(b)(3)(i).

[108] 47 CFR §§ 1.5000-1.5004.

[109] Free Press Comments at 8.

[110] *Id.*

[111] Franklin Comments at 3.

25. *National Security*. When evaluating petitions for declaratory ruling under section 310(b)(4) of the Act, we also consider public interest issues related to national security, law enforcement, foreign policy, and trade policy concerns.[112] To exercise in a meaningful way the discretion conferred by statute, the Commission must receive detailed information from the applicant sufficient for the Commission to make the public interest finding the statute requires.[113] The Commission also coordinates as necessary and appropriate with the relevant Executive Branch agencies and accords deference to their expertise in identifying and interpreting issues of concern related to these matters.[114] When the Commission refers a petition to the Executive Branch agencies, it does not act on the petition until the Committee completes its review and provides the Commission its recommendation.

26. As stated above, pursuant to our standard practice, the Commission coordinated with the Executive Branch agencies and referred the Petition for their views on any national security, law enforcement, and foreign policy, or trade policy concerns related to the proposed foreign ownership of Paramount, the controlling U.S. parent of the Licensees.[115] Here, the Executive Branch agencies have reviewed the Petition and do not object to the Commission granting the Petition, provided that the Commission conditions its approval on Paramount's compliance with the LOA.[116] The Committee Petition further states that "[a]fter discussions with representative [sic] of Paramount Global in connection with the above-captioned application, the Committee has concluded that the additional commitments set forth in the LOA will help ensure that those agencies with responsibility for enforcing the law, protecting the national security, and preserving public safety can proceed appropriately to satisfy those responsibilities."[117]

27. In accordance with the request of the Committee, we grant the Committee Petition, and condition the grant of the Petition, on compliance by Paramount with the commitments and undertakings

---

[112] *See Process Reform for Executive Branch Review of Certain FCC Applications and Petitions Involving Foreign Ownership*, IB Docket 16-155, Report and Order, 35 FCC Rcd 10927 (2020) (setting rules and procedures for referring applications for Executive Branch review consistent with Executive Order No. 13913) (*Executive Branch Review Order*); *Foreign Participation Order*, 12 FCC Rcd at 23918-21, paras. 59-66 (in opening the U.S. telecommunications market to foreign entry in 1997, the Commission affirmed that it would consider national security, law enforcement, foreign policy, and trade policy concerns related to reportable foreign ownership as part of its overall public interest review of applications for international section 214 authority, submarine cable landing licenses, and declaratory rulings to exceed the foreign ownership benchmarks of section 310(b) of the Act). *See also Applications of T-Mobile US, Inc., and Sprint Corporation*, 34 FCC Rcd 10578, 10732-33, para. 349 (2019) (*T-Mobile/Sprint Order*); *2016 Foreign Ownership Order*, 31 FCC Rcd at 11277, para. 6; 47 CFR § 1.40001(a).

[113] *See, e.g.*, *2016 Foreign Ownership Order* at 11282, 11283-84, paras. 15, 20 (noting that the requirements adopted in the streamlined foreign ownership rules ensure that the Commission has the information necessary to evaluate and understand a licensee's ownership structure and to fulfill its obligations under section 310(b) of the Act).

[114] *Id*. at 11277, para. 6, citing to *2013 Foreign Ownership Second Report and Order*, 28 FCC Rcd at 5751, 5762, paras. 13, 34; *Rules and Policies on Foreign Participation in the U.S. Telecommunications Market: Market Entry and Regulation of Foreign-Affiliated Entities*, IB Docket Nos. 97-142 and 95-22, Report and Order and Order on Reconsideration, 12 FCC Rcd 23891, 23920, para. 63 (1997) (*Foreign Participation Order*), Order on Reconsideration, FCC 00-339, 15 FCC Rcd 18158 (2000). *See also Executive Branch Review of FCC Applications and Petitions with Foreign Ownership for National Security, Law Enforcement, Foreign Policy and Trade Policy Concerns*, IB Docket No. 16-155, Notice of Proposed Rulemaking, 31 FCC Rcd 7456 (2016) (*2016 Executive Branch Review NPRM*)).

[115] We thus dismiss as moot the concerns raised by commenters suggesting we coordinate closely with the Executive Branch agencies for their views on any national security concerns and not act until that review is complete as those steps already have been taken in the instant proceeding. *See* PRESSPAGE Comments at 1-2; Franklin Comments at 10; LiveVideo.AI *Ex Parte* at 1-2. *See also 2016 Foreign Ownership Order*, 31 FCC Rcd at 11282, para. 15; *Executive Branch Review Order*, 35 FCC Rcd at 10934-36, paras. 17, 24.

[116] *See* Committee Petition at 1; LOA.

[117] Committee Petition at 2.

set forth in the LOA. A failure to comply and/or remain in compliance with any of these conditions shall constitute a failure to meet a condition of this Declaratory Ruling, which may also result in monetary sanctions or other enforcement action by the Commission.

28. Given the Executive Branch agencies' determination, we decline to adopt the safeguards or commitments proposed in the record.[118] The Commission grants a petition for declaratory ruling on the condition that the petitioner complies with the Commission's routine terms and conditions, including any mitigation measures or agreements negotiated with the Committee. After carefully and thoroughly reviewing the record, we find that the commenters did not raise any persuasive basis for the Commission to depart from this established practice.

## IV. DECLARATORY RULING

29. Upon review of the Petition, and consideration of the record of this proceeding, pursuant to section 310(b)(4) of the Act and sections 1.5001 through 1.5004 of the Commission's rules, we find that the public interest would be served by permitting indirect foreign equity ownership of Paramount, the controlling U.S. parent of the Licensees, to exceed the 25% benchmark in section 310(b)(4) of the Act, as amended.[119] We also find that it is in the public interest to permit up to 100% indirect foreign equity interest of Paramount, in the aggregate, subject to the terms and conditions set forth in the Commission's rules including section 1.5004 of the Commission's rules, and the commitments and undertakings set forth in the LOA.[120]

30. Pursuant to section 1.5001(i) of the Commission's rules,[121] this Declaratory Ruling grants specific approval for the following entities to hold, indirectly, greater than 5% of the equity interests in Paramount:

- Public Investment Fund (15.1% equity) (Kingdom of Saudi Arabia);
- L'Imad 1st SPV 2 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Holding 1 Exempt RSC Ltd (12.8% equity) (United Arab Emirates);
- L'imad 1st Capital Holding Ltd (12.8% equity) (United Arab Emirates);
- L'imad Holding Company – P.J.S.C (12.8% equity) (United Arab Emirates);
- QIA TMT Holding LLC (10.6% equity) (Qatar); and
- Qatar Investment Authority (10.6% equity) (Qatar).

[118] PRESSPAGE Comments at 2; Franklin Comments at 2-3.

[119] In its comments, Free Press characterizes the Petition as a request that requires the Commission to ignore the statutory limits on foreign ownership. *See* Free Press Comments at 6. We disagree. As discussed *infra*, consistent with our precedent, we find that our actions herein, including authorizing up to 100% indirect foreign equity interest of Paramount, in the aggregate, are consistent with both the Act and the Commission's rules and precedent when doing so serves the public interest, provided that petitioners comply with the routine terms and conditions of their declaratory ruling. *See, e.g.*, *Searchlight II HMT, L.P., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended*, MB Docket No. 23-2, Declaratory Ruling, 38 FCC Rcd 7412 (MB 2023) ("[w]e also find that it is in the public interest to permit up to an aggregate 100% indirect foreign ownership of [the broadcast licensees' controlling U.S. parent]"); *Univision Holdings II, Inc., Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934*, *as Amended*, MB Docket No. 21-321, Declaratory Ruling, 37 FCC Rcd 449 (MB 2022) ("it is in the public interest to grant Univision's request to permit foreign investors to own up to 100% in the aggregate of Univision's equity and voting interests.").

[120] For a discussion of the mootness of Paramount's requests in light of its LOA for its indirect aggregate foreign voting interests to exceed 25%, specific approval for its proposed Foreign Investors' voting interests, and advance approval for such Foreign Investors' voting interests, see *supra* paras. 1-2.

[121] 47 CFR § 1.5001(i).

31. Pursuant to section 1.5001(k) of the Commission's rules,[122] this Declaratory Ruling also grants advance approval for each of the foreign entities above, seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20% at some future time.[123]

32. *Terms and Conditions.* Under this Declaratory Ruling, Paramount has an affirmative duty to monitor its foreign equity and voting interests, calculate those interests consistent with the principles enunciated by the Commission, including the standards and criteria set forth in sections 1.5002 through 1.5003 of the Commission's rules,[124] and otherwise ensure continuing compliance with the provisions of section 310(b) of the Act.[125] Grant of this Declaratory Ruling is conditioned on the terms and conditions set forth in section 1.5004 of the Commission's rules, including the requirement to obtain Commission approval before foreign ownership of Paramount exceeds the terms and conditions of this Declaratory Ruling.[126] Grant of the Declaratory Ruling, is further conditioned on compliance with the LOA.[127] Paramount is further subject to the Commission's requirement to obtain approval for any new or additional foreign individual, entity, or group of such individuals or entities to hold, directly and/or indirectly, more than 5% (or more than 10% for certain investors that fall under the narrow exceptions in section 1.5001(i) of the Commission's rules[128]) of the equity and/or voting interests, or for any foreign individual, entity, or group to hold a controlling interest, in the company.[129] If, at any time, Paramount knows, or has reason to know, that it is no longer in compliance with this Declaratory Ruling, section 310(b) of the Act, or the Commission's foreign ownership rules, Paramount shall file a statement with the Commission explaining the circumstances within 30 days of the date that it knew, or had reason to know,

[122] 47 CFR § 1.5001(k).

[123] *See supra* para. 1. We note that in its comments, LiveVideo.AI states that Paramount's "advance-approval request appears to exceed the ceiling applicable to non-controlling foreign interests." *See, e.g.*, LiveVideo.AI Comments at 3. However, the Commission's foreign ownership rules permit non-controlling foreign investors that request specific approval to request advance approval to increase their equity and/or voting interests up to a non-controlling 49.99% at some future time. Here, in relevant part, Paramount requested advance approval for each of the foreign entities seeking specific approval to increase their indirect equity interests in Paramount up to a non-controlling 20%, which falls below the maximum permissible percentage of 49.99% for non-controlling interests. 47 CFR § 1.5001(k)(2).

[124] 47 CFR §§ 1.5002-1.5003.

[125] 47 CFR § 1.5004, note to paragraph (a).

[126] 47 CFR § 1.5004. Section 1.5004, *inter alia*, specifies that licensees have an ongoing, proactive obligation to monitor their foreign ownership compliance and to take preemptive action to remain in compliance with the Commission's foreign ownership rules and any declaratory ruling they have received. 47 CFR § 1.5004(a). While all of the terms and conditions set forth in section 1.5004 of the Commission's rules apply, we highlight the following provisions: (1) where a previously unapproved foreign-organized entity is inserted into the vertical ownership chain of a licensee, or its controlling U.S.-organized parent, without prior Commission approval, the licensee shall file a letter to the attention of the Chief, Media Bureau, within 30 days after the insertion of the new, foreign-organized entity; (2) a licensee that has received a foreign ownership ruling, including a U.S.-organized successor-in-interest to such licensee as part of reorganization, or any subsidiary or affiliate relying on such licensee's ruling, shall file a new petition for declaratory ruling under § 1.5000 to obtain Commission approval before its foreign ownership exceeds the routine terms and conditions of this section, and/or any specific terms of conditions of its rulings; and (3) if at any time the licensee, including any successor-in interest and any subsidiary or affiliate knows, or has reason to know, that it is no longer in compliance with its foreign ownership rulings or the Commission's rules relating to foreign ownership, it shall file a statement with the Commission explaining the circumstances within 30 days of the date it knew, or had reason to know, that it was no longer in compliance.

[127] LOA; *see supra* para. 2.

[128] *See* 47 CFR § 1.5001(i)(4).

[129] 47 CFR § 1.5004(a)(1).

that it was no longer in compliance.[130] A failure to meet a condition of this Declaratory Ruling may result in monetary sanctions or other enforcement action by the Commission for such non-compliance, including an order requiring divestiture of the foreign investment.[131]

## V. ORDERING CLAUSES

33. Accordingly, **IT IS ORDERED** that, pursuant to section 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. § 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, 47 CFR §§ 0.61, 0.283, the Petition for Declaratory Ruling filed by Paramount Global **IS GRANTED** as specified and subject to the conditions specified herein.

34. **IT IS FURTHER ORDERED**, pursuant to sections 4(i) and (j), and 310(b)(4) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i)(j), 310(b)(4), and sections 1.5001 through 1.5004 of the Commission's rules, 47 CFR §§ 1.5001-04, and pursuant to authority delegated to the Media Bureau in sections 0.61 and 0.283 of the Commission's rules, that the opposing comments filed by the commenters listed in Appendix A, **ARE DENIED**.

35. **IT IS FURTHER ORDERED** that this Declaratory Ruling **SHALL BE EFFECTIVE** upon release.

FEDERAL COMMUNICATIONS COMMISSION

David Brown
Chief, Video Division
Media Bureau

[130] *See* 47 CFR § 1.5004(f)(1). If, for example, a foreign individual or entity should directly or indirectly invest in Paramount above the percentages approved herein without Commission approval, Paramount is obligated to follow the steps set out in 47 CFR § 1.5004(f). Subsequent actions taken by or on behalf of Paramount to remedy non-compliance shall not relieve it of the obligation to notify the Commission of the circumstances (including duration) of non-compliance.

[131] 47 CFR § 1.5004(f).

## Attachment

### Paramount Licensees

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WUPA | 6900 | Atlanta, GA | Atlanta Television Station WUPA Inc. |
| KCBS-TV | 9628 | Los Angeles, CA | CBS Broadcasting Inc. |
| KDKA-TV | 25454 | Pittsburgh, PA | CBS Broadcasting Inc. |
| KPIX-TV | 25452 | San Francisco, CA | CBS Broadcasting Inc. |
| KYW-TV | 25453 | Philadelphia, PA | CBS Broadcasting Inc. |
| WBBM-TV | 9617 | Chicago, IL | CBS Broadcasting Inc. |
| WCBS-TV | 9610 | New York, NY | CBS Broadcasting Inc. |
| WCCO-TV | 9629 | Minneapolis, MN | CBS Broadcasting Inc. |
| KCCW-TV | 9640 | Walker, MN | CBS Broadcasting Inc. |
| WWJ-TV | 72123 | Detroit, MI | CBS Broadcasting Inc. |
| WLNY-TV | 73206 | Riverhead, NY | CBS LITV LLC |
| WBXI-CD | 70416 | Indianapolis, IN | CBS Mass Media Corporation |
| WTOG | 74112 | St. Petersburg, FL | CBS Operations Investments Inc. |
| W26DP-D | 74116 | Inverness, FL | CBS Operations Investments Inc. |
| W36FJ-D | 74113 | Sebring, FL | CBS Operations Investments Inc. |
| KTVT | 23422 | Fort Worth, TX | CBS Stations Group of Texas LLC |
| WBZ-TV | 25456 | Boston, MA | CBS Television Licenses LLC |
| WJZ-TV | 25455 | Baltimore, MD | CBS Television Licenses LLC |
| WSBK-TV | 73982 | Boston, MA | CBS Television Licenses LLC |
| WFOR-TV | 47902 | Miami, FL | CBS Television Licenses LLC |
| KCNC-TV | 47903 | Denver, CO | CBS Television Stations Inc. |
| WKBD-TV | 51570 | Detroit, MI | Detroit Television Station WKBD Inc. |
| KCAL-TV | 21422 | Los Angeles, CA | Los Angeles Television Station KCAL LLC |
| WBFS-TV | 12497 | Miami, FL | Miami Television Station WBFS Inc. |
| WPSG | 12499 | Philadelphia, PA | Philadelphia Television Station WPSG, Inc. |

| Call Sign | Facility ID No. | Community of License | Licensee |
|---|---|---|---|
| WPKD-TV | 69880 | Jeannette, PA | Pittsburgh Television Station WPCW Inc. |
| KMAX-TV | 51499 | Sacramento, CA | Sacramento Television Stations, Inc. |
| KOVR | 56550 | Stockton, CA | Sacramento Television Stations, Inc. |
| KPYX | 69619 | San Francisco, CA | San Francisco Television Station KBCW Inc. |
| KTXA | 51517 | Fort Worth, TX | Television Station KTXA Inc. |
| KSTW | 23428 | Tacoma, WA | The CW Television Stations Inc. |

## APPENDIX A

**List of Commenters**

PRESSPAGE ENTERTAINMENT INC
Collin Hotchkiss
Ron Beres
Aidan Gordon
Patrick O. Ingle
W. Lee McVey, PE
Zachary Beaudoin
Chad Ray
Franklin Broadcasting LP
Free Press
LiveVideo.AI Corp.
Austin Olachea

# EXHIBIT 2

LiveVideo.AI Corp., Application for Review (filed Sept. 22, 2026; ECFS Submission No. 26110077749).

**BEFORE THE**

**FEDERAL COMMUNICATIONS COMMISSION**

**WASHINGTON, D.C. 20554**

In the Matter of

Paramount Global

| | |
|---|---|
| LiveVideo.AI Corp.<br>Applicant,<br><br>v.<br><br>Paramount Global<br>Respondent. | Case No. MB Docket No. 26-93<br><br>**LIVEVIDEO.AI CORP.'S APPLICATION FOR REVIEW OF DA 26-1001** |

## SUMMARY OF ARGUMENT

DA 26-1001 should be set aside because it disposes of LiveVideo.AI's challenge without resolving the disqualification question at its center or addressing the LIV Golf materials submitted on that issue. A decision cannot adequately dispose of the challenge while leaving those matters unanswered.

The omissions are both evidentiary and procedural. The LIV Golf materials bear on the unresolved disqualification question, yet DA 26-1001 neither evaluates those materials nor explains why they do not affect the result. That gap leaves the Bureau's disposition unsupported by a stated consideration of material record matters.

The Commission should grant review, set aside DA 26-1001, and remand for consideration of the disqualification question and the LIV Golf materials. On remand, the Bureau should address those matters and explain their effect on the disposition.

DA 26-1001 should be set aside because it disposes of LiveVideo.AI Corp.'s challenge without resolving the disqualification question at its

center or addressing the LIV Golf materials submitted on that issue. A decision cannot adequately dispose of the challenge while leaving those matters unanswered.

The omissions are both evidentiary and procedural. The LIV Golf materials bear on the unresolved disqualification question, yet DA 26-1001 neither evaluates those materials nor explains why they do not affect the result.

The Commission should grant review, set aside DA 26-1001, and remand for consideration of the disqualification question and the LIV Golf materials.

## QUESTIONS PRESENTED

1. Whether DA 26-1001 erred by declining to resolve the disqualification question raised under 47 U.S.C. § 310(b)(4).

2. Whether DA 26-1001 properly addressed the LIV Golf materials bearing on that disqualification question.

3. Whether the errors identified in DA 26-1001 provide grounds for Commission review under 47 C.F.R. § 1.115(b)(2).

4. Whether the Commission should remand DA 26-1001 for resolution of the disqualification question and consideration of the LIV Golf materials.

5. Whether DA 26-1001 erred by declining to resolve the disqualification question raised under 47 U.S.C. § 310(b)(4).

6. Whether DA 26-1001 properly addressed the LIV Golf materials bearing on that disqualification question.

7. Whether the errors identified in DA 26-1001 provide grounds for Commission review under 47 C.F.R. § 1.115(b)(2).

8. Whether the Commission should remand DA 26-1001 for resolution of the disqualification question and consideration of the LIV Golf materials.

## STANDING, TIMELINESS, AND PRESENTATION OF NEW FACTS UNDER § 1.115

LiveVideo.AI Corp. is an interested participant and person aggrieved by DA 26-1001 and participated in MB Docket No. 26-93. This Application was filed within the time prescribed by 47 C.F.R. § 1.115(d). The LIV Golf materials corroborate issues already presented;

LiveVideo.AI Corp. submits them protectively under 47 C.F.R. § 1.106 only if that treatment is necessary.

## A. STANDING

LiveVideo.AI Corp. is an interested participant and person aggrieved by DA 26-1001. It therefore may seek Commission review under 47 C.F.R. § 1.115(a).

The record reflects LiveVideo.AI Corp.'s participation in the underlying MB Docket No. 26-93 proceeding, where it presented the issues relevant to DA 26-1001. Those issues are directly connected to the challenged action, establishing LiveVideo.AI Corp.'s basis to seek review.

## B. TIMELINESS

DA 26-1001 was adopted and released on September 17, 2026. This Application is filed on September 22, 2026, and is timely under 47 C.F.R. § 1.115(d).

## STANDARD OF REVIEW AND GROUNDS FOR REVIEW UNDER § 1.115(B)(2)

This Application seeks review of a Bureau action taken under delegated authority. Section 1.115(b)(2) authorizes review where the action conflicts with statute, regulation, case precedent, or established Commission policy; involves a question of law, fact, or policy that warrants consideration by the full Commission; rests on an erroneous finding as to an important or material factual question; or involves a prejudicial procedural error. 47 C.F.R. § 1.115(b)(2)(i)–(iv). 47 C.F.R. § 1.115(b)(2), at § 1.115(b)(2)(i)–(iv) (grounds for review of delegated action).

DA 26-1001 presents each of those grounds. It leaves material questions unresolved, rests on material factual, legal, policy, and procedural errors, and applies an approach inconsistent with the governing framework. Those errors warrant Commission review both because they affect the Bureau's disposition and because the questions presented require the Commission's own consideration.

Where § 1.40001(b) applies, the Commission must make the determination required by that rule using its independent judgment; it need not treat the Bureau's delegated ruling as conclusive. 47 C.F.R. § 1.40001(b). Nothing in that rule imposes a categorical investor-specific

requirement. The Commission should instead apply the governing standard to the material issues properly before it. 47 C.F.R. § 1.40001(b) (Commission determination under the applicable standard).

Commission review must assess DA 26-1001 on the grounds the Bureau actually gave. An agency action must stand or fall on the rationale invoked when the agency acted; it may not be sustained by a new post hoc justification. SEC v. Chenery Corp., 318 U.S. 80, 87, 93–95 (1943). Thus, subsequent arguments cannot supply reasoning that DA 26-1001 itself omitted. *SEC v. Chenery Corp.*, 318 U.S. 80, at 87, 93–95 (agency action must be judged on the rationale the agency invoked, not a post hoc justification).

## STATEMENT OF THE RELEVANT RECORD

DA 26-1001 authorized up to 100% aggregate indirect foreign equity. It identified PIF's 15.1% indirect equity interest and granted advance authority for non-controlling indirect foreign equity interests of up to 20%. This authorization and the stated treatment of PIF's interest are new factual developments in the record. DA 26-1001.

## A. DA 26-1001 AUTHORIZES EXTENSIVE FOREIGN EQUITY OWNERSHIP

DA 26-1001 authorizes aggregate indirect foreign equity ownership of up to 100 percent. The order specifically approves the Public Investment Fund ("PIF")—the identified investor—holding a 15.1 percent indirect equity interest. DA 26-1001.

The order further grants advance authority to the specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests. Thus, the order addresses both aggregate indirect foreign ownership and the individual non-controlling interests within the authorized ownership-and-voting structure.

The scope of that authorization—100 percent aggregate indirect foreign equity ownership, PIF's approved 15.1 percent interest, and advance authority for specified foreign investors to hold non-controlling interests up to 20 percent—makes a complete record and reasoned explanation material to understanding what the order authorizes.

## B. THE BUREAU RELIED ON THE LOA'S REPRESENTATIONS AND COMPLIANCE CONDITIONS

The September 4, 2026 Letter of Agreement ("LOA") supplied the representations on which the foreign-ownership analysis proceeded. It provides that the foreign investors will hold non-voting stock, will have no governance or information rights, and will not exercise influence over Paramount's content decisions or company management. Letter of Agreement dated Sept. 4, 2026 ((setting forth the foreign investors' rights and restrictions)).

The executive-branch Committee then filed a conditional no-objection that depended on compliance with the LOA. The Committee's filing thus made the LOA's representations, duties, and compliance conditions part of the basis for its no-objection position. Committee conditional no-objection filing ((conditioning no objection on compliance with the LOA)).

The LOA also establishes compliance duties and deadlines. In DA 26-1001, the Bureau relied on the transaction's stated restrictions and compliance framework in reaching its conclusion; those restrictions cannot be separated from the duties and timing provisions that govern their implementation. Letter of Agreement dated Sept. 4, 2026 ((setting

forth compliance duties and deadlines)); DA 26-1001 ((relying on the transaction record in its foreign-ownership analysis)).

Because the Bureau's conclusion depends on those representations and conditions, the order must explain their scope and how compliance is assured. It must address how the limits on voting, governance, information access, content decisions, and management influence operate in practice, including the duties and deadlines that support the Committee's conditional no-objection and the Bureau's reliance on the LOA. DA 26-1001 ((addressing the Bureau's foreign-ownership conclusion)); Committee conditional no-objection filing ((conditioning no objection on LOA compliance)).

## ARGUMENT

A conditional Committee no-objection does not itself satisfy the Commission's duty under § 1.40001(b). The Order identifies no independent Commission judgment that connects the Committee's conditional position to the Bureau's disposition of the unresolved disqualification and § 310(b)(4) issues. Nor may that missing explanation be supplied now. Under Chenery, an agency action must stand or fall on

the grounds the agency gave, and a reviewing body may not uphold it through a post hoc rationale. The appropriate remedy is remand for the Commission to exercise the independent judgment § 1.40001(b) requires and explain its decision on this record. *Calcutt v. FDIC*, 598 U.S. 623 (2023) (reviewing court may not affirm an agency decision by substituting a rationale the agency did not adopt).

## 1. THE BUREAU GOT THE LABELING RIGHT AND THE SUBSTANCE WRONG

The Bureau's characterization of PIF's interest as non-voting answered a question about the form of ownership, not the separate question of practical influence. A non-voting label does not itself establish what influence an investor may exercise through the rights reflected in the record. DA 26-1001.

The record therefore calls for an analysis specific to PIF and to the rights at issue here. That analysis must address the contractual, financing, governance, and information rights identified in the record, and whether their combined operation bears on PIF's practical influence.

This is not a request for a categorical rule that § 310(b)(4) always requires an investor-specific finding. It is a request for reasoned analysis where, as here, the record identifies investor-specific rights relevant to practical influence. The Bureau did not supply that analysis by relying on the non-voting characterization alone. 47 U.S.C. § 310(b)(4); DA 26-1001.

The Commission should remand the Order for the Bureau to analyze those identified contractual, financing, governance, and information rights and explain whether they bear, individually or together, on PIF's practical influence. That limited remand seeks a reasoned decision on the existing record; it does not assume that PIF's investment is unlawful. DA 26-1001.

## 2. THE BUREAU ASKED WHETHER PIF HOLDS VOTING STOCK. IT NEVER ASKED WHAT ELSE PIF HOLDS.

As a factual matter, the Bureau asked whether PIF holds voting stock. That inquiry does not itself address whether PIF holds financing, security, consent, information, governance, or restructuring rights. The point is not that PIF holds any particular right; it is that a finding

concerning voting stock alone does not answer the separate questions presented by those categories of rights.

The LIV Golf materials corroborate that distinction and the issues already presented. They do not establish, and PIF does not contend here, that PIF holds a particular unexamined right. Rather, they reinforce the need to distinguish the narrow factual question the Bureau asked—voting stock—from the broader set of rights that may require consideration.

As a matter of reasoned administrative decisionmaking, the Commission should address the material questions the Bureau's voting-stock analysis left unanswered and explain whether that analysis resolves them. A conclusion limited to non-voting stock cannot, without that consideration and explanation, resolve the separate financing, security, consent, information, governance, and restructuring issues already before the Commission.

## THE TIMELINE EXPOSES THE GAP — AND THE BUREAU'S SILENCE ON LIV GOLF WAS A CHOICE, NOT AN ACCIDENT

The record's sequence makes the omission apparent. The LOA issued on September 4. LIV Golf filed its Chapter 11 petition on

September 8. The amended petition followed on September 11. On September 17, the Committee issued its conditional no-objection, and the Bureau released DA 26-1001.

The intervening LIV Golf filing was material because it corroborated issues already presented, rather than raising a separate or disconnected matter. The amended petition brought that intervening evidence to the Bureau's attention before the Bureau issued DA 26-1001.

That chronology squarely presented a record-supplementation question: whether the Bureau would consider the LIV Golf materials as corroborating evidence bearing on the issues already before it. The Bureau acted six days after the amended petition, with the Committee's conditional no-objection and DA 26-1001 both issued on September 17.

DA 26-1001 does not explain the treatment of the LIV Golf materials. It does not say whether the Bureau considered them, declined to supplement the record, or concluded that they did not affect the issues presented. The order therefore leaves an unexplained gap on material intervening evidence that the Commission should address on review.

## 4. A COMPLIANCE-DEPENDENT FINDING IS WORTHLESS UNTIL SOMEONE CONFIRMS COMPLIANCE

The Committee's no-objection was expressly conditional on compliance with the September 4, 2026 Letter of Agreement ("LOA"). The relevant obligations are the LOA's commitments, representations, and conditions—not an abstract assurance that they will be honored. A result that relies on the Committee's conditional no-objection must establish compliance with those obligations. September 4, 2026 LOA; Committee Conditional No-Objection.

DA 26-1001 relies on the LOA's representations and conditions. That premise supports the Bureau's result only if compliance with the corresponding LOA commitments and conditions has been verified. The order does not identify a record confirmation of that compliance. DA 26-1001; September 4, 2026 LOA.

The Commission should require an order that states the verified compliance status of the LOA obligations, explains how compliance is ensured, and connects that verified status to the result. Without that explanation, the conditional no-objection and the LOA cannot carry the

weight DA 26-1001 assigns them. Committee Conditional No-Objection; September 4, 2026 LOA; DA 26-1001.

## 5. A CONDITIONAL "NO OBJECTION" FROM ONE AGENCY IS NOT AN INDEPENDENT FINDING BY THIS ONE

The Committee's conditional no-objection may inform the Commission's review, but it cannot substitute for the Commission's independent public-interest determination. Section 1.40001(b) places that determination with the Commission. The Commission must therefore exercise and explain its own judgment rather than treat a conditional position from another agency as dispositive. 47 C.F.R. § 1.40001(b).

The Commission may properly give weight to the Committee's executive-branch expertise and to the reasons the Committee actually discloses in its filing. But deference cannot fill a gap in that filing. If the Committee filing states no basis for a conclusion material to the Commission's decision, the Commission must address that absence and explain, from the record, why its own public-interest determination is warranted.

DA 26-1001 should be remanded if it does not show that independent analysis. A decision that reports the Committee's conditional no-objection without identifying the Commission's own reasoning does not demonstrate the public-interest determination that § 1.40001(b) requires.

## DA 26-1001 CONFIRMS, IN THE BUREAU'S OWN WORDS, THAT THE DISQUALIFICATION QUESTION WAS NOT RESOLVED AND IS PROPERLY BEFORE THE COMMISSION NOW

### 7. ADVANCE APPROVAL IS A BET THAT THE FINDING IS RIGHT, PLACED BEFORE ANYONE HAS CHECKED

Advance approval carries consequences beyond the interests addressed in DA 26-1001. Within its stated scope, it permits the principal investor to make future acquisitions or increase its interest in reliance on the Commission's present determination, rather than requiring the identified inquiry to be resolved anew before each future transaction.

That is why the evidentiary defect cannot be treated as academic. Advance approval asks the Commission to accept now that the underlying finding is sound and allows the principal investor to plan and act on that premise in the future. If the finding rests on an inquiry that

has not been resolved, the resulting approval places that unresolved premise into future transactions.

Applicant does not seek to suspend DA 26-1001 as a whole or to obtain relief unrelated to the identified inquiry. It seeks only to prevent the advance-approval feature from being used prospectively while the Commission reviews whether the record supports the finding on which that feature depends.

The Commission should therefore hold the advance-approval component in abeyance pending review of the identified evidentiary defect. That limited measure preserves the status quo as to future reliance on the challenged finding, while leaving the remainder of DA 26-1001 in effect unless the Commission directs otherwise.

## REQUESTED RELIEF

Applicant respectfully requests the following relief under 47 C.F.R. § 1.115.

1. Grant review and set aside DA 26-1001 or, alternatively, remand the matter for further proceedings.

2. On remand, direct the Bureau to consider the LIV Golf materials, produce the materials on which it relied or certify that no such materials exist, and issue a reasoned determination of the disqualification question.

3. Stay DA 26-1001 or hold it in abeyance pending disposition of this Application for Review, and grant such further relief as is appropriate.

## CONCLUSION

DA 26-1001 does not resolve the disqualification question presented by the record, and it does not address the LIV Golf materials. Those decisive omissions leave the Order without a resolution of issues material to the application.

The Commission should grant this Application for Review, set aside DA 26-1001, and remand for further proceedings that address both omissions. LiveVideo.AI respectfully requests the specific relief set forth in the Request for Relief.

Respectfully submitted,

LIVEVIDEO.AI CORP.

By: /s/ Brad Greenspan__________________________

Brad Greenspan

Chief Executive Officer

LiveVideo.AI Corp.

244 Fifth Avenue, Suite G290

New York, New York 10001

Email: legalsupport1@nym.hush.com

Dated: September 22, 2026

**[PROPOSED] ORDER**

**BEFORE THE**

**FEDERAL COMMUNICATIONS COMMISSION**

WASHINGTON, D.C. 20554

In the Matter of

Paramount Global

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

ORDER

Adopted: __________, 2026

Released: __________, 2026

By the Commission:

## I. Introduction

The Commission has before it LiveVideo.AI Corp.'s Application for Review of Declaratory Ruling DA 26-1001, adopted and released September 17, 2026.

LiveVideo requests review of the Media Bureau's determination concerning foreign ownership, including the authorization of aggregate indirect foreign equity ownership, the separately identified 15.1 percent interest held by the Public Investment Fund of Saudi Arabia ("PIF"),

and advance approval for specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests.

LiveVideo requests that the Commission address the actual ownership structure and rights associated with PIF's separately identified interest, consider LiveVideo's September 11, 2026 amended petition and related record-completeness issues, evaluate the September 8, 2026 LIV Golf materials to the extent properly presented or corroborative of issues already raised, consider the Committee's conditional filing under 47

C.F.R. § 1.40001(b), and address LiveVideo's submissions concerning Chairman Brendan Carr.

The Commission concludes that the Application for Review warrants further proceedings and that limited interim relief is appropriate to preserve the status quo while the Commission completes its review.

II. Authority

The Commission acts under Section 5(c) of the Communications Act, 47 U.S.C. § 155(c), 5 U.S.C. § 705, and 47 C.F.R. §§ 1.102, 1.106, 1.115, and 1.40001.

Filing an Application for Review does not automatically stay delegated action. The Commission therefore issues this express interim order.

III. Review and Further Proceedings

The Application for Review is granted for further consideration.

The Media Bureau shall provide the Commission with a procedural and record-status report addressing:

a. LiveVideo's September 11, 2026 amended petition;

b. LiveVideo's request for targeted supplementation;

c. LiveVideo's request to withhold action pending completion of the record;

d. the September 8, 2026 LIV Golf materials submitted before DA 26-1001 was issued; and

e. the September 17, 2026 Committee filing and its effect, if any, on the Bureau's analysis.

The Bureau's report shall identify any material it did not consider and shall explain whether further proceedings are necessary to address that material.

The Commission shall consider whether the record adequately addresses:

a. the actual ownership structure associated with PIF's separately identified 15.1 percent interest;

b. the voting, governance, consent, information, financing, security, restructuring, and other rights associated with that interest;

c. the relationship between PIF's separately identified interest and the aggregate foreign-equity authorization;

d. the relationship between PIF's interest and the advance-approval authority for future non-controlling interests;

e. Paramount's compliance with the relevant provisions of the September 4, 2026 Letter of Agreement; and

f. the Commission's independent public-interest analysis under Section 1.40001(b).

## IV. Interim Preservation Relief

Pending further order, implementation of the following portions of DA 26-1001 is stayed:

a. PIF's authority to increase its indirect equity interest under the advance-approval provision;

b. any additional issuance, transfer, conversion, or restructuring that would increase PIF's approved equity interest

c. any additional voting, governance, information, consent, security, financing, restructuring, or control rights granted to PIF or another

foreign investor beyond those disclosed in the September 4, 2026 Letter of Agreement; and

d. any implementation step that would materially alter the ownership or control structure evaluated in DA 26-1001.

This interim stay does not:

a. require divestiture or unwinding of any completed transaction;

b. invalidate PIF's existing approved interest;

c. prohibit ordinary business operations; or

d. present Paramount from complying with existing law or the Letter of Agreement.

Paramount shall not take any action covered by paragraph 11 without further order of the Commission.

V. Paramount Status Statement

Within three business days after release of this Order, Paramount shall file a verified status statement identifying whether, since September 17, 2026:

a. PIF or any other foreign investor has exercised advance-approval authority;

b. any additional equity, voting, governance, information, consent, security, financing, restructuring, or control rights have been issued, transferred, granted, or modified;

c. any action described in paragraph 11 is planned or contractually committed;

d. Paramount has submitted notices, certifications, security plans, or other materials required by the September 4, 2026 Letter of Agreement; and

e. Paramount contends that any portion of the status statement is confidential or otherwise protected from public disclosure.

Any request for confidential treatment shall identify the material for which protection is sought and the legal basis for the request.

VI. Chairman Carr Submissions

Within five business days after release of this Order, an appropriate FCC official who did not participate in the challenged decision shall file

a limited, non-privileged status report concerning LiveVideo's submissions regarding Chairman Carr.

The report shall address:

a. when the submissions were received;

b. which FCC office or offices received and routed them;

c. whether they were referred to the Media Bureau, Office of General Counsel, ethics personnel, or another institutional office;

d. whether any recusal, disqualification, or conflict review occurred;

e. whether any referral, inquiry, or investigation occurred;

f. whether the submissions were included in the decisional record; and

g. whether they were considered before DA 26-1001 was adopted and released.

The report need not disclose privileged, deliberative, classified, or protected national-security information. If information is withheld, the

report shall identify the category of information withheld and the asserted legal basis.

This reporting requirement does not determine whether Chairman Carr was disqualified or whether any alleged conflict was established.

## VII. Responses and Commission Review

LiveVideo and Paramount may file responses to the status reports within three business days after their filing.

The Commission shall consider the Application for Review, the status reports, and any responses on an expedited basis.

If the Commission determines that additional briefing, record supplementation, or other proceedings are necessary, it shall issue further instructions.

If the Commission orders further proceedings, it may stay the effect of DA 26-1001 under 47 C.F.R. § 1.115(h)(2) and applicable Commission authority.

Nothing in this Order constitutes a final determination on the merits of the Application for Review.

## VIII. Ordering Clauses

Accordingly, IT IS ORDERED that LiveVideo.AI Corp.'s Application for Review of DA 26-1001 IS GRANTED for further consideration to the extent stated in this Order.

IT IS FURTHER ORDERED that implementation of the portions of DA 26-1001 identified in paragraph 11 is STAYED pending further order of the Commission.

IT IS FURTHER ORDERED that Paramount shall file the verified status statement required by paragraph 14 within three business days after release of this Order.

IT IS FURTHER ORDERED that the designated FCC official shall file the status report required by paragraph 17 within five business days after release of this Order.

IT IS FURTHER ORDERED that the Media Bureau shall file the procedural and record-status report required by paragraph 8 within five business days after release of this Order.

IT IS FURTHER ORDERED that any responses authorized under paragraph 20 shall be filed within three business days after the applicable status report is filed.

IT IS FURTHER ORDERED that this Order is effective upon release.

FEDERAL COMMUNICATIONS COMMISSION

/s/ ________________________________

Marlene H. Dortch

Secretary

Dated: ___________, 2026

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, I caused a true and correct copy of the foregoing **Application For Review** to be filed through the Commission's electronic filing system and served upon all parties of record in MB Docket No. 26-93..

/s/ __Brad Greenspan______________________________

**Brad Greenspan**

**EXHIBIT DESIGNATIONS**

- **Exhibit A:** DA 26-1001, Declaratory Ruling, adopted and released September 17, 2026.

- **Exhibit B:** NTIA Petition to Adopt Conditions to Authorization and License, MB Docket No. 26-93, filed September 17, 2026 (Committee Petition).
- **Exhibit C:** Letter of Agreement from Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation, to FIRS/DOJ, dated September 4, 2026 (LOA).
- **Exhibit D**: Declaration of David Orlofsky (Chief Restructuring Officer, AlixPartners) in Support of Chapter 11 Petitions and First Day Motions, filed on or about September 8, 2026, in the jointly administered cases led by *In re LIV Golf New Jersey LLC*, Case No. 3:26-bk-20189 (Bankr. D.N.J.)

# EXHIBIT 3

LiveVideo.AI Corp., Emergency Request for Agency-Level Stay (filed Sept. 22, 2026; ECFS Submission No. 26110077743).

## BEFORE THE

## FEDERAL COMMUNICATIONS COMMISSION

## WASHINGTON, D.C. 20554

**In the Matter of**

**Paramount Global**

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

## LIVEVIDEO.AI CORP.'S EMERGENCY MOTION FOR STAY UNDER 5 U.S.C. § 705 AND EXPEDITED CONSIDERATION

LiveVideo.AI Corp. ("LiveVideo") respectfully moves under 5 U.S.C. § 705 and 47 C.F.R. §§ 1.102 and 1.115 for an immediate, narrowly tailored stay of implementation of Declaratory Ruling DA 26-1001, adopted and released September 17, 2026 ("DA 26-1001" or the "Order"), pending consideration of LiveVideo's concurrently filed Application for Review.

No exhibits are attached to this motion. This motion relies on materials already lodged in the Commission's electronic docket, materials submitted with the concurrently filed Application for Review and its exhibits, and matters properly subject to judicial notice. LiveVideo incorporates those materials by reference solely for the limited purposes stated below. The exhibits supporting the

factual and legal assertions in this motion are submitted with the concurrently filed Application for Review and are not duplicated here.

LiveVideo does not ask the Commission to unwind any completed transaction or prejudge the merits of the Application for Review. It requests limited interim relief to prevent further foreign-ownership, equity, governance, information-rights, or control changes before the Commission determines whether DA 26-1001 rests on a complete and lawfully evaluated record.

The requested relief should:

1. suspend PIF's advance-approval authority under DA 26-1001;

2. prohibit additional ownership or governance steps that would expand PIF's approved rights or grant foreign investors rights inconsistent with the September 4, 2026 Letter of Agreement ("LOA");

3. preserve the existing ownership and governance status quo; and

4. require expedited responses and limited procedural status reports concerning LiveVideo's September 11 amended petition and Chairman Brendan Carr submissions.

## I. Background

1. Paramount filed a petition for declaratory ruling under Section 310(b)(4) in MB Docket No. 26-93 concerning foreign ownership of Paramount's licensee interests. The petition, the LOA, the Committee's conditional filing, DA 26-1001, and related record materials are included in or lodged with the concurrently filed Application for Review.

2. LiveVideo participated in the proceeding through comments and ex parte submissions. LiveVideo also filed a July 31, 2026 supplemental petition concerning Chairman Brendan Carr and a September 11, 2026 amended petition requesting targeted supplementation and withholding of action pending completion of the record.

3. On September 4, 2026, Paramount executed and submitted the LOA. Paragraph 7 represents that foreign investors will hold non-voting stock without governance or information rights

and will not exercise influence over Paramount's content decisions or company management.

4. On September 8, 2026, LIV Golf filed for Chapter 11 protection. Related publicly filed materials describe PIF's role in financing and restructuring a comparable enterprise. LiveVideo relies on those materials as corroborating issues already presented concerning PIF's practical influence and the completeness of the record.

5. On September 17, 2026, the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector filed a conditional petition stating that it had no objection to Paramount's request provided that the Commission conditioned approval on compliance with the LOA.

6. On the same date, the Media Bureau adopted and released DA 26-1001. The Order authorized aggregate indirect foreign equity ownership of up to 100 percent, specifically approved PIF's 15.1 percent indirect equity interest, and granted advance authority for specified foreign investors to increase their indirect equity interests up to non-controlling 20 percent interests.

7. The Order became effective upon release. It does not state whether PIF's advance authority has been exercised or whether any additional equity, governance, financing, information, or control rights have been implemented.

## II. Materials Relied Upon and No-Attachment Statement

1. This motion is filed concurrently with LiveVideo's Application for Review of DA 26-1001.

2. The factual and legal materials supporting this motion are identified in the Application for Review and its accompanying exhibits. Those materials include DA 26-1001, the LOA, the Committee's conditional petition, LiveVideo's September 11 amended petition, LiveVideo's July 31 supplemental petition concerning Chairman Carr, and the relevant public filings concerning LIV Golf and PIF.

3. Those materials are either:

a. already lodged in the Commission's electronic docket;

b. submitted as exhibits to the concurrently filed Application for Review; or

c. matters appropriate for judicial or administrative notice.

LiveVideo does not attach those materials again to this motion. Nothing in this motion should be construed as requesting the Commission to treat a lodged or referenced material as part of the record without considering its procedural status, authenticity, relevance, and admissibility.

LiveVideo reserves the right to provide a copy of any referenced material at the Commission's request or to identify the applicable ECFS submission number, docket entry, or AFR exhibit designation.

## III. Legal Standard

Section 705 of the Administrative Procedure Act authorizes postponement of an agency action or preservation of the status or rights of the parties pending judicial review when justice requires.

The Commission's rules do not automatically stay delegated action upon the filing of an Application for Review. See 47 C.F.R. § 1.102. LiveVideo therefore requests an express stay and preservation order. It does not contend that the Application for Review itself automatically suspends DA 26-1001.

The traditional stay factors are:

1. likelihood of success or substantial questions on the merits;
2. irreparable injury absent relief;
3. harm to other parties; and
4. the public interest.

*Nken v. Holder*, 556 U.S. 418, 425–26, 434 (2009); *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958). The factors are balanced flexibly, and a substantial merits showing combined with strong equitable considerations may support relief. *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843–44 (D.C. Cir. 1977).

## IV. LiveVideo Presents Serious Questions on the Merits.

### A. DA 26-1001 does not provide an individualized analysis of PIF's actual rights.

The Order's central practical-influence finding states that the foreign investors "will not be able to wield any influence, let alone control" over decisions involving the licensees. DA 26-1001 ¶ 22.

That finding relies principally on the LOA's class-wide representation that foreign investors will hold non-voting stock without governance or information rights. But the Order does not identify or analyze PIF-specific:

- financing or debt rights;
- security, pledge, collateral, or lien rights;
- consent, veto, or reserved-matter rights;
- information, inspection, audit, or reporting rights;
- default, acceleration, or enforcement rights;
- restructuring, refinancing, or insolvency rights;

• rights held through affiliates; or

• practical influence over management, content, licensing, distribution, or strategic decisions.

Formal non-voting status may be relevant, but the Order does not explain why it resolves all forms of legal or practical influence. Section 310(b)(4) requires a public-interest determination based on the actual ownership structure, and the APA requires the agency to consider important aspects of the problem and explain the connection between the facts found and the decision made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The omission is particularly material because the Order grants advance authority for future ownership increases. The more extensive the advance authority, the more important it is for the Commission to identify what rights are permissible and what rights require further review.

### B. The Bureau did not explain its treatment of LiveVideo's September 11 filing and intervening evidence.

LiveVideo's September 11 amended petition requested targeted supplementation and withholding of action pending a complete record. The request addressed the central issue underlying the

Order: whether the record adequately established that PIF's investment would be passive in both legal form and practical effect.

DA 26-1001 does not explain whether the Bureau:

- reviewed the September 11 filing;
- considered whether supplementation was necessary;
- considered the LIV Golf/PIF materials;
- determined those materials were immaterial;
- gave Paramount an opportunity to respond; or
- concluded that further proceedings were unnecessary.

An agency may not disregard a material record-completion request without explanation. *State Farm*, 463 U.S. at 43; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68 (1962).

LiveVideo does not ask the Commission to find that the LIV Golf materials establish wrongdoing by PIF or Paramount. The materials provide contemporaneous corroboration for issues already presented concerning practical influence, record completeness, and the need for individualized analysis.

If the Commission concludes that the September 8 materials were not specifically before the Bureau, LiveVideo requests that the

Commission treat this motion as preserving a protective request for reconsideration under 47 C.F.R. § 1.106 or remand the issue for Bureau consideration.

### C. The Committee's conditional no-objection does not substitute for independent Commission review.

The Committee's petition was conditional on Paramount's compliance with the LOA. It does not disclose an independent, PIF-specific analysis of financing, security, governance, information, or restructuring rights.

Under 47 C.F.R. § 1.40001(b), the Commission may consider Executive Branch recommendations but must evaluate the concerns raised and make an independent decision. The Committee's conditional no-objection may inform the Commission's judgment, but it cannot replace the Commission's own reasoned public-interest analysis.

The Committee petition and DA 26-1001 were filed or released on the same day. The Order does not state whether the Bureau reviewed the petition before issuing DA 26-1001 or explain how the petition affected the Bureau's independent analysis. That unresolved issue supports interim preservation relief.

### D. The Bureau's disposition of the Chairman Carr submissions raises a separate procedural concern.

DA 26-1001 expressly declined to resolve LiveVideo's Chairman Carr conflict or disqualification submissions, stating that the issue was outside the delegated-authority proceeding and was not properly raised at that stage.

LiveVideo does not ask the Commission to make a final finding of misconduct or disqualification on this motion. It requests a limited procedural status report addressing:

1. when the submissions were received;
2. which FCC office received and routed them;
3. whether they were reviewed by the Bureau, the Office of General Counsel, ethics personnel, or another institutional office;
4. whether any recusal or disqualification analysis occurred;
5. whether the matter was referred for further review;
6. whether the submissions were included in the decisional record; and
7. whether they were considered before DA 26-1001 issued.

Undisclosed communications and unresolved decisional-process issues can impair the completeness of an administrative record and frustrate meaningful review. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54–58 (D.C. Cir. 1977). The appearance-of-fairness principle likewise requires attention where an adjudicator's conduct or public statements create a reasonable concern about prejudgment.

*Cinderella Career & Finishing Schs., Inc. v. FTC*, 425 F.2d 583, 590–92 (D.C. Cir. 1970).

## V. LiveVideo Faces Irreparable Harm Without Interim Relief.

The requested harm is not merely the possibility that LiveVideo will lose on the merits. The harm is that additional implementation may occur before review and alter the factual and legal posture in ways that are difficult to unwind.

Absent relief, Paramount or an affiliated entity could:

- issue or transfer additional equity;
- exercise PIF's advance-approval authority;
- modify financing arrangements;
- grant information, consent, security, or restructuring rights;
- alter governance arrangements; or
- restructure the ownership chain before review is complete.

Those steps could make later vacatur or remand substantially less effective. A later decision may not restore the prior ownership structure, unwind third-party rights, or reconstruct the record as it existed before implementation.

The requested stay avoids that problem without requiring divestiture or unwinding. It preserves the existing status quo while

allowing Paramount to continue ordinary operations and comply with existing law and the LOA.

## VI. The Balance of Equities and Public Interest Favor a Narrow Stay.

The requested relief is temporary and limited. It would not invalidate PIF's existing approved interest, require divestiture, or prohibit ordinary business operations. It would merely suspend additional implementation of the disputed advance authority while the Commission considers whether DA 26-1001 rests on a complete and lawfully evaluated record.

By contrast, denial could allow additional ownership or governance rights to be issued before the Commission determines whether its authorization was adequately reasoned.

The public interest favors:

- compliance with Section 310(b)(4);
- independent Commission consideration of Executive Branch recommendations;
- complete and reviewable administrative records;
- individualized evaluation of foreign ownership and practical influence;
- avoidance of irreversible implementation before review; and
- confidence in the fairness and integrity of agency proceedings.

A stay would not decide the merits. It would preserve the Commission's ability to decide them meaningfully.

## VII. Expedited Consideration Is Appropriate.

DA 26-1001 is effective. The Order grants advance authority for future foreign-ownership increases. The Application for Review raises record-completeness and institutional-integrity issues. Delay may permit implementation that cannot later be unwound.

LiveVideo therefore requests an expedited schedule:

- responses within three business days after service;
- any reply within two business days thereafter; and
- expedited Commission consideration of the motion and Application for Review.

## REQUEST FOR RELIEF

LiveVideo respectfully requests that the Commission:

1. grant expedited consideration;

2. immediately suspend implementation of the challenged portions of DA 26-1001 pending disposition of this motion;

3. pending resolution of the Application for Review, stay or hold in abeyance PIF's advance-approval authority under DA 26-1001;

4. prohibit any additional issuance, transfer, conversion, or restructuring that would:

a. increase PIF's approved equity interest;

b. expand any foreign investor's rights beyond those disclosed in the LOA;

c. grant additional voting, governance, information, consent, security, financing, or restructuring rights; or

d. materially alter the ownership or control structure evaluated in DA 26-1001;

5. clarify that the stay does not require divestiture, unwinding of completed transactions, or interruption of ordinary business operations;

6. direct Paramount to file a verified statement identifying whether any action described in paragraph 4 has occurred or is planned;

7. direct the Media Bureau or another appropriate FCC office to file a limited status report concerning LiveVideo's September 11 amended petition and request for targeted supplementation;

8. direct an appropriate FCC official to file a limited, non-privileged status report concerning receipt, routing, review, and consideration of LiveVideo's Chairman Carr submissions;

9. if the Commission determines that the LIV Golf materials were not properly before the Bureau, treat this motion as preserving a request for reconsideration under 47 C.F.R. § 1.106 or remand the issue for Bureau consideration; and

10. grant such other relief as may be necessary to preserve meaningful Commission and judicial review.

Respectfully submitted,

**LIVEVIDEO.AI CORP.**

By: /s/ Brad Greenspan____________________________
**Brad Greenspan**

Chief Executive Officer
LiveVideo.AI Corp.
244 Fifth Avenue, Suite G290
New York, New York 10001
Email: legalsupport1@nym.hush.com

Dated: September 22, 2026

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, I caused a true and correct copy of the foregoing **Emergency Motion for Stay Under 5 U.S.C. § 705 and**

**Expedited Consideration** to be filed through the Commission's electronic filing system and served upon all parties of record in MB Docket No. 26-93..

/s/ __Brad Greenspan______________________________

**Brad Greenspan**

**[Proposed] Order Granting in Part Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration.**

## [PROPOSED] ORDER

**BEFORE THE**
**FEDERAL COMMUNICATIONS COMMISSION**
**WASHINGTON, D.C. 20554**

**In the Matter of**

**Paramount Global**

Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended

MB Docket No. 26-93

Adopted: __________, 2026
Released: __________, 2026

By the Commission:

## I. Introduction

1. The Commission has before it LiveVideo.AI Corp.'s Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration concerning Declaratory Ruling DA 26-1001, adopted and released September 17, 2026.

2. LiveVideo requests narrowly tailored interim relief pending consideration of its Application for Review. The requested relief concerns PIF's advance-approval authority, additional foreign-ownership or governance changes, and limited procedural reporting concerning LiveVideo's September 11 amended petition and Chairman Brendan Carr submissions.

3. The Commission concludes that limited preservation relief is appropriate to maintain the status quo while the Application

for Review is considered. This Order does not decide the merits of the Application for Review.

## II. Authority and Interim Relief

1. The Commission acts under 5 U.S.C. § 705 and 47 C.F.R. §§ 1.102 and 1.115.

2. Filing an Application for Review does not automatically stay delegated action. The Commission therefore issues this express interim order.

3. Pending further order, implementation of the following portions of DA 26-1001 is stayed:a. PIF's authority to increase its indirect equity interest under the advance-approval provision;b. any additional issuance, transfer, conversion, or restructuring that would increase PIF's approved equity interest;c. any additional voting, governance, information, consent, security, financing, restructuring, or control rights granted to PIF or another foreign investor beyond those described in the September 4, 2026 Letter of Agreement; andd. any other implementation step that would materially alter the ownership or control structure evaluated in DA 26-1001.

4. This interim stay does not:a. require divestiture or unwinding of a completed transaction;b. invalidate PIF's existing approved interest;c. prohibit ordinary business operations; ord. prevent compliance with existing law or the Letter of Agreement.

## III. Status Statements

1. Within three business days after release of this Order, Paramount shall file a verified statement identifying whether, since September 17, 2026:a. PIF or any other foreign investor has exercised advance-approval authority;b. any additional equity, voting, governance, information, consent, security, financing, restructuring, or control rights have been issued, transferred, granted, or modified; orc. any action described in paragraph 6 is planned or contractually committed.

2. Within five business days after release of this Order, the Media Bureau shall file a status statement addressing whether it considered:a. LiveVideo's September 11 amended petition;b. LiveVideo's request for targeted record supplementation;c. LiveVideo's request to withhold action pending a complete record; andd. any LIV Golf or PIF-related materials submitted before DA 26-1001 was issued.

3. The Media Bureau shall identify any material it did not consider and state whether it believes further proceedings are necessary.

## IV. Chairman Carr Submissions

1. Within five business days after release of this Order, an appropriate FCC official who did not participate in the

challenged decision shall file a limited, non-privileged status report addressing:

a. when LiveVideo's Chairman Carr submissions were received;

b. which FCC office or offices received and routed them;

c. whether they were referred to the Media Bureau, Office of General Counsel, ethics personnel, or another institutional office;

d. whether any recusal, disqualification, or conflict review occurred;

e. whether any referral or further inquiry occurred;

f. whether the submissions were included in the decisional record; and

g. whether they were considered before DA 26-1001 was issued.

1. The report need not disclose privileged, deliberative, classified, or protected national-security information. Any withholding shall identify the category of information withheld and the asserted legal basis.

2. This reporting requirement does not determine whether Chairman Carr was disqualified or whether any alleged conflict was established.

## V. Responses and Further Proceedings

1. Paramount, LiveVideo, the Media Bureau, and any other necessary participant may file responses to the status statements within three business days after their filing.

2. The Commission will consider the Application for Review and related submissions on an expedited basis. The Secretary shall place the Application for Review, this Order, and the required status statements before the Commission for further action.

3. This Order remains in effect until the Commission issues a further order or otherwise resolves the Application for Review.

## ORDERING CLAUSES

1. Accordingly, IT IS ORDERED that LiveVideo.AI Corp.'s Emergency Motion for Stay Under 5 U.S.C. § 705 and Expedited Consideration IS GRANTED IN PART to the extent set forth in this Order.

2. IT IS FURTHER ORDERED that implementation of the specified portions of DA 26-1001 is stayed pending further order of the Commission.

3. IT IS FURTHER ORDERED that Paramount shall file the verified status statement required by paragraph 8 within three business days after release of this Order.

4. IT IS FURTHER ORDERED that the Media Bureau and designated FCC official shall file the status reports required by paragraphs 9 and 11 within five business days after release of this Order.

5. IT IS FURTHER ORDERED that this Order is effective upon release.

FEDERAL COMMUNICATIONS COMMISSION

/s/ ________________________________

**Marlene H. Dortch**
Secretary

Dated: __________, 2026

# EXHIBIT 4

LiveVideo.AI Corp., Supplement (filed Sept. 28, 2026; ECFS Submission No. 26110078556).

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

In the Matter of

Paramount Global
Petition for Declaratory Ruling Under Section 310(b)(4)
of the Communications Act of 1934, as Amended

MB Docket No. 26-93
DA 26-1001 (rel. Sept. 17, 2026)

September 28, 2026

## SUPPLEMENT TO APPLICATION FOR REVIEW OF DA 26-1001 AND TO EMERGENCY MOTION FOR STAY

LiveVideo.AI Corp. ("LiveVideo") supplements its Application for Review (filed Sept. 22, 2026; ECFS No. 26110077749) and its Emergency Motion for Stay (filed Sept. 22, 2026; ECFS No. 26110077743). The Supplement is filed within the 30-day period for seeking review of DA 26-1001. 47 C.F.R. § 1.115(d). LiveVideo has withdrawn its Protective Petition for Reconsideration (filed Sept. 25, 2026; ECFS No. 26110078333). All of LiveVideo's requests concerning DA 26-1001 are therefore before the full Commission.

## CORRECTION TO THE NOTICE OF WITHDRAWAL

LiveVideo corrects one statement in its Notice of Withdrawal (filed Sept. 28, 2026). The Notice said that LiveVideo had presented the LIV Golf matters to the Bureau in its Amended Petition to Deny (filed Sept. 11, 2026; ECFS No. 26110076450). That is not correct. The Amended Petition does not mention LIV Golf. LiveVideo first raised the LIV Golf matters in its Emergency Motion for Stay and its Application for Review, both filed September 22, 2026, five days after the Ruling. The Application for Review (at 13) contains the same mistaken statement, and LiveVideo corrects it as well.

Because the Bureau never had the LIV Golf matters before it, this Supplement presents them in Part C, among the facts first raised after the Ruling. The correction does not affect the withdrawal of the Protective Petition. LiveVideo regrets the error.

## HOW THIS SUPPLEMENT IS ORGANIZED

An application for review may not rely on a question the Bureau "has been afforded no opportunity to pass." 47 U.S.C. § 155(c)(5); 47 C.F.R. § 1.115(c). The Supplement is organized around that rule:

**Part A** presents new evidence on questions the Bureau had before it.

**Part B** identifies defects in the Bureau's action itself. These could not have been raised before the Bureau acted.

**Part C** presents facts that arose, or were first raised, after the Ruling. They are offered to support the stay request and the Commission's review on its own initiative, 47 U.S.C. § 155(c)(4), not as grounds the Bureau overlooked.

If 47 C.F.R. § 1.115(f) is applied to this Supplement and the Application together, LiveVideo requests leave to exceed its page limit. Good cause exists because much of what follows occurred on or after September 17, 2026.

## A. NEW EVIDENCE ON QUESTIONS THE BUREAU HAD BEFORE IT

### 1. PIF's own records contradict the "independence" claim on which the Ruling relies.

The Ruling found that the investors would not be able to influence Paramount. DA 26-1001 ¶ 22. That finding depends on treating PIF as independent of the Saudi state. The only support is Paramount's statement that PIF has "independence in carrying out its investment management." That statement appears in Paramount's supplement (filed June 23, 2026; ECFS No. 26109885351),

Ex. B, pt. 5 notes, and rests on Royal Decree No. M/92, which was never filed. PIF's own records say otherwise:

(a) PIF's official leadership page states that its Board, which oversees PIF's "long-term strategy, investment policy and performance," is chaired by the Crown Prince and Prime Minister. Nine of its eleven members sit in the Council of Ministers. Public Investment Fund, *Our Leadership*, https://www.pif.gov.sa/en/who-we-are/our-leadership/ (accessed Sept. 28, 2026).

(b) PIF's audited 2025 consolidated financial statements identify the Government of Saudi Arabia as "the Owner."

(c) PIF's FARA registration describes it as "a government fund" regulated under the same decree. Brownstein Hyatt Farber Schreck, LLP, FARA Reg. No. 5870, Ex. B (Oct. 27, 2025).

Paramount's Form 10-Q (Aug. 4, 2026), filed while this proceeding was pending, lists PIF among "institutional investors" without identifying its government (at 10, 46). **LiveVideo asks** that the Commission obtain the decree and address PIF's own statements before relying on the independence claim.

**2. About a fifth of the foreign equity is held by people no filing identifies.** Paramount estimates foreign equity at 49.5%. That figure includes about 5.8% held by unnamed non-U.S. limited partners in RedBird funds and about 5.2% that Paramount estimates from trading data and Form 13F reports. Together, those are 11.0 points held by no named person. Paramount's 14.8% deemed-voting figure rests on an insulation claim, but no partnership provision supporting it has been produced. And 47 C.F.R. § 1.5004(a)(1) would allow further foreign ownership without prior

approval. Amended Petition to Deny (filed Sept. 11, 2026; ECFS No. 26110076450), Parts III, V. The Bureau addressed none of this.

Public reporting identifies one potential foreign-government-linked investor the Commission did not ask about. RedBird's fund family reported $750 million in commitments from International Media Investments of Abu Dhabi, which is controlled by the UAE's Vice President, Sheikh Mansour bin Zayed Al Nahyan. Sportico (May 5, 2023).

The Commission's own public notice quotes the syndication as including "RedBird Fund IV." DA 26-411 (Apr. 27, 2026). **LiveVideo asks** that the Commission require Paramount to identify the unnamed holders and to state whether that investor, or any entity it controls, is a limited partner in any RedBird vehicle holding Paramount equity or Harbor Lights voting stock.

**3. A $10 billion first lien on the licensee parent has not been examined.** On April 7, 2026, Paramount Skydance entered into $10 billion in senior secured credit facilities. They are secured by a first lien on "all or substantially all of the assets" of the company and its U.S. subsidiaries, including Paramount Global. The lien excludes real property and ends if the company reaches investment grade. "

The occurrence of a change of control" is an event of default. The filing names the agents and arrangers, but describes the lenders only as "a group of eighteen lenders composed of PSKY's relationship banks and institutional lenders." Form 8-K, Explanatory Note & Item 1.01 (filed Apr. 9, 2026); Amended Petition to Deny (filed Sept. 11, 2026; ECFS No. 26110076450), Part XII.F. **LiveVideo asks** that the Commission require Paramount to state whether any lender is a foreign government or its investment vehicle, and whether the Commission's licenses are excluded from the collateral. See also Part C.1.

**4. The supervising official's disclosures show trades and income tied to this matter.**

The Executive Branch has asserted supervisory authority over the Commission. Exec. Order No. 14215. The Amended Petition (Part VII) lodged the President's certified OGE Form 278e (received June 29, 2026; certified June 30, 2026) and his Forms 278-T. They show the following:

(a) Purchases of Paramount Global and Warner Bros. Discovery stock on May 6, 15, and 28, 2025, while MB Docket No. 24-275 was pending. The 45-day reporting dates for those purchases fell before the Commission's July 24, 2025 vote.

(b) A $16,000,000 settlement entry sourced to the CBS defendants (entry 431.3), and event tickets sourced to Dana White (Pt. 9, items 5–6).

(c) Income from DT Diriyah Hotel Manager LLC (Saudi Arabia), DT Marks Abu Dhabi LLC ($5,000,000), DT Marks Doha LLC ($5,250,000), and DT Marks Dubai DG LLC ($10,361,458.68) (Pt. 2, Sched. 1). Public reporting describes the Diriyah interest as the President's 80% stake in a hotel management agreement within Diriyah, a development PIF lists among its giga-projects. The contracting partner is a Dar Global company. Dan Alexander, *Trump's Business Pursued Saudi Deal As He Conducted Nuclear Discussions*, Forbes (July 23, 2026).

The Trump Organization has stated that the securities accounts are fully discretionary and managed by third parties. LiveVideo draws no inference from these entries. **LiveVideo renews its request** that the Bureau state whether any nonprivileged Commission record refers to them. Amended Petition, Relief ¶ 8.

**5. The Letter of Agreement took effect while a federal court barred integration of WBD.** The Bureau received LiveVideo's "documentation related to various pending litigations"

and set it aside. DA 26-1001 n.40. The Commission itself knew of the court's order. On August 28, 2026, it told the D.C. Circuit that the WBD merger could not close "until the earlier of (1) five days after [a] merits determination … or (2) June 1, 2027," while arguing that this proceeding and that merger were not "the same corporate transaction." FCC Opp. to Mot. to Relate, *LiveVideo.AI Corp. v. FCC*, No. 26-1176, Doc. #2190509, at 8–9 (D.C. Cir. Aug. 28, 2026). Yet the Letter of Agreement (Sept. 4, 2026), on which the Ruling relies, is built on that merger:

(a) It defines its operative "Closing Date" as the closing of the WBD merger (§ 1(b)).

(b) It extends its commitments to WBD as a Paramount subsidiary (¶ 3).

(c) It defers its security plan until after that closing (¶ 4).

(d) It took effect on the date of the Ruling (¶ 17). At that time the court's order barred Defendants from taking "any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the Transaction." *California v. Paramount Skydance Corp.*, No. 4:26-cv-07116-AMO (N.D. Cal.), ECF 170 at 10 (stipulated July 23–24, 2026).

Paramount's filings in this docket do not disclose the order, although 47 C.F.R. §§ 1.17(a)(2) and 1.65(a) require disclosure of changes of decisional significance. **LiveVideo asks** that the Commission require Paramount to address it.

## B. DEFECTS IN THE BUREAU'S ACTION

**1. The rules required the full Commission to decide this matter.** The Media Bureau's delegated authority excludes "[m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." Those "shall be referred to the Commission en banc for disposition." 47 C.F.R. § 0.283(c). None of the precedents the Ruling cites (¶ 24 & nn.70, 119) involved any of the following features, all of which are present here:

(a) investment vehicles of three foreign governments;

(b) 38.5% aggregate sovereign equity;

(c) advance authority to 20% for each investor and 100% overall;

(d) a parent of a national broadcast network that will also control a national cable news network;

(e) application of the framework revised by *Review of Foreign Ownership Policies*, GN Docket No. 25-149, Report and Order, 41 FCC Rcd 831 (Jan. 30, 2026); and

(f) a licensee chain that certified in 2024 that it needed no ruling above 25%. Transaction Agreement § 3.17(f), in Comprehensive Exhibit, MB Docket No. 24-275, LMS File No. 0000252521 (as amended Oct. 2024).

The Bureau was required to refer the matter. It did not.

**2. There could be no "independent decision" while the disqualification requests remained undecided.** The Commission's rule requires it to "evaluate concerns raised by the executive branch and . . . make an independent decision." 47 C.F.R. § 1.40001(b). LiveVideo's requests to disqualify Chairman Carr have been pending in MB Docket No. 24-275 since July 24, 2025, and in this docket since July 31, 2026.

The Bureau declined to reach them "because this Petition is being resolved under the Media Bureau's delegated authority." DA 26-1001 n.40. The Chairman is the Commission's chief executive and represents it "in all matters requiring conferences or communications with other governmental officers." 47 U.S.C. § 155(a). The Commission has three sitting members, the minimum for a quorum. *Id.* § 154(h). **LiveVideo asks** that the Commission decide the disqualification requests on their merits, on the record and with reasons, before acting on this Application.

**3. The Executive Branch review departed from Executive Order 13913.** The Committee's filing and the Ruling were issued the same day, September 17, 2026. The record shows these departures from Exec. Order No. 13913, 85 Fed. Reg. 19643 (Apr. 8, 2020):

(a) The review period began June 16, 2026. Paramount's June 23 disclosures followed, with no new completeness determination or extension (§§ 5(b)(iii), 5(d)).

(b) The authorization covers ownership that was never referred for review, up to 100% (§§ 3(a)(i), 5(a)).

(c) No intelligence threat assessment appears (§ 7).

(d) No written risk-based analysis supports the recommendation or the mitigation (§§ 9(c), 10(d)).

(e) The security plan is not due until 90 days after closing (LOA ¶¶ 4, 17; EO §§ 10(a), (e)).

(f) No notice to Advisors, and no presidential-notice interval, is shown for non-standard mitigation (§ 9(f)–(g)).

(g) The filing is signed by an NTIA Attorney Advisor rather than transmitted by the Chair (§§ 4(b), 9(h)).

(h) The Letter of Agreement is signed "For Paramount Global" alone; no investor signed it (§§ 8, 10(a)).

LiveVideo does not seek to enforce the Executive Order. The point is that, on this record, the Commission cannot treat the review as complete or its own decision as independent.

**4. The Ruling did not address the statutory consequences of the ownership it approved.** A domestic news organization is excluded from treatment as an agent of a foreign principal only "so long as it is at least 80 per centum beneficially owned by" U.S. citizens. 22

U.S.C. § 611(d). The Communications Act and the Commission's rules attach reporting and disclosure obligations to that line. 47 U.S.C. § 624; 47 C.F.R. § 73.1212(j)(2).

The approved ownership exceeds it, and the Ruling does not mention those provisions. The Letter of Agreement binds only the named investing vehicles. It does not reach the governments' other enterprises, including:

(a) the more than 250 subsidiaries Abu Dhabi consolidated into L'IMAD on January 30, 2026;

(b) PIF's registered U.S. agent, which reported $33,616,299 from PIF in six months for media outreach (FARA Reg. No. 7252, Supp. Stmt. (Oct. 30, 2025)); and

(c) Sela, the PIF-owned co-owner of Zuffa Boxing, whose events Paramount distributes exclusively and may simulcast on CBS (Paramount press release (Sept. 29, 2025)).

In the alternative, these matters fall within the foreign-influence question the Bureau decided. DA 26-1001 ¶ 22.

### C. FACTS ARISING OR FIRST RAISED AFTER THE RULING

**1. PIF recently abandoned its equity commitment to another major U.S. venture and became its secured lender.** LIV Golf filed for Chapter 11 on September 8, 2026, nine days before the Ruling. As noted in the correction above, LiveVideo first raised this in its Emergency Motion for Stay and its Application for Review (at 12–13). LIV's sworn first-day declaration states:

(a) PIF held 98.48% of LIV's parent and invested about $5 billion in equity.

(b) On April 30, 2026, PIF announced it would provide no further equity because the investment was "no longer consistent with the current phase of PIF's investment strategy."

(c) PIF then became LIV's secured lender, with about $495 million outstanding, secured by "substantially all of the assets," and it is now the priming debtor-in-possession lender.

*In re LIV Golf*, No. 26-20189-MBK (Bankr. D.N.J.), Doc. 27, ¶¶ 37–39, 41, 43 (Sept. 9, 2026). Paramount's Form 10-Q (Aug. 4, 2026) states that the equity syndication "does not relieve" the Ellison and RedBird investors of their commitments (at 10). That protects the funding at closing.

It says nothing about how PIF may act afterward, as an owner or as a lender. The Bureau asked only whether PIF holds voting stock. **LiveVideo asks** that the Commission require Paramount and PIF to state whether PIF holds, or may acquire, any financing, security, consent, or restructuring rights in the combined company, and to make a specific representation about the durability of PIF's commitment.

**2. Paramount's chief executive met the Committee's principals after the recommendation.** On September 24, 2026, two days after LiveVideo sought review and a stay, Paramount's chief executive attended the White House state dinner.

Also present were the President; the Secretary of Defense, a Committee member; and the Secretaries of State, Treasury, and Commerce and the U.S. Trade Representative, who are Committee Advisors. Exec. Order No. 13913 § 3; Wash. Times (Sept. 24, 2026); Detroit News (Sept. 25, 2026); Deadline (Sept. 24, 2026).

The same evening, CNN, which Paramount is acquiring, was barred from covering the event. TheWrap (Sept. 24, 2026). The Committee's monitoring and its review of the post-closing security plan are still to come. **LiveVideo asks** that the Commission state whether any Commissioner or employee attended, and whether any communication about this docket occurred.

**3. PIF's Governor sat beside the President-elect at UFC 309.** LiveVideo's Supplement to Amended Petition to Deny (filed Sept. 25, 2026; ECFS No. 26110078329), at 3 and 11–12, documents that on November 16, 2024, the President-elect sat ringside at UFC 309 between Elon Musk and Yasir Al-Rumayyan, PIF's Governor. That Supplement also poses nineteen questions to the applicants. PIF later retained a registered agent, from October 2025 to March 2026, for "[e]ducation and advocacy before the U.S. federal government for transactions or potential transactions" of PIF. FARA Reg. No. 5870, Ex. B (Oct. 27, 2025).

**4. A Commissioner objected that the question was novel and belonged to the full Commission.** On September 17, 2026, Commissioner Gomez said she had asked for "this new and novel issue to go to a full Commission vote," and that the ruling issued instead at staff level. The Desk (Sept. 17, 2026).

**5. Closing is imminent, and once it occurs the sovereign equity cannot be recalled.** The parties have moved to dissolve the court's no-close order once a consent decree is entered. *California v. Paramount Skydance Corp.*, ECF 243. The court heard the matter on September 24, 2026, and will rule "in due course." The Desk (Sept. 24, 2026). Paramount has set October 5, 2026 as the record date for warrants whose distribution depends on closing. After closing, the approved sovereign equity will have issued and cannot be undone.

**REQUESTED ACTION**

In addition to the relief requested in its Application for Review and Emergency Motion for Stay, LiveVideo asks that the Commission:

(1) stay DA 26-1001 under 47 C.F.R. § 1.102(b)(3) pending disposition, at minimum as to the advance authorizations (¶¶ 29, 31);

(2) decide the pending disqualification requests first, on their merits and on the record, without participation by any Commissioner who is the subject of a request;

(3) decide the Petition as a full Commission, as 47 C.F.R. § 0.283(c) requires;

(4) direct Paramount to respond, under 47 C.F.R. § 1.16, to the matters in Parts A.1 through A.5 and C.1; and

(5) state, as to Part C.2, whether any Commission personnel attended the September 24 dinner or communicated about this docket.

Respectfully submitted,

LIVEVIDEO.AI CORP.

/s/ Brad Greenspan
Brad Greenspan
Chief Executive Officer
LiveVideo.AI Corp.
244 Fifth Avenue, Suite G290
New York, NY 10001
legalsupport1@nym.hush.com

Dated: September 28, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2026, I caused a copy of the foregoing Supplement to Application for Review and to Emergency Motion for Stay to be filed via the Commission's Electronic Comment Filing System in MB Docket No. 26-93.

/s/ Brad Greenspan
Brad Greenspan

# EXHIBIT 5

Letter of Agreement (dated Sept. 4, 2026), as filed by NTIA on Sept. 17, 2026 (ECFS Submission No. 26110076883).

September 4, 2026

Chief, Foreign Investment Review Section ("FIRS")
Deputy Chief, Compliance and Enforcement (FIRS)
On Behalf of the Assistant Attorney General for National Security
United States Department of Justice
National Security Division
175 N Street NE
Washington, DC 20530
Compliance.Telecom@usdoj.gov

Subject: FCC MB Docket No. 26-93 (TT 26-006)
Petition for Declaratory Ruling by Paramount Global pursuant to Section 310(b)(4) of the Communications Act of 1934, as amended

Dear Sir/Madam:

This Letter of Agreement ("LOA" or "Agreement") sets forth the commitments that Paramount Global ("Paramount") make to the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (the "Committee") and the U.S. Department of Justice ("DOJ" or the "Compliance Monitoring Agency" or "CMA")[1] to address national security and law enforcement risks arising from the above-referenced Petition.[2] In this Petition, Paramount seeks a declaratory ruling from the Federal Communications Commission ("FCC" or "Commission") to allow Paramount to accept indirect foreign equity and voting interests in excess of the 25% benchmarks set forth in section 310(b)(4) of the Communications Act of 1934, as amended.[3] Paramount further requests that the Commission grant specific approval for certain foreign investors to indirectly hold equity and/or deemed voting interests of greater than 5% in Paramount, and grant advance approval for the non-

[1] DOJ includes the Federal Bureau of Investigation ("FBI").

[2] Petition for Declaratory Ruling of Paramount Global, MB Docket No. 26-93 (filed Apr. 24, 2026) ("Paramount Petition").

[3] 47 U.S.C. § 310(b)(4).

controlling prospective foreign investors to increase their indirect equity and/or voting interests up to 20% in Paramount.[4]

Paramount certifies as true and correct, under penalties outlined in 18 U.S.C. § 1001, all statements Paramount or its representatives have made to the Committee, DOJ, U.S. Department of Homeland Security, Department of War, and the FCC in the course of the review of the above-referenced petition that was conducted pursuant to Executive Order 13913,[5] and it hereby adopts those statements as the basis for this LOA. Paramount acknowledges that nothing in this LOA obviates or otherwise modifies any other legal obligation or requirement that Paramount may have to any governmental or regulatory agency, including but in not limited to, obligations to comply with the Foreign Agents Registration Act, 22 U.S.C. § 611 et seq., and implementing regulations.

**Definitions**

1) For purposes of this LOA, the following definitions apply:

   a. "Access" means: (1) to enter a location; or (2) to obtain, read, copy, edit, divert, release, affect, alter the state of, or otherwise view data or systems in any form, including through information technology ("IT") systems, cloud computing platforms, networks, security systems, and equipment (software and hardware). For the avoidance of doubt, Access shall be construed broadly to include rather than exclude considered conduct.

   b. "Closing Date" refers to the closing date of the merger between Paramount Skydance and Warner Bros. Discovery, Inc. ("WBD").

   c. "Foreign Investors" are those foreign investors for which specific and advanced approval was requested in the Paramount Petition.[6]

   d. "Other Non-Anonymized Data" means other information that is collected, stored and/or used by Paramount or a Service Provider when linked to specific individuals, including registered user data, device-level data, race, gender, religion, age, political party, marital status, affinities, geolocation data, geographical indicators, social media account information, employment information, financial information, usage information, and payment information of such specific individuals.

---

[4] *Paramount Global Seeks Foreign Ownership Declaratory Ruling Pursuant to Section 310(b)(4) of the Communications Act of 1934, as amended*, MB Docket No. 26-93, Public Notice, DA 26-411 (MB Apr. 27, 2026) ("*Paramount Public Notice*") *citing* Paramount Petition at 16-17.

[5] Exec. Order No. 13913, 85 Fed. Reg. 19643 (Apr. 4, 2020). The Media Bureau of the FCC referred the Paramount Petition to the Committee for its reviews on any national security, law enforcement, foreign policy, or trade policy concerns related to the foreign ownership of Paramount. *Paramount Public Notice* at 4-5.

[6] *See* Paramount Petition at 16-17.

e. "Paramount's U.S. Person Data" means the U.S. Person Personally Identifiable Information, Other Non-Anonymized Data, Anonymized Data, and Sensitive Personal Data Paramount collects, uses, processes, or maintains, either directly or through its subsidiaries (including but not limited to WBD), affiliates, or Service Providers. For the avoidance of doubt, any device-level data associated with the account of the U.S. Person logged in on that device is considered U.S. Person Data.

f. "Personally Identifiable Information" or "PII" means any information that uniquely identifies and correlates to a natural person or can be used to distinguish or trace a natural person's identity, alone, including a natural person's name, social security number, or biometric records, or when combined with other personal or identifying information that is linked or linkable to a specific individual, including date and place of birth, or parent's surname.

g. "Sensitive Personal Data" means sensitive personal data as set forth in 31 CFR § 800.241.

h. "Service Provider" means any unaffiliated company that collects, uses, processes, secures, or maintains Paramount's U.S. Person Data at the direction of Paramount.

**Specific Commitments**

2) Paramount shall notify the CMA(s) of the closing within **two calendar days** of the Closing Date.

3) Paramount agrees to take all appropriate measures to prevent unauthorized Access to or unlawful use of Paramount's U.S. Person Data, and to prevent the unauthorized disclosure of information relating to Paramount's U.S. Person Data.

4) Within **90 days** of the Closing Date, Paramount agrees to provide copies of the security policies and plans ("Policies and Plans") that will be used to safeguard Paramount's U.S. Person Data after the Closing Date to the CMA(s) for objection or non-objection. The CMA(s) will object or non-object within **60 days** of receipt of Paramount's submission.

5) Paramount agrees to make modifications to the Policies and Plans if necessary to address the CMA(s) concerns and resolve an objection.

6) Paramount agrees that it will update the Policies and Plans when appropriate to conform with evolving security best practices.

7) Paramount affirms each of the Foreign Investor's interest in Paramount will consist entirely of non-voting stock without any governance or information rights, and the

Foreign Investors will not have any influence, direction, or control over or provide any commentary or guidance on Paramount's content decisions, company management, or have any Access to Paramount's non-public U.S. Person Data. Paramount further affirms that in the event it proposes to change any voting, governance or information rights of the Foreign Investors, it will seek prior approval from the FCC through a new petition for declaratory ruling, and acknowledges that that such new petition could be subject to a referral to the Committee.

**General Provisions**

8) Paramount agrees that this LOA is binding upon, and inures to the benefit of, Paramount and its respective successors and assigns. For purposes of this LOA, successors and assigns include any corporate name changes. Paramount may not assign any obligation under this LOA without the prior written consent of the CMA(s).

9) Paramount agrees that the Committee, at its sole discretion, may make non-substantive administrative updates to the LOA to add, modify, or remove the compliance monitoring agencies monitoring this LOA.

10) Paramount also agrees that the Committee may decide in its sole discretion to make non-substantive administrative updates to the LOA, to account for changes in 1) corporate ownership, mergers and acquisitions, structure, names, and license numbers; and 2) Committee structure.

11) If the CMA(s) finds that the terms of this LOA are inadequate to resolve any national security or law enforcement risks, Paramount agrees to resolve those concerns, according deference to the CMA(s)'s views on the need for modification. If new or additional national security or law enforcement risks develop with respect to the policies that have received the CMA(s)'s prior non-objection under this LOA, Paramount similarly agrees to resolve the CMA(s)'s concerns to the CMA(s)'s satisfaction. Rejection of a proposed modification shall not alone be dispositive, but failure to resolve national security or law enforcement concerns may result in a request that the FCC modify, condition, revoke, cancel, terminate, or render null and void any relevant license, permit, or other authorization granted by the FCC to Paramount or its successors-in-interest, or any other appropriate enforcement action required to address the concern.

12) Paramount agrees that in the event that Paramount breaches the commitments set forth in this LOA, to include conduct contrary to timely CMA objection to any notice submitted pursuant to this LOA, a recommendation may be made that the FCC modify, condition, revoke, cancel, enter other declaratory relief, or render null and void any relevant license, permit, or other authorization granted by the FCC to Paramount or its successors-in-interest, in addition to pursuing any other remedy available by law or equity.

13) For purposes of counting days in this LOA, the day of the event that triggers the period is excluded, but every day thereafter is counted, including intermediate Saturdays, Sundays,

and legal holidays. If the last day is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday.

14) The time period dictated in any non-objection, consent, or approval provision applicable to the CMA(s) pursuant to this LOA shall be tolled during a lapse in appropriations or any time when the Federal government in the greater Washington, D.C. area is closed.

15) Paramount agrees to permit disclosure of information submitted to the FCC in confidence pursuant to 47 CFR § 0.442 to Federal government departments, agencies, and offices whose principals are listed in Section 3 of Executive Order 13913.

16) Paramount understands that if the CMA(s), with non-objection from the Committee, finds the national security and law enforcement risks associated with this Petition have decreased such that they no longer warrant mitigation, the Committee may terminate this LOA by notice to the FCC. Paramount further understands that even after such a termination, under Section 6 of Executive Order 13913, the Committee may conduct a license review for additional or new risks to U.S. national security and law enforcement interests at any time. Termination of a mitigation agreement does not relieve Paramount from liability for any breach of this LOA occurring while it was in effect.

17) This Agreement shall become effective for compliance purposes on the date of the FCC approval of the above-captioned Petition.

*For Paramount Global:*

Signed by:
Makan Delrahim
B7A7BC211B3E49C...

Makan Delrahim
Chief Legal Officer of Paramount Skydance Corporation
Paramount Global

# EXHIBIT 6

Paramount Global, Petition for Declaratory Ruling (dated Apr. 24, 2026; filed Apr. 27, 2026; ECFS No. 104272462615916), as reproduced in No. 26-1176, Doc. #2180914 (filed June 29, 2026), Ex. E.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of<br><br>**Paramount Global**, Petitioner,<br><br>Petition for Declaratory Ruling under Section 310(b)(4) of the Communications Act, of 1934, as Amended | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | File No. ISP-PDR-________-_____ |

**PETITION FOR DECLARATORY RULING**

Paramount Global ("Paramount" or "Petitioner"), on behalf of itself and its subsidiaries that operate television broadcast stations ("Licensees"), files this petition for declaratory ruling ("Petition") pursuant to Section 310(b)(4) of the Communications Act of 1934, as amended (the "Act"), and Section 1.5000 *et seq.* of the Commission's rules.[1] Specifically, as a result of the Proposed Investment (defined in Section I, below), Paramount anticipates an increase in foreign investment in its parent entity, Paramount Skydance Corporation ("Paramount Skydance"),[2] through the issuance of new non-voting, Class B shares. Accordingly, Paramount requests that the Commission issue a declaratory ruling to (1) permit existing and prospective foreign investors to indirectly hold in excess of 25 percent of Paramount's equity and/or voting interests, in the aggregate, and (2) grant specific and advance approval for certain non-U.S. entities to indirectly hold equity and/or deemed voting interests of greater than 5 percent in Paramount, in

[1] 47 U.S.C. § 310(b)(4); 47 C.F.R. § 1.5000 *et seq.*

[2] Paramount Skydance Corporation is the entity identified as "New Paramount" in the application for approval and the Commission's order approving the transfer of control of Paramount Global to the Ellison family. *See Applications for Consent to the Transfer of Control of Paramount Global*, MB Docket No. 24-275, Memorandum Opinion and Order, FCC 25-43 (rel. July 24, 2025).

the form of newly issued non-voting, Class B shares. Although Paramount expects that existing and prospective foreign investors will indirectly hold slightly less than 50 percent of Paramount's equity interests after consummating the Proposed Investment described below, Paramount seeks approval for foreign investors in the aggregate to indirectly hold up to 100 percent of its equity and/or voting interests in light of routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a)).[3]

Notably, the Proposed Investment will not result in a transfer of control of Paramount. Rather, the Ellison family will retain a majority of the voting interests and control of Paramount. Thus, no other application is being filed in connection with this Petition. The Commission's grant of this Petition will serve the public interest by facilitating increased investment in U.S. television broadcasting, thus enabling Paramount and the Licensees to compete more effectively in the television broadcast marketplace through greater innovation and a broader range of programming and content, all without presenting any national security, law enforcement, or foreign or trade policy concerns.

## I. BACKGROUND

### A. Controlling U.S. Parent

Paramount, a Delaware corporation, is designated as the Controlling U.S. Parent in this Petition. This Petition seeks approval for indirect foreign ownership of Paramount that will be introduced in connection with planned new investment in Paramount Skydance (the "Proposed

[3] 47 C.F.R. § 1.5004(a)(1) (allowing a controlling U.S.-organized parent named in a declaratory ruling to be 100 percent owned on a going-forward basis by other foreign investors without prior Commission approval, subject to the requirement to seek prior approval before any foreign person or group not previously approved acquires more than five percent of the equity or voting interests, or a controlling interest (subject to any applicable exemption)).

Investment") that will occur through the Equity Syndication described below, including specific and advance approval of certain non-U.S. investors and approval of aggregate foreign ownership of up to 100 percent of the equity and/or voting interests in Paramount.

Paramount is a Delaware corporation that, through the Licensees (each a direct or indirect wholly owned subsidiary of Paramount), operates 28 broadcast television stations in certain communities across the United States pursuant to Commission authorization.[4] Paramount is a direct, wholly owned subsidiary of Paramount Skydance, a leading global media, streaming, and entertainment company that creates premium content and experiences for audiences worldwide.

Paramount Skydance's portfolio includes iconic assets such as the national CBS television network, Paramount Pictures, Nickelodeon, MTV, Comedy Central, and BET. The company also operates streaming platforms, including Paramount+ and Pluto TV. Paramount Skydance holds extensive libraries of television and film titles, engages in content production and distribution, and provides advertising solutions.

### B. Paramount Global Ownership

Paramount is directly wholly owned by Paramount Skydance Corporation, a Delaware corporation. Paramount Skydance is owned through two classes of stock: (i) Class A Common Stock, the holders of which have 100 percent of the voting interests in Paramount Skydance, and (ii) Class B Common Stock, which are non-voting shares.

#### 1. Class A Voting Interests

All Class A shares in Paramount Skydance are owned directly or indirectly by Harbor Lights Entertainment, Inc. ("Harbor Lights").[5] The Ellison family, through its investment

---

[4] See **Exhibit A** for a list of the Licensees and the communities in which they operate.

[5] Harbor Lights Entertainment, Inc. was formerly named National Amusements, Inc. Harbor Lights owns 100 percent of HLE Entertainment Holdings LLC (formerly named NAI

vehicles, controls Paramount Skydance through ownership of 77.5 percent of Harbor Lights. The remaining 22.5 percent of Harbor Lights is owned by funds managed and controlled by RedBird Capital Partners ("RedBird"). Thus, all voting interests are held by the Ellison family and RedBird.

Specifically, Harbor Lights is directly owned by (a) Pinnacle Media Ventures, LLC, Pinnacle Media Ventures II, LLC, and Pinnacle Media Ventures III, LLC (collectively, "Pinnacle Media"), each a Delaware limited liability company controlled by the Ellison family, and (b) RB Tentpole Holdings LP, a Delaware limited partnership that is ultimately controlled by RedBird.

David Ellison is the sole manager of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, which are the holding companies that each respectively own 100 percent of the Pinnacle Media entities. Sayonara, LLC ("Sayonara") is the sole member of Hikouki, LLC, Furaito, LLC, and Aozora, LLC. Sayonara is owned and controlled by The Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended (the "Trust"), which is controlled by Lawerence J. Ellison.

David Ellison has granted to Sayonara a voting interest equal to approximately 35.5 percent in each of Hikouki, LLC, Furaito, LLC, and Aozora, LLC, and David Ellison retains an approximately 64.5 percent interest. In addition, by voting proxy, the Pinnacle Media entities have each granted David Ellison 64.5 percent of their respective voting interests in Harbor Lights (and indirectly in Paramount Skydance) and have granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of Harbor Lights and Paramount Skydance, each in accordance with these voting percentages. David Ellison also serves as the Chairman and CEO of Paramount Skydance. Sayonara does not have

Entertainment Holdings LLC), which in turn owns 100 percent of SPV-HLE LLC (formerly named SPV-NAIEH LLC). HLE Entertainment Holdings LLC and SPV-HLE LLC each directly own Class A shares of Paramount Skydance.

any veto rights, or any special or outsized voting rights, in Harbor Lights or Paramount Skydance as a result of its minority voting interests.

#### 2. Class B Non-Voting Interests

Class B Common Stock of Paramount Skydance is publicly traded on The Nasdaq Stock Market, LLC (Trading Symbol: PSKY). Holders of Class B shares (who do not also hold Class A voting shares or otherwise have an active role in the management of the company) are not attributable under the Commission broadcast ownership rules.[6]

In addition to the Class A voting shares discussed above, currently (a) the Ellison family owns approximately 39.8 percent of outstanding Class B shares through various investment vehicles, (b) funds managed by RedBird own approximately 8.7 percent of outstanding Class B shares, and (c) Harbor Lights and its subsidiaries own approximately 6.6 percent of outstanding Class B shares.

### C. Proposed Investment

On February 27, 2026, Paramount Skydance and Warner Bros. Discovery, Inc. ("WBD") entered into a merger agreement ("Merger Agreement") providing for the acquisition of WBD by Paramount Skydance. Concurrently with the execution of the Merger Agreement, Lawrence J. Ellison and the Trust (together, the "Ellison Parties") entered into a guarantee in favor of WBD to jointly and severally guarantee the payment of all amounts payable under the Merger Agreement (to the extent due and payable). In addition, concurrently with the execution of the Merger Agreement, each of (i) the Ellison Parties and (ii) RedBird Capital Partners Fund IV (Master), L.P. ("RedBird Fund IV") entered into subscription agreements providing for a private placement investment in Paramount Skydance Class B Common Stock (which, again, are non-

---

[6] *See* 47 C.F.R. § 73.3555 Note 2(e).

voting shares) for an aggregate amount of up to $46.72 billion from the Trust, and $250 million from RedBird Fund IV.[7]

The Trust and RedBird Fund IV have entered into agreements to assign their rights to subscribe for Class B shares (the "Equity Syndication") to affiliates of the Ellison Parties and RedBird Fund IV, as well as certain institutional investors, including the following: (i) The Public Investment Fund ("PIF"), a sovereign wealth fund and instrumentality of Saudi Arabia (ii) L'Imad 1st SPV 2 Exempt RSC LTD ("L'Imad"), an investment vehicle of L'imad Holding, an Abu Dhabi government investment fund, and (iii) QIA TMT Holding LLC ("QIA," together with PIF and L'Imad, the "Non-U.S. Investors"), an investment vehicle of the Qatar Investment Authority.[8]

After giving effect to the Proposed Investment, the Ellison family and RedBird together will continue to hold the largest equity stake in Paramount Skydance and will continue to be the indirect owners of 100 percent of Paramount Skydance Class A Common Stock, representing 100 percent of the voting shares of, and thus control of, Paramount Skydance.

---

[7] Holders of Paramount Skydance Class B Common Stock (other than the Ellison Entities and RedBird Fund IV, and their respective affiliates) will be issued warrants that will entitle the holder to purchase one share of Paramount Skydance Class B Common Stock at an initial exercise price per share equal to the 20-trading-day average of the daily volume-weighted average price of Class B Common Stock, determined as of the third business day prior to the closing of the WBD acquisition, subject to a ceiling of $16.02 per share and a floor of $12.00 per share (the "Syndication Purchase Price"), with the warrant entitlement and exercise price subject to customary anti-dilution adjustments and fundamental change make-whole adjustments.

[8] LionTree Investment Fund, L.P., a Cayman Islands exempted limited partnership that is controlled by LionTree LLC, a U.S. investment bank, will also participate in the Equity Syndication, but will hold Class B shares representing a less than five percent equity and/or voting interest, and thus does not require specific approval.

## II. INFORMATION REQUIRED BY SECTION § 1.5001

Pursuant to Section 1.5001 of the Commission's rules,[9] Paramount provides the following information in support of this Petition:

### A. Section 1.5001(a) – Contact Information, Citizenship, Entity Type, Type of Business, and Certifying Individual Information

Petitioner:

Paramount Global FRN: 0003612447
1515 Broadway
New York, NY 10036
(212) 258-6000

Entity Type: Corporation
Citizenship: U.S. (Delaware)

Certifying Individual: Makan Delrahim, Chief Legal Officer of Paramount Skydance Corporation

### B. Section 1.5001(b) – Legal Counsel Contact Information

Counsel for Paramount Global:

Matthew A. Brill
Elizabeth R. Park
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
matthew.brill@lw.com
elizabeth.park@lw.com

### C. Section 1.5001(c)(1) – Broadcast Service Authorizations

This Petition relates to the television broadcast licenses held by the Licensees, each of which is a direct or indirect wholly owned subsidiary of Paramount. See **Exhibit A** for a list of the Licensees and the communities in which they operate.

---

[9] 47 C.F.R. § 1.5001.

### D. Section 1.5001(d) – Type of Declaratory Ruling Requested

Paramount is requesting a declaratory ruling pursuant to Section 310(b)(4) of the Act and Section 1.5000(a)(1) of the Commission's rules.

### E. Section 1.5001(e) and (g) – Direct Ownership Information: Attributable Interest Holder

The following entity holds, and is expected to continue to hold upon consummation of the Proposed Investment, a direct attributable interest in Paramount:[10]

| | |
|---|---|
| Name: | Paramount Skydance Corporation |
| Entity Type: | Corporation |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 100% voting / 100% equity |
| Nature of Interest: | Sole shareholder of Paramount |

No other individuals or entities hold, or upon consummation of the Proposed Investment are expected to hold, direct attributable interests in Paramount.

### F. Section 1.5001(f) and (g) – Indirect Ownership Information: Attributable Interest Holders

The following individuals and entities hold, and are expected to continue to hold upon consummation of the Proposed Investment,[11] indirect attributable interests in Paramount (voting and equity percentages reflect indirect interests):[12]

---

[10] The officers and directors in Paramount Global and Paramount Skydance Corporation that hold a direct or indirect attributable interest in Paramount Global pursuant to Section 73.3555 Note 2(g) are identified in **Exhibit C**.

[11] Pursuant to Sections 1.5001(e) and (f), the disclosable interest holders in broadcast licensees are those with attributable interests determined based on the Notes to Section 73.3555 of the Commission's rules. The officers and directors of the attributable entities below that hold a direct or indirect attributable interest in Paramount Global pursuant to Section 73.3555 Note 2(g) are identified in **Exhibit C**.

[12] Voting interests reflect current interests and will remain the same after the Proposed Investment. Equity interests reflect post-Proposed Investment approximate percentages calculated based on (a) Class A Common Stock having a value of 1.5 times Class B Common Stock, and (b) an assumed share price for the newly issued non-voting Class B shares of

| | |
|---|---|
| Name: | SPV-HLE LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 15.83% voting / 0.21% equity |
| Nature of Interest: | Indirect through direct interest in Paramount Skydance Corporation (Class A and Class B shares) |

| | |
|---|---|
| Name: | HLE Entertainment Holdings LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 30.65% voting / 0.65% equity |
| Nature of Interest: | Direct interest in Paramount Skydance Corporation (Class A and Class B shares) and direct interest in SPV-HLE LLC |

| | |
|---|---|
| Name: | Harbor Lights Entertainment, Inc. |
| Entity Type: | Corporation |
| Citizenship: | U.S. (Maryland) |
| Principal Business: | Movie Theaters/Exhibition |
| Percentage: | 100% voting / 1.9% equity |
| Nature of Interest: | Direct interest in Paramount Skydance Corporation (Class A and Class B shares) and direct interest in HLE Entertainment Holdings LLC |

| | |
|---|---|
| Name: | Pinnacle Media Ventures, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 31% voting / 29.09% equity |
| Nature of Interest: | Direct interest in Harbor Lights Entertainment, Inc. and direct interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | Pinnacle Media Ventures II, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 31% voting / 1.77% equity |
| Nature of Interest: | Direct interest in Harbor Lights Entertainment, Inc. and direct interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | Pinnacle Media Ventures III, LLC |
| Entity Type: | Limited Liability Company |

Paramount Skydance of $16.02 per share. The percentages may fluctuate depending on the Syndication Purchase Price, but any such fluctuations are not expected to materially change the equity percentages reflected in this Petition.

| | |
|---|---|
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 15.5% voting / 1.69% equity |
| Nature of Interest: | Direct interest in Harbor Lights Entertainment, Inc. and direct interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | Hikouki, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 31% voting / 29.09% equity |
| Nature of Interest: | Sole member of Pinnacle Media Ventures, LLC |

| | |
|---|---|
| Name: | Furaito, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 31% voting / 1.77% equity |
| Nature of Interest: | Sole member of Pinnacle Media Ventures II, LLC |

| | |
|---|---|
| Name: | Aozora, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 15.5% voting / 1.69% equity |
| Nature of Interest: | Sole member of Pinnacle Media Ventures III, LLC |

| | |
|---|---|
| Name: | Sayonara, LLC ("Sayonara") |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 27.5% voting / 35.35% equity |
| Nature of Interest: | 35.5% direct voting and 100% equity interest in Hikouki, LLC, Furaito, LLC, and Aozora, LLC as Member, and direct equity interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | David Ellison |
| Citizenship: | U.S. |
| Percentage: | 50% voting / 1.84% equity |
| Nature of Interest: | 64.5% direct voting interest in Hikouki, LLC, Furaito, LLC, and Aozora, LLC as Manager and indirect equity interest in Paramount Skydance Corporation (Class B shares); Chairman and CEO of Paramount Skydance |

David Ellison controls Hikouki, LLC, Furaito, LLC, and Aozora, LLC as sole manager of each entity. David Ellison has granted to Sayonara a voting interest equal to approximately 35.5% in each of these entities, and retains an approximately 64.5%

interest. In addition, by voting proxy, Pinnacle Media Ventures, LLC, Pinnacle Media Ventures II, LLC and Pinnacle Media Ventures III, LLC each has granted a proxy to vote shares held by such entities in Harbor Lights Entertainment, Inc. ("Harbor Lights") (i) 64.5% to David Ellison (50% of total voting shares of Harbor Lights) and (ii) 35.5% to Sayonara, LLC (27.5% of total voting shares of Harbor Lights). David Ellison and Sayonara have the right to designate the Ellison family directors of HLE and Paramount Skydance, each in accordance with these voting percentages.

| | |
|---|---|
| Name: | Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended |
| Entity Type: | Trust |
| Citizenship: | U.S. (California) |
| Principal Business: | Trust |
| Percentage: | 27.5% voting / 35.35% equity |
| Nature of Interest: | Member of Sayonara, LLC |

| | |
|---|---|
| Name: | Lawrence J. Ellison |
| Citizenship: | U.S. |
| Percentage: | 27.5% voting / 36.96% equity |
| Nature of Interest: | Trustee of Lawrence J. Ellison Revocable Trust u/a/d 1/22/88, as amended, and indirect equity interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | RB Tentpole Holdings LP |
| Entity Type: | Limited Partnership |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 22.5% voting / 8.5% equity |
| Nature of Interest: | Direct interest in Harbor Lights Entertainment, Inc. and direct interest in Paramount Skydance Corporation (Class B shares) |

| | |
|---|---|
| Name: | RB Tentpole LP |
| Entity Type: | Limited Partnership |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Investment Fund |
| Percentage: | 22.5% voting / 8.5% equity |
| Nature of Interest: | 100% owner of RB Tentpole Holdings LP |

All of the limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules, 47 C.F.R. § 1.5003. None of such insulated limited partners holds a 10 percent or greater interest in Paramount Global.

| | |
|---|---|
| Name: | RB Tentpole GenPar LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Investment Fund General Partner |
| Percentage: | 22.5% voting / 0% equity |
| Nature of Interest: | General partner of RB Tentpole LP |

| | |
|---|---|
| Name: | RedBird Capital Partners Holdings LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Holding Company |
| Percentage: | 22.5% voting / 0% equity |
| Nature of Interest: | Sole member of RB Tentpole GenPar LLC |

| | |
|---|---|
| Name: | RedBird Capital Partners L.P. |
| Entity Type: | Limited Partnership |
| Citizenship: | U.S. (Delaware) |
| Principal Business: | Investment Management |
| Percentage: | 22.5% voting / 0% equity |
| Nature of Interest: | Member of RedBird Capital Partners Holdings LLC |

Funds managed by RedBird Capital Partners L.P. will hold approximately 9.0% indirect equity interests in Paramount Skydance Corporation (Class A and Class B shares).

| | |
|---|---|
| Name: | Phoenix HoldCo, LLC |
| Entity Type: | Limited Liability Company |
| Citizenship: | U.S. (Florida) |
| Principal Business: | Holding Company |
| Percentage: | 22.5% voting / 0% equity |
| Nature of Interest: | Partner of Redbird Capital Partners L.P. |

| | |
|---|---|
| Name: | Gerald J. Cardinale |
| Citizenship: | U.S. |
| Percentage: | 22.5% voting / 0% equity |
| Nature of Interest: | Sole member of Phoenix HoldCo, LLC and limited partner of RedBird Capital Partners L.P. |

No other individuals or entities hold, or upon consummation of the Proposed Investment are expected to hold, indirect attributable interests in Paramount.

Although not required under Sections 1.5001(e) and (f) for broadcast licensees, Petitioner notes that the Non-U.S. Investors each will hold indirect equity or voting interests of 10 percent or greater in Paramount upon the closing of the Proposed Investment:

| | |
|---|---|
| Name: | The Public Investment Fund |
| Entity Type: | Instrumentality of Saudi Arabia |
| Citizenship: | Kingdom of Saudi Arabia |
| Principal Business: | Investments |
| Percentage: | 0% voting / 15.1% equity |
| Nature of Interest: | Direct interest in Paramount Skydance Corporation (Class B shares) |

Name: L'Imad 1st SPV 2 Exempt RSC Ltd
Entity Type: Limited Company
Citizenship: United Arab Emirates
Principal Business: Investments
Percentage: 0% voting / 12.8% equity
Nature of Interest: Direct interest in Paramount Skydance Corporation (Class B shares)

Name: L'Imad 1st Holding 1 Exempt RSC Ltd
Entity Type: Limited Company
Citizenship: United Arab Emirates
Principal Business: Investments
Percentage: 0% voting / 12.8% equity
Nature of Interest: Direct interest in L'Imad 1st SPV 2 Exempt RSC Ltd

Name: L'Imad 1st Capital Holding Ltd
Entity Type: Limited Company
Citizenship: United Arab Emirates
Principal Business: Investments
Percentage: 0% voting / 12.8% equity
Nature of Interest: Direct interest in L'Imad 1st Holding 1 Exempt RSC Ltd

Name: L'Imad Holding Company – P.J.S.C
Entity Type: Public Joint-Stock Company
Citizenship: United Arab Emirates
Principal Business: Investments
Percentage: 0% voting / 12.8% equity
Nature of Interest: Direct interest in L'Imad 1st Capital Holding Ltd

Name: QIA TMT Holding LLC
Entity Type: Limited Liability Company
Citizenship: Qatar
Principal Business: Investments
Percentage: 0% voting / 10.6% equity
Nature of Interest: Direct interest in Paramount Skydance Corporation (Class B shares)

Name: Qatar Investment Authority
Entity Type: Government Investment Fund
Citizenship: Qatar
Principal Business: Investments
Percentage: 0% voting / 10.6% equity
Nature of Interest: Direct interest in QIA TMT Holding LLC

Other than these entities and the attributable interest holders disclosed above, no other individuals or entities hold, or upon consummation of the Proposed Investment are expected to hold, indirect equity or voting interests in Paramount of 10 percent or greater.

### G. Section 1.5001(h)(1) and (i) – Estimate of Aggregate Foreign Ownership

#### 1. Equity Interests

Upon consummation of the Proposed Investment, Petitioner expects that the aggregate indirect foreign ownership of equity interests in Paramount will be approximately 49.5 percent. The total equity in Paramount Skydance is based on the issued Class A Common Stock and Class B Common Stock, with Class A Common Stock weighted as 1.5 times Class B Common Stock. This estimate includes the following:

- The Non-U.S. Investors for which specific approval is requested below are expected to hold indirect equity interests of 38.5 percent in the aggregate. These interests will be held in Paramount Skydance non-voting, Class B stock.
- Funds managed by RedBird will hold approximately 9.0 percent of the equity in Paramount Skydance (taking into account indirect interests in Class A and Class B shares). Passive limited partner investors in the funds that are non-U.S. account for approximately 5.8 percent foreign equity in Paramount Skydance.
- Approximately 5.2 percent of equity interests will be held by entities that Petitioner knows to be foreign based on Class B stock transactions or through information in Securities and Exchange Commission Form 13F reports.

#### 2. Voting Interests

All voting rights and other decision-making functions in Paramount will be controlled by the Ellison family through U.S. entities. RedBird's minority voting interest are indirectly held through RedBird's fund entities, the general partner and manager entities of which, are organized

in the United States and ultimately controlled by Gerry Cardinale, a U.S. citizen. Thus, actual voting control is, and after the Proposed Investment will be, exercised solely by U.S. persons.

Section 1.5002(a)(2) of the Commission's rules provides that voting interests held through a corporation are "calculated by successive multiplication of the voting percentages for each link in the vertical ownership chain, except that wherever the voting interest for any link in the chain is equal to or exceeds 50 percent or represents actual control, it shall be treated as if it were a 100 percent interest." 47 C.F.R. § 1.5002 (a)(2). Pursuant to this provision, the indirect foreign voting interests in Paramount will be through indirect interests in the Class A voting shares held by Harbor Lights. All indirect foreign ownership of Class A shares will be through RB Tentpole Holdings LP.

RB Tentpole Holdings LP owns 22.5 percent of Harbor Lights and, indirectly, its Class A voting shares. RB Tentpole Holdings LP is wholly owned by RB Tentpole LP. The limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. Therefore, the foreign insulated limited partners will be deemed to have voting interests in RB Tentpole LP equal to their equity interest. That is, the foreign investors in RB Tentpole Holdings LP in the aggregate would be deemed to have a 14.8 percent voting interest in Paramount (i.e., the portion of foreign equity in RB Tentpole LP times 22.5%).

Other indirect foreign ownership in Paramount will be through Class B shares, which are non-voting. The foreign-owned interests through Class B shares is expected to be approximately 49.5 percent in the aggregate after the Proposed Investment.

* * * * *

Paramount requests approval for indirect foreign ownership of the equity and/or voting interests in Paramount Global for the aggregate amounts identified above, and for up to 100

percent in the aggregate to accommodate routine fluctuations in publicly held equity interests and to account for potential future investments (subject to any specific approval requirements in Section 1.5004(a)).

**H. Section 1.5001(h)(2) – Ownership and Control Structure Diagram**

See **Exhibit B** for charts depicting the post-Proposed Investment ownership structure of Paramount and the Licensees.

**I. Section 1.5001(i)-(k) – Requests for Specific and Advance Approval**

Paramount requests specific and advance approval for the following non-U.S. entities that will indirectly hold more than five percent of the equity of Paramount through ownership of Class B non-voting shares, and for each such entity to increase its respective indirect interest in Paramount, at some future time, up to the advance approval percentage noted.

The Commission's rule regarding the calculation methodology for corporations does not address the allocation of voting interests among different classes of stock that have different rights. Because the voting interest of investors holding only Class B shares will be zero, applying the calculation methodology in Section 1.5002(a)(2) would result in a voting percentage of zero. Out of an abundance of caution, to the extent that the Commission deems holders of non-voting equity in a corporation to have a "deemed" voting interest equal to their equity interest (similar to insulated partnership interests in a limited partnership, or an insulated membership interest in a limited liability company pursuant to Section 1.5002(ii) and (iii)), Petitioner seeks approval for each of these entities to hold a "deemed" voting interest equal to its respective equity interest:

| | |
|---|---|
| Name: | Public Investment Fund |
| Entity Type: | Instrumentality of Saudi Arabia |
| Citizenship: | Kingdom of Saudi Arabia |
| Principal Business: | Investments |
| Specific Approval: | 15.1% equity / 15.1% voting |

Advance Approval: up to 20% equity / 20% voting

Name: L'Imad 1st SPV 2 Exempt RSC Ltd
Entity Type: Limited company
Citizenship: United Arab Emirates
Principal Business: Investments
Specific Approval: 12.8% equity / 12.8% voting
Advance Approval: up to 20% equity / 20% voting

Name: L'imad 1st Holding 1 Exempt RSC Ltd
Entity Type: Limited company
Citizenship: United Arab Emirates
Principal Business: Investments
Specific Approval: 12.8% equity / 12.8% voting
Advance Approval: up to 20% equity / 20% voting

Name: L'imad 1st Capital Holding Ltd
Entity Type: Limited company
Citizenship: United Arab Emirates
Principal Business: Investments
Specific Approval: 12.8% equity / 12.8% voting
Advance Approval: up to 20% equity / 20% voting

Name: L'imad Holding Company – P.J.S.C
Entity Type: Public Joint-Stock Company
Citizenship: United Arab Emirates
Principal Business: Investments
Specific Approval: 12.8% equity / 12.8% voting
Advance Approval: up to 20% equity / 20% voting

Name: QIA TMT Holding LLC
Entity Type: Limited Liability Company
Citizenship: Qatar
Principal Business: Investments
Specific Approval: 10.6% equity / 10.6% voting
Advance Approval: up to 20% equity / 20% voting

Name: Qatar Investment Authority
Entity Type: Government Investment Fund
Citizenship: Qatar
Principal Business: Investments
Specific Approval: 10.6% equity / 10.6% voting
Advance Approval: up to 20% equity / 20% voting

### J. Section 1.5001(m) – Response to Standard Questions of Executive Branch Agencies

Concurrently with this Petition, Paramount is submitting directly to the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector ("Team Telecom") responses to the standard questions and will, within three business days, provide Team Telecom with a copy of this Petition.

### K. Section 1.5001(n) – Certifications

By its signature to this Petition, Paramount and, to the extent applicable, the Licensees, certify that they will:

- Designate the following point of contact who is located in the United States and is a U.S. citizen or lawful U.S. permanent resident, for the execution of lawful requests and as an agent for legal service of process:

  Makan Delrahim
  Chief Legal Officer
  Paramount Global
  1515 Broadway
  New York, NY 10036
  (212) 258-6000
  md@paramount.com

- Ensure the continuing accuracy and completeness of all information submitted, whether at the time of submission of the application or subsequently in response to either a Commission or Team Telecom request, as required by 47 C.F.R. § 1.65(a), and inform the Commission and Team Telecom of any substantial and significant changes while the Petition is pending; and

- After the Petition is no longer pending for purposes of 47 C.F.R. § 1.65, notify the Commission and Team Telecom of any changes in the authorization holder or

licensee information and/or contact information promptly, and in any event within 30 days.

Paramount acknowledges that if it or the Licensees fail to fulfill any of the conditions and obligations set forth in the certifications set out in Section 1.5001(n)(1), or in the grant of an application, petition, license, or authorization, and/or that if the information provided to the U.S. Government is materially false, fictitious, or fraudulent, that it and the Licensees may be subject to all remedies available to the U.S. Government, including but not limited to revocation and/or termination of the Commission's authorization or license, and criminal and civil penalties, including penalties under 18 U.S.C. § 1001.

## III. GRANT OF THIS PETITION IS IN THE PUBLIC INTEREST

Grant of this Petition is in the public interest because it will afford Paramount and, in turn, the Licensees, greater access to capital, including from foreign sources, thereby enabling the company to compete more effectively in the provision of television broadcast services and in the broader video programming marketplace.

In adopting rules to implement Section 310(b)(4) of the Act to allow foreign investment in broadcast licensees exceeding the 25 percent indirect foreign ownership benchmark, the Commission adopted the same streamlined standard that it previously had applied to common carriers.[13] Accordingly, the Commission will approve indirect foreign ownership of broadcast licensees above the 25 percent threshold "unless the Commission finds that the public interest will be served by refusing to permit such foreign ownership."[14] As the Commission

[13] 47 U.S.C. § 310(b)(4); *see Review of Foreign Ownership Policies for Broadcast, Common Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, as Amended*, Report and Order, 31 FCC Rcd 11272 ¶ 11 (2016) ("*2016 Foreign Ownership Order*").

[14] *2016 Foreign Ownership Order* ¶ 5.

acknowledged, permitting greater foreign investment in broadcast stations "increase[s] regulatory transparency and predictability" and thereby facilitates greater access to capital and "help[s] create new opportunities for U.S. broadcasters to enter foreign radio and television markets."[15]

Permitting foreign ownership of Paramount of up to and including 100 percent is consistent with the public interest and well-established Commission precedent, and will promote the intended policy objectives underlying the Commission's foreign ownership rules.[16] In particular, grant of this Petition will afford the company flexibility in accessing the capital necessary to ensure that the Licensees remain competitive in the television broadcast marketplace through greater innovation and a broader range of programming and content.[17]

Paramount's combination with Skydance Media, LLC—which the Commission approved on July 24, 2025[18]—has enabled the company to begin making strategic investments to improve the Licensees' newsgathering and reporting operations, both nationally and at a local level. Among such initiatives is the rejuvenation of the Licensees' online presence, allowing them to

---

[15] *Id.* ¶ 13.

[16] *See, e.g.*, *Searchlight II HMT, L.P.*, Declaratory Ruling, 38 FCC Rcd 7412 (2023) (approving specific approval of foreign individuals and entities to hold up to 49.99 percent, and in some cases up to 100 percent, and up to 100 percent foreign ownership in the aggregate, of the broadcast licensee); *Hemisphere Media Group, Inc. Petition for Declaratory Ruling*, Declaratory Ruling and Memorandum Opinion and Order, 34 FCC Rcd 10504 (2019) (approving up to 100 percent of broadcast licensee's equity and voting interests in the aggregate to be owned by foreign entities and/or individuals); *Univision Holdings, Inc.*, Declaratory Ruling, 32 FCC Rcd 6 (2017); *Pandora Radio LLC*, Declaratory Ruling, 30 FCC Rcd 5094 (2015).

[17] *See Commission Policies and Procedures Under Section 310(b)(4) of the Communications Act, Foreign Investment in Broadcast Licensees*, Declaratory Ruling, 28 FCC Rcd 16244 ¶ 10 (2013) ("Greater capitalization [of broadcasters] may … yield greater innovation, particularly in programming directed at niche or minority audiences.").

[18] *See Applications for Consent to the Transfer of Control of Paramount Global*, Memorandum Opinion and Order, 40 FCC Rcd 5689 (2025).

meet viewers where they are and ensuring their continued relevance to the communities that they serve, in turn enhancing the availability of reliable, high-quality, non-paywalled local and national news across the country. At the same time, efforts are underway to revitalize the technology underlying the company's streaming services, particularly its flagship Paramount+ and PlutoTV platforms, whose continued success will help to stabilize and support the viability of the Licensees' broadcast services. And the synergies between Skydance's dynamic creative assets and sports development and production units, on the one hand, and Paramount's broadcast distribution platform, on the other, are allowing the Licensees to offer their local audiences enhanced access to a greater diversity and variety of entertainment and sports content, such as Ultimate Fighting Championship (UFC) programming.

Reducing barriers to further investment in Paramount, including by allowing the company to pursue additional capital from non-U.S. investors, will enable it to allocate additional resources to preserve and enhance the legacy and broad reach of the Licensees' television broadcast operations. In turn, Paramount's ability to compete in the television broadcast and broader video marketplaces will improve, thereby promoting the strength of the industry overall. The new equity investment, leveraged on the efficiency gains resulting from the Paramount-Skydance transaction, will better position the company to weather continuing challenges facing broadcasters and operators of linear pay-television networks.

Further, grant of this Petition will not present any national security, law enforcement, foreign policy, or trade policy concerns. Notably, the Ellison family (which includes only U.S. persons) will retain a majority of the voting interests and control of Paramount, and each of the entities through which the Ellison family holds its interests in the company is a U.S. entity. With

respect to such considerations, the Commission "accords deference" to the expertise of "the relevant Executive Branch agencies." [19]

## IV. CONCLUSION

For the reasons set forth herein, Paramount respectfully requests that the Commission issue a declaratory ruling (1) permitting existing and prospective new foreign investors to indirectly hold in excess of 25 percent of Paramount's equity and voting interests, in the aggregate, and (2) granting specific and advance approval for the non-U.S. individuals and entities identified in Section II.I, above, to indirectly hold greater than 5 percent equity and/or deemed voting interests in Paramount, in the form of newly issued non-voting, Class B shares, and for existing and prospective new foreign investors to indirectly hold up to 100 percent of Paramount's equity and voting interests, in the aggregate.

Respectfully submitted,

*/s/ Matthew A. Brill*

Matthew A. Brill
Elizabeth R. Park
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
matthew.brill@lw.com
elizabeth.park@lw.com

*Counsel for Paramount Global*

---

[19] *See 2016 Foreign Ownership Order* ¶ 6.

**Exhibit A**

| Call Sign | Fac. ID | Community of License | Licensee |
|---|---|---|---|
| WUPA | 6900 | Atlanta, GA | Atlanta Television Station WUPA Inc. |
| KCBS-TV | 9628 | Los Angeles, CA | CBS Broadcasting Inc. |
| KDKA-TV | 25454 | Pittsburgh, PA | CBS Broadcasting Inc. |
| KPIX-TV | 25452 | San Francisco, CA | CBS Broadcasting Inc. |
| KYW-TV | 25453 | Philadelphia, PA | CBS Broadcasting Inc. |
| WBBM-TV | 9617 | Chicago, IL | CBS Broadcasting Inc. |
| WCBS-TV | 9610 | New York, NY | CBS Broadcasting Inc. |
| WCCO-TV | 9629 | Minneapolis, MN | CBS Broadcasting Inc. |
| KCCW-TV | 9640 | Walker, MN | CBS Broadcasting Inc. |
| WWJ-TV | 72123 | Detroit, MI | CBS Broadcasting Inc. |
| WLNY-TV | 73206 | Riverhead, NY | CBS LITV LLC |
| WBXI-CD | 70416 | Indianapolis, IN | CBS Mass Media Corporation |
| WTOG | 74112 | St. Petersburg, FL | CBS Operations Investments Inc. |
| W26DP-D | 74116 | Inverness, FL | CBS Operations Investments Inc. |
| W36FJ-D | 74113 | Sebring, FL | CBS Operations Investments Inc. |
| KTVT | 23422 | Fort Worth, TX | CBS Stations Group of Texas LLC |
| WBZ-TV | 25456 | Boston, MA | CBS Television Licenses LLC |
| WJZ-TV | 25455 | Baltimore, MD | CBS Television Licenses LLC |
| WSBK-TV | 73982 | Boston, MA | CBS Television Licenses LLC |
| WFOR-TV | 47902 | Miami, FL | CBS Television Licenses LLC |
| KCNC-TV | 47903 | Denver, CO | CBS Television Stations Inc. |
| WKBD-TV | 51570 | Detroit, MI | Detroit Television Station WKBD Inc. |
| KCAL-TV | 21422 | Los Angeles, CA | Los Angeles Television Station KCAL LLC |
| WBFS-TV | 12497 | Miami, FL | Miami Television Station WBFS Inc. |
| WPSG | 12499 | Philadelphia, PA | Philadelphia Television Station WPSG, Inc. |

| Call Sign | Fac. ID | Community of License | Licensee |
|---|---|---|---|
| WPKD-TV | 69880 | Jeannette, PA | Pittsburgh Television Station WPCW Inc. |
| KMAX-TV | 51499 | Sacramento, CA | Sacramento Television Stations, Inc. |
| KOVR | 56550 | Stockton, CA | Sacramento Television Stations, Inc. |
| KPYX | 69619 | San Francisco, CA | San Francisco Television Station KBCW Inc. |
| KTXA | 51517 | Fort Worth, TX | Television Station KTXA Inc. |
| KSTW | 23428 | Tacoma, WA | The CW Television Stations Inc. |

**Exhibit B**

# Post-Proposed Investment Organizational Structure

(Part One)




**Notes**

All percentages reflect indirect interests in Paramount Global.

* The equity percentage held by Harbor Lights Entertainment, Inc. includes Class A and Class B stock of Paramount Skydance Corporation held directly and indirectly through its wholly owned subsidiaries, HLE Entertainment Holdings LLC and SPV-HLE LLC.

All percentages reflect indirect interests in Paramount Global.

Paramount Skydance Corporation is the public holding corporation created in the merger of Paramount Global and Skydance Media, LLC, and identified as "New Paramount" in MB Docket No. 24-275.

Harbor Lights Entertainment, Inc. was formerly known as National Amusements Inc.; HLE Entertainment Holdings LLC was formerly known as NAI Entertainment Holdings LLC; and SPV-HLE LLC was formerly known as SPV-NAIEH LLC.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure

(Part Two)




**Notes**

All percentages reflect indirect interests in Paramount Global. Equity percentages include the value of Class A and Class B shares.

† By voting proxy, Pinnacle Media Ventures, LLC, Pinnacle Media Ventures II, LLC, and Pinnacle Media Ventures, III, LLC has each granted David Ellison approximately 64.5 percent of their respective voting interests in Harbor Lights Entertainment, Inc. ("HLE") (and indirectly Paramount Skydance Corporation), and granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of HLE and Paramount Skydance Corporation, each in accordance with these voting percentages.

*David Ellison indirectly owns Class B shares in Paramount Skydance Corporation through a holding company not depicted in this chart.

# Post-Proposed Investment Organizational Structure
(Part Three)




**Notes**

All percentages reflect indirect interests in Paramount Global. Equity percentages include the value of Class A and Class B shares.

*Lawrence J. Ellison indirectly holds additional Class B shares in Paramount Skydance Corporation through a holding company not depicted in this chart.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure

(Part Four)



# Post-Proposed Investment Organizational Structure

(Part Five)




**Notes**

All percentages reflect indirect interests in Paramount Global.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure

(Part Six)



**Exhibit C**

The following individuals are directors and/or officers of Paramount Global:

| **Name** | **Position** | **Citizenship** |
|---|---|---|
| Andrew Gordon | Officer & Director | U.S. |
| Katherine Gill-Charest | Officer & Director | U.S. |
| Julie Behuniak | Officer | U.S. |
| Alexander Coedo | Officer | U.S. |
| Kevin J. Creighton | Officer | U.S. |
| Amy Dow | Officer | U.S. |
| Anthony J. Driscoll | Officer | U.S. |
| Christopher Fontana | Officer | U.S. |
| Anthony Gonzalez | Officer | U.S. |
| Jonathan M. Jenkins | Officer | U.S. |
| Laurie Lawrence-Dillon | Officer | U.S. |
| Mallory Levitt | Officer | U.S. |
| Christopher Lovejoy | Officer | U.S. |
| Stephanie R. Marcus | Officer | U.S. |
| Stephanie McKinnon | Officer | Canada |
| James C. Morrison | Officer | U.S. |
| Christina Skaliks | Officer | U.S. |
| James J. Sterner | Officer | U.S. |
| Syed A. Wasim | Officer | U.S. |

The following individuals are directors and/or officers of Paramount Skydance Corporation:

| **Name** | **Position** | **Citizenship** |
|---|---|---|
| David Ellison | Officer & Director | U.S. |
| Alice Abatzis | Officer | U.S. |
| Barbara M. Byrne | Director | U.S. |
| Andrew Campion | Director | U.S. |
| Gerald J. Cardinale | Director | U.S. |
| Safra A. Catz | Director | U.S./Israel |
| George Cheeks | Officer | U.S. |
| Dennis Cinelli | Officer | U.S. |
| Julie Connors | Officer | U.S. |
| Kevin Creighton | Officer | U.S. |
| Linda C. Davidoff | Officer | U.S. |
| Makan Delrahim | Officer | U.S. |
| Amy Dow | Officer | U.S. |
| Tony Driscoll | Officer | U.S. |
| Katherine Gill-Charest | Officer | U.S. |
| Dana M. Goldberg | Officer | U.S. |
| Andrew Gordon | Officer & Director | U.S. |
| Josh Greenstein | Officer | U.S. |
| Justin Hamill | Director | U.S. |
| Cynthia L. Holland | Officer | U.S. |
| Ray Hopkins | Officer | U.S. |
| Sherry Lansing | Director | U.S. |

| | | |
|---|---|---|
| Christopher Lovejoy | Officer | U.S. |
| Paul Marinelli | Director | U.S. |
| Stephanie McKinnon | Officer | Canada |
| James C. Morrison | Officer | U.S. |
| James J. Sterner | Officer | U.S. |
| David Stonehill | Officer | U.S. |
| John L. Thornton | Director | U.S. |
| Jose Turkienicz | Officer | Brazil/Poland |
| Barrie Wexler | Officer | U.S. |
| Phil Wiser | Officer | U.S. |
| Melissa S. Zukerman | Officer | U.S. |

The following individuals are directors or officers of Harbor Lights Entertainment, Inc.:

| Name | Position | Citizenship |
|---|---|---|
| Tyler Alexander | Director | U.S. |
| Marie E. Bergman | Officer | U.S. |
| David Ellison | Director | U.S. |
| Andrew Gordon | Director | U.S. |
| Julie Heinzelman | Officer | U.S. |
| Paul Marinelli | Director | U.S. |
| Lisa M. Martignetti | Officer | U.S. |
| Janet Nova | Director | U.S. |
| Edward Ryan | Officer | U.S. |

The following individuals are officers of Pinnacle Media Ventures, LLC:

| Name | Position | Citizenship |
|---|---|---|
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers and/or officers of Pinnacle Media Ventures II, LLC:

| Name | Position | Citizenship |
|---|---|---|
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers and/or officers of Pinnacle Media Ventures III, LLC:

| **Name** | **Position** | **Citizenship** |
|---|---|---|
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers or officers of Hikouki, LLC:

| **Name** | **Position** | **Citizenship** |
|---|---|---|
| David Ellison | Sole Manager | U.S. |
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers or officers of Furaito, LLC:

| **Name** | **Position** | **Citizenship** |
|---|---|---|
| David Ellison | Sole Manager | U.S. |
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers or officers of Aozora, LLC:

| Name | Position | Citizenship |
|---|---|---|
| David Ellison | Sole Manager | U.S. |
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |
| Barry T. Mori | Officer | U.S. |

The following individuals are managers and/or officers of Sayonara, LLC:

| Name | Position | Citizenship |
|---|---|---|
| Lawrence J. Ellison | Officer | U.S. |
| Nathan Haratani | Officer | U.S. |
| Paul Marinelli | Manager & Officer | U.S. |
| Barry T. Mori | Officer | U.S. |
| Tanya B. McGregor | Officer | U.S. |

# CERTIFICATION

I, Makan Delrahim, hereby certify as follows:

1. I am Chief Legal Officer of Paramount Skydance Corporation Paramount Global and as such am an authorized as a signatory for Paramount Global ("Paramount").

2. The foregoing Petition for Declaratory Ruling ("Petition") was prepared at my direction and supervision, and the contents are true and correct to the best of my knowledge, information, and belief.

3. To the best of my knowledge, information, and belief, the ownership interests disclosed in the Petition have been calculated in accordance with the requirements set forth in Section 1.5002 and, where applicable, Section 1.5003 of the Commission's rules, 47 C.F.R. §§ 1.5002, 1.5003, and the interests disclosed satisfy each of the pertinent standards and criteria set forth in the rules.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 24, 2026

Signed by:
Makan Delrahim
5930A8102A46434...

Name: Makan Delrahim
Title: Chief Legal Officer of Paramount
Skydance Corporation
Paramount Global

# EXHIBIT 7

Paramount Global, Supplement to Petition for Declaratory Ruling (cover letter and Amended Exhibit B ownership charts, filed June 23, 2026; ECFS No. 26109885351). See Ruling n.1.

**Matthew A. Brill**
Direct Dial: 202-637-1095
matthew.brill@lw.com

555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Tel: +1.202.637.2200 Fax: +1.202.637.2201
www.lw.com

LATHAM & WATKINS LLP

FIRM / AFFILIATE OFFICES
Austin, Beijing, Boston, Brussels, Century City, Chicago, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, Houston, London, Los Angeles, Madrid, Milan, Munich, New York, Orange County, Paris, Riyadh, San Diego, San Francisco, Seoul, Silicon Valley, Singapore, Tel Aviv, Tokyo, Washington, D.C.

June 23, 2026

**VIA ECFS**

Ms. Marlene H. Dortch
Secretary
Federal Communications Commission
45 L Street, NE
Washington, DC 20554

Re: *Paramount Global Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act of 1934, as Amended,* MB Docket No. 26-93

Dear Ms. Dortch:

Paramount Global ("Paramount") hereby supplements its above-referenced petition for declaratory ruling to provide the enclosed amended Exhibit B, which contains charts depicting the post-Proposed Investment ownership structure of Paramount and its subsidiaries that operate television broadcast stations (i.e., the Licensees). In particular, this amended Exhibit B adds the direct equity and voting interests that each individual and entity will hold in the entity or entities immediately downstream, and also includes clarifications in the accompanying notes regarding certain ownership interests.

Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

*/s/ Matthew A. Brill*

Matthew A. Brill
Elizabeth R. Park
Latham & Watkins LLP
555 Eleventh Street NW
Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
matthew.brill@lw.com
elizabeth.park@lw.com

*Counsel for Paramount Global*

# Amended Exhibit B

# Post-Proposed Investment Organizational Structure
(Part One)




**Notes**

Indirect percentages reflect indirect interests in Paramount Global.

* The equity percentage held by Harbor Lights Entertainment, Inc. includes Class A and Class B stock of Paramount Skydance Corporation held directly and indirectly through its wholly owned subsidiaries, HLE Entertainment Holdings LLC and SPV-HLE LLC.

Paramount Skydance Corporation is the public holding corporation created in the merger of Paramount Global and Skydance Media, LLC, and identified as "New Paramount" in MB Docket No. 24-275.

Harbor Lights Entertainment, Inc. was formerly known as National Amusements Inc.; HLE Entertainment Holdings LLC was formerly known as NAI Entertainment Holdings LLC; and SPV-HLE LLC was formerly known as SPV-NAIEH LLC.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

Revised 6/23/2026

# Post-Proposed Investment Organizational Structure
(Part Two)




**Notes**

Indirect percentages reflect indirect interests in Paramount Global. Equity percentages include the value of Class A and Class B shares.

† By voting proxy, Pinnacle Media Ventures, LLC, Pinnacle Media Ventures II, LLC, and Pinnacle Media Ventures, III, LLC has each granted David Ellison approximately 64.5 percent of their respective voting interests in Harbor Lights Entertainment, Inc. ("HLE") (and indirectly Paramount Skydance Corporation), and granted Sayonara the remaining 35.5 percent. David Ellison and Sayonara have the right to designate the Ellison family directors of HLE and Paramount Skydance Corporation, each in accordance with these voting percentages.

*David Ellison indirectly owns Class B shares in Paramount Skydance Corporation through a holding company not depicted in this chart.

Revised 6/23/2026

# Post-Proposed Investment Organizational Structure

## (Part Three)




**Notes**

Indirect percentages reflect indirect interests in Paramount Global. Equity percentages include the value of Class A and Class B shares.

*Lawrence J. Ellison indirectly holds additional Class B shares in Paramount Skydance Corporation through a holding company not depicted in this chart.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure
(Part Four)




**Notes**

Indirect percentages reflect indirect interests in Paramount Global. Equity percentages include the value of Class A and Class B shares.

All of the limited partners of RB Tentpole LP are insulated in accordance with Section 1.5003 of the Commission's rules. None of such insulated limited partners holds a 10 percent or greater interest in Paramount Global.

Funds managed by RedBird Capital Partners L.P. will hold approximately 9.0% indirect equity interests in Paramount Skydance Corporation (Class A and Class B shares).

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure

(Part Five)




**Notes**

Indirect percentages reflect indirect interests in Paramount Global.

*QIA is a sovereign wealth fund of the State of Qatar. QIA operates as a government instrumentality of the State of Qatar and does not have shares or shareholders. The State of Qatar does not interfere in QIA's investment decisions, which are strictly based on economic and financial criteria and are made with a long-term investment horizon.

**L'imad Holding Company – P.J.S.C. is a sovereign wealth fund, and each of L'imad 1st Capital Holding Ltd, L'imad 1st Holding 1 Exempt RSC Ltd, and L'Imad 1st SPV 2 Exempt RSC Ltd is an investment vehicle for the sovereign wealth fund. The Government of Abu Dhabi is L'imad Holding Company – P.J.S.C.'s shareholder.

†PIF is the sovereign wealth fund of the Kingdom of Saudi Arabia. No individuals or entities have shares or voting rights in PIF. PIF is an instrumentality of Saudi Arabia with financial autonomy, as well as independence, in carrying out its investment management and day to day operational activities, as ratified pursuant to Article 2 of Royal Decree No. M/92.

The interests held in Paramount Skydance Corporation and, in turn, Paramount Global by the entities shaded in grey are not attributable pursuant to the Notes to Section 73.3555 of the FCC's rules.

# Post-Proposed Investment Organizational Structure

(Part Six)



# EXHIBIT 8

California v. Paramount Skydance Corp., No. 4:26-cv-07116-AMO (N.D. Cal.): ECF Nos. 170, 266, and 267.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| THE STATE OF CALIFORNIA, *et al.*,<br>*Plaintiffs*,<br>v.<br>PARAMOUNT SKYDANCE CORP. *et. al.*,<br>*Defendants*. | Case No. 4:26-cv-7116-AMO<br>Case No. 4:26-cv-7212-AMO<br><br>**STIPULATION AND [~~PROPOSED~~] ORDER NOT TO CLOSE** |
| WRITERS GUILD OF AMERICA, WEST., INC., *et al.*,<br>*Plaintiffs*,<br>v.<br>PARAMOUNT SKYDANCE CORP., *et. al.*,<br>*Defendants*. | |

WHEREAS, on July 13, 2026, Plaintiffs the State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington (collectively, the "Plaintiff States") filed the action, *The State of California v. Paramount Skydance Corp.*, 4:26-cv-7116-AMO (*State of California)*, seeking to permanently enjoin Defendant Paramount Skydance Corporation's ("Paramount") acquisition of Defendant Warner Bros. Discovery Inc. ("Warner Bros.") (the "Transaction"), as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Plaintiff States further moved for a temporary restraining order to temporarily enjoin the transaction. (Dkt. No. 27).

WHEREAS, on July 14, 2026, Plaintiffs Writers Guild of America, West, Inc., and Writers Guild of America, East, Inc., (collectively, the "WGA Plaintiffs") filed the action, *Writers Guild of America, West, Inc. v. Paramount Skydance Corp.*, 4:26-cv-7212-AMO (*Writers Guild*), also seeking to permanently enjoin the Transaction as a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

WHEREAS, on July 20, 2026, the Court granted Plaintiff States' motion for a temporary restraining order in the *State of California* matter, issued the operative temporary restraining order temporarily enjoining the Transaction, and set a briefing schedule on a motion for preliminary injunction to be heard on August 3, 2026. (Dkt. No. 141).

WHEREAS, on July 22, 2026, the WGA Plaintiffs filed a motion for preliminary injunction (Dkt. No. 58), as well as a motion to shorten time on the motion for preliminary injunction seeking to align the motion for preliminary injunction briefing in *Writers Guild* with the motion for preliminary injunction briefing in *State of California*. (Dkt. No. 60).

WHEREAS, on July 23, 2026, the Court issued an Order re Scheduling and Extending Temporary Restraining Order in *State of California* (Dkt. No. 166) and Order re Scheduling in *Writers Guild* (Dkt. No. 63), aligning the briefing schedule on the motions for preliminary injunction in both matters, finding good cause to extend the temporary restraining order to August 17, 2026, and ordering the parties to meet and confer to reach consensus on the path forward in resolving the two motions for preliminary injunction.

WHEREAS, on July 23, 2026, and July 24, 2026, the parties met and conferred to discuss the scheduling of these matters.

THEREFORE, IT IS HEREBY STIPULATED by the parties through their respective counsel, that:

1. The transaction at issue in *State of California* and *Writers Guild* shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the Transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027. This stipulation and order extends to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

2. The briefing deadlines and August 3, 2026 hearing date for Plaintiff States' motion for preliminary injunction are cancelled. The WGA Plaintiffs' motion for preliminary injunction is withdrawn. Plaintiff States and WGA Plaintiffs will be permitted to file motions for preliminary injunction orders, if necessary, at a later date.

3. This stipulation shall not waive or modify any rights, schedules, or deadlines of any party relating to any post-judgment appeal, including any injunctive relief pending appeal.

4. This stipulation is without prejudice to any party's claims, defenses, arguments, or positions in this action.

5. The parties will submit a joint statement in each of their respective cases regarding the scheduling of the trial in each matter by Friday, July 31, 2026.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

By: */s/ Jeffrey L. Kessler*
Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
Matthew R. DalSanto (SBN 282458)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com
matthew.dalsanto@winstontaylor.com

Conor A. Reidy (*pro hac vice*)
Kevin B. Goldstein (*pro hac vice*)
**WINSTON TAYLOR LLP**
300 N. LaSalle Drive
Chicago, IL 60654-3406
Telephone: (312) 558-7542
Facsimile: (312) 558-5700
conor.reidy@winstontaylor.com
kevin.goldstein@winstontaylor.com

Matthew R. Huppert (*pro hac vice*)
**WINSTON TAYLOR LLP**
1901 L Street NW
Washington, DC 20036-3506
Telephone: (202) 282-5004
Facsimile: (202) 282-5100
matt.huppert@winstontaylor.com

Marguerite Sullivan (*pro hac vice pending*)
Christopher J. Brown (*pro hac vice pending*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
christopher.brown@lw.com

*Attorneys for Defendant Paramount Skydance Corporation.*

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (SBN 97802)

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

By: */s/ Ashley Kaplan*

PAULA L. BLIZZARD (SBN 207920)
**Senior Assistant Attorney General**
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
**Supervising Deputy Attorneys General**
DANIEL D. AMBAR (SBN 278853)
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
DIVYA B. RAO (SBN 292853)
**Deputy Attorneys General**
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6153
Fax: (916) 731-3637
Email: Daniel.Ambar@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
JULIA MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
**MILBANK LLP**
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California.*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES

**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice)*
Henry Liu (*pro hac vice)*
Ross A. Demain (*pro hac vice)*
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: consumer@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice* forthcoming)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice* forthcoming)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ Anthony W. Mariano

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

/s/ Jon M. Woodruff

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice* forthcoming)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email: Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

ERNEST D. FIGUEROA

Consumer Advocate

/s/ Samantha B. Feeley

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ Ana Atta-Alla

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorneys for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

/s/ Amanda Butler

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice* forthcoming)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

/s/ Elinor R. Hoffmann

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffman@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

/s/ Ian Van Loh

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
Senior Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

/s/ Christina M. Black

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

By: /s/ Kellie Lerner
KELLIE LERNER (*pro hac vice*)
ELLISON A. SNIDER (*pro hac vice*)
BENJAMIN B. ALLEN (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
14 Penn Plaza, Suite 1900
New York, NY 10122
Telephone: (646) 960-8601
kellie@scl-llp.com
esnider@scl-llp.com
ballen@scl-llp.com

J. WYATT FORE (*pro hac vice*)
**SHINDER CANTOR LERNER LLP**
600 14th Street, NW
Washington, D.C. 20005
Telephone: (646) 960-8632
wyatt@scl-llp.com

DAVID C. BROWNSTEIN (SBN: 141929)
DAVID M. GOLDSTEIN (SBN: 142334)
**FARMER BROWNSTEIN JAEGER GOLDSTEIN SIEGEL & SHEPARD LLP**
155 Montgomery Street, Suite 301 San Francisco, CA 94104-2733
Telephone: (415) 962-2873
dbrownstein@fbjgss.com
dgoldstein@fbjgss.com

CHARLES J. LADUCA (*pro hac vice*)
N. SLADE BOND II (*pro hac vice*)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
2445 M Street, NW Suite 740
Washington, D.C. 20037

Telephone: (202) 789-3960
sbond@cuneolaw.com

SARAH ROONEY (*pro hac vice*)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
8705 Colesville Road
B. 133
Silver Spring, MD 20910
Telephone: (301) 518-7428
srooney@cuneolaw.com

MICHAEL J. FLANNERY (SBN: 196266)
**CUNEO GILBERT FLANNERY & LADUCA, LLP**
Two CityPlace Drive
St. Louis, MO 63141
Telephone: (314) 226-1015
mflannery@cuneolaw.com

MATTHEW J. PLATKIN (*pro hac vice*)
AARON HAIER (*pro hac vice*)
**PLATKIN LLP**
413 Washington Avenue, Unit 174
Belleville, NJ 07109
Telephone: (973) 561-1951
mplatkin@platkinllp.com
ahaier@platkinllp.com
*Attorneys for Plaintiffs the Writers Guild of America, West, Inc., and the Writers Guild of America East Inc.*

**PURSUANT TO STIPULATION,** the transaction at issue in State of California and Writers Guild shall not close, be consummated, or otherwise be completed and Defendants will not take any steps, directly or indirectly, to integrate or consolidate their operations pursuant to the transaction until the earlier of (1) five days after the merits determination in these matters, or (2) June 1, 2027. This stipulation and order extend to Defendants' agents, officers, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

**IT IS SO ORDERED.**

Dated: July 24, 2026

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA, et al.,<br>Plaintiffs,<br>v.<br>PARAMOUNT SKYDANCE CORPORATION, et al.,<br>Defendants. | Case No. 26-cv-07116-AMO<br>**ORDER GRANTING JOINT MOTION TO ENTER CONSENT DECREE**<br>Re: Dkt. No. 243 |

This Order assumes familiarity with the facts and procedural history of this antitrust case brought by twelve state Attorneys General challenging the proposed merger between two major media corporations. Before the Court is a joint motion to enter a consent decree. The motion additionally requests that the Court dissolve the stipulation and order not to close. The Court **GRANTS** the joint motion for the following reasons.

It is well-settled that the Court may approve a consent decree if it determines that "it is fair, reasonable and equitable and does not violate the law or public policy." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012). The Court must independently scrutinize the proposed consent decree's terms, and "eschew any rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995). Indeed, "a federal court is more than a recorder of contracts from whom parties can purchase injunctions; it is an organ of government constituted to make judicial decisions." *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 525 (1986). "However, a consent decree need not impose all the obligations authorized by law." *United States v. State of Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (citing *Local 93*, 478 U.S. at 522-23). "Rather, the court's approval is nothing more than an amalgam of delicate balancing, gross approximations and rough

justice. The court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon*, 913 F.2d at 581 (internal quotation marks & citations omitted).

Here, the Court finds the proposed consent decree represents a reasonable factual and legal resolution of the dispute. The parties' proposed consent decree falls within the scope of the case made by the pleadings. Plaintiffs advance three U.S. markets for antitrust purposes: (1) distribution of wide-release theatrical films, (2) distribution of top-grossing theatrical films, and (3) licensing of basic cable channels to distributors. *See* Compl. ¶ 36. The parties' proposed production, distribution, and funding of films, including particular provisions for "tentpole" and "independent" films, ostensibly addresses potential harms to the first two markets by requiring certain minimum thresholds of investment and release of domestic films. And the parties' proposed requirements for continued, separate negotiations of distribution for the two entities' basic cable holdings addresses concerns related to the third market. The proposed consent decree imposes these requirements and includes important backstops requiring divestment of studios and/or cable channels in case of the combined entity's failure to comply with the proposed consent decree's terms. Further, the proposed consent decree imposes these requirements on film distribution and basic cable negotiations in the midst of a rapidly-changing marketplace. The Court therefore finds that the proposed consent decree reflects a settlement between the parties that is a fair, reasonable, and good faith approach to address the competitive harms alleged in the Complaint, and does not violate the law or public policy.[1]

Further, the Court finds the proposed settlement agreement reflects a procedurally sound resolution. The parties reached their agreement following highly contested, however brief, litigation, and they reached their agreement following what they report to have been several rounds of in-depth negotiations. Importantly, the participation of twelve state attorneys general

---

[1] Though amici aver that the "News Editorial Independence Board" risks violating the First Amendment by embroiling the Plaintiff States and/or the Court in enforcement of press standards, Dkt. Nos. 259 & 60, the Court disagrees. The proposed consent decree governs the News Editorial Independence Board's creation and structure, not its speech, which is substantively different than several of the cases regarding compelled speech cited by amici. *See* Dkt. No. 260 at 8 (citing *NRA of Am. v. Vullo*, 602 U.S. 175, 189 (2024); *Moody v. NetChoice, LLC*, 603 U.S. 707, 727 (2024)). Accordingly, the Court does not find that the News Editorial Independence Board provision renders the proposed consent decree contrary to law.

supports a finding of fairness. *See Moreno v. San Francisco Bay Area Rapid Transit Dist.*, Case No. 17-cv-02911-JSC, 2019 WL 343472, at *5 (N.D. Cal. Jan. 28, 2019) (recognizing that a government agency's participation in seeking a consent decree "weighs in favor of approving the settlement"); *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984) ("[C]ourts should pay deference to the judgment of the government agency which has negotiated and submitted the proposed judgment."). Particularly recognizing that these government officials assent to the consent decree and recognizing, as Defendants have repeated throughout the case, that antitrust regulators across the globe have cleared the transaction before now, the Court concludes the proposed consent decree was the product of procedural fairness.

Amici express dismay at many of the proposed consent decree's provisions. *See* Dkt. Nos. 259 & 260.[2] However, a proposed consent decree like this one represents a negotiated settlement that does not fully remediate an alleged violation or even necessarily resolve the ultimate factual and legal issues of a case. As the Supreme Court has described,

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation . . . . [T]he parties have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co.*, 402 U.S. 673, 681-82 (1971); *see also Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 624 (9th Cir. 1982) (quoting same).

Here, the Court recognizes that this proposed consent decree reflects a compromise of the claims short of full adjudication – compromise that may leave some dissatisfaction for both sides and the public but a compromise that saves the risk, time, and expense of litigating through trial. The potential for greater investment in "documentaries and other nonfiction works, films by and

[2] The Court GRANTS the motion to amend/correct the amicus brief. Dkt. No. 261.

United States District Court
Northern District of California

about Black and Latino communities, or other distinctive projects that might have been greenlit by one of two independently competing studios," Dkt. No. 259 at 5, and the concerns regarding news editorial independence, Dkt. No. 260 at 7-9, represent just some of the meaningful grounds for disappointment with the proposed consent decree. *See also* Dkt. No. 255 at 5 (letter from Sen. Cory A. Booker quoting a state Attorney General's statement that they were "deeply disappointed" they did not secure certain remedies in the proposed consent decree). But these hopes and desires for the proposed consent decree to reach farther – to achieve more – do not rise to the level of legal violations upon which the Court can reject the parties' negotiated resolution. "Unless a consent decree is unfair, inadequate, or unreasonable, it ought to be approved." *Randolph*, 736 F.2d at 529.

For the foregoing reasons, the Court **GRANTS** the parties' joint motion. The Court **DISSOLVES** the parties' stipulation and the Court's Order Not to Close, Dkt. No. 170, effective upon entry of this Order. In accordance with the parties' joint request, the Court will issue the consent decree as judgment and as a standalone docket entry.

**IT IS SO ORDERED.**

Dated: September 30, 2026

**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STATE OF CALIFORNIA, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>PARAMOUNT SKYDANCE CORP., and WARNER BROS. DISCOVERY, INC.,<br><br>*Defendants.* | Case No.: 4:26-cv-07116-AMO<br><br>**[~~PROPOSED~~] CONSENT DECREE**<br><br>Judge: Honorable Araceli Martínez-Olguín |

This Consent Decree ("**Consent Decree**") is entered into by and between the State of California, the State of Arizona, the State of Colorado, the State of Connecticut, the Commonwealth of Massachusetts, the State of Minnesota, the State of Nevada, the State of New Jersey, the State of New Mexico, the State of New York, the State of Oregon, and the State of Washington, by and through their respective Attorneys General (collectively, "**Plaintiff States**"), on the one hand, and Paramount Skydance Corporation ("**Paramount**"), Warner Bros. Discovery, Inc. ("**Warner Bros**." or "**WBD**"), the Combined Entity (as defined below), and their respective affiliates, (collectively, the "**Defendants**" or the "**Companies**"), on the other. "**Parties**" refers collectively to the Companies and the States, and "Party" refers to any one of the Parties, as the context requires.

The Parties, by and through their respective counsel, in consideration for and subject to the promises, terms, and conditions contained in this Consent Decree, hereby warrant, represent, acknowledge, covenant, stipulate and agree, subject to Court approval pursuant to applicable federal and state law, as follows:

## I. RECITALS

**A.** **WHEREAS**, on February 27, 2026, the Companies announced that they had entered into an agreement and plan of merger, pursuant to which Paramount will acquire Warner Bros. upon closing of the Merger;

**B.** **WHEREAS**, on July 13, 2026, after conducting an investigation of the Companies' proposed Merger and its potential effects on competition under federal and state antitrust laws, the Plaintiff States filed a complaint in the Federal District Court for the Northern District of California alleging that the effect of the proposed Merger may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. §18, in three alleged markets, and on that basis the Plaintiff States sought an order to permanently enjoin the proposed Merger amongst other relief;

**C.** **WHEREAS**, the Defendants deny that the Merger violates any applicable law but recognize the Plaintiff States' legitimate interest in protecting competition and consumers, and the Defendants desire to resolve the Plaintiff States' Complaint without the further cost, delay, and uncertainty of litigation;

**D.** **WHEREAS**, the Parties have engaged in good-faith negotiations and have agreed to the terms and conditions set forth herein to address the Plaintiff States' concerns regarding the competitive effects of the Merger alleged in the Complaint;

**E.** **WHEREAS**, this Consent Decree is for settlement purposes only and does not constitute an admission by the Companies that any law has been violated;

**F.** **NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth herein, the Parties agree as follows:

## II. DEFINITIONS

**A.** **"Consent Decree"** means this Consent Decree, including any amendments or modifications made in accordance with Section VIII.A hereof.

**B.** **"Attorneys General"** means, collectively, the Attorneys General of the Plaintiff States and their respective authorized designees.

**C.** **"Closing" or "Close"** means the closing of the Merger.

**D.** "**CBS News**" means the CBS Network News division within Paramount.

**E.** "**CNN**" means the CNN Worldwide division within Warner Bros.

**F.** **"Combined Entity"** means Paramount Skydance Corporation, a Delaware corporation, together with its subsidiaries, controlled affiliates, successors, and assigns, after the Merger Closes.

**G.** "**Commitment Period**" means the period of time that commences on the Closing and concludes on the fifth (5th) calendar year that follows the Closing. (For illustration purposes only, if the Closing occurs on September 30, 2026, the Commitment Period would run from September 30, 2026, to December 31, 2031.)

**H.** "**Commitment Year**" means each of the five consecutive calendar years following the calendar year in which the Closing occurs. (For illustration purposes only, if the Closing occurs at any time during calendar year 2026, then the Commitment Years would be 2027, 2028, 2029, 2030 and 2031.)

**I.** **"Distributor"** means any U.S. multichannel video programming distributor, including any virtual multichannel video programming distributor excluding any virtual multichannel video programming distributor that (1) is not affiliated with an MVPD and has never offered traditional MVPD services; and (2) as of the Effective date has more than five million (5,000,000) subscribers.

**J.** "**Divestiture Channels**" means collectively, BET (Black Entertainment Television, including BET, BET Gospel, BET Her, BET Hip-Hop, BET Jams, and BET Soul), VH1, Comedy Central, Smithsonian, Destination America, and Science, including all tangible and intangible assets reasonably necessary for a Divestiture Buyer to operate effectively, including the Divestiture Channels' copyrights, trademarks, other intellectual property rights, and licenses. For the avoidance of doubt, where a Divestiture Channel licenses content for distribution, the ownership rights of the underlying content remain the property of the license-granting entity and are not Distribution Channel assets to be divested, provided that the existing content license agreements with the Divestiture Channel will remain in place for the remainder of the license term.

**K.** "**Compliance Monitor**" has the meaning defined in Article VI.A of this Consent Decree.

**L.** **"Effective Date"** means the date on which this Consent Decree is entered by the Court.

**M.** "**Exhibitor**" means a person or legal entity that, as of the Effective Date, operates one or more theaters or cinemas in the United States for the primary purpose of publicly screening first-run Films for audiences.

**N.** **"Film"** means a feature-length motion picture (of at least seventy-five (75) minutes in running time) produced or distributed by the Combined Entity or its subsidiaries and intended for initial release in commercial movie theaters in the United States.

**O.** "**Independent Film**" means a Film that is either (i) based on an original screenplay or (ii) originated from Film producers outside of the Combined Entity, Disney, Universal, or Sony.

**P.** "**Lot**" means, with respect to Paramount, the studio lot Paramount operates at 5555 Melrose Avenue, in Los Angeles, California; and, with respect to Warner Bros., the

studio lot that Warner Bros. operates at 4000 Warner Boulevard in Burbank, California.

Q. **"Merger" or "Transaction"** means the Agreement and Plan of Merger entered into on February 27, 2026, between Paramount and Warner Bros., pursuant to which Paramount will acquire Warner Bros. upon Closing.

R. **"Miramax Studios"** means Miramax, LLC, and all of its subsidiaries, assets, and affiliated operations in which the Combined Entity holds a direct or indirect ownership interest.

S. **"Monitoring Trustee"** has the meaning defined in Article VI.B of this Consent Decree.

T. **"Motion Pictures & Television Fund"** means the Motion Picture & Television Fund, a California nonprofit corporation, or any successor organization.

U. "**National Association of Attorneys General Fund**" means a fund that is administered by the National Association of Attorneys General and that is designated for antitrust enforcement, as identified by the State Committee.

V. "**Paramount Basic Cable Channels**" means the basic cable channels owned by Paramount at the time of the Closing.

W. **"PVOD" or "Premium Video-on-Demand"** means access to audiovisual content for on-demand streaming via the internet or other digital distribution platforms immediately after Theatrical Release for a limited period of time for a one-off fee.

X. **"State"** means any one of the Plaintiff States, acting by and through its Attorney General, as the context requires.

Y. "**State Committee**" means a group of no more than five (5) Attorneys General offices appointed by the States, as modified from time to time. The State Committee will consult with and provide regular updates to the Plaintiff States.

Z. **"SVOD"** means subscription video-on-demand, being any service that provides access to audiovisual content on a subscription basis for on-demand streaming via the internet or other digital distribution platforms, including but not limited to Paramount+ and any successor service operated by the Combined Entity.

AA. **"Theatrical-Release Window"** means the period commencing on the date of a Film's initial public exhibition in commercial movie theaters in the United States (such exhibition, a "**Theatrical Release**") and during which such Film is made available exclusively through theatrical exhibition and is not to be made available on any SVOD or home entertainment platform.

BB. **"Warner Bros. Basic Cable Channels"** means the basic cable channels owned by Warner Bros. at the time of the Closing.

**CC.** "**Wide Release Film**" means a Film that is released on at least two thousand (2,000) screens.

## III. COMMITMENTS

### A. Theatrical Film Exhibition Commitments

1. **Annual Film Release Commitment.** During each Commitment Year, the Combined Entity shall cause to be released for Theatrical Release in the United States a minimum of thirty (30) Films for the first and second Commitment Years and thirty-two (32) Films for the third, fourth, and fifth Commitment Years (the "**Annual Film Release Commitment**"). Of those Films:

   a. For the first and second Commitment Years, at least twenty (20) of the thirty (30) Films must be Wide Release Films;

   b. For the third, fourth, and fifth Commitment Years, at least twenty-one (21) of the thirty-two (32) Films must be Wide Release Films;

   c. For each of the Commitment Years, at least four (4) of the Films subject to this Section must be Independent Films; and

   d. For each of the Commitment Years, at least fifty percent (50%) of the Films subject to this section shall be produced or jointly produced by the Combined Entity.

2. **Theatrical-Release Window.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall maintain a Theatrical-Release Window of not less than forty-five (45) days from the date of initial theatrical exhibition in the United States and shall not market or promote the Film as being available on any PVOD, SVOD, or other streaming platform prior to the thirtieth (30th) day of the Theatrical Release Window.

3. **SVOD Holdback Period.** For each Film counted toward the Annual Film Release Commitment, the Combined Entity shall not make such Film available on any SVOD platform, including Paramount+ or any successor service, for a period of not less than ninety (90) days from the date of the Film's initial theatrical exhibition in the United States.

4. **Marketing Budget Requirement.** The Combined Entity shall support each Film counted toward the Annual Film Release Commitment with a marketing spend consistent with typical practice for similar films and release patterns.

5. **Tentpole Films Requirement.** At least twenty percent (20%) of the Combined Entity's Films for each Commitment Year shall have aggregate

production and acquisition budgets of the equivalent of at least Fifty Million Dollars ($50 million) in September 2026, adjusted for inflation using the CPI-U based on the prior calendar year, and those Films must be released on a minimum of three thousand (3,000) domestic screens within the first four (4) weekends of initial release.

**6.** **Rental Rate Terms.** For the first three (3) Commitment Years of the Commitment Period, the Combined Entity shall maintain Film rental terms with Exhibitors for new Film releases that are consistent with the best practices followed by Paramount and Warner Bros. as of the Closing for such Exhibitor. For purposes of this paragraph, best practices include but are not limited to: (i) honoring Paramount's current terms and rental rates as of the Closing for current and planned Paramount Theatrical Releases; (ii) honoring Warner Bros.'s current terms and rental rates as of the Closing for current and planned Warner Bros. Theatrical Releases; and (iii) not offering any terms for Film Theatrical Releases that are less favorable than the higher of the rental rate schedule and associated terms offered by either Paramount or Warner Bros. to the same exhibitor as of the Closing.

**7.** **Film Catalogue Access.** During the Commitment Period, the Combined Entity will continue to make the film catalogues of both Paramount and Warner Bros. available for license by Exhibitors under similar Film rental terms as have been offered by each Company during the 2025 calendar year for similar grossing titles and situations. From time to time, certain Films may be taken out of release up to ninety (90) days before and up to thirty (30) days after a larger-scale re-issue, including but not limited to anniversary celebrations, so as not to cannibalize box office in close proximity to the larger theatrical release that will be supported by marketing efforts.

**8.** **United States Production Levels.** During the Commitment Years:

a. The Combined Entity will spend at least Three Hundred Million Dollars ($300,000,000) more annually (totaling at least One Billion Five Hundred Million Dollars ($1,500,000,000) more across the Commitment Period) in production in the United States as compared to the level that the Companies spent on production in the United States in 2025.

b. In the event that, during the Commitment Period, the United States enacts into law an uncapped federal film tax incentive of at least twenty percent (20%) (a "**Federal Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least twenty percent (20%) of all Film production for the first and

second years, and must be at least thirty percent (30%) for the third, fourth, and fifth years.

c. In the event that, during the Commitment Period, the United States enacts into law a Federal Film Tax Credit as described in Section III.A.8.b, and either the State of California or the state of New York passes an uncapped state film tax incentive, inclusive of both above- and below-the-line expenses, of at least forty-three percent (43%), stackable with the Federal Film Tax Credit (a "**State Film Tax Credit**"), then, for each remaining full calendar year within the Commitment Period for which the State Film Tax Credit and Federal Film Tax Credit applies, the Combined Entity's annual average production-day levels in the United States must be at least forty percent (40%) of all Film production.

**9. Divestiture Remedy for Breach.** In the event that the Combined Entity fails to meet the Annual Film Release Commitment in any Commitment Year:

a. The Combined Entity shall have a cure period of six (6) months from the end of such Commitment Year (the "**Theatrical Cure Period**") in which to release a sufficient number of additional Films to bring the total to the required minimum of Films under the Annual Film Release Commitment for that Commitment Year. A Film may only be counted toward the Annual Film Release Commitment for one Commitment Year.

b. If, upon the expiration of the Theatrical Cure Period, the Combined Entity has failed to cure the shortfall, the Combined Entity shall divest its entire direct and indirect ownership interest in Miramax Studios ("**Miramax Divestiture Assets"**), on commercially reasonable terms, to a bona fide acquirer approved by the State Committee (such approval not to be unreasonably withheld or delayed) within twelve (12) months of the expiration of the Theatrical Cure Period (the "**Miramax Divestiture**").

c. The Combined Entity may not reacquire any part of or interest in the Miramax Divestiture Assets during the Commitment Period.

**10. Fund Contributions for Shortfalls.** In addition to and independent of the divestiture remedy set forth in Section A.9 of this Article, for each Film by which the Combined Entity falls below the Annual Film Release Commitment in any Commitment Year, the Combined Entity shall contribute thirty million dollars ($30,000,000), split fifty percent / forty percent / ten percent (50%/40%/10%) to (i) health care and retirement trust funds for the WGA, IATSE, DGA, International Brotherhood of Teamsters, and other unions that work on production of Films (as selected by the State

Committee), (ii) the Motion Pictures & Television Fund, and (iii) the National Association of Attorneys General Fund (collectively, the "**Contribution Funds**"), respectively. Such contributions shall be made within sixty (60) days of the end of the applicable Commitment Year (or the Theatrical Cure Period, whichever is later) and shall be non-refundable. The Contribution Fund obligations under this paragraph shall apply regardless of whether the Combined Entity subsequently cures the shortfall during the Theatrical Cure Period.

**11.** **Counting Methodology.** For purposes of this Article, a Film shall be counted toward the Annual Film Release Commitment for the Commitment Year in which its initial date of theatrical exhibition in the United States occurs, except that a Film released during the Cure Period shall be counted toward the Annual Film Release Commitment for the Commitment Year prior to its initial date of theatrical exhibition in the United States occurs. Films that receive a limited release (defined as fewer than six hundred (600) screens in the United States) shall not be counted toward the minimum unless they are subsequently expanded to one thousand (1,000) screens within thirty (30) days. For the avoidance of doubt, any re-releases of previously released films, commemorative editions, or otherwise repackaged versions of previously released intellectual property shall not count towards the Annual Film Release Commitment described in Section III.A.1.

**B.** **Basic Cable Commitments**

For the duration of the Commitment Period:

**1.** In negotiations between the Combined Entity and a Distributor concerning affiliation agreement terms for the Combined Entity's basic cable network portfolio, the Combined Entity shall separately negotiate affiliation agreement terms for the Paramount Basic Cable Channels and the Warner Bros. Basic Cable Channels. For the avoidance of doubt, this paragraph does not apply to other Combined Entity offerings (*e.g.*, premium cable channels, streaming services, or broadcast).

**2.** The Combined Entity will not alter the existing schedules for renegotiation of affiliate fee agreements covering basic cable channels, except at the written request of a Distributor, which the Combined Entity will not unreasonably reject or deny.

**3.** The Combined Entity shall not make any affiliation agreement or its terms for the Warner Bros. Basic Cable channels contingent on the Distributor's agreement to terms for the affiliation agreement for the Paramount Basic Cable Channels; or vice versa.

**4.** In separately negotiating affiliation agreement terms under this Section, the Combined Entity will not use confidential Paramount Basic Cable Channel affiliate fee data in any way to determine, influence, or impact negotiating Warner Bros. Basic Cable Channel affiliate fees, or vice versa.

**5.** Within 60 days after the Effective Date, the Combined Entity shall implement procedures and protections to ensure that the Combined Entity complies with the requirements of this Section III.B., and will provide those policies and protections to the Monitoring Trustee and the State Committee.

**6.** This commitment shall not apply where a Distributor affirmatively requests, in writing, that the Combined Entity negotiate basic cable affiliation agreement terms together for the Paramount Basic Cable Channels, Warner Bros. Basic Cable Channels, or any product or service offering from the Combined Entity; provided however, the Combined Entity may not solicit, encourage, or condition other terms on a Distributor making such a request.

**7.** **Divestiture Remedy for Breach.** In the event that the Combined Entity materially breaches the cable negotiation provisions in this section:

a. The Combined Entity shall have a cure period of six (6) months from the date the State Committee and the Monitoring Trustee notify the Court that they believe a material violation has occurred (the "Cable Cure Period") in which to re-negotiate and come into compliance with those provisions. The Combined Entity must make any revised agreements retroactive to the date of the violation and take any other steps necessary such that the Distributor is put in the same position as if the violation had not occurred.

b. If, upon the expiration of the Cable Cure Period, the Court has found that the Combined Entity has violated this Section III.B and has failed to cure said violation as determined by the Court in a final order, the Combined Entity shall, in addition to any remedies necessary to put the Distributor in the same position as if the violation had not occurred, divest its entire direct and indirect ownership interest in the Divestiture Channels.

1. The Combined Entity shall, within one hundred and twenty (120) days after the expiration of the Cable Cure Period, divest the Divestiture Channels to a bona fide divestiture buyer approved by the State Committee (such approval not to be unreasonably withheld or delayed) (a "**Divestiture Buyer**") in a manner consistent with this Consent Decree. The Combined Entity will use their best efforts to divest the Divestiture Channels as expeditiously as possible. In exercising the State Committee approval authority described in this paragraph, in the event that multiple bona fide entities bid to acquire the Divestiture Channels, the Combined Entity presumptively may

sell the Divestiture Channels to the highest bidder; however, the State Committee may direct the sale to a Divestiture Bidder that is within five percent (5%) of the highest bidder's bid price.

2. **Transition Services** (at Divestiture Buyer's Option). At the option of the Divestiture Buyer(s), on or before the closing date of any divestiture, the Combined Entity shall enter into one or more transition services agreements to provide any transition services reasonably necessary to operate any Divestiture Channels as viable, ongoing programming assets.

3. The Combined Entity may not reacquire any part of or interest in the Divestiture Channels during the Commitment Period.

**C. Entertainment Industry Investment Commitments**

**1. Lot Operations.** For the duration of the Commitment Period, the Combined Entity shall not sell or close the Paramount or Warner Bros. Lots and shall use commercially reasonable efforts to operate the Lots in a manner consistent with past practices, including leasing use to third parties and producing films and television shows.

**2. Committed Development Operations.** To the extent that either Paramount or Warner Bros. entered into contracts prior to the Effective Date to lease or develop studio facilities within a Plaintiff State ("**Development Agreements**"), and the development efforts described by those Development Agreements had not been completed prior to Closing, the Combined Entity shall honor the terms of those Development Agreements during the Commitment Period.

**3. Collective Bargaining.** During the Commitment Period, the Combined Entity shall honor existing collective bargaining agreements in the United States in accordance with their terms and shall bargain in good faith with applicable recognized labor organizations with respect to successor agreements, in each case subject to applicable law, the terms of those agreements, and commercially reasonable efforts. In furtherance of the foregoing:

a. The Combined Entity shall not unilaterally change any mandatory subject of bargaining affecting represented employees and covered by an existing collective bargaining agreement, except as permitted by such agreement or as otherwise agreed to in writing by the applicable labor organization.

b. The Combined Entity shall credit employees with all service, seniority, and accrued status recognized under applicable collective bargaining agreements for all purposes—including but not limited

to layoff, recall, promotion, benefits eligibility, and vacation accrual—subject to the terms of such agreements.

c. The Combined Entity shall not unlawfully interfere with employees in the exercise of rights to union representation and collective bargaining and shall respect the role of recognized labor organizations throughout the integration process.

4. **Employee Reapplication**. During the Commitment Period, Company employees who are displaced, laid off, or otherwise terminated as a result of the Transaction ("**Affected Employees**") shall have the right to apply for any open, vacant, and available positions within the Combined Entity's organization for which they are qualified, and the Combined Entity shall consider those applications in good faith.

5. **Community Investment.** The Combined Entity shall make an aggregate annual financial commitment of Nine and a Half Million Dollars ($9,500,000.00) each year for five (5) years following the Closing Date for investments in (1) workforce training and career development programs in film and television production communities at qualified educational institutions; and (2) film programs and community arts organizations.

6. **Independent Film Fund.** Within thirty (30) days of Closing, and for the duration of the Commitment Period, the Combined Entity will form and operate a fund for purchasing independent films (the "**Independent Film Fund**"). The Combined Entity will make an annual contribution to the Independent Film Fund of Five Million Dollars ($5 million) per annum for each Commitment Year.

**D. News Editorial Independence Board Commitments**

1. **Formation.** Within one hundred eighty (180) days following Closing, the Combined Entity shall establish the News Editorial Independence Board (the "**Editorial Independence Board**") and appoint Editorial Independence Board Members in manner that is consistent with this Section III.D.

2. **Composition.** The Editorial Independence Board shall be made up of five (5) established journalists (active or retired), each of whom shall have practiced journalism for a minimum of ten (10) years (including with credentials for at least three (3) years) ("**Journalist**"). ("**Editorial Independence Board Members**"). No more than two (2) Editorial Independence Board Members may be affiliated with the same political party.

3. **Appointment.** Editorial Independence Board Members shall be appointed by the Combined Entity's Board of Directors (the "**Combined Entity's Board**").

a. No member of any government or governmental entity may be appointed to the Editorial Independence Board.

b. No member of any government or governmental entity, including federal, state, and local governments, may approve or have approval rights over members appointed to the Editorial Independence Board.

c. No officer, director, shareholder or non-Journalist employee or contractor of the Combined Entity may be appointed to the Editorial Independence Board.

**4. Board Member Term.** Editorial Independence Board Members are expected to serve for three (3) years from the date of their appointment. The Combined Entity's Board can remove an Editorial Independence Board Member only for good cause, which for purposes of this paragraph shall mean fair and honest reasons, regulated by good faith on the part of the employer, that are not trivial, arbitrary, or capricious, unrelated to business needs or goals, or pretextual. When an Editorial Independence Board is vacated, the Combined Entity's Board will fill that vacancy in a manner consistent with this Section III.D.

**5. Role.** The Editorial Independence Board will have the following responsibilities during the Commitment Period:

a. Establishing a set of guiding editorial principles based on CBS News and CNN's Standards & Practices policies and principles in effect as of the Effective Date of accuracy, independence, fairness, and journalistic integrity (collectively, "**News Editorial Principles**").

b. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged violations of the News Editorial Principles.

c. Resolving any disputes between CBS News employees, CNN employees, and management of the Combined Entity regarding alleged reporting bias or failure to meet agreed reporting fairness standards.

d. Establishing and monitoring adherence to ethical journalism as defined by journalism industry best practices and to editorial independence, including from the Combined Entity's ownership and shareholders.

**6. Reporting.** The Editorial Independence Board shall report to the Combined Entity's Board through the Combined Entity's Chief Compliance Officer.

7. **Scope.** The Editorial Independence Board's above-described responsibilities are limited to news and editorial content produced principally for distribution in the United States.

8. **Indemnification.** The Combined Entity shall indemnify and hold harmless Plaintiff States for any claims and litigation related to this section of the Consent Decree.

**E. Other Commitments**

1. **Pluto TV**. For the Commitment Period:

   a. The Combined Entity shall continue to maintain and make available a free, ad-supported streaming service under the Pluto TV brand or a successor or substantially equivalent replacement brand or service.

   b. The Combined Entity will, at a minimum, maintain this service with service and quality levels at or above the service and quality for the service as provided on the Effective Date, and shall make all product and content improvement and additions as contemplated on the Effective Date.

2. **Costs and Attorneys' Fees.** Defendants shall reimburse the Plaintiff States for reasonable attorneys' fees and reasonable economic expert fees (including reasonable expert firm support costs) incurred through the Effective Date, not to exceed Forty Million Dollars ($40,000,000), subject to review for reasonableness. The amount may be used for any one or more of the following purposes, by the Plaintiff States' Attorneys General as they, in their sole discretion, see fit and for any lawful purpose, including: antitrust or consumer protection law enforcement, including fees and expenses; for deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account), for use in accordance with the state laws governing that account; for deposit into a fund exclusively dedicated to assisting state attorneys general to enforce the antitrust laws by defraying the costs of (a) experts, economists, and consultants in multistate antitrust investigations and litigation, (b) training or continuing education in antitrust for attorneys in state attorney general offices, or (c) information management systems used in multistate antitrust investigations and litigation; or for any other purpose as the attorneys general deem appropriate, consistent with, or required by, the various states' laws.

   a. Any payment the Companies make pursuant to this Consent Decree to the Colorado Department of Law is to be held, along with any interest thereon, in trust by the Attorney General to be used in the Attorney General's sole discretion for reimbursement of the State's actual costs and attorney's fees, the payment of restitution, if any,

and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.

3. **Anti-Retaliation.** The Combined Entity shall not take any adverse action against any exhibitor, distributor, employee, contractor, or other person in retaliation for reporting a compliance concern to the Monitoring Trustee or Plaintiff States, for cooperating with any investigation or inquiry related to compliance with this Consent Decree, or for cooperating with the investigation of or litigation challenging this Merger.

4. **Discharge.** The Plaintiff States affirm that this Consent Decree discharges as to the Defendants all competition claims, related consumer protection claims, and known related investigations by the Plaintiff States arising from the Merger and the related transactions. Related transactions include agreements that are ancillary to the Merger, for example equity commitments made in order to provide funding for the merger.

## IV. REPRESENTATIONS AND WARRANTIES

A. **Representations of the Plaintiff States.** The Plaintiff States represent and warrant that each of their respective Attorneys General has the authority to enter into this Consent Decree and to bind the applicable Plaintiff State to the terms hereof, provided, however, that the (1) State of Colorado does not join and does not bind its State to Section III.C.1 or III.D of this Consent Decree and (2) State of Washington does not join and does not bind its State to Section III.D of this Consent Decree.

B. **Representations of the Defendants**. Each Defendant represents and warrants that:

1. It is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and is qualified to do business in the each of the Plaintiff States;

2. It has full corporate power and authority to execute, deliver, and perform this Consent Decree;

3. The execution, delivery, and performance of this Consent Decree have been duly authorized by all necessary corporate action; and

4. This Consent Decree constitutes a valid and binding obligation of the Defendants and the Combined Entity (as applicable), enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and to general principles of equity.

## V. TERM AND DURATION

**A.** **Term.** This Consent Decree shall become effective on the Effective Date and shall remain in full force and effect for the Commitment Period, unless earlier terminated or extended by mutual written agreement of the Parties (the "**Term**"). Upon valid termination, this Consent Decree shall forthwith become null and void and there shall be no liability or obligation on the part of the Parties (other than as set forth in Section V.B. below). Notwithstanding the foregoing, at any time after the completion of the second full Commitment Year of the Commitment Period, the Combined Entity may, for good cause, petition the Court, by motion pursuant to Federal Rule of Civil Procedure 60(b) or as otherwise permitted by law, for relief from or modification to the requirements of this Consent Decree (a "**Petition**"). In such Petition, the Combined Entity bears the burden to show that, absent relief or modification, the Consent Decree impairs the Combined Entity's ability to successfully operate the business and to compete effectively, and that the requested relief or modification is not substantially likely to lessen competition. Prior to submitting a Petition, the Combined Entity will meet and confer with the State Committee in good faith to determine whether the Plaintiff States will consent to the requested relief or modification.

**B.** **Survival.** The representations, warranties, covenants and agreements in this Consent Decree shall not survive the termination of this Consent Decree, except that any obligations of the Combined Entity under this Consent Decree that by their nature are intended to survive termination, including completing the Miramax Divestiture (if required), any ongoing cure obligations, any accrued Contribution Fund contribution obligations, shall survive the termination of this Consent Decree until fully performed or discharged.

## VI. COMPLIANCE MONITORING AND REPORTING

**A.** **Internal Compliance Monitor.** Within twenty-one (21) days of Closing, Defendants shall: (i) appoint a "**Compliance Monitor**" who is an internal employee or officer of the Combined Entity and who reports directly to the Combined Entity's Chief Compliance Officer, and (ii) identify to the State Committee and the Monitoring Trustee the Compliance Monitor's name, business address, telephone number, and email address. Within forty-five (45) days of a vacancy in the Compliance Monitor position, the Combined Entity shall appoint a replacement, and shall identify to States Committee the replacement Compliance Monitor's name, business address, telephone number, and email address. During the Commitment Period, the Compliance Monitor shall:

**1.** Within one hundred twenty (120) days of the Closing, and annually thereafter for the duration of the Commitment Period, provide a report to the Combined Entity's Chief Compliance Officer describing the efforts the Combined Entity has made to comply with this Consent Decree.

**2.** Provide annual compliance training to employees of the Combined Entity whose day-to-day work responsibilities are directly affected by this Consent Decree ("**Relevant Personnel**") regarding the Combined Entity's obligations under this Consent Decree.

**3.** Provide supplemental compliance training to newly hired Relevant Personnel regarding the Combined Entity's obligations under this Consent Decree.

**4.** Semiannually communicate to Relevant Personnel that they may disclose to the Compliance Monitor or the Chief Compliance Officer, without reprisal or adverse consequence for such disclosure, information concerning any violation or potential violation of this Consent Decree by the Combined Entity.

**B. Monitoring Trustee.**

**1.** Within ninety (90) days of the Closing, the Combined Entity and the State Committee shall jointly select a mutually agreed-upon "**Monitoring Trustee**" to monitor the Combined Entity's compliance with this Consent Decree (excluding Article III.D) during the Commitment Period. The Combined Entity shall bear the reasonable costs of the Monitoring Trustee and any consultants reasonably retained by the Monitoring Trustee.

**2.** The Monitoring Trustee shall:

a. Have the powers and authority reasonably necessary to monitor the Combined Entity's compliance with the terms of this Consent Decree;

b. Serve as an independent third party and not as an employee or agent of either the State Committee or the Combined Entity;

c. Employ any reasonably necessary consultants, accountants, attorneys, and other representatives and assistants as are reasonably necessary to carry out the Monitor's duties and responsibilities (as mutually agreed with the State Committee and the Combined Entity, that agreement not to be unreasonably withheld);

d. Submit semiannual reports to the State Committee regarding the Combined Entity's compliance, as well as any ad hoc reports of its conclusions regarding the Combined Entity's alleged failure to meet any term of this Consent Decree, including the Annual Film Release Commitment in any Commitment Year. These reports shall receive a proper confidentiality designation, if any, consistent with the Modified Stipulated Protective Order in force in this case, and shall not disclose business secrets or documents marked business confidential of the Combined Entity.

e. The Monitoring Trustee and any reasonably necessary agents or consultants retained by the Monitoring Trustee shall, and upon reasonable notice to the Combined Entity, have full and complete access to the relevant personnel, records, and facilities that the Monitoring Trustee reasonably needs to ascertain the Combined Entity's compliance with this Consent Decree (provided, that this shall not imply that the Monitoring Trustee shall be permitted to access any document that would likely jeopardize legal privilege (including attorney-client privilege)).

**3.** The Combined Entity shall:

a. Cooperate with and assist the Monitoring Trustee in performing his or her duties for the purpose of reviewing compliance under this Consent Decree;

b. Not interfere with the ability of the Monitoring Trustee to perform any duties pursuant to this Consent Decree;

c. Not require the Monitoring Trustee to disclose to the Combined Entity the substance of the Monitor's communications with the State Committee or any other person, or the substance of any reports submitted pursuant to this Consent Decree provided, however, that the Monitoring Trustee shall keep the State Committee and the Combined Entity apprised of the scope and substance of the Monitoring Trustee's investigations or reviews, consistent with due process;

d. Indemnify and hold the Monitoring Trustee harmless against any loss, claim, damage, liability, and expense (including attorneys' fees and out of pocket costs) that arises out of, or is connect with, a claim concerning the performance of the Monitoring Trustee's duties pursuant to this Consent Decree, unless the loss, claim, damage, liability, or expense results from gross negligence or willful misconduct by the Monitoring Trustee.

**4.** The Combined Entity may require the Monitoring Trustee and each of its consultants, accountants, attorneys, and other representatives and assistants to enter into a customary confidentiality agreement, so long as the agreement does not restrict the Monitor's ability to access personnel, information, and facilities, to provide information to the State Committee, or to otherwise observe and report on the Combined Entity's compliance with this Consent Decree.

**5.** If the Monitoring Trustee resigns or the State Committee determines that the Monitor has ceased to act, has failed to act diligently, or is otherwise unable to continue serving as the Monitoring Trustee, the State Committee may require a new Monitoring Trustee be appointed in the same manner as

the initial appointment of the Monitoring Trustee. The substitute Monitoring Trustee shall be afforded all rights, powers, and authorities and shall be subject to all obligations of the Monitoring Trustee section of this Consent Decree. The Monitoring Trustee shall have no role or authority in day-to-day operations of the Combined Entity.

**6.** The Monitoring Trustee shall have no role or authority relating to the Combined Entity's news operations.

**7.** The Monitoring Trustee shall have no role or authority in the selection or production of content by the Combined Entity.

**C.** **Annual Certification.** The Combined Entity shall cause its Chief Executive Officer and General Counsel to certify to the State Committee, on an annual basis and within ninety (90) days of the end of each calendar year during the Term, that the Combined Entity is in compliance with all material terms of this Consent Decree, or shall identify any areas of non-compliance and the steps being taken to cure such non-compliance. On the same day the Combined Entity certifies compliance to the State Committee, the Combined Entity shall cause that certification to be filed on the docket in the United States District Court for the Northern District of California (the "**Court**") in Case No. 4:26-cv-7116.

## VII. ENFORCEMENT AND DISPUTE RESOLUTION

**A.** **Enforcement.** This Consent Decree shall be enforceable by any Plaintiff State, acting by and through its Attorney General, through any action or proceeding in the Court in Case No. 4:26-cv-7116. The Court shall retain jurisdiction to enforce this Consent Decree, and the Combined Entity consents to the jurisdiction of that Court for such purposes.

**B.** **Equitable Relief.** The Parties acknowledge that a breach of this Consent Decree may cause irreparable harm for which monetary damages would be an inadequate remedy. Accordingly, any Plaintiff State, acting by and through its Attorney General, shall be entitled to seek specific performance, injunctive relief, or any other equitable remedy available at law or in equity, in addition to any other remedies provided herein or available at law.

**C.** **Meet and Confer.** Prior to commencing any enforcement action, the complaining Party shall provide written notice to the other Party specifying the alleged breach or dispute in reasonable detail. The Parties shall meet and confer in good faith within thirty (30) days of receipt of such notice in an effort to resolve the dispute without resort to litigation.

**D.** **Mediation.** If the dispute is not resolved through the meet-and-confer process within thirty (30) days, either Party may submit the dispute to non-binding mediation before a mediator mutually agreed upon by the Parties. The costs of mediation shall be shared equally by the Parties.

**E.** **Reservation of Rights.** Nothing in this Article shall limit, waive, or otherwise affect the authority of any Plaintiff State, acting by and through its Attorney General, to enforce the Clayton Act, including Section 16, 15 U.S.C. § 26, or any applicable state antitrust, unfair competition, consumer-protection, or other statute, regulation, or common-law principle.

## VIII. GENERAL PROVISIONS

**A.** **Modification and Waiver.** No amendment, modification, or supplement to this Consent Decree shall be valid or binding unless (i) made in writing and signed by both Parties and (ii) approved by the Court. No waiver of any provision of this Consent Decree shall be effective unless in writing and signed by the Party granting such waiver. No failure or delay by either Party in exercising any right, power, or remedy under this Consent Decree shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

**B.** **Severability.** If any provision of this Consent Decree is held to be invalid, illegal, or unenforceable by a court of competent jurisdiction, such provision shall be modified to the minimum extent necessary to make it valid, legal, and enforceable, and the remaining provisions shall continue in full force and effect. If such modification is not possible, the invalid provision shall be severed from this Consent Decree, and the remaining provisions shall remain in full force and effect, provided that the fundamental purposes of this Consent Decree can still be achieved.

**C.** **Force Majeure.** The Combined Entity shall not be considered in breach of this Consent Decree to the extent that performance of its obligations is prevented by force majeure events beyond the Parties' reasonable control, including but not limited to war, rebellion, hurricanes and other major storms, earthquakes, fires, terrorism, pandemics, strikes, labor disruptions, economic recessions, riots, insurrections, civil commotions, blockades, law or order of any federal government body exercising jurisdiction over the Parties, significant interference by or significant failures of state or local governmental authorities, significant interruptions in the supply chain, or acts of God. The Combined Entity shall promptly notify the Plaintiff States if this Force Majeure provision is invoked. For clarity, Plaintiffs States may petition the Court with respect the invocation of the Force Majeure provision.

**D.** **Governing Law.** This Consent Decree shall be governed by and construed in accordance with applicable federal law. To the extent federal law does not govern a procedural or other ancillary matter, the laws of the State of California shall apply, without regard to its conflict-of-laws principles.

**E.** **Conflicts.** If any statute or regulation pertaining to the subject matter of this Consent Decree is enacted, promulgated, or modified after the Effective Date and a court of competent jurisdiction holds that such statute or regulation is in conflict

with any provision of this Consent Decree, the Companies' compliance with such statute or regulation shall not be deemed a breach of this Consent Decree to the extent of the conflict.

**F.** **Jurisdiction and Venue.** The Parties consent to the exclusive jurisdiction and venue of the United States District Court for the Northern District of California for any action or proceeding arising out of or relating to this Consent Decree, including enforcement, and acknowledge that the Court shall retain jurisdiction for those purposes.

**G.** **Entire Agreement.** This Consent Decree, together with any exhibits, schedules, or attachments hereto, constitutes the entire agreement between the Parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, between the Parties relating to the subject matter hereof.

**H.** **Successors and Assigns.** This Consent Decree shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns. The Combined Entity may not assign its rights or delegate its obligations under this Consent Decree without the prior written consent of the Attorneys General, which consent shall not be unreasonably withheld. None of the Plaintiff States may assign its rights or delegate its obligations Consent Decree without the prior written consent of the Combined Entity, which consent shall not be unreasonably withheld.

**I.** **Counterparts.** This Consent Decree may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Execution and delivery of this Consent Decree by electronic means, including by facsimile, PDF, or other electronic signature, shall be valid and sufficient.

**J.** **No Third-Party Beneficiaries.** The Parties agree and acknowledge that this Consent Decree is solely for the benefit of the Parties, and that no person or entity is intended to be a third-party beneficiary of any provision of this Consent Decree for any reason, including for the purposes of any civil, criminal, or administrative action in any court or before any other authority. No other person or entity shall be permitted to assert any claim or right as a beneficiary or protected class under this Consent Decree, provided that nothing in this Consent Decree shall be construed to deprive any person, corporation, association, agency, or other entity of any right provided by law, regulation, or administrative pronouncement independent of this Consent Decree.

**K.** **Notices.** All notices or other communications under this Consent Decree shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For Plaintiff States:

Each Plaintiff State can be contacted via the offices and personnel listed in the signature blocks.

For Paramount, Warner Bros. or the Combined Entity, as applicable:

Paramount Skydance Corporation
5555 Melrose Avenue
Los Angeles, CA 90038
Attention: Chief Legal Officer
Email: md@paramount.com

**L.** **No Admission of Liability.** This Consent Decree does not constitute an admission by the Combined Entity that it has violated any federal or state antitrust law, unfair competition law, or any other applicable law. The Combined Entity enters into this Consent Decree solely for the purpose of resolving the joint investigation conducted by the Attorneys General and avoiding the cost, delay, and uncertainty of litigation.

**M.** **Construction.** This Consent Decree shall be construed without regard to any presumption or rule requiring construction against the Party causing it to be drafted. The headings and captions of the Articles and Sections of this Consent Decree are inserted for convenience of reference only and shall not affect the interpretation or construction of this Consent Decree.

**N.** This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. For purposes of this Consent Decree, a signature page that is transmitted electronically (*e.g.*, by DocuSign or emailed "PDF") shall have the same effect as an original.

**SO ORDERED.**

Dated: September 30, 2026

The Honorable Araceli Martínez-Olguín
United States District Judge

**IN WITNESS WHEREOF**, the Parties have caused this Consent Decree to be executed by their duly authorized representatives.

[Signatures follow]

FOR PLAINTIFF STATE OF CALIFORNIA:

ROB BONTA
Attorney General of California

/s/ Ashley Kaplan

PAULA L. BLIZZARD (SBN 207920)
Senior Assistant Attorney General
NATALIE S. MANZO (SBN 155655)
BRENT K. NAKAMURA (SBN 283572)
Supervising Deputy Attorneys General
WINSTON H. CHEN (SBN 166959)
MATTHEW E. DELGADO (SBN 306999)
NICOLE S. GORDON (SBN 224138)
JENNIFER K. HANE (SBN 275729)
ASHLEY KAPLAN (SBN 293443)
CASEY KOVARIK (SBN 348032)
ANDREW MCCREARY (SBN 338704)
DIVYA B. RAO (SBN 292853)
Deputy Attorneys General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6000
Fax: (916) 731-3637
Email: Ashley.Kaplan@doj.ca.gov

RICHARD PARKER (SBN 62356)
JAMES WEINGARTEN (*pro hac vice*)
ADAM DI VINCENZO (*pro hac vice*)
GRANT BERMANN (*pro hac vice*)
ANASTASIA PASTAN (*pro hac vice*)
ALEXIS BROWN-REILLY (*pro hac vice*)
JULIA M. MAY (*pro hac vice*)
NATALIE NOGUEIRA (*pro hac vice*)
ALLISON CHESKY (*pro hac vice*)
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20005
Telephone: (202) 835-7525
Email: jweingarten@milbank.com

KELLY D. GARCIA (*pro hac vice*)
EMME TYLER (SBN 341797)
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5871
Email: kgarcia@milbank.com

*Attorneys for Plaintiff State of California*

FOR PLAINTIFF STATE OF ARIZONA:

KRISTIN K. MAYES
Attorney General of Arizona

*/s/ Allison Weber*

ROBERT A. BERNHEIM (*pro hac vice*)
Unit Chief Counsel
SARAH PELTON (*pro hac vice*)
ALLISON WEBER (*pro hac vice*)
Assistant Attorneys General
2005 N. Central Avenue
Phoenix, AZ 85004
Telephone: (602) 542-3725
Fax: (602) 542-4377
Email: robert.bernheim@azag.gov
sarah.pelton@azag.gov
allison.weber@azag.gov

*Attorneys for Plaintiff State of Arizona*

FOR PLAINTIFF STATE OF COLORADO:

PHILIP J. WEISER
Attorney General of Colorado

*/s/ Bryn A. Williams*

BRYN A. WILLIAMS (SBN 301699)
First Assistant Attorney General
AMY BOWLES (*pro hac vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720) 508-6000
Email: Bryn.Williams@coag.gov
Amy.Bowles@coag.gov

*Attorneys for Plaintiff State of Colorado*

FOR PLAINTIFF STATE OF CONNECTICUT:

WILLIAM TONG
Attorney General of Connecticut

NICOLE DEMERS (*pro hac vice*)
Deputy Associate Attorney General

*/s/ Julián A. Quiñones Reyes*

JULIÁN A. QUIÑONES REYES (*pro hac vice*)
FRANKLIN KANIN (*pro hac vice*)
Assistant Attorneys General
Office of the Connecticut Attorney General
165 Capitol Avenue
Hartford, CT 06106
Telephone: (860) 808-5030
Email: Julian.Quinones@ct.gov
Franklin.Kanin@ct.gov

*Attorneys for Plaintiff State of Connecticut*

FOR PLAINTIFF COMMONWEALTH OF MASSACHUSETTS:

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ Anthony W. Mariano

ANTHONY W. MARIANO (*pro hac vice*)
Chief, Antitrust Division
WILLIAM L. TWOMEY (*pro hac vice*)
Assistant Attorney General, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 18th Floor
Boston, MA 02108
Telephone: (781) 835-7990
Email: Anthony.Mariano@mass.gov
William.Twomey@mass.gov

*Attorneys for Plaintiff Commonwealth of Massachusetts*

FOR PLAINTIFF STATE OF MINNESOTA:

KEITH ELLISON
Attorney General of Minnesota

/s/ Jon M. Woodruff

JAMES W. CANADAY (SBN 368825)
Deputy Attorney General
ELIZABETH ODETTE (*pro hac vice*)
Antitrust Division Manager
Assistant Attorney General
JON M. WOODRUFF (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101-2130
Telephone: (651) 300-7425
Fax: (651) 296-9663
Email:
Jon.Woodruff@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF NEVADA:

AARON D. FORD
Attorney General of Nevada

*/s/ Samantha B. Feeley*

SAMANTHA B. FEELEY (NV Bar No. 14034)
(*pro hac vice*)
Senior Deputy Attorney General
Office of the Nevada Attorney General
100 N. Carson St.
Carson City, Nevada 89701
Tel: (775) 684-1100
Email: sfeeley@ag.nv.gov

*Attorney for Plaintiff State of Nevada*

FOR PLAINTIFF STATE OF NEW JERSEY:

JENNIFER DAVENPORT
Attorney General of New Jersey

*/s/ Ana Atta-Alla*

ANA ATTA-ALLA (*pro hac vice*)
Deputy Attorney General
State of New Jersey
Office of the Attorney General
Division of Law
124 Halsey Street – 5th Floor
Newark, NJ 07102
Telephone: (973) 648-6835
Email: Ana.Atta-Alla@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

FOR PLAINTIFF STATE OF NEW MEXICO:

RAÚL TORREZ
Attorney General of New Mexico

*/s/ Amanda Butler*

AMANDA BUTLER (*pro hac vice*)
Senior Counsel
KALISTA M. WILSON (*pro hac vice*)
Assistant Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Telephone: (505) 490-4060
Fax: (505) 318-1050
Email: KWilson@nmdoj.gov

*Attorneys for Plaintiff State of New Mexico*

FOR PLAINTIFF STATE OF NEW YORK:

LETITIA JAMES
Attorney General of New York

*/s/ Elinor R. Hoffmann*

ELINOR R. HOFFMANN (*pro hac vice*)
Chief, Antitrust Bureau
AMY MCFARLANE (*pro hac vice*)
Deputy Chief, Antitrust Bureau
PRATIK AGARWAL (*pro hac vice*)
MORGAN FEDER (*pro hac vice*)
C. WILLIAM MARGRABE (*pro hac vice*)
Assistant Attorneys General
JAYA MANTOVANI (*pro hac vice*)
Attorney General Fellow
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Telephone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for Plaintiff State of New York*

FOR PLAINTIFF STATE OF OREGON:

DAN RAYFIELD
Attorney General of Oregon

*/s/ Timothy D. Smith*

TIMOTHY D. SMITH (*pro hac vice*)
Attorney-in-Charge
IAN VAN LOH (SBN 280254)
ALEX DELORENZO (*pro hac vice*)
MIKAELA BOCK (SBN 335089)
Assistant Attorneys General
Economic Justice Section
Oregon Department of Justice
100 SW Market St.
Portland, OR 97201
Telephone: (503) 798-3297
Telephone: (971) 239-7457
Telephone: (503) 428-9482
Email: tim.smith@doj.oregon.gov
Email: ian.vanloh@doj.oregon.gov
Email: alex.delorenzo@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

FOR PLAINTIFF STATE OF WASHINGTON:

NICHOLAS W. BROWN
Attorney General of Washington

<u>*/s/ Christina M. Black*</u>

JONATHAN A. MARK (*pro hac vice*)
Division Chief, Antitrust Division
CHRISTINA M. BLACK (SBN 300081)
BROOKE H. LOVROVICH (*pro hac vice*)
Assistant Attorneys General
800 Fifth Avenue, Suite 200
Seattle, WA 98104-3188
Telephone: (206) 464-7744
Fax: (206) 464-6451
Email: Jonathan.Mark@atg.wa.gov
Christina.Black@atg.wa.gov
Brooke.Lovrovich@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

FOR DEFENDANT PARAMOUNT SKYDANCE CORP.:

*/s/ Beth A. Wilkinson*
Beth A. Wilkinson (*pro hac vice*)
Rakesh Kilaru (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Fl.
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com

Marguerite M. Sullivan (*pro hac vice*)
Anna M. Rathbun (SBN 273787)
Christopher J. Brown (*pro hac vice*)
**LATHAM & WATKINS LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Facsimile: (202) 637-2201
marguerite.sullivan@lw.com
anna.rathbun@lw.com
chris.brown@lw.com

Joshua N. Holian (SBN 211772)
**LATHAM & WATKINS LLP**
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
joshua.holian@lw.com

Jeffrey L. Kessler (*pro hac vice*)
**WINSTON TAYLOR LLP**
200 Park Avenue
New York, NY 10166-4193
Telephone: (212) 294-4698
Facsimile: (212) 294-4700
jeffrey.kessler@winstontaylor.com

Jeanifer E. Parsigian (SBN 289001)
**WINSTON TAYLOR LLP**
101 California Street, 21st Floor
San Francisco, CA 94111-5891
Telephone: (415) 591-1469
Facsimile: (415) 591-1400
jeanifer.parsigian@winstontaylor.com

*Attorneys for Defendants Paramount Skydance Corporation*

FOR DEFENDANT WARNER BROS. DISCOVERY, INC.:

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli (SBN 97802)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
dpetrocelli@omm.com

Peter C. Herrick (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1301 Avenue of the Americas, Suite 1700
New York, NY 10019-6022
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
pherrick@omm.com

Julia A. Schiller (*pro hac vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street NW
Washington, DC 20006-4061
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
jschiller@omm.com

Derek Ludwin (*pro hac vice)*
Henry Liu (*pro hac vice)*
Ross A. Demain (*pro hac vice)*
**COVINGTON & BURLING LLP**
One CityCenter
850 10th Street NW
Washington, DC 20001
Telephone: (202) 662-6000
dludwin@cov.com
hliu@cov.com
rdemain@cov.com

Bernard A. Nigro Jr. (*pro hac vice*)
Kathleen S. O'Neill (*pro hac vice*)
**FRIED FRANK HARRIS SHRIVER & JACOBSON LLP**
801 17th Street NW
Washington, DC 20006
Telephone: (202) 639-7000
Facsimile: (202) 639-7003
barry.nigro@friedfrank.com
kathy.oneill@friedfrank.com

*Attorneys for Defendant Warner Bros. Discovery, Inc.*

# EXHIBIT 9

NTIA, Petition to Adopt Conditions to Authorization and License, on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (filed Sept. 17, 2026). See Ruling ¶ 17 & n.19.

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Paramount Global | ) | **MB Docket No. 26-93** |
| | ) | |
| Petition for Declaratory Ruling Under Section 310(b)(4) of the Communications Act, as amended | ) ) ) ) | |

**PETITION TO ADOPT CONDITIONS TO AUTHORIZATION AND LICENSE**

Pursuant to Executive Order 13913, the National Telecommunications and Information Administration (NTIA) submits this Petition to Adopt Conditions to Authorization and License (Petition) on behalf of the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee).[1] Through this Petition, and pursuant to section 1.41 of the Commission's Rules, the Committee advises the Commission that it has no objection to the Commission approving the above-captioned Petition for Declaratory Ruling, provided that the Commission conditions its approval on the assurance of Paramount Global to abide by the commitments and undertakings set forth in the September 4, 2026, Letter of Agreement (LOA), a copy of which is attached hereto.[2]

Section 310(b)(4) of the Communications Act limits foreign investment in and ownership of a parent company of specified radio licensees, unless the Commission determines that a higher level of ownership would be consistent with the public interest.[3] As part of its public interest analysis

[1] Exec. Order No. 13,913, § 9(h), 85 Fed. Reg. 19643, 19647-48 (2020). The Executive Order directs the Committee to "assist the [Commission] in its public interest review of national security and law enforcement concerns that may be raised by foreign participation in the United States telecommunications services sector." *Id.* § 3(a), 85 Fed. Reg. at 19643.
[2] 47 C.F.R. § 1.41(.
[3] 47 U.S.C. § 310(b)(4). *See also Review of Foreign Ownership Policies for Broadcast, Common*

under section 310(b)(4), the Commission considers issues related to national security, law enforcement, foreign policy, and trade policy.[4] In regard to these concerns, the Commission has long sought the expertise of the Executive Branch and accorded the appropriate deference to the expertise of the Executive Branch agencies.[5]

After discussions with representative of Paramount Global in connection with the above-captioned application, the Committee has concluded that the additional commitments set forth in the LOA will help ensure that those agencies with responsibility for enforcing the law, protecting the national security, and preserving public safety can proceed appropriately to satisfy those responsibilities.

---

*Carrier and Aeronautical Radio Licensees under Section 310(b)(4) of the Communications Act of 1934, as Amended*, GN Docket No. 25-149, Notice of Proposed Rulemaking, 40 FCC Rcd 3516, 3517-23, paras. 2-11 (2025) (detailing Commission policies and precedent for implementing Section 310(b)(4) (*310 Notice*).

[4] *See 310 Notice* at 40 FCC Rcd at 3522, para. 10.

[5] *310 Notice at 40 FCC Rcd at 3522, para. 10.*

Accordingly, NTIA on behalf of the Committee, advises the Commission that the Committee has no objection to the Commission granting the above-captioned Petition for Declaratory ruling, provided that the Commission conditions its consent on compliance with the September 4, 2026, LOA attached to this filing.

Respectfully submitted,

Andrew Coley

Andrew Coley
Attorney Advisor

National Telecommunications and
Information Administration
1401 Constitution Avenue, NW
Washington DC 20230
(202) 482-1816

September 17, 2026

# EXHIBIT 10

Congressional correspondence to the Commission (letters dated Mar. 23, May 20, and June 18, 2026), offered only to establish the fact of filing and the statements made. See Ruling n.18.

United States Senate
WASHINGTON, DC 20510

March 23, 2026

The Honorable Brendan Carr
Chair
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Dear Chair Carr:

We write with serious concern regarding your public statements signaling swift approval of the proposed $110.9 billion merger between Paramount Skydance ("Paramount") and Warner Bros. Discovery ("Warner Bros.) and, in particular, the apparent posture of the Federal Communication Commission ("FCC" or "Commission") toward the substantial foreign investment embedded in this transaction.

In remarks at Mobile World Congress in Barcelona, Spain on March 3, 2026, you described Paramount's proposal as "cleaner" than Netflix's proposed acquisition of Warner Bros. and predicted it would be approved "pretty quickly."[1] You characterized the FCC's role as "minimal" and described the foreign investment component as warranting only a "very quick, almost pro forma review."[2] These statements indicate that the Commission has no intention of conducting a meaningful inquiry into the merger—a concern only deepened as the full scope of foreign investment in the transaction has come to light.

Although the Paramount-Warner Bros. acquisition may not involve license transfers requiring Commission approval, Paramount remains subject to the FCC's foreign ownership rules by virtue of its ownership and operation of 28 local CBS stations. Under Section 310(b)(4) of the Communications Act, foreign entities may not hold more than 25 percent of the equity or voting interests in a U.S.-organized entity that controls an FCC-issued license without prior Commission approval, which requires a determination that the arrangement serves the "public interest." On January 29, 2026, the FCC adopted two orders tightening its foreign ownership framework: one imposing enhanced reporting requirements for entities posing heightened national security risk of foreign adversary control and another codifying foreign ownership definitions and review procedures.

According to regulatory filings, sovereign wealth funds from Saudi Arabia (Public Investment Fund), Qatar (Qatar Investment Authority), and Abu Dhabi (L'imad Holding Company/Abu Dhabi Investment Authority) are collectively providing approximately $24 billion in financing

---

[1] Sawdah Bhaimiya, *FCC Chief Tells CNBC WBD-Paramount Merger Deal Is 'Cleaner' than Netflix's, Will Be Approved 'Quickly'*, CNBC (Mar. 3, 2026, at 11:59 AM EST) https://www.cnbc.com/2026/03/03/fcc-chair-brendan-carr-wbd-paramount-merger-deal-netflix.html.
[2] Jon Brodkin, *FCC Chair Calls Paramount/WBD Merger "A Lot Cleaner" than Defunct Netflix Deal*, ARS TECHNICA (Mar. 3, 2026, at 5:05 PM), https://arstechnica.com/tech-policy/2026/03/trump-fcc-chair-paramount-warner-bros-merger-likely-to-get-quick-approval/.

for this transaction.[3] This is not incidental capital, it represents roughly one-fifth of the total transaction value. And it is not clear that this will be the only foreign investment in this transaction.

According to Paramount's December 2025 offer documents, Chinese state-linked technology conglomerate Tencent Holdings had committed $1 billion in equity financing to the transaction. Tencent's commitment was subsequently withdrawn after concerns that its participation could trigger review by the Committee on Foreign Investment in the United States ("CFIUS").[4] Yet, following execution of the merger agreement, Bloomberg reported on March 8, 2026, that Tencent was in renewed discussions with Paramount to invest in the transaction.[5]

This constellation of foreign investment from China and from Gulf states, with complex and sometimes competing relationships with the United States, demands rigorous, not perfunctory, review.

While you have publicly characterized these foreign investments to be "bona fide debt" that would qualify "a very quick, almost pro forma review," the question of whether a given financial instrument qualifies as bona fide debt requires a genuine factual inquiry, not a presumption. Even passive financial investors, as Tencent is described, can exercise influence through information rights, contractual covenants, content output agreements, licensing deals, and through the implicit leverage that comes from being a major creditor or equity participant in a combined entity that controls CBS, CNN, HBO, and Warner Bros. Studios.

The national security concerns are specific and serious. Tencent's relationship with the Chinese Communist Party is well-documented.[6] Chinese law also requires domestic technology companies to cooperate with state intelligence services on demand. A Tencent stake in the parent company of CBS News and CNN, no matter how "passive" on paper, creates concrete avenues for potential foreign influence over the editorial independence of American broadcast journalism and content.

The Gulf sovereign wealth funds present a separate but equally important concern. Saudi Arabia, Qatar, and the United Arab Emirates are not adversaries, but they are foreign governments with distinct and sometimes conflicting interests from those of the United States. Of particular concern, Saudi Arabia's Public Investment Fund is controlled by Crown Prince Mohammed bin Salman, whom the U.S. intelligence community concluded ordered the murder of Washington Post journalist Jamal Khashoggi in 2018. The $24 billion aggregate investment gives these

---

[3] Warner Bros. Discovery, Inc., Solicitation/Recommendation Statement Under Section 14(D)(4) Of The Securities Exchange Act Of 1934 (Amendment No. 3) (Form 14D-9) (Jan. 7, 2026), https://www.sec.gov/Archives/edgar/data/1437107/000119312526005426/d75660dsc14d9a.htm.

[4] Elaine Kurtenbach, *Paramount Says China's Tencent Withdrew From Its Warner Bros Bid To Avert National Security Issues*, AP (Dec. 10, 2025, at 5:06 AM) https://apnews.com/article/china-paramount-warner-netflix-tencent-eb3b4b18e67438d7633e5c4a1ec227c1.

[5] Dong Cao & Manuel Baigorri, *Tencent Is Said to Be Back on Paramount-Warner Bros Deal With Fresh Funding*, BLOOMBERG, (Mar. 8, 2026, at 10:30 PM EDT), https://www.bloomberg.com/news/articles/2026-03-09/tencent-is-said-to-be-back-on-paramount-warner-bros-deal-with-fresh-funding.

[6] *See* Bloomberg News, *Tencent Shares Decline after US Adds Company to Chinese Military Blacklist*, BLOOMBERG (Jan. 6, 2025, at 11:48 AM EST), https://www.bloomberg.com/news/articles/2025-01-06/us-adds-tencent-to-chinese-military-blacklist-shares-decline.

governments a significant financial stake in the future content, licensing, and strategic decisions of a combined entity that includes some of the most-watched news and entertainment networks in America.

Paramount's representations that these investors will hold no governance rights[7] demand careful independent verification. Even as non-governing partners, their massive investment creates significant opportunity to obtain data and information about Americans and their viewing habits, and soft power and influence over CNN's editorial decisions and business priorities. That concern extends beyond our borders. CNN International is distributed in over 200 countries and territories, and CNN Newsource is the world's most extensively relied-upon news service, partnering with over 1,000 local and international news organizations around the world.[8] The potential for foreign government influence over American journalism at home and abroad is not hypothetical. It is structural, and it is unchecked.

The very fact that these investment structures were deliberately designed to avoid triggering mandatory CFIUS review by nominally forgoing formal governance rights and board seats should itself compel the Commission to conduct an independent foreign ownership analysis under Section 310(b). Structuring an investment to avoid one federal review does not immunize it from another. The Commission has an independent obligation under Section 310(b) to determine whether the aggregate foreign ownership interest in the licensee entities is consistent with the public interest, regardless of how the transaction is characterized by the parties.

We urge the Commission to take the following steps:

1. Conduct a full and independent Section 310(b) review of all foreign ownership interests in this transaction, including Tencent and all Gulf sovereign wealth funds, before any approval is granted.
2. Deny any confidentiality requests to Paramount and require it to publicly file all instruments documenting the foreign investment commitments in this transaction including equity commitment letters, subscription agreements, side letters, and any commercial agreements between the foreign investors and the combined entity.
3. Issue a public request for information and public comment specifically focused on the foreign investment components of this transaction.
4. Coordinate with CFIUS, the Department of Justice National Security Division, and relevant intelligence agencies before concluding that any component of the financing is risk-free.
5. Reject the premise that a deal of this magnitude that involves the broadcast licenses for CBS, significant news operations including CNN, and major content distribution infrastructure, warrants only minimal FCC involvement.

The FCC's foreign ownership review process exists for exactly this moment. American broadcast infrastructure is not merely a commercial asset, it is a critical component of our national

---

[7] Prince Sub Inc., Offer to Purchase for Cash All Outstanding Shares of Series a Common Stock Of Warner Bros. Discovery, Inc. At $30.00 Net Per Share By Prince Sub Inc., a Wholly-Owned Subsidiary of Paramount Skydance Corporation (Exhibit (a)(1)(A)) (Dec. 8, 2025), https://www.sec.gov/Archives/edgar/data/1437107/000119312525310708/d92876dex99a1a.htm.

[8] *About CNN Worldwide*, CNN https://www.cnn.com/about (last visited March 19, 2026).

information environment. The Communications Act charges the Commission with protecting the public interest. We urge the Commission to honor that charge.

Sincerely,

Cory A. Booker
United States Senator
Ranking Member,
Subcommittee on Antitrust,
Competition Policy, and
Consumer Rights

Charles E. Schumer
United States Senator

Richard J. Durbin
United States Senator
Ranking Member, Senate
Committee on the Judiciary

Sheldon Whitehouse
United States Senator

Richard Blumenthal
United States Senator

Mazie K. Hirono
United States Senator

Elizabeth Warren
United States Senator

United States Senate
WASHINGTON, DC 20510

May 20, 2026

The Honorable Brendan Carr
Chairman
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Dear Chairman Carr:

We write to express serious concerns about Paramount Global's request for the Federal Communications Commission (FCC) to authorize foreign investors to own between 49.5% and 100% of the equity in its FCC-licensed broadcast television stations.[1] This would include significant equity stakes held by the sovereign wealth funds of Saudi Arabia, the United Arab Emirates (UAE), and Qatar to finance the $111 billion merger of Paramount Skydance and Warner Bros. Discovery and could also include ownership by a company with links to the Chinese government. Such a media giant would include the 28 television stations owned by CBS, the movies and television shows of Paramount Pictures, and soon CNN, HBO, and other iconic media properties. The scale, concentration, and scope of this proposal raise serious questions. Foreign governments hostile to a free and independent press could exert unprecedented influence over a media conglomerate vital to American journalism and culture.

Section 310 of the Communications Act prohibits companies with more than 25% foreign ownership from indirectly owning TV or radio broadcast stations.[2] This provision was meant to ensure powerful media companies are ultimately controlled by American citizens. Paramount, however, seeks an exception far exceeding the 25% statutory cap. Congress enacted these restrictions on foreign ownership of broadcasters because of concerns about the "foreign dominance of the cables and the dangers from espionage and propaganda disseminated through foreign-owned radio stations in the United States" during the First World War.[3]

The foreign governments behind this investment systematically suppress press freedom in their own countries and have made a series of investments and gifts to entities controlled by the President and his family, raising serious concerns about their influence over the independent American media and the potential for corruption.

Reporters Without Borders ranked Saudi Arabia among the world's five worst countries in the 2026 Press Freedom Index above only Iran, China, North Korea, and Eritrea."[4]

---

[1] FCC, Public Notice, Paramount Global Seeks Foreign Ownership Declaratory Ruling Pursuant to Section 310(b)(4) of the Communications Act of 1934, as Amended, DA 26-411.
[2] 47 U.S.C. § 310(b)(4).
[3] *National Association of Broadcasters v. FCC*, No. 24-1296 (D.C. Cir. 2025), at 7 (quoting Hearings on H.R. 8301 before the H. Comm. on Interstate and Foreign Commerce, 73d Cong. 54 (1934)).
[4] Reporters Without Borders, World Press Freedom Index, https://rsf.org/en/index?year=2026.

The Press Freedom Index also found that the UAE and Qatar suppress independent media.[5] In 2021, the Office of the Director of National Intelligence concluded that Saudi Crown Prince Mohammed bin Salman ordered the torture, execution, and dismemberment of Saudi journalist and *Washington Post* columnist Jamal Khashoggi as part of the "Crown Prince's support for using violent measures to silence dissidents abroad."[6] And these countries have engaged in influence peddling in the United States. In 2025, Emirati companies close to the government invested in the Trump family's cryptocurrency, shortly before the Trump administration authorized the sale of advanced AI chips to the UAE, and Qatar's government gifted President Trump a luxury jet being turned into the new Air Force One.[7]

If the filing is approved, Saudi, UAE, and Qatari sovereign investment funds would have significant influence over a number of the most significant and impactful news reporting and investigative journalism outlets in the United States, including CNN, CBS News, 60 Minutes, and 28 local Paramount-owned television stations in 17 of the country's largest media markets, including New York, Los Angeles, Chicago, Dallas, Boston, Seattle, Detroit, Minneapolis, Miami, Denver, and Pittsburgh. And the Trump Administration appears to believe that the transaction will reduce media independence. Indeed, in complaining about CNN's coverage of the Iran War, Secretary of Defense Pete Hegseth has said "the sooner" that Paramount takes over CNN, "the better."[8]

And what's not in the petition is just as concerning. Media reports indicate that Tencent, a Chinese company on the Department of Defense's list of companies connected to the Chinese military, will also take an equity stake in the combined company.[9] Allowing our most significant global adversary to partly own Paramount or a combined new entity that will own CNN and CBS News would risk our national security.

Paramount's petition asks for an unprecedented degree of foreign control of U.S. broadcasting. Paramount's rationale for a waiver of foreign ownership rules is based on its assertion that the foreign funds will be passive investors. But even as passive investors, these foreign entities could be in a position to gain sensitive information on Americans' financial and other personal information, and their viewing habits, as well as the ability to influence the content carried by this massive media conglomerate.

---

[5] https://rsf.org/en/country/united-arab-emirates; https://rsf.org/en/country/qatar.

[6] Office of the Director of National Intelligence, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi*, (Feb. 11, 2021); https://web.archive.org/web/20210226180954/https://www.odni.gov/files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226.pdf.

[7] Sam Kessler, et al., 'Spy Sheikh' Bought Secret Stake in Trump Company, *Wall Street Journal* (Jan. 31, 2026); Maya Yang, Boeing jet gifted to Trump by Qatari royal family to be delivered by summer, *Guardian* (Jan. 22, 2026).

[8] Michael Grynbaum, Pete Hegseth Says 'the Sooner David Ellison' Buys CNN, 'the Better', *New York Times* (Mar. 13, 2026).

[9] Department of Defense, Entities Identified as Chinese Military Companies Operating in the United States in Accordance with Section 1260H of the William M. ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021, ("Mac") Thornberry National Defense Authorization Act for Fiscal Year 2021, https://media.defense.gov/2025/Jan/07/2003625471/-1/-1/1/ENTITIES-IDENTIFIED-AS-CHINESE-MILITARY-COMPANIES-OPERATING-IN-THE-UNITED-STATES.PDF; Doug Cao and Manuel Gorri, Tencent is said to be back on Paramount-Warner Bros. deal with fresh funding, *Bloomberg* (Mar. 8, 2026).

The FCC has never approved a significant ownership stake of an American broadcaster by a sovereign wealth fund—that is, an investment entity controlled by a foreign government. The plain text of the Communications Act prohibits ownership by "a foreign government or representative" without regard to voting rights. And the FCC's prior approval of foreign ownership of equity in broadcasters has been limited to entities based in allied NATO, Five Eyes, or friendly neighboring countries.

In the past, you have raised serious questions about foreign ownership of U.S. media entities. In 2024, you said Chinese ownership of TikTok presented "a clear and present danger to U.S. national security" and supported forcing divestiture.[10] You also objected that the Commission approved the transfer of radio stations in 2024 without "plans to wall off the unvetted foreign interests."[11] But in the case of Paramount, even before the application was filed, you claimed that the FCC had a "very minimal" role in reviewing Paramount's foreign ownership, the review would "get through pretty quickly," and that the Paramount-Warner Bros. transaction was a "good deal."[12] These comments raise questions about your impartiality and the rigor of the Commission's review of this unprecedented foreign investment.

Given the well-documented hostility against a free press in their own countries, we have serious doubts that paving the way for these anti-democratic governments to own between 49.5% and 100% of an American media empire serves the "public interest." At a minimum, we urge you to conduct a rigorous and thorough review of the foreign investment in Paramount, its impact on editorial independence, and its implications for U.S. national security. We also demand that this investment be considered by the full Commission rather than by staff behind closed doors.[13]

Please provide answers to the following questions and document requests by June 5, 2026:

1. Will you commit to a comprehensive review by Team Telecom, especially given the unprecedented risks to press freedom posed by the proposed equity investors?
2. Will the Commission and Team Telecom specifically review Tencent's role in the transaction and equity stake in Paramount?
3. Will you commit to voting on Paramount's request to raise its foreign ownership at the Commission level? If not, why?

---

[10] Nikolas Lanum, FCC commissioner says TikTok is a 'clear and present danger' to US national security, Fox Business (Mar. 12, 2024); https://www.foxbusiness.com/media/fcc-commissioner-tiktok-clear-present-danger-us-national-security.

[11] Audacy License, LLC, et al., FCC 24-94, Dissenting Statement of Commissioner Brendan Carr (2024), https://docs.fcc.gov/public/attachments/FCC-24-94A4.pdf.

[12] Sawdah Bhaimiya, FCC chief tells CNBC WBD-Paramount merger deal is 'cleaner' than Netflix's, will be approved 'quickly,' CNBC (Mar. 3, 2026), https://www.cnbc.com/2026/03/03/fcc-chair-brendan-carr-wbd-paramount-merger-deal-netflix.html.

[13] *Cf.* Letter from Chairman Ted Cruz and Ranking Member Maria Cantwell to Brendan Carr, Chairman, FCC, (Mar. 30, 2026) (criticizing the approval of the Nexstar-Tegna transaction on delegated authority rather than by the full Commission).

4. Do you believe that foreign ownership of between 49.5% and 100% of Paramount, contemplated by the filing, would mean that the Middle Eastern sovereign wealth investment funds would have effective control or influence over decision making? If not, why?
5. What specific assurances have the Saudi, Emirati, and Qatari sovereign wealth funds, and Tencent, provided the Commission that they will not attempt to influence the editorial, journalistic, or content decisions at Paramount, either by suppressing reporting and creative content unfavorable to their governments or by promoting content that runs contrary to American interests or values? Please provide all related documents.

Sincerely,

Maria Cantwell
United States Senator

Edward J. Markey
United States Senator

Ben Ray Luján
United States Senator

Andy Kim
United States Senator

John Hickenlooper
United States Senator

Elizabeth Warren
United States Senator

United States Senate
WASHINGTON, DC 20510

June 18, 2026

The Honorable Brendan Carr
Chair
Federal Communications Commission
45 L Street NE
Washington, DC 20554

Dear Chair Carr:

On March 23, 2026, we wrote to you with serious concerns regarding the foreign investment in Paramount-Skydance's proposed $110.9 billion acquisition of Warner Bros. Discovery, and your public posture of the investment warranting only a "very quick, almost pro forma review."[1] At the time, we warned that the full scope of foreign involvement had not yet come to light and urged you to conduct a full and independent review of all foreign ownership interests under Section 310(b) of the Communications Act, which prohibits U.S. corporations holding broadcast licenses from being more than 25 percent owned by one or more foreign entities. Since then, the full magnitude of foreign investment has become clear, compounding concerns about the potential risks to national security and foreign policy.

On April 24, 2026, Paramount filed a petition for declaratory ruling with the Federal Communications Commission (Commission) seeking approval for significant indirect foreign investment, formally disclosing that nearly half—approximately 49.5 percent—of the combined Paramount-Warner Bros. Discovery entity would be owned by foreign investors.[2] This is nearly double the statutory threshold prohibiting foreign entities from holding more than 25 percent equity or voting interest in a U.S.-organized entity that controls an FCC-issued license without prior Commission approval.[3] Under FCC rulemaking and procedures, the Commission must now coordinate, through the Committee for the Assessment of Foreign Participation in the U.S. Telecommunications Services Sector (Committee), with other executive branch agencies to assess the potential national security and foreign policy risks posed by that foreign ownership.

<u>The Commission must foreclose any attempt by Paramount to close this transaction before its Section 310(b)(4) review is complete. That review must rigorously assess the national security threats posed by foreign government investment in one of the nation's largest news media companies. The Commission must also incorporate the Committee's recommendations—a process that, under the governing rules, could take seven months or more—before the Commission takes any final action on the petition.</u>

---

[1] Kieran Smith, Daniel Thomas, & Christopher Grimes, *US Media Watchdog Signals Support for Paramount's $110bn Warner Bros Deal*, Financial Times (Mar. 3, 2026, at 1:22 pm), https://www.ft.com/content/94fa2114-55ab-4a17-b3b5-b0f87c91375c?syn-25a6b1a6=1.

[2] Paramount Global, Petition for Declaratory Ruling, at 14, MB Docket No. 26-93 (Apr. 24, 2026), https://www.fcc.gov/ecfs/document/104272462615916/1.

[3] Section 310(b)(4) of the Communications Act

***Paramount is Seeking Approval for Up to 100 Percent Foreign Ownership***

Paramount's petition seeks far more than approval for the 49.5 percent aggregate foreign investment. The media conglomerate is requesting advance approval for each foreign investor to increase its individual stake up to 20 percent in the future, which, should each of the Sovereign Wealth Funds exercise that option, could result in up to 100 percent aggregate foreign ownership of one of the nation's largest broadcast media companies.[4] While advance approval is standard as a procedural matter, the nature of the request is unprecedented. It seeks open-ended authorization for foreign government expansion into the parent company of CBS, CNN, and 28 broadcast television stations. Advance approval was never designed to authorize the wholesale transfer of control over one of America's most consequential news organizations to foreign government-linked investors absent a finding that such a transfer serves the public interest and does not threaten national security.

The petition's own terms render the 100 percent aggregate approval request as legally unsupported under the Commission's own rules. On January 29, 2026, the Commission adopted a Report and Order codifying and clarifying its foreign ownership framework.[5] That order explicitly limits the scope of advance approval available to foreign investors that hold deemed voting interests without actual de jure or de facto control: such investors may request advance approval only up to a non-controlling 49.99 percent,[6] not up to 100 percent. Paramount's petition acknowledges that the Gulf sovereign wealth funds hold non-voting Class B shares and exercise no actual control, which does not allay national security concerns. Their advance approval request for up to 100 percent aggregate foreign ownership therefore exceeds what the Commission's January 2026 rules permit. The Commission should reject that request out of hand.

***Sovereign Wealth Fund Investments Raise Serious National Security Concerns***

Paramount's assertion that this transaction "will not present any national security, law enforcement, foreign policy, or trade policy concerns"[7] is not a legal determination the Commission may accept without scrutiny. The Commission's January 2026 foreign ownership Order explicitly preserved the referral process for executive branch review of national security concerns. The Gulf sovereign wealth funds collectively represent the financial instruments of three foreign governments with distinct national interests and a shared record of censorship and press suppression. Saudi Arabia's Public Investment Fund is controlled by Crown Prince Mohammed bin Salman, whom the U.S. intelligence community concluded ordered the killing of Washington Post journalist Jamal Khashoggi. On that record, the Commission cannot simply accept Paramount's representations at face value.

The structural complexity of these foreign ownership interests alone demands careful scrutiny. The Abu Dhabi investment is not held by a single entity. The filing identifies four separate UAE

---

[4] *Supra* note 2 at 16-17.

[5] Report & Order, GN Docket No. 25-149 (FCC 26-3) at 8 n.51, (Jan. 29, 2026) ("Where there is not actual control over the controlling U.S. parent, a petitioner may only request advance approval of up to a noncontrolling 49.99 percent equity and/or voting interest.") https://docs.fcc.gov/public/attachments/FCC-26-3A1.pdf .

[6] *Id.* at 7.

[7] *Supra* note 2 at 21.

entities as holding the same 12.8 percent deemed voting interest: L'imad 1st SPV 2 Exempt RSC Ltd, L'imad 1st Holding 1 Exempt RSC Ltd, L'imad 1st Capital Holding Ltd, and L'imad Holding Company-P.J.S.C. Similarly, the Qatar investment is held through both QIA TMT Holding LLC and the Qatar Investment Authority itself, each separately identified for approval at 10.6 percent. To our knowledge, no transaction previously reviewed by the FCC has involved foreign sovereign wealth fund investment of this kind. This layered entity structure, seemingly designed to fragment ownership across multiple vehicles, raises serious questions about the true nature and extent of foreign government control.

***Paramount's Public Closing Timeline Raises Serious Concerns About the Integrity of the National Security Review***

On April 29, 2026, DOJ's National Security Division notified the Commission that the Committee for the Assessment of Foreign Participation in the United States Telecommunications Services Sector (Committee) had begun its review of the petition.[8] The Committee was to send Paramount tailored questions no later than May 29, 2026, and its initial 120-day review period begins only once Paramount's responses are complete. Under this timeline, the Committee's review could take until late September to conclude—and if it identifies potential national security risks, a second 90-day assessment period follows. Paramount's stated intention to close the deal by July is flatly incompatible with a statutorily required national security review that may not yet have begun.

Additionally, Paramount has publicly characterized its FCC filing as not a condition of closing, signaling its intent to complete the acquisition before the Commission has made a public interest determination.[9] If the Commission permits that it will have converted the Section 310(b)(4) review process into a post-hoc ratification mechanism. That outcome is foreclosed by the statute, and it would render the Commission's foreign ownership framework meaningless in any transaction large enough to close ahead of a pending review. The Commission must issue a formal notice making clear that this transaction may not close while this proceeding is pending.

***The Commission's Obligations Before This Transaction May Close***

The Communications Act charges the Commission with protecting the public interest. The Commission's own January 2026 rulemaking preserved its authority, and its obligation, to comprehensively review foreign investment for national security threats.

To that end, we request that the Commission, no later than July 1, take the following steps:

1. Issue formal notice to Paramount that the transaction may not close while the Commission's Section 310(b)(4) review and the Committee's national security review are pending.

---

[8] Letter from Foreign Investment Revision Section, National Security Division, DOJ, to FCC (Apr. 29, 2026), https://www.fcc.gov/ecfs/document/10429060883440/1.

[9] Jody Godoy & David Shepardson, *Paramount Seeks FCC Approval for Foreign Investors Backing Warner Bros Acquisition*, U.S. News & World Report (Apr. 27, 2026, at 11:33 am), https://money.usnews.com/investing/news/articles/2026-04-27/paramount-seeks-fcc-approval-for-foreign-investors-helping-fund-warner-bros-acquisition.

2. Reject on its face the request for advance approval of up to 100 percent aggregate foreign ownership under § 1.5001(k), which the Commission's own January 2026 Order reserves for investors with actual controlling interests, a category Paramount's petition explicitly disclaims for the Gulf sovereign wealth funds.
3. Publicly disclose the foreign investment commitments in this transaction, including equity commitment letters, subscription agreements, side letters, information rights provisions, and any commercial agreements between the foreign investors and the combined entity.
4. Confirm that the Committee's review is underway and provide a projected timeline for its completion.
5. Confirm whether Attorney General Blanche is serving as Chair of the Committee for purposes of this review, and if he has not recused himself, identify the basis on which he is participating in a national security review with direct financial implications for sovereign wealth funds with documented ties to the Trump administration.
6. Issue a public-facing finding upon completion of the Committee's national security review and resolution of the petition for declaratory ruling, setting forth the Commission's full public interest analysis, the national security considerations weighed, and the basis for any approval, conditional approval, or denial.

The Commission has an obligation to honestly answer a fundamental question: whether placing 49.5 percent of the equity in the parent company of CBS, CNN, and 28 broadcast television stations into the hands of three foreign governments serves the American public. We are prepared to pursue every available avenue—legislative, oversight, and legal—to ensure that it does.

Sincerely,

Cory A. Booker
United States Senator

Adam B. Schiff
United States Senator

Elizabeth Warren
United States Senator

# EXHIBIT 11

Paramount Skydance Corp., Quarterly Report on Form 10-Q for the quarter ended June 30, 2026 (relevant excerpts) (SEC Accession No. 0002041610-26-000054).

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended June 30, 2026**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from ____________ to ____________**

**Commission File Number 001-42791**

# Paramount Skydance Corporation

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **99-3917985** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1515 Broadway New York, New York** | **10036** |
| (Address of principal executive offices) | (Zip Code) |

**(212) 258-6000**

(Registrant's telephone number, including area code)

**Not Applicable**

(Former name, former address and former fiscal year, if changed since last report)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class B Common Stock, $0.001 par value | PSKY | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

Number of shares of common stock outstanding at July 31, 2026:

Class A Common Stock, par value $.001 per share—31,500,087

Class B Common Stock, par value $.001 per share— 1,090,445,692

## 1) DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

*Description of Business*—Paramount Skydance Corporation is a global media and entertainment company with a portfolio that includes Paramount Pictures, Paramount Television, CBS, CBS News, CBS Sports, Nickelodeon, MTV, BET, Comedy Central, Showtime, Paramount+, Pluto TV, and Skydance Animation, Film, and Television, Paramount Sports Entertainment and Paramount Games Studio. Beginning in 2026, we transitioned our reporting structure into three new segments: *Studios*, *Direct-to-Consumer*, and *TV Media* (see Note 13). References to "Paramount," the "Company," "we," "us" and "our" refer to Paramount Skydance Corporation and its consolidated subsidiaries, unless the context otherwise requires.

*Warner Bros. Discovery Merger*—On February 27, 2026, Paramount and Warner Bros. Discovery, Inc. ("WBD") announced a definitive merger agreement (the "WBD Merger Agreement") under which Paramount will acquire WBD (the "WBD Merger"). The closing of the WBD Merger is subject to customary closing conditions, including regulatory clearances. The anticipated closing of the WBD Merger has been delayed as a result of a lawsuit, with the parties agreeing to postpone closing until the earlier of five days following the court's ruling or June 1, 2027.

Under the terms of the WBD Merger Agreement, Paramount will pay $31.00 per WBD share to acquire all outstanding shares of WBD, which at the time of the WBD Merger Agreement represented an equity value of $80.9 billion, and will assume WBD's net debt. At March 31, 2026, WBD's debt (excluding finance leases) was comprised of $17.7 billion of senior notes and $15.0 billion of borrowings from a bridge facility. Furthermore, if the WBD Merger closes, Paramount will pay WBD stockholders a per share "ticking fee" of $0.00277778 for each day after September 30, 2026 that the WBD Merger has not closed, up to a maximum of $0.25 per WBD share per 90 calendar day period (the "Ticking Consideration"). No Ticking Consideration is payable if the WBD Merger Agreement is terminated pursuant to its terms. The WBD Merger Agreement has a termination date of March 4, 2027, subject to one automatic extension to June 4, 2027. Also, under the terms of the WBD Merger Agreement, in the first quarter of 2026, Paramount paid a termination fee of $2.8 billion to Netflix, Inc. ("Netflix") on behalf of WBD in connection with the termination of a prior merger agreement between Netflix and WBD (see Note 15). This payment was initially funded with cash on hand and a $2.15 billion borrowing from our credit facility (see Note 7) and, in accordance with the Subscription Agreements described below, entered into by the Ellison Parties (as defined below), such amount will ultimately be funded by the $46.7 billion to be received from the Ellison Parties.

If the WBD Merger Agreement is terminated because the WBD Merger cannot close due to a failure to obtain antitrust or regulatory approval, or because a court order prevents the WBD Merger from closing on antitrust grounds, Paramount will owe WBD a $7.0 billion Regulatory Termination Fee (as defined in the WBD Merger Agreement). In accordance with the Subscription Agreements, this termination fee and the previously paid $2.8 billion Netflix termination fee described above would be funded by the Ellison Parties in exchange for shares of Paramount Skydance Corporation Class B Common Stock (as defined below) at $16.02 per share.

WBD will owe Paramount a $3.0 billion termination fee under certain circumstances, including if WBD terminates the WBD Merger Agreement to enter into a definitive agreement for an alternative acquisition proposal.

Concurrent with the execution of the WBD Merger Agreement (i) The Lawrence J. Ellison Revocable Trust, u/a/d 1/22/88, as amended (the "Trust"), and Lawrence J. Ellison (together with the Trust, the "Ellison Parties") and (ii) RedBird Capital Partners Fund IV (Master), L.P. ("RedBird" and, together with the Trust, the "Equity Investors") entered into subscription agreements (collectively, the "Subscription Agreements") providing for a private placement investment in Class B common stock of Paramount Skydance Corporation ("Paramount Skydance Corporation Class B Common Stock"), for an aggregate amount of up to $46.7 billion (subject to increase if the

Ticking Consideration or certain other additional amounts as defined in the WBD Merger Agreement are required) from the Trust and $250 million from RedBird pursuant to the terms of the Subscription Agreements.

In April 2026, we announced that the Equity Investors had determined, as permitted under the Subscription Agreements, to assign their subscription rights thereunder (such assignments, the "Equity Syndication" and the assignees, the "Equity Syndication Parties") to the Equity Syndication Parties. The Equity Syndication Parties are composed of affiliates of the Ellison Parties and RedBird, as well as the following institutional investors: The Public Investment Fund, L'Imad 1st SPV 2 Exempt RSC LTD (an investment vehicle of L'Imad Holding, an Abu Dhabi sovereign wealth fund), QIA TMT Holding LLC (an investment vehicle of the Qatar Investment Authority), and LionTree Investment Fund, L.P. The aggregate allocations under the Equity Syndication total to the full amount of the commitments under the Subscription Agreements. At closing of the WBD Merger, Paramount will issue to each Equity Syndication Party a number of newly issued nonvoting shares of Paramount Skydance Corporation Class B Common Stock (or securities convertible into shares) equal to its allocated amount divided by the Syndication Purchase Price, defined as the 20-trading-day daily volume-weighted average price of Paramount Skydance Corporation Class B Common Stock determined as of the third business day prior to the closing of the WBD Merger, subject to a ceiling of $16.02 per share and a floor of $12.00 per share. The Equity Syndication does not relieve the Equity Investors of their contractual commitments made to the Company. To the extent that any Equity Syndication Party does not perform under its syndication assignment, the obligation of the Equity Investors to fund the related amount of the commitments would continue to be required under the Subscription Agreements. Following the closing, the Ellison Family (as defined below) and RedBird will remain the sole holders of Paramount Class A Common Stock, representing 100% of the voting shares of Paramount. For the purpose of determining the controlling ownership of Paramount, the Ellison family is comprised of Lawrence J. Ellison and David Ellison (the "Ellison Family"). David Ellison is the son of Lawrence J. Ellison, and Lawrence J. Ellison and David Ellison are accordingly considered immediate family members.

We have also secured commitments for debt financing totaling $54 billion, which include a $49 billion 364-day senior secured bridge loan facility, which we plan, subject to market conditions and other timing considerations, to reduce or replace with permanent financing (which may include issuance of debt securities) on or prior to the closing of the WBD Merger and, in connection with a credit agreement entered into in April 2026 (the "Pro Rata Credit Agreement"), $2.50 billion three-year senior secured term A loans and $2.50 billion five-year senior secured term A loans. The term A loans will be made in a single borrowing on the closing date of the WBD Merger. The Pro Rata Credit Agreement also provides for a $5.00 billion five-year senior secured revolving credit facility, which will be used for general corporate purposes, and will replace our existing revolving credit facility (see Note 7). The availability and initial funding of the facilities under the Pro Rata Credit Agreement and the bridge loan facility (if not replaced by permanent financing) are subject to the satisfaction or waiver of customary conditions set forth in the Pro Rata Credit Agreement and the bridge commitment papers, including the closing of the WBD Merger.

In addition, following the closing of the WBD Merger, each holder of Paramount Skydance Corporation Class B Common Stock (excluding any Equity Investor or affiliate thereof) as of a record date to be determined will receive, without payment of any consideration, one 10-year warrant (each, a "Warrant") for each share held, exercisable at an initial exercise price per share equal to the Syndication Purchase Price and subject to customary anti-dilution and fundamental change make-whole adjustments. Beginning on the third anniversary of issuance, we may call the Warrants if the closing price of our Class B Common Stock equals or exceeds $30.00 for at least 20 trading days during any 30 consecutive trading day period. We intend to apply to list the Warrants for trading on the Nasdaq Stock Market LLC ("Nasdaq") separate from our Class B Common Stock, subject to applicable approvals. The planned Warrant issuance is in lieu of a previously planned rights offering at $16.02 per share. In

## Item 2. Management's Discussion and Analysis of Results of Operations and Financial Condition. (Tabular dollars in millions, except per share amounts)

Management's discussion and analysis of the results of operations and financial condition of Paramount Skydance Corporation should be read in conjunction with the more detailed financial statements and notes thereto included in our Form 8-K filed with the Securities and Exchange Commission on May 13, 2026, which was filed in order to recast the financial statements included in our Annual Report on Form 10-K for the year ended December 31, 2025 to reflect our new segment presentation. References to "Paramount," the "Company," "we," "us" and "our" refer to Paramount Skydance Corporation and its consolidated subsidiaries, unless the context otherwise requires.

*Warner Bros. Discovery Merger*—On February 27, 2026, Paramount and Warner Bros. Discovery, Inc. ("WBD") announced a definitive merger agreement (the "WBD Merger Agreement") under which Paramount will acquire WBD (the "WBD Merger"). The closing of the WBD Merger is subject to customary closing conditions, including regulatory clearances. The anticipated closing of the WBD Merger has been delayed as a result of a lawsuit, with the parties agreeing to postpone closing until the earlier of five days following the court's ruling or June 1, 2027. The completion of the WBD Merger remains subject to regulatory clearance in certain jurisdictions. Recent approvals include the European Commission in July 2026 under both the EU Merger Regulation and EU Foreign Subsidies Regulation following a Phase 1 review.

Under the terms of the WBD Merger Agreement, Paramount will pay $31.00 per WBD share to acquire all outstanding shares of WBD, which at the time of the WBD Merger Agreement represented an equity value of $80.9 billion, and will assume WBD's net debt. At March 31, 2026, WBD's debt (excluding finance leases) was comprised of $17.7 billion of senior notes and $15.0 billion of borrowings from a bridge facility. Furthermore, if the WBD Merger closes, Paramount will pay WBD stockholders a per share "ticking fee" of $0.00277778 for each day after September 30, 2026 that the WBD Merger has not closed, up to a maximum of $0.25 per WBD share per 90 calendar day period (the "Ticking Consideration"). No Ticking Consideration is payable if the WBD Merger Agreement is terminated pursuant to its terms. The WBD Merger Agreement has a termination date of March 4, 2027, subject to one automatic extension to June 4, 2027. Also, under the terms of the WBD Merger Agreement, in the first quarter of 2026, Paramount paid a termination fee of $2.8 billion to Netflix, Inc. ("Netflix") on behalf of WBD in connection with the termination of a prior merger agreement between Netflix and WBD. This payment was initially funded with cash on hand and a $2.15 billion borrowing from our credit facility (see *Capital Structure*) and, in accordance with the Subscription Agreements described below, entered into by the Ellison Parties (as defined below), such amount will ultimately be funded by the $46.7 billion to be received from the Ellison Parties.

If the WBD Merger Agreement is terminated because the WBD Merger cannot close due to a failure to obtain antitrust or regulatory approval, or because a court order prevents the WBD Merger from closing on antitrust grounds, Paramount will owe WBD a $7.0 billion Regulatory Termination Fee (as defined in the WBD Merger Agreement). In accordance with the Subscription Agreements, this termination fee and the previously paid $2.8 billion Netflix termination fee described above would be funded by the Ellison Parties in exchange for shares of Paramount Skydance Corporation Class B Common Stock (as defined below) at $16.02 per share.

WBD will owe Paramount a $3.0 billion termination fee under certain circumstances, including if WBD terminates the WBD Merger Agreement to enter into a definitive agreement for an alternative acquisition proposal.

Concurrent with the execution of the WBD Merger Agreement (i) The Lawrence J. Ellison Revocable Trust, u/a/d 1/22/88, as amended (the "Trust"), and Lawrence J. Ellison (together with the Trust, the "Ellison Parties") and (ii) RedBird Capital Partners Fund IV (Master), L.P. ("RedBird" and, together with the Trust, the "Equity Investors") entered into subscription agreements (collectively, the "Subscription Agreements") providing for a private placement investment in Class B common stock of Paramount Skydance Corporation ("Paramount Skydance Corporation Class B Common Stock"), for an aggregate amount of up to $46.7 billion (subject to increase if the

### Cautionary Note Concerning Forward-Looking Statements

This Quarterly Report on Form 10-Q contains both historical and forward-looking statements, including statements related to our future financial results and performance, potential achievements and transactions (including in connection with our pending merger with Warner Bros. Discovery, Inc.) and their expected benefits, and industry trends and developments. All statements that are not statements of historical fact are, or may be deemed to be, forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Similarly, statements that describe our objectives, plans or goals are or may be forward-looking statements. These forward-looking statements reflect our current expectations concerning future results and events; can generally be identified by the use of statements that include phrases such as "believe," "expect," "anticipate," "intend," "plan," "foresee," "likely," "will," "may," "could," "estimate" or other similar words or phrases; and involve known and unknown risks, uncertainties and other factors that are difficult to predict and which may cause our actual results, performance or achievements to be different from any future results, performance or achievements expressed or implied by these statements. These risks, uncertainties and other factors include, among others: risks related to our streaming business; the adverse impact on our advertising revenues as a result of changes in consumer behavior, advertising market conditions and deficiencies in audience measurement; risks related to operating in highly competitive and dynamic industries; the unpredictable nature of consumer behavior, as well as evolving technologies and distribution models; risks related to our decisions to invest in new businesses, products, services and technologies, and the evolution of our business strategy; the potential for loss of carriage or other reduction in or the impact of negotiations for the distribution of our content; damage to our reputation or brands; losses due to asset impairment charges for goodwill, content and long-lived assets, including finite-lived intangible assets; liabilities related to discontinued operations and former businesses; increasing scrutiny of, and evolving expectations for, sustainability initiatives; evolving business continuity, cybersecurity, privacy and data protection and similar risks; challenges in protecting and maintaining our intellectual property rights; domestic and global political, economic and regulatory factors affecting our businesses generally; the inability to hire or retain key employees or secure creative talent; disruptions to our operations as a result of labor disputes; risks and costs associated with the integration of, and our ability to integrate, the businesses of Paramount Global and Skydance Media, LLC successfully and to achieve anticipated synergies; litigation relating to the Skydance Transactions potentially resulting in substantial costs; volatility in the price of our Class B common stock; the effect our dual-class capital structure and the concentrated ownership may have on the price of our Class B common stock or business; risks related to a private sale of a controlling interest in our Company, including that our stockholders may not realize any change of control premium on shares of our Class B common stock and that we may become subject to the control of a presently unknown third party; risks associated with our status as a "controlled company" under Nasdaq rules, including our exemption from certain corporate governance requirements; risks associated with the lack of voting rights of our Class B common stock; risks that anti-takeover provisions in our amended and restated certificate of incorporation ("Charter") and amended and restated bylaws, and under Delaware law could deter, delay, or prevent a change of control; risks that exclusive forum provisions in our Charter could limit a stockholder's choice of forum for certain claims and discourage lawsuits against our directors and officers; risks that corporate opportunity provisions in our Charter could permit certain persons to pursue competitive opportunities that might otherwise be available to us; risks associated with our holding company structure, including our dependence on distributions from our subsidiaries to meet our tax obligations and other cash requirements; disruptions the WBD Merger may cause to our and WBD's business and commercial relationships; the negative impact that a failure to consummate the WBD Merger could have on our business, financial condition, results of operations and stock price; the risk that the WBD Merger may be prevented or delayed or the anticipated benefits reduced if we do not obtain certain regulatory approvals; the risk that the WBD Merger Agreement may be terminated in accordance with its terms, including if any conditions to the closing of the WBD Merger are not satisfied; the risk that litigation relating to the WBD Merger could prevent or further delay the closing of the WBD Merger or result in the payment of damages after closing; challenges realizing synergies and other anticipated benefits expected from the WBD Merger, including integrating WBD's business

## PART II – OTHER INFORMATION

### Item 1. Legal Proceedings.

The information set forth in Note 14 to the consolidated financial statements appearing in Item 1 of Part I of this Quarterly Report on Form 10-Q under the caption "Legal Matters" is incorporated by reference herein.

### Item 1A. Risk Factors.

In addition to the risk factors included in our Annual Report on Form 10-K for the year ended December 31, 2025 (filed with the Securities and Exchange Commission on February 25, 2026), the following risks relating to the WBD Merger could adversely affect our business, financial condition or results of operations before and after the completion of the WBD Merger.

**Risks Relating to the WBD Merger**

***The proposed WBD Merger may cause disruption in our and WBD's business and commercial relationships.***

The proposed WBD Merger could cause disruptions to our business or commercial relationships, or those of WBD, which could have an adverse impact on our and WBD's business, financial condition or results of operations. Parties with which we or WBD have business relationships may experience uncertainty as to the future of such relationships and may delay or defer certain business decisions, seek alternative relationships with third parties or seek to alter their present business relationships with us. Parties with whom we or WBD otherwise may have sought to establish business relationships may seek alternative relationships with third parties. We have experienced, and may continue to experience, negative publicity relating to the WBD Merger, which could have an adverse effect on our or WBD's ongoing operations including, but not limited to, retaining and attracting employees and creative talent, maintaining our relationships with existing customers and obtaining potential new customers. We compete with other content creators for creative talent, including producers, directors, actors and writers and if we fail to retain or attract new key employees or creative talent, our business, financial condition or results of operations could be adversely affected.

The pursuit of the WBD Merger and the preparation for the integration of WBD may place a significant burden on our management and internal resources. The diversion of management's attention away from day-to-day business concerns and any difficulties encountered in the transition and integration process could adversely affect our business, financial condition or results of operations.

***Failure to consummate the WBD Merger could negatively impact our business, financial condition, results of operations and stock price.***

The WBD Merger cannot be consummated until conditions to Closing (as defined in the WBD Merger Agreement) are satisfied or, if permissible under applicable law, waived. The WBD Merger is subject to numerous Closing conditions, including the receipt of required regulatory approvals and the absence of any orders enjoining the consummation of the WBD Merger. See "—*The WBD Merger is subject to a number of Closing conditions and, if these conditions are not satisfied, the WBD Merger Agreement may be terminated in accordance with its terms and the WBD Merger may not be consummated. In addition, the parties have the right to terminate the WBD Merger Agreement under certain circumstances, in which case the WBD Merger would not be consummated*."

There can be no assurance that the conditions to completion of the WBD Merger, including the receipt of required regulatory approvals, will be satisfied or waived on a timely basis or at all. Further, there can be no assurance that governmental authorities will not impose conditions, terms, obligations or restrictions and that such conditions, terms, obligations or restrictions will not have the effect of delaying or preventing consummation of the WBD Merger. For example, in July 2026, twelve states (California, Arizona, Colorado, Connecticut, Massachusetts,

Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon and Washington) filed an antitrust action in the U.S. District Court for the Northern District of California against Paramount and WBD relating to the WBD Merger, seeking to block the WBD Merger, among other relief. On July 24, 2026, we entered into a stipulation agreeing that the WBD Merger will not close, and we will not take any steps to integrate the operations of Paramount with those of WBD, until the earlier of five days following the court's ruling or June 1, 2027.

If in connection with any of the above or otherwise, WBD or Paramount is required to divest assets or businesses or to agree to other conditions, obligations or restrictions on the conduct of its business, there can be no assurance that we or WBD will be able to negotiate such divestitures or other measures expeditiously or on favorable terms or that the governmental authorities will approve the terms of such divestitures or other measures. In addition, we can provide no assurance that these conditions, terms, obligations or restrictions will not result in the abandonment of the WBD Merger. If the conditions to completion of the WBD Merger are not satisfied or waived, we may be unable to complete the WBD Merger in the time frame or manner currently anticipated or at all.

If the WBD Merger is not completed by September 30, 2026, we have agreed in the WBD Merger Agreement to pay as merger consideration to WBD stockholders an additional amount in cash equal to $0.00277778 multiplied by the number of calendar days elapsed after September 30, 2026, to and including the closing date (which, for the avoidance of doubt, will not exceed $0.25 per 90 calendar day period). The anticipated closing of the WBD Merger has been delayed as a result of the lawsuit described above, with the parties agreeing to postpone closing until the earlier of five days following the court's ruling or June 1, 2027.

Additionally, if the WBD Merger is not completed, our ongoing business may be adversely affected and we will be subject to several risks or consequences, including:

- if the WBD Merger Agreement is terminated under certain circumstances, including where required regulatory approvals have not been obtained or because a court order prevents the WBD Merger from closing on antitrust grounds, we may be required to pay WBD a $7.0 billion Regulatory Termination Fee (as defined in the WBD Merger Agreement), the payment of which would likely require us to issue additional equity pursuant to the Subscription Agreements, with corresponding dilution to our existing stockholders;

- we will be required to pay certain costs relating to the WBD Merger, whether or not the WBD Merger is consummated, such as significant fees and expenses relating to financial advisory, legal, accounting, consulting or other advisory fees or expenses, employee-benefit or related expenses, regulatory filings or filing and printing fees, none of which we would be able to recover;

- matters relating to the WBD Merger may require substantial commitments of time and resources by our management or the expenditure of significant funds in the form of fees and expenses, which could otherwise have been devoted to day-to-day operations or other opportunities that may have been beneficial to us;

- the commitments we have obtained to finance the WBD Merger, including a senior secured bridge term loan facility, may require us to pay certain fees and expenses in connection with such commitments, and such fees and expenses could be substantial;

- the ratings agencies could downgrade, or take other negative actions with respect to, our credit ratings or ratings outlook, which could adversely affect our ability to obtain cost-effective financing;

- the price of our Class B Common Stock could decline significantly, including to the extent the current market price reflects an assumption that the WBD Merger will be consummated;

- we would not realize the benefits expected from the WBD Merger, which could place us at a disadvantage in competing with technology companies and others for content, creative talent and distribution;

- we would continue to operate on a standalone basis, without the cost savings, synergies and other benefits expected from the WBD Merger, and as a result we may face greater challenges in executing our strategic and financial plans, and be required to implement additional cost-reduction measures, including further reductions in content and other spending, in order to achieve those plans; and

- declines in our linear television revenues are expected to persist, and the growth of our streaming business on a standalone basis may be insufficient to offset them. See the risk factors included in our Annual Report on Form 10-K referred to above under "Risks Relating to Our Business and Industry."

In addition, if the WBD Merger is not consummated, we may experience negative reactions from the financial markets or from our employees, commercial partners, clients or customers. We could also be subject to litigation, including litigation related to failure to consummate the WBD Merger or to enforce our obligations under the WBD Merger Agreement. If the WBD Merger is not consummated, the risks described above may materially adversely affect our business, financial condition, results of operations or stock price. For a description of the circumstances under which the Regulatory Termination Fee is payable, see the WBD Merger Agreement.

***Paramount and WBD must obtain certain regulatory approvals in order to consummate the WBD Merger; if such approvals are not obtained or are obtained with conditions or if the WBD Merger is enjoined in connection with legal or regulatory proceedings, the WBD Merger may be prevented or delayed or the anticipated benefits of the WBD Merger could be reduced.***

The Closing is conditioned upon, among other things, the clearance or approval by various regulatory authorities in the United States and other jurisdictions and the absence of any orders enjoining the consummation of the WBD Merger. As a condition to granting the necessary approvals or clearances, regulatory authorities may impose conditions, terms, obligations or restrictions or require divestitures or place restrictions on our business after consummation of the WBD Merger. If any such divestitures negatively impact our credit profile and credit ratings as compared to the combined business if we did not have to undertake such divestitures, we may not be able to obtain financing on as favorable terms as we otherwise anticipated, or at all. Any such requirements or restrictions sought by regulatory authorities could negatively affect our business, financial condition or results of operations following consummation of the WBD Merger. Any such requirements or restrictions may prevent or delay consummation of the WBD Merger or may reduce the anticipated benefits of the WBD Merger, which could also have a material adverse effect on our business, financial condition or results of operations.

***The WBD Merger is subject to a number of Closing conditions and, if these conditions are not satisfied, the WBD Merger Agreement may be terminated in accordance with its terms and the WBD Merger may not be consummated. In addition, the parties have the right to terminate the WBD Merger Agreement under certain circumstances, in which case the WBD Merger would not be consummated.***

The WBD Merger is subject to a number of Closing conditions and, if these conditions are not satisfied or waived (to the extent permitted by law), the WBD Merger may not be consummated. These conditions include: (i) the expiration of certain mandatory waiting periods or receipt of certain other clearances or affirmative approvals of certain governmental bodies, agencies or authorities and (ii) the absence of any law or order, issued by a court or governmental entity of competent jurisdiction, restraining, enjoining, prohibiting or preventing the consummation of the WBD Merger. Each of WBD's and Paramount's obligations to consummate the WBD Merger is also subject to certain other conditions, including, among others, the compliance with pre-closing covenants by and the accuracy of the representations and warranties of WBD (on the part of Paramount), on the one hand, and Paramount and Merger Sub (as defined in the WBD Merger Agreement) (on the part of WBD), on the other hand (in each case, subject to certain qualifications). Paramount's obligation to consummate the WBD Merger is also

subject to (x) the absence of certain changes that have had, or would reasonably be expected to have, a material adverse effect with respect to the Streaming and Studios segments of WBD and (y) WBD not having completed the separation of its Streaming and Studios business from its Global Linear Networks business nor having declared or made any dividend to WBD's stockholders to effectuate such separation. These Closing conditions may not be fulfilled and, accordingly, the WBD Merger may not be consummated.

Additionally, the WBD Merger Agreement may be terminated by either Paramount or WBD (i) by mutual written consent, (ii) if any governmental entity of competent jurisdiction issues, enacts, enforces or enters any order permanently enjoining or prohibiting the consummation of the WBD Merger, and such order becomes final and non-appealable, or (iii) subject to certain limitations, if the Effective Time (as defined in the WBD Merger Agreement) has not occurred on or before 11:59 p.m., Eastern time, on March 4, 2027 (the "End Date"), subject to one automatic extension to June 4, 2027 if on such date all of the closing conditions, except those related to regulatory approvals and governmental orders, have been satisfied or waived. In addition, (x) the WBD Merger Agreement may be terminated by Paramount due to certain breaches by WBD of its representations, warranties and covenants contained in the WBD Merger Agreement, subject to certain cure rights and (y) the WBD Merger Agreement may be terminated by WBD due to certain breaches by Paramount of its representations, warranties and covenants contained in the WBD Merger Agreement, subject to certain cure rights.

***Litigation relating to the WBD Merger could prevent or further delay the Closing and/or result in the payment of damages following the Closing.***

In connection with the WBD Merger, we and WBD are subject to litigation and related proceedings, including proceedings seeking to block or enjoin the WBD Merger or seeking monetary damages, and we may become subject to additional litigation, demand letters, claims, enforcement actions or other proceedings relating to the WBD Merger. See Note 14 to the consolidated financial statements appearing in Item 1 of Part I of this Quarterly Report on Form 10-Q under the caption "Legal Matters—Litigation Relating to the WBD Merger," and Part II, Item 1, "Legal Proceedings," for additional information regarding certain pending WBD Merger litigation and related proceedings.

The outcome of litigation and other proceedings is uncertain, and these matters, and any additional litigation, demand letters, claims, enforcement actions or other proceedings relating to the WBD Merger, could prevent or delay the Closing, result in substantial costs to WBD and Paramount, result in the payment of damages following the Closing, or otherwise adversely affect our business, financial condition or results of operations.

In addition, governmental authorities have initiated, and could initiate additional, actions challenging the WBD Merger, which could further delay or prevent the Closing, result in burdensome conditions, terms, obligations or restrictions, or otherwise adversely affect the post-close entity. The anticipated closing of the WBD Merger has been delayed as a result of the lawsuit described above, with the parties agreeing to postpone closing until the earlier of five days following the court's ruling or June 1, 2027.

***Although we expect the WBD Merger will result in synergies and other benefits, those synergies and benefits may not be realized or may not be realized within the expected time frame. WBD's business may not be integrated successfully, or such integration may be more difficult, time-consuming or costly than expected. Operating costs, customer loss and business disruption, including difficulties in maintaining relationships with employees, customers, suppliers or vendors, may be greater than expected following the WBD Merger. Revenues following the WBD Merger may be lower than expected.***

Our ability to realize the anticipated benefits of the WBD Merger will depend, to a large extent, on our ability to integrate WBD's business in a manner that facilitates growth opportunities or achieves the potential synergies, cost savings or revenue growth opportunities identified by Paramount without adversely affecting current revenues or investments in future growth. If we were required to divest certain businesses or assets, it may reduce our ability to

- potential unknown liabilities, adverse consequences and unforeseen increased expenses associated with the WBD Merger.

Many of these factors are outside of the control of Paramount and WBD, and any one of them could result in lower revenues, higher costs and diversion of management time and energy, which could materially and adversely impact our business, financial condition or results of operations. In addition, even if the operations of WBD's business are integrated successfully with Paramount, the full benefits of the WBD Merger may not be realized, including, among others, the synergies, cost savings or sales or growth opportunities that are expected. These benefits may not be achieved within the anticipated time frame or at all. Further, additional unanticipated costs may be incurred in the integration of WBD's business and the financing of the transactions. All of these factors could cause dilution to the earnings per share of Paramount, decrease or delay the projected accretive effect of the WBD Merger, and negatively impact the price of our Class B Common Stock following the WBD Merger. As a result, no assurances can be provided that acquisition of WBD will result in the realization of the full benefits expected from the WBD Merger within the anticipated time frames or at all.

***We have incurred, and will continue to incur, substantial direct and indirect costs as a result of the WBD Merger.***

We have incurred, and will continue to incur, substantial expenses in connection with and as a result of completing the WBD Merger, including financial advisory, legal, accounting, consulting and other advisory fees and expenses, employee-benefit and related expenses, regulatory filings, financing fees and filing and printing fees. In addition, over a period of time following the Closing, we expect to incur substantial expenses in connection with integrating and coordinating WBD's business, operations, policies and procedures. A portion of the transaction costs related to the WBD Merger will be incurred regardless of whether the WBD Merger is completed. While we have assumed that a certain level of transaction expenses will be incurred, factors beyond our control could affect the total amount or the timing of these expenses. Many of the expenses that will be incurred are, by their nature, difficult to estimate accurately. These expenses may exceed the costs historically borne by us. These costs could adversely affect our business, financial condition or results of operations. We expect that these expenses will increase, the longer it takes to complete the WBD Merger.

***We are incurring substantial indebtedness in connection with the WBD Merger, and the degree to which we will be leveraged following the completion of the WBD Merger may materially and adversely affect our business, financial condition and results of operations.***

We are incurring substantial indebtedness in connection with the WBD Merger. As of June 30, 2026, as adjusted for the WBD Merger, including assuming (i) an estimated $17.7 billion of outstanding senior notes of WBD as of March 31, 2026, are assumed in connection with the WBD Merger, (ii) borrowing the full amount of the $49.0 billion 364-day senior secured bridge term loan facility (or any other permanent financing incurred to reduce or replace such facility), including to refinance the WBD Term Loans, (iii) the two term A loans each for $2.5 billion to be funded at Closing, with maturities of three and five years, respectively, (iv) that our existing revolving credit facility is paid down at Closing and (v) that the new $5.0 billion five-year senior secured revolving credit facility remains undrawn, we would have had approximately $86.3 billion of total debt (excluding debt issuance costs and capital lease obligations).

Our ability to make payments on and to refinance our indebtedness, including the debt incurred pursuant to the WBD Merger, as well as any future debt that we may incur, will depend on our ability to generate cash in the future from operations or financings. Our ability to generate cash is subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond our control. We may not generate sufficient cash flow from our operations or that future borrowings will be available to us in an amount sufficient to service our debt and meet our business needs, such as funding working capital or the expansion of our operations.

If our cash flows and capital resources are insufficient to fund debt service obligations or we are not able to repay or refinance our debt as it becomes due, we may be forced to take certain actions, including reducing spending on content and programming, reducing future financing for working capital, capital expenditures and general corporate purposes, reducing or delaying investments, reducing, suspending or eliminating our dividend, disposing of material assets or operations, seeking additional debt or equity capital, restructuring or refinancing our indebtedness or dedicating an unsustainable level of our cash flow from operations to the payment of principal and interest on our indebtedness. The lenders or bondholders that hold our debt could also accelerate amounts due in the event that we default, which could potentially trigger a default or acceleration of the maturity of our other debt.

The level and quality of the combined company's earnings, operations, business and management, among other things, will impact the determination of the combined company's credit ratings. A decrease in the ratings assigned to the combined company or any series of its debt by the ratings agencies may negatively impact the combined company's access to the debt capital markets and increase the combined company's cost of borrowing. There can be no assurance that the combined company will be able to obtain financing on acceptable terms or at all, or be able to generate sufficient cash flow to reduce leverage in the time frame expected or at all. In addition, there can be no assurance that the combined company will be able to maintain the current creditworthiness or prospective credit ratings of Paramount or WBD, particularly given recent negative ratings actions or credit watches taken in light of the WBD Merger, and any further actual or anticipated changes or downgrades in such credit ratings may have a negative impact on the liquidity, capital position or access to capital markets of the combined company.

In addition, our leverage could put us at a competitive disadvantage compared to our competitors that are less leveraged. These competitors could have greater financial flexibility to pursue strategic acquisitions and secure additional financing for their operations. Our leverage could also impede our ability to withstand downturns in our industry or the economy in general.

***Despite our expected level of indebtedness, we may still incur substantially more indebtedness. This could exacerbate the risks associated with our substantial indebtedness.***

We may incur substantial additional indebtedness in the future. The terms of the agreements governing the indebtedness we will incur in connection with the WBD Merger may limit, but not prohibit, us from incurring additional indebtedness. If new indebtedness is added to our current debt levels, the related risks that we now face could increase. Any additional indebtedness could have the effect of, among other things, reducing our flexibility to respond to changing business and economic conditions. In addition, the amount of cash required to pay interest on any additional indebtedness levels will increase the demand on our cash resources and reduce funds available for capital expenditures, share repurchases and dividends, and other activities and may create competitive disadvantages for us relative to other companies with lower debt levels.

***Our existing stockholders will have a reduced ownership and economic interest in Paramount after the WBD Merger. The PIPE Transaction and the issuance of the Warrants may cause dilution to the earnings per share of Paramount, which may negatively affect the market price of our Class B Common Stock.***

Following Closing, it is anticipated that the Equity Syndication Parties (excluding affiliates of the Ellison Parties and RedBird) will receive approximately 40% to 43% of the outstanding shares of our Class B Common Stock as a result of the PIPE Transaction (as defined in the WBD Merger Agreement). The shares of Class B Common Stock issued in the PIPE Transaction will represent, in the aggregate, 73% to 78% of the shares of our Class B Common Stock outstanding after giving effect to the PIPE Transaction and assuming no Ticking Consideration is payable. Consequently, our existing stockholders will have a reduced ownership and economic interest following the consummation of the WBD Merger and the PIPE Transaction. Additionally, the Subscription Agreement with the Ellison Parties would result in the issuance of additional shares of Class B Common Stock in the amount required to finance any such Ticking Consideration. Assuming payment of the maximum Ticking Consideration that would be payable through the extended End Date of June 4, 2027 pursuant to the WBD Merger Agreement, the shares of

# EXHIBIT 12

Paramount Skydance Corp., Current Report on Form 8-K (filed Sept. 25, 2026) (relevant excerpts) (SEC Accession No. 0001104659-26-111034).

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): September 25, 2026**

# Paramount Skydance Corporation
**(Exact name of registrant as specified in its charter)**

| Delaware | 001-42791 | 99-3917985 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |

| 1515 Broadway<br>New York, New York | 10036 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**Registrant's telephone number, including area code: (212) 258-6000**

**Not Applicable**
**(Former name or former address, if changed since last report)**

Deadline

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class B Common Stock, $0.001 par value | PSKY | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 3.01. Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing.**

***(d) Transfer of Listing.***

***Transfer of Listing from Nasdaq to NYSE***

On September 25, 2026, Paramount Skydance Corporation, a Delaware corporation (the "Company"), acting pursuant to authorization from its Board of Directors (the "Board"), determined to voluntarily withdraw the listing of its Class B common stock, par value $0.001 per share (the "Class B Common Stock"), from The Nasdaq Global Select Market ("Nasdaq") and transfer the listing to the New York Stock Exchange (the "NYSE"). The Company expects that the listing and trading of the Class B Common Stock on Nasdaq will end at market close on or about October 5, 2026, and that trading will begin on the NYSE at market open on or about October 6, 2026.

**Item 7.01. Regulation FD Disclosure.**

***Warrant Distribution Record Date***

The Board has set a record date of the close of business on October 5, 2026 (the "Record Date") for the Company's previously announced distribution of warrants ("Warrants") to purchase shares of Class B Common Stock. The Company expects to distribute the Warrants on or about October 13, 2026 (the "Issue Date"). The distribution of the Warrants is contingent on the closing of the previously announced acquisition by the Company of Warner Bros. Discovery, Inc. (the "WBD Merger"); however, the WBD Merger is subject to further closing conditions, and the ultimate timing for the closing of the WBD Merger, if any, is not yet certain. As a result, the Company may, at its discretion, choose to cancel the Record Date and/or the Issue Date or postpone the Record Date and/or the Issue Date to a later date. If the Record Date and/or the Issue Date is cancelled or postponed, the Company will issue a public announcement of such change in a manner that complies with the rules of the exchange where the Company is then listed.

As previously disclosed on April 7, 2026, a special committee of the Board that was established in connection with the Company's approval of the WBD Merger recommended to the Board the declaration of a distribution of Warrants to holders of Class B Common Stock as of the Record Date, excluding each of Lawrence J. Ellison, David F. Ellison, Gerald J. Cardinale, The Lawrence J. Ellison Revocable Trust, u/a/d 1/22/88, as amended, and RedBird Capital Partners Fund IV (Master), L.P. or any of their respective affiliates, successors or transferees (collectively, the "Restricted Holders").

On the Issue Date, each share of Class B Common Stock held by a stockholder as of the Record Date, other than the Restricted Holders (including any of the Company's wholly owned subsidiaries that own Class B Common Stock), the Paramount Global 401(k) Plan and the Paramount Global Master Trust, will receive one (1) Warrant, rounded down to the nearest whole Warrant. The Company expects to issue approximately 470 million Warrants on the Issue Date. Shares of Class B Common Stock held by the Paramount Global 401(k) Plan and the Paramount Global Master Trust will, in lieu of receiving Warrants in the warrant distribution, receive shares of Class B Common Stock.

If issued, each Warrant initially will entitle the holder thereof to purchase one (1) share of Class B Common Stock at an initial exercise price per share equal to the average of the daily volume-weighted average price of the Class B Common Stock for the twenty (20) trading days ending on (and including) the third (3rd) business day prior to the closing of the WBD Merger, subject to a maximum of $16.02 per share and a minimum of $12.00 per share. The exercise price of the Warrants will be subject to certain anti-dilution and other adjustments. The Company intends to apply to list the Warrants for trading on the NYSE, subject to applicable approvals, and the Warrants will trade separately from the Company's Class B Common Stock.

Deadline

The Warrants will expire and cease to be exercisable at the earlier of (i) 5:00 p.m., New York City time, on the date that is the tenth (10th) anniversary of the Issue Date or (ii) an earlier expiration date that the Company may designate following the third (3rd) anniversary of the Issue Date, if within any period of thirty (30) consecutive trading days following such third (3rd) anniversary, there are at least twenty (20) trading days (whether or not consecutive), including the trading day immediately preceding the date on which the Company issues the early expiration notice, on which the closing sale price of the Class B Common Stock is at least equal to $30.00 initially, which price will be subject to certain anti-dilution adjustments.

This Current Report on Form 8-K does not constitute an offer to sell or the solicitation of an offer to buy any securities, including, without limitation, the Warrants or the shares of Class B Common Stock issuable upon exercise of the Warrants. Any offers, solicitations of offers to buy, or any sales of securities will be made in accordance with the registration requirements of the Securities Act of 1933, as amended (the "Securities Act").

In connection with the declaration of the Record Date, the Company posted a document containing questions and answers (the "Warrant Distribution FAQ") regarding the Warrant distribution on the Investor Relations section of the Company's website.

The information furnished pursuant to this Item 7.01, including Exhibit 99, shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities under that section and shall not be deemed to be incorporated by reference into any filing under the Securities Act or the Exchange Act, except as expressly set forth by reference in such filing.

**Cautionary Note Concerning Forward-Looking Statements**

This communication contains "forward-looking statements" regarding the timing and terms of any distribution of Warrants and the timing and expectations regarding the proposed listing on the NYSE of the Class B Common Stock and Warrants. The reader is cautioned not to rely on these forward-looking statements. These statements are based on current expectations of future events. If underlying assumptions prove inaccurate or known or unknown risks or uncertainties materialize, actual results could vary materially from the Company's expectations and projections. Risks and uncertainties include, but are not limited to: the risk that the closing conditions for the WBD Merger will not be satisfied; the possibility that the WBD Merger will not be completed in the expected timeframe or at all; damage to the Company's reputation or brands; volatility in the price of the Class B Common Stock and any Warrants; the effect the Company's dual-class capital structure and the concentrated ownership may have on the price of its Class B Common Stock; risks associated with the Company's status as a "controlled company" under Nasdaq rules and, following the transfer of listing described in Item 3.01 of this Current Report on Form 8-K, NYSE rules, including its exemption from certain corporate governance requirements; and risks associated with the lack of voting rights of the Class B Common Stock. A further list and description of these risks, uncertainties and other factors and the general risks associated with the Company can be found in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2025, filed with the U.S. Securities and Exchange Commission (the "SEC") on February 25, 2026, and the Company's Form 10-Q for the quarterly period ended June 30, 2026, filed with the SEC on August 4, 2026, including, in each case, in the sections captioned "Cautionary Note Concerning Forward-Looking Statements" and "Item 1A. Risk Factors," and the Company's subsequent filings with the SEC. Copies of these filings, as well as subsequent filings, are available online at www.sec.gov. The Company undertakes no obligation to update any forward-looking statement as a result of new information or future events or developments, except as required by law.

Deadline

**Item 9.01. Financial Statements and Exhibits.**

***(d) Exhibits.***

| Exhibit Number | Description |
|---|---|
| 99 | Warrant Distribution FAQ |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

Deadline

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

PARAMOUNT SKYDANCE CORPORATION

By: /s/ Stephanie Kyoko McKinnon
Name: Stephanie Kyoko McKinnon
Title: General Counsel and Secretary

Date: September 25, 2026

Deadline

# EXHIBIT 13

FCC ECFS, Proceeding 26-93 History Report (generated Oct. 1, 2026), reflecting docket status as of the ECFS search conducted at 10:01 a.m. ET, Oct. 1, 2026.

# Proceeding 26-93 History Report

| Name of Filer | Date Received | Filing Type | Viewing Status |
|---|---|---|---|
| LiveVideo.AI Corp | 09/30/2026 | SUBMISSION FOR THE RECORD | Unrestricted |
| LiveVideo.AI Corp | 09/28/2026 | SUPPLEMENT | Unrestricted |
| LiveVideo.AI Corp | 09/28/2026 | WITHDRAWAL | Unrestricted |
| LiveVideo.AI Corp | 09/25/2026 | PETITION | Unrestricted |
| LiveVideo.ai Corp | 09/25/2026 | SUPPLEMENT | Unrestricted |
| LiveVideo.ai Corp | 09/22/2026 | APPLICATION FOR REVIEW | Unrestricted |
| LiveVideo.ai Corp | 09/22/2026 | MOTION | Unrestricted |
| Austin Olachea | 09/21/2026 | PETITION FOR RECONSIDERATION | Unrestricted |
| National Telecommunications and Information Administration | 09/17/2026 | LETTER | Unrestricted |
| Media Bureau | 09/17/2026 | OTHER | Unrestricted |
| LiveVideo.AI Corp | 09/11/2026 | AMENDMENT | Unrestricted |
| LiveVideo.AI Corp | 09/08/2026 | PETITION | Unrestricted |
| LiveVideo.AI Corp | 09/08/2026 | REQUEST FOR SUPPLEMENTAL INFORMATION | Unrestricted |
| LiveVideo.AI Corp | 07/31/2026 | SUPPLEMENTAL COMPLAINT | Unrestricted |
| Susan Mattioni | 07/27/2026 | COMMENT | Unrestricted |
| clinton hardy | 07/23/2026 | COMMENT | Unrestricted |
| Austin Olachea | 07/22/2026 | COMMENT | Unrestricted |
| LiveVideo.AI Corp | 07/14/2026 | EXHIBIT | Unrestricted |
| LiveVideo.AI Corp | 07/14/2026 | ERRATA, ERRATUM OR ADDENDUM | Unrestricted |
| LiveVideo.AI Corp | 07/14/2026 | NOTICE OF EXPARTE | Unrestricted |
| LiveVideo.AI Corp | 07/13/2026 | MOTION TO ACCEPT LATE FILED COMMENTS | Unrestricted |
| Christine Maltinsky | 07/02/2026 | COMMENT | Unrestricted |
| The View | 06/25/2026 | COMMENT | Unrestricted |
| ABC | 06/25/2026 | COMMENT | Unrestricted |
| Paramount Global | 06/23/2026 | SUPPLEMENT | Unrestricted |
| DOJ/NSD/FIRS | 06/16/2026 | LETTER | Unrestricted |
| Paramount Global | 06/11/2026 | REPLY TO COMMENTS | Unrestricted |
| W. Lee McVey, PE (Ret.) | 06/10/2026 | REPLY | Unrestricted |

| | | | |
|---|---|---|---|
| Dr Teresa Goodell | 06/04/2026 | COMMENT | Unrestricted |
| Free Press | 05/27/2026 | COMMENT | Unrestricted |
| Franklin Broadcasting LP | 05/27/2026 | COMMENT | Unrestricted |
| Franklin Broadcasting LP | 05/27/2026 | COMMENT | Unrestricted |
| PRESSPAGE ENTERTAINMENT INC | 05/22/2026 | NOTICE OF EXPARTE | Unrestricted |
| W. Lee McVey, PE (Ret.) | 05/21/2026 | ERRATA, ERRATUM OR ADDENDUM | Unrestricted |
| W. Lee McVey, PE (Ret.) | 05/21/2026 | ERRATA, ERRATUM OR ADDENDUM | Unrestricted |
| Chad Ray | 05/20/2026 | COMMENT | Unrestricted |
| Zachary Beaudoin | 05/18/2026 | COMMENT | Unrestricted |
| W. Lee McVey, PE (Ret.) | 05/07/2026 | OPPOSITION | Unrestricted |
| PATRICK O. INGLE | 05/07/2026 | COMMENT | Unrestricted |
| PRESSPAGE ENTERTAINMENT INC | 05/05/2026 | NOTICE OF EXPARTE | Unrestricted |
| Aidan Gordon | 05/05/2026 | COMMENT | Unrestricted |
| Ron Beres | 04/29/2026 | COMMENT | Unrestricted |
| Department of Justice, National Security Division | 04/29/2026 | LETTER | Unrestricted |
| Collin Hotchkiss | 04/28/2026 | COMMENT | Unrestricted |
| PRESSPAGE ENTERTAINMENT INC | 04/28/2026 | COMMENT | Unrestricted |
| Paramount Global | 04/27/2026 | PETITION FOR DECLARATORY RULING | Unrestricted |
| Media Bureau | 04/27/2026 | PUBLIC NOTICE | Unrestricted |

# EXHIBIT 14

LiveVideo.AI Corp., Supplemental Petition to Disqualify Chairman Brendan Carr (filed July 31, 2026; ECFS No. 26110069211 (MB Docket No. 24-275); ECFS No. 26110069210 (MB Docket No. 26-93)), offered only to establish its filing, contents, and requested relief.

# SUPPLEMENTAL PETITION TO DISQUALIFY CHAIRMAN

# BRENDAN CARR

# FOR BIAS AND CONFLICT OF INTEREST

FILED: JULY 31, 2026

DOCKETS:

MB DOCKET NO. 24-275 (PARAMOUNT TRANSFER) [SUPPLEMENTAL]

& MB DOCKET NO. 26-93 (FOREIGN OWNERSHIP CAP) [INITIAL]

REFERENCED IN: LIVEVIDEO.AI CORP. V. FCC, NO. 26-1176 (D.C. CIRCUIT)

## TO THE FEDERAL COMMUNICATIONS COMMISSION:

LiveVideo.AI Corp. ("Petitioner") hereby respectfully files this Supplemental Petition to Disqualify Chairman Brendan Carr for bias, conflict of interest, and violation of federal ethics rules governing acceptance of gifts from prohibited sources.

This petition supplements and renews the grounds set forth in Petitioner's prior disqualification filings:

(1) Amended Petition for Rehearing ("Bias Petition"), filed July 29, 2025, ECFS ID 107290415412090, which detailed Chairman Carr's undisclosed ex parte meeting with Skydance CEO David Ellison on July 15, 2025, Carr's public celebration of the cancellation of The Late Show with Stephen Colbert, Carr's biased attacks on Colbert in media appearances, and Carr's undisclosed conflict of interest through his wife's employment at Palantir (strategically aligned with David Ellison's Oracle).

(2) Motion to Expedite Consideration of Recusal/Disqualification, filed November 26, 2025, which documented the undisclosed professional relationship between CBS News ombudsman Kenneth R. Weinstein and Jeff Shell through their concurrent service on the BBG/USAGM Board (2013-2020), demonstrating that the "independent ombudsman" condition Chairman Carr relied upon to justify merger approval is structurally compromised and illusory.

This petition now adds critical new evidence from Chairman Carr's certified financial disclosure reports (OGE Form 278e), which establish a pattern of $59,534+ in undisclosed gifts from Paramount Global (and its corporate predecessors) spanning 2018-2025, for which no written ethics determinations authorizing acceptance have been produced or disclosed, in violation of 5 C.F.R. § 2635.204(g)(3) and 5 C.F.R. § 2635.502. (Ex. A)

## I. PRIOR DISQUALIFICATION FILINGS: SUMMARY OF GROUNDS

### A. Amended Petition for Rehearing (July 29, 2025, ECFS 107290415412090)

The Bias Petition established the following facts and legal grounds for disqualification:

#### 1. Ex Parte Violation: Undisclosed Meeting with David Ellison (July 15, 2025)

Chairman Carr held a private, undisclosed ex parte meeting with Skydance CEO David Ellison on July 15, 2025. This meeting:

- Excluded other stakeholders with interests in the proceedings
- Allegedly involved concealment of critical evidence: a $16 million cash settlement, $20 million in broadcast credits, and a secret deal involving President Trump
- Violated FCC rules 47 C.F.R. §§ 1.1202, 1.1206, 1.1208, and 1.1216 requiring disclosure of substantive ex parte communications and duty of candor
- Violated Sea Island Broadcasting Corp. v. FCC, 627 F.2d 240 (D.C. Cir. 1980), which requires strict scrutiny of ex parte violations affecting licensing decisions

Two days after the ex parte meeting, Paramount announced the cancellation of The Late Show with Stephen Colbert, creating the appearance that Carr had directed or condoned this editorial change in exchange for merger approval.

## 2. Bias and Prejudgment: Public Statements Attacking Stephen Colbert

Following the Ellison ex parte meeting and Colbert's cancellation, Chairman Carr made a series of public statements celebrating and endorsing the cancellation, including:

- Twitter/X post (July 22, 2025): "The partisan left's ritualist wailing and gnashing of teeth over Colbert is quite revealing. They're acting like they're losing a loyal DNC spokesperson that was entitled to an exemption from the laws of economics."
- Fox News appearance (July 23, 2025): Attacked Colbert as having "clearly doesn't have 'it' anymore – if he ever did" and stated he's "paid millions of dollars to be funny and entertaining, and he's just not able to make it work."
- Interview with Oliver Darcy: Expressed disdain for Colbert and the "legacy broadcast media," praised President Trump's dismantling of media "gatekeepers," and tied Colbert's cancellation to a broader Trump administration policy of editorial control over broadcasters.

These public statements demonstrate that Chairman Carr had prejudged the outcome of the transfer application based on ideological opposition to CBS News's editorial direction, not on neutral application of FCC criteria.

## 3. Undisclosed Conflict of Interest: Palantir-Oracle Connection

The Bias Petition documented that Chairman Carr's wife was hired by Palantir as Head of Global IP Policy in February 2025— during the pendency of the Paramount-Skydance transfer application. Palantir's primary strategic

partner is Oracle, whose founder and CEO is Larry Ellison, father of Skydance CEO David Ellison. The FCC is a customer of Palantir.

This creates a clear conflict: if Carr approves the Ellison-Skydance transaction, Larry Ellison and Oracle benefit, which benefits Palantir, which benefits Carr's wife's employer and her compensation and career advancement. This conflict was never disclosed and Carr never recused himself.

**B. Motion to Expedite Recusal/Disqualification (November 26, 2025)**

The Motion to Expedite established the following facts demonstrating that Chairman Carr's key justification for the merger—the "independent ombudsman" safeguard—is structurally compromised:

**1. Undisclosed Professional Relationship: Shell and Weinstein on BBG/USAGM Board**

The Motion documented extensive official records (BBG/USAGM Board meeting minutes from 2013-2020) showing that:

- Jeffrey Shell and Kenneth Weinstein served together on the BBG/USAGM Board for approximately 7 years (2013-2020)
- Shell served as BBG Chairman from 2013-2015 and again in 2016
- Weinstein served as a Governor under Shell's chairmanship (2013-2016), then succeeded Shell as Chairman (Jan. 24, 2017)
- They attended multiple board meetings together, including documented joint attendance on:
    * November 30, 2016 (Shell as Chair, Weinstein as Governor)

* August 30, 2017 (Weinstein as Chair, Shell as Governor)

* March 14, 2018 (both in attendance)

* June 6, 2018 (both in attendance)

**2. Weinstein's Public Acknowledgment of Shell's Leadership**

When Weinstein succeeded Shell as BBG Chairman (April 6, 2017), he publicly stated:

> "He expressed his gratitude to Jeff Shell for his dedication and leadership of the Board and noted that he was critical to the transformation of the agency."
>
> When announcing Weinstein's appointment as CBS News ombudsman, Shell stated: "I've known him for many years and have great respect for his integrity, sound judgment, and thoughtful approach to complex issues."

**3. Ombudsman Lacks Independence**

The Motion established that Weinstein, the newly appointed CBS News ombudsman, is NOT independent of Jeff Shell because:

- He has a 7-12 year professional relationship with Shell spanning concurrent service on a small, collegial federal board
- He succeeded Shell in a leadership position and publicly praised Shell's stewardship
- He is structurally dependent on Shell (reporting directly to Shell, compensation determined by Shell)
- He lacks the "adversarial distance" required of a true ombudsman

By approving the merger conditioned on an "independent ombudsman," Carr approved a sham safeguard—a condition that, on its face, appeared to constrain editorial control but in fact embedded an executive (Weinstein) who is personally

aligned with and dependent upon the very executive (Shell) whose editorial decisions he is purportedly to monitor.

**4. Chairman Carr's Personal Stake in Defending the Ombudsman Condition**

The Motion noted that Carr has a "reputational and political incentive to defend" the ombudsman structure against evidence that it is compromised. Now that the Shell-Weinstein relationship is exposed, Carr cannot impartially adjudicate challenges to his own negotiated conditions, placing him in the position of "reviewing the propriety of his own judgment" in a matter where his prior advocacy is directly undercut by new facts.

This is precisely the situation contemplated by Withrow v. Larkin, 421 U.S. 35 (1975), where an official's interest in defending his prior decision creates an appearance of bias incompatible with impartial adjudication.

---

---

## II. NEW EVIDENCE: UNDISCLOSED GIFTS FROM PARAMOUNT AND MISSING ETHICS DETERMINATIONS

This supplemental petition adds critical new evidence that independently warrants disqualification: a pattern of undisclosed gifts from Paramount Global

(and its corporate predecessors) totaling at least $59,534 across nine entries in Chairman Carr's certified OGE Form 278e financial disclosure reports (2018-2025), for which no written ethics determinations authorizing acceptance have been produced, despite demand. (Exhibit A)

**A. Pattern of Gifts from Paramount (Disclosed in Chairman's Financial Disclosures)**

Chairman Carr accepted gifts from Paramount Global (and its predecessors CBS Corporation, ViacomCBS) totaling at least $59,534 across nine distinct entries in his certified OGE Form 278e financial disclosure reports, spanning 2018–2025:

| Report Year | Source | Description | Value |
|---|---|---|---|
| 2018 | CBS Corporation & Kennedy Center | Honors Gala Dinner, 12/3/17 (two orchestra tickets) | $8,000 |
| 2018 | CBS Corporation & Kennedy Center | Cocktail reception, 12/3/17 (two tickets) | $450 |
| 2020 | Kennedy Center / ViacomCBS | Annual Honors Gala and Supper Dance, 12/8/19 | $8,490 |
| 2022 | Kennedy Center & Viacom/CBS | Annual Honors Gala / Supper Dance, 12/5/21 ($4,745 pp) | $9,490 |
| 2022 | Viacom/CBS | Honors Reception, 12/5/21 ($210 pp) | $420 |
| 2023 | Kennedy Center & Paramount | Annual Gala and Dinner, 12/4/22 | $10,060 |
| 2023 | Paramount | Reception prior to Honors, 12/4/22 | $420 |
| 2024 | Paramount | Kennedy Center Honors Reception, Event, and Dinner | $10,480 |
| 2025 | Paramount | Kennedy Center 47th Annual Honors Gala and Dinner | $11,724 |

TOTAL: $59,534 across six report years

Independent public reporting places the total above $63,000 since Carr's appointment in 2017. The value of gifts escalated in each successive year in which a gift was reported, from $8,450 (2018) to $11,724 (2025). These gifts continued to be accepted during the pendency of Paramount's transfer application in dockets 24-275 and 26-93.

### B. Paramount is a "Prohibited Source" Under Federal Ethics Rules

Paramount Global (and its corporate predecessors CBS Corporation, ViacomCBS) is a prohibited source as to Chairman Carr by operation of law. 5 C.F.R. § 2635.203(d) defines a prohibited source as:

> "Any person or organization seeking official action by, doing business with, or having interests substantially affected by the performance or nonperformance of the employee's official duties…"

Paramount is the licensee whose transfer application is the subject matter of dockets 24-275 and 26-93, and whose foreign ownership structure is the subject of ongoing FCC review in docket 26-93. Its interests are quintessentially affected by the Chairman's official duties. It is, by definition, a prohibited source.

### C. The Gifts Exceed All Applicable Exceptions

The de minimis exception under 5 C.F.R. § 2635.204(a) allows acceptance of gifts up to $20 per occasion and $50 per source per year.

Each gift in the table above vastly exceeds this threshold—the minimum gift was $420, the maximum $11,724. No de minimis exception applies.

The only exception that could cover gifts of this magnitude is the "widely attended gathering" exception under 5 C.F.R. § 2635.204(g).

That exception applies only where:

> "(3) The agency designee determines that the agency's interest in the employee's participation outweighs the concern that the employee may be, or may appear to be, improperly influenced…When the gift is from someone other than the sponsor or is valued at more than $250, this determination must be in writing."

Each of the Paramount gifts exceeds $250. Kennedy Center is the sponsor of the Kennedy Center Honors events; Paramount is a co-host, benefactor, or entertainment-industry partner. The regulation therefore requires a written determination for each gift acceptance.

**D. No Ethics Determination Has Been Disclosed; Silence Creates Reasonable Inference of Bias**

The Commission has not disclosed any written determination(s) purportedly authorizing Chairman Carr's acceptance of these gifts. Petitioner requested these determinations via formal FOIA request (filed July 31, 2026, currently pending) (included as Exhibit C hereto).

The Commission has taken no position on whether:

(i) Written determinations authorizing acceptance were made;

(ii) If made, why they were not disclosed;

(iii) If not made, why the acceptances proceeded without the required authorization.

This silence is probative of conflict. An agency head's participation in a matter involving a party who has lavished substantial gifts upon him—gifts that ostensibly required written authorization but for which no authorization has ever been produced—falls below the constitutional standard of impartiality and the statutory requirement of recusal set forth in 5 U.S.C. § 455 (analogous judicial recusal standards).

**E. Recusal Analysis Under § 2635.502 Has Never Been Disclosed**

An independent issue arises under 5 C.F.R. § 2635.502, which requires an employee to determine whether "a reasonable person with knowledge of the relevant facts would question his impartiality in a particular matter involving specific parties." If the answer is yes, the employee must obtain a determination from the agency designee before participating.

Dockets 24-275 and 26-93 involve Paramount. Chairman Carr has accepted $59,534+ in gifts from Paramount while those dockets were pending. A reasonable person with knowledge of these facts would question his impartiality.

The Commission has never disclosed whether any § 2635.502 recusal analysis was performed, whether any determination was issued, by whom, or with what result. The absence of disclosure suggests the analysis was not performed—or, if performed, was deliberately concealed to avoid triggering mandatory recusal.

## III. CUMULATIVE EFFECT: THREE INDEPENDENT GROUNDS FOR DISQUALIFICATION

Petitioner's prior disqualification filings (Bias Petition, Motion to Expedite) established serious concerns regarding Chairman Carr's impartiality. This supplemental petition now establishes a third, independent ground: violation of federal ethics rules governing gifts from prohibited sources.

Viewed together, the three grounds create an overwhelming case for disqualification:

**GROUND 1 (Bias Petition):**

- Ex parte violation (undisclosed Ellison meeting on July 15, 2025)
- Public bias and prejudgment (celebration of Colbert cancellation; public attacks on Colbert's politics)
- Undisclosed conflict (wife employed by Palantir, strategically aligned with Ellison/Oracle)

**GROUND 2 (Motion to Expedite):**

- Reliance on compromised ombudsman safeguard to justify merger approval
- Ombudsman not independent (Shell-Weinstein relationship documented in BBG/USAGM minutes)
- Personal stake in defending sham safeguard against evidence of its compromise

- Disqualification standard under Withrow v. Larkin (prejudgment + personal stake = disqualification)

**GROUND 3 (This Supplemental Petition):**

- $59,534+ in undisclosed gifts from prohibited source (Paramount) spanning 2018-2025
- No written ethics determinations disclosed despite legal requirement (5 C.F.R. § 2635.204(g)(3))
- No recusal analysis under § 2635.502 disclosed despite legal requirement
- Accepting gifts while the source's regulatory matters are pending creates reasonable appearance of bias
- Silence on ethics determinations creates inference that none were made, rendering acceptances unauthorized

No one of these grounds is trivial. Taken together, they establish a pattern of undisclosed conflicts, bias, and violation of federal ethics law that renders Chairman Carr manifestly unfit to serve as an impartial arbiter in matters involving Paramount.

## IV. LEGAL STANDARDS FOR DISQUALIFICATION

### A. Statutory Standard: 5 U.S.C. § 455 (Analogous Judicial Recusal)

While § 455 is formally a judicial recusal statute, courts and the D.C. Circuit have applied its principles to agency decision-makers as the applicable standard for disqualification. See Withrow v. Larkin, 421 U.S. 35 (1975) (establishing that due process may require recusal where official has prejudged matters or personal stake in defending prior decisions).

Under § 455, disqualification is required where the official's "impartiality might reasonably be questioned."

Here, Carr's impartiality is not merely questioned—it is demonstrably compromised by: (a) undisclosed gifts from the regulated entity; (b) public statements showing ideological hostility toward editorial choices at Paramount-controlled networks; (c) undisclosed ex parte meeting with the applicant; (d) reliance on a demonstrably sham safeguard to justify the decision.

**B. Administrative Law Standard: FCC Rules and Analogous Precedent**

5 C.F.R. § 2635.502 requires recusal where a reasonable person with knowledge of relevant facts would question impartiality in a particular matter involving specific parties. Sangamon Valley Television Corp. v. FCC, 269 F.2d 221 (D.C. Cir. 1959), requires reversal of agency decisions tainted by ex parte violations or appearance of bias affecting licensing decisions. Sea Island Broadcasting Corp. v. FCC, 627 F.2d 240 (D.C. Cir. 1980), emphasizes strict scrutiny of ex parte violations in matters involving undisclosed communications that affect licensing outcomes.

**C. Constitutional Standard: Due Process**

The Constitution requires that agency decision-makers be, and appear to be, impartial. An agency head who accepts substantial gifts from a regulated entity while ruling on that entity's applications violates due process.

## V. APPLICATION TO BOTH DOCKETS

A. MB Docket No. 24-275 (Paramount Transfer Order FCC 25-43)

Chairman Carr participated in the July 24, 2025 vote approving Paramount's transfer of broadcast properties. At that time, he had accepted at least $49,490 in gifts from Paramount across prior years (2018-2023), with an additional $11,724 received in December 2024 (during the pendency of the application).

No written determination authorizing these gifts has been disclosed. No § 2635.502 recusal analysis has been disclosed. His participation was therefore likely unauthorized, and the Order itself is voidable.

The D.C. Circuit case (26-1176) contains extensive evidence that the Order was tainted by bias—the Chairman's public statements about "editorial leverage" over broadcasters match exactly the stated rationale for approving the transfer (Footnote 60: "serious changes" to CBS newsrooms). Combined with:

(1) The undisclosed ex parte meeting with Ellison (Bias Petition);

(2) The public celebration of Colbert's cancellation (Bias Petition);

(3) The reliance on a compromised ombudsman safeguard (Motion to Expedite);

(4) The $59,534+ in undisclosed gifts from Paramount (this petition);

This creates a prima facie case for disqualification, vacatur, and remand.

B. MB Docket No. 26-93 (Foreign Ownership § 310(b)(4) Ceiling)

The same Chairman will rule on the foreign-ownership petition now pending in this docket, which seeks approval of beneficial ownership by Gulf investors at 49.5% (exceeding the 25% statutory ceiling). The same conflict of interest applies: the same regulated entity (Paramount), the same undisclosed gifts, the same absence of documented ethics determinations or recusal analysis.

If the Chairman is disqualified from 24-275, logic and law require he be disqualified from 26-93, as both matters involve Paramount and both are tainted by the same undisclosed financial relationship.

---

---

## VI. PRIOR DISQUALIFICATION FILINGS IN MB DOCKET 24-275

Petitioner incorporates by reference:

(1) Amended Petition for Rehearing, filed July 29, 2025, ECFS ID 107290415412090 (the "Bias Petition"), which detailed:

- Undisclosed ex parte meeting with David Ellison (July 15, 2025)
- Concealment of material evidence ($16M settlement, $20M broadcast credits, Trump deal)
- Public bias: celebration and attacks on Colbert

- Undisclosed conflict: wife employed at Palantir (Oracle/Ellison connection)
- Violation of FCC rules and Sea Island Broadcasting precedent

(2) Motion to Expedite Consideration of Recusal/Disqualification, filed November 26, 2025, which detailed:

- Undisclosed professional relationship between ombudsman Weinstein and Shell (BBG/USAGM board service 2013-2020)
- Shell-Weinstein documented concurrent attendance at multiple board meetings (Nov 30, 2016; Aug 30, 2017; Mar 14, 2018; Jun 6, 2018)
- Weinstein's public acknowledgment of Shell's leadership and "dedication" to the agency transformation
- Ombudsman lacks independence (lacks "arms-length" relationship, structurally dependent on Shell, embedded in prior loyalty)
- Chairman Carr's personal stake in defending the ombudsman condition (his prior advocacy and negotiation)
- Withrow v. Larkin standard: prejudgment + personal stake = disqualification

This supplemental petition updates and expands those grounds with documented evidence of gifts from Paramount and missing ethics determinations.

---

---

## VII. RELIEF SOUGHT

Petitioner respectfully requests that the Federal Communications Commission:

1. Immediately disqualify Chairman Brendan Carr from participating in MB Docket No. 24-275 and all decisions relating to Paramount Global, Skydance Entertainment, TKO Group, or any related entity;

2. Immediately disqualify Chairman Carr from participating in MB Docket No. 26-93 and all decisions relating to foreign ownership of Paramount or any successor entity;

3. Produce, or certify the non-existence of, all written determinations under 5 C.F.R. § 2635.204(g)(3) authorizing the Chairman's acceptance of the gifts listed above;

4. Produce, or certify the non-existence of, any determination or authorization under 5 C.F.R. § 2635.502 concerning the Chairman's participation in matters involving Paramount, Skydance, TKO Group, or Warner Bros. Discovery;

5. Produce, or certify the non-existence of, any ethics advice sought or received in connection with either determination;

6. Certify in writing that the Commission has performed, or has failed to perform, any § 2635.502 impartiality analysis as to the

Chairman's participation in FCC 25-43 and/or any other matter involving Paramount;

7. In the alternative, if the Commission determines that no ethics determinations were required or were made, produce that determination in writing and explain the legal basis for permitting the Chairman's participation without documented authorization;

8. Vacate or remand for reconsideration any Commission decisions in which the Chairman participated during the period in which he accepted gifts from Paramount without disclosed authorization or recusal analysis;

9. Stay any further action on MB Docket No. 26-93 pending the Commission's response to this petition and the D.C. Circuit's ruling in Case No. 26-1176;

10. Designate the remaining Commissioners to decide all pending and future matters in both dockets absent the Chairman's participation.

---

## VIII. PROCEDURAL STATEMENT

This petition is filed as a Direct Case notice in both MB Docket No. 24-275 (supplementing the July 29, 2025 Bias Petition and the November 26, 2025 Motion to Expedite) and MB Docket No. 26-93 (as an initial disqualification

filing), consistent with 47 C.F.R. § 1.49 (ex parte presentations in adjudicatory proceedings).

It is submitted simultaneously with Petitioner's Notice of Filing of D.C. Circuit Materials (July 31, 2026, Direct Case filing), which includes as Exhibit C the detailed documentation of the Chairman's gifts, OGE Form 278e excerpts, ethics regulatory analysis, and relief demanded. The Commission's receipt of this petition before the D.C. Circuit proceeding advances ensures awareness of the disqualification demand and prevents the claim of surprise or procedural forfeiture if the Circuit subsequently raises the same issues.

The petition incorporates by reference the findings, evidence, and arguments in:

- Exhibit C to the Direct Case Notice (Chairman's gifts, OGE form excerpts, ethics regulatory framework, relief demanded)
- Bias Petition (ECFS 107290415412090, July 29, 2025)
- Motion to Expedite Recusal/Disqualification (November 26, 2025)

---

## CONCLUSION

Chairman Carr has accepted over $59,534 in gifts from Paramount Global while that entity's critical regulatory matters were pending before him. No written authorization for these gifts has been disclosed. No impartiality analysis under § 2635.502 has been disclosed.

He held an undisclosed ex parte meeting with the applicant. He made public statements showing bias and prejudgment. He relied upon a demonstrably sham "independent ombudsman" safeguard to justify the merger approval, and has a personal stake in defending that condition even as evidence of its compromise emerges.

A reasonable person with knowledge of these facts would question his impartiality. Federal law requires disqualification.

Petitioner respectfully requests immediate relief.

Respectfully submitted,

July 31, 2026

Signed:

/s/ Brad Greenspan
Brad Greenspan
CEO, LiveVideo.AI Corp

Address: 244 5th Ave, Suite G290 New York, NY 10001

Email: legalsupport1@nym.hush.com

CERTIFICATE OF SERVICE

This Supplemental Petition to Disqualify is filed in FCC ECFS as:

(1) A supplemental filing in MB Docket No. 24-275, updating and expanding the prior disqualification filings

(Bias Petition, ECFS 107290415412090, July 29, 2025; Motion to Expedite, November 26, 2025);

(2) An initial disqualification filing in MB Docket No. 26-93.

Service on Chairman Carr is effected via his office at the Federal Communications Commission, 45 L Street, NE, Washington, D.C. 20554, and via the FCC's electronic filing system (ECFS).

/s/ Brad Greenspan
Brad Greenspan
CEO, LiveVideo.AI Corp
Address: 244 5th Ave, Suite G290 New York, NY 10001
Email: legalsupport1@nym.hush.com

EXHIBIT A

# Executive Branch Personnel
# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

**Carr, Brendan**

Member, Federal Communications Commission

Report Year: 2018

Other Federal Government Positions Held During the Preceding 12 Months:

General Counsel, Federal Communications Commission (4/2017 - 8/2017)

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

**/s/ Carr, Brendan [electronically signed on 04/20/2018 by Carr, Brendan in Integrity.gov]**

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
**/s/ Halprin, Jane H, Certifying Official [electronically signed on 05/11/2018 by Halprin, Jane H in Integrity.gov]**

Other review conducted by

U.S. Office of Government Ethics Certification
**/s/ Skalla, Daniel L, Certifying Official [electronically signed on 05/18/2018 by Skalla, Daniel L in Integrity.gov]**

| # | CREDITOR NAME | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|
| 2 | PHH Mortgage | Mortgage on Personal Residence | $250,001 - $500,000 | 2011 | 4.375 | 30 years |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | CBS Corporation and Kennedy Center | Washington, District of Columbia | Kennedy Center Honors Gala Dinner, 12/3/17 (two orchestra tickets) | $8,000 |
| 2 | CBS Corporation and Kennedy Center | Washington, District of Columbia | Cocktail reception in connection with Kennedy Center Honors, 12/3/17 (two tickets) | $450 |

## Endnotes

# Executive Branch Personnel
# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

**Carr, Brendan**

Member, Federal Communications Commission

Report Year: 2019

Other Federal Government Positions Held During the Preceding 12 Months:
None

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

**/s/ Carr, Brendan [electronically signed on 05/02/2019 by Carr, Brendan in Integrity.gov]**

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
**/s/ Northrop, Lauren, Certifying Official [electronically signed on 05/07/2019 by Northrop, Lauren in Integrity.gov]**

Other review conducted by

U.S. Office of Government Ethics Certification
**/s/ Granahan, Megan, Certifying Official [electronically signed on 05/20/2019 by Granahan, Megan in Integrity.gov]**

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Kennedy Center /CBS | Washington, District of Columbia | Annual Kennedy Center Honors Event, 12/2/18 | 4,120 |

## Endnotes

# Executive Branch Personnel

# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Member, Federal Communications Commission

Report Year: 2020

Other Federal Government Positions Held During the Preceding 12 Months:
None

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 08/03/2020 by Carr, Brendan in Integrity.gov] - Filer received a 90 day filing extension.

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
/s/ Northrop, Lauren, Certifying Official [electronically signed on 09/22/2020 by Northrop, Lauren in Integrity.gov]

Other review conducted by

U.S. Office of Government Ethics Certification
/s/ Granahan, Megan, Certifying Official [electronically signed on 09/28/2020 by Granahan, Megan in Integrity.gov]

| # | CREDITOR NAME | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|
| 2 | PHH Mortgage | Mortgage on Personal Residence | $250,001 - $500,000 | 2011 | 4.375 | 30 years |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Kennedy Center/ViacomCBS Corporation | Washington, District of Columbia | Annual Kennedy Center Honors Gala and Supper Dance with a guest (December 8, 2019). | $8,490 |

## Endnotes

# Executive Branch Personnel

# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Member, Federal Communications Commission

Report Year: 2021

Other Federal Government Positions Held During the Preceding 12 Months:
None

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 04/22/2021 by Carr, Brendan in Integrity.gov]

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
/s/ Fulp, Kathleen, Certifying Official [electronically signed on 06/08/2021 by Fulp, Kathleen in Integrity.gov]

Other review conducted by

U.S. Office of Government Ethics Certification
/s/ Granahan, Megan, Certifying Official [electronically signed on 06/11/2021 by Granahan, Megan in Integrity.gov]

## 9. Gifts and Travel Reimbursements

None

---

## Endnotes

# Executive Branch Personnel

# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Member, Federal Communications Commission

Report Year: 2022

Other Federal Government Positions Held During the Preceding 12 Months:
None

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 07/27/2022 by Carr, Brendan in Integrity.gov] - Filer received a 91 day filing extension.

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
/s/ Northrop, Lauren, Certifying Official [electronically signed on 11/15/2022 by Northrop, Lauren in Integrity.gov]

Other review conducted by

U.S. Office of Government Ethics Certification
/s/ Granahan, Megan, Certifying Official [electronically signed on 11/21/2022 by Granahan, Megan in Integrity.gov]

| # | CREDITOR NAME | | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|---|
| 2 | DC Condo-PennyMac | See Endnote | Mortgage (investment/rental property) | $500,001 - $1,000,000 | 2020 | 2.750 | 30 years |
| 3 | Virginia - PennyMac | | Mortgage on Personal Residence | $500,001 - $1,000,000 | 2021 | 3.125 | 30 years fixed |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Kennedy Center and Viacom/CBS | Washington, District of Columbia | Annual Honors Gala and Supper Dance with guest, December 5, 2021 ($4,745 per ticket/person) | $9,490 |
| 2 | Viacom/CBS | Washington, District of Columbia | Kennedy Center Honors Reception with guest, December 5, 2021 ($210/pp) | $420 |

## Endnotes

| PART | # | ENDNOTE |
|---|---|---|
| 5. | 9 | My spouse earns a salary for work for Kevin McCarthy for Congress. |
| 6. | 11 | My primary residence was a condo in DC between 2011 and 2021. In 2021, I purchased a home in Virginia and kept the condo, which we now rent out. |
| 8. | 2 | My spouse and I lived in this condo as our primary residence from 2011 to 2021. We purchased a home in Virginia in 2021, and now rent this D.C. condo out. |

# Executive Branch Personnel

# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Commissioner, Federal Communications Commission

Report Year: 2023

---

Other Federal Government Positions Held During the Preceding 12 Months:

Commissioner, Federal Communications Commission (8/2017 - Present)

---

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 07/14/2023 by Carr, Brendan in Integrity.gov] - Filer received a 60 day filing extension.

---

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
/s/ Northrop, Lauren, Certifying Official [electronically signed on 07/19/2023 by Northrop, Lauren in Integrity.gov]

---

Other review conducted by

---

U.S. Office of Government Ethics Certification
/s/ Granahan, Megan, Certifying Official [electronically signed on 08/14/2023 by Granahan, Megan in Integrity.gov]

| # | CREDITOR NAME | | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|---|
| 1 | Navient (student loan) | See Endnote | Student Loan | $15,001 - $50,000 | 2005 | 2.770 | 30 years |
| 2 | DC Condo-PennyMac | | Mortgage (investment/rental property) | $500,001 - $1,000,000 | 2020 | 2.750 | 30 years |
| 3 | Virginia - PennyMac | | Mortgage on Personal Residence | $500,001 - $1,000,000 | 2021 | 3.125 | 30 years fixed |
| 4 | Tower Federal Credit Union | | HELOC | $100,001 - $250,000 | 2021 | 7.0 | 30 years |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Kennedy Center and Paramount | Washington, District of Columbia | Kennedy Center Honors Annual Gala and Dinner with a guest, 12/4/22 | $10,060 |
| 2 | Paramount | New York, New York | Reception prior to Kennedy Center Honors with a guest, 12/4/22 | $420 |

## Endnotes

| PART | # | ENDNOTE |
|---|---|---|
| 5. | 9 | My spouse earns a salary for work for Kevin McCarthy for Congress. This is in addition to the salary she earns from the federal government (the U.S. House of Representatives) for working for Speaker McCarthy this year and Leader McCarthy last year. |
| 8. | 1 | In 2022, I qualified for the Public Service Loan Forgiveness program based on 10+ years of government work. So this loan was paid off through that program after being transferred to MOHELA. |

# Executive Branch Personnel

# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Commissioner, Federal Communications Commission

Report Year: 2024

Other Federal Government Positions Held During the Preceding 12 Months:

Commissioner, Federal Communications Commission (8/2017 - Present)

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 05/17/2024 by Carr, Brendan in Integrity.gov]

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).
/s/ Jacobi, Will, Certifying Official [electronically signed on 05/22/2024 by Jacobi, Will in Integrity.gov]

Other review conducted by

U.S. Office of Government Ethics Certification

## 8. Liabilities

| # | CREDITOR NAME | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|
| 1 | DC Condo-PennyMac | Mortgage (investment/rental property) | $250,001 - $500,000 | 2020 | 2.750 | 30 years |
| 2 | Virginia - PennyMac | Mortgage on Personal Residence | $500,001 - $1,000,000 | 2021 | 3.125 | 30 years fixed |
| 3 | Tower Federal Credit Union | HELOC | $100,001 - $250,000 | 2021 | 7.0 | 30 years |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Paramount | | Kennedy Center Honors Reception, Event, and Dinner for two | $10,480 |
| 2 | Federalist Society | Washington, District of Columbia | Federalist Society 2023 Scalia Dinner | $600 |

## Endnotes

| PART | # | ENDNOTE |
|---|---|---|
| 1. | 1 | I am serving as the executor of my father's estate. He passed away in September 2023. |

OGE Form 278e (Updated 08/2024) (Expires 08/31/2027)
U.S. Office of Government Ethics; 5 C.F.R. part 2634 | Form Approved: OMB No. (3209-0001)

Report Type: Annual Report
Year (Annual Report only): 2025
Date of Appointment: 08/2017
Date of Termination:
Appointment Type: PAS

# Executive Branch Personnel
# Public Financial Disclosure Report (OGE Form 278e)

## Filer's Information

Carr, Brendan

Chairman, Federal Communications Commission

Report Year: 2025

Other Federal Government Positions Held During the Preceding 12 Months:

Commissioner, Federal Communications Commission (8/2017 - Present)

Electronic Signature - I certify that the statements I have made in this form are true, complete and correct to the best of my knowledge.

/s/ Carr, Brendan [electronically signed on 06/24/2025 by Carr, Brendan in Integrity.gov] - Filer received a 60 day filing extension.

Agency Ethics Official's Opinion - On the basis of information contained in this report, I conclude that the filer is in compliance with applicable laws and regulations (subject to any comments below).

## 8. Liabilities

| # | CREDITOR NAME | TYPE | AMOUNT | YEAR INCURRED | RATE | TERM |
|---|---|---|---|---|---|---|
| 1 | DC Condo-PennyMac | Mortgage (investment/rental property) | $250,001 - $500,000 | 2020 | 2.750 | 30 years |
| 2 | Virginia - PennyMac | Mortgage on Personal Residence | $500,001 - $1,000,000 | 2021 | 3.125 | 30 years fixed |
| 3 | Tower Federal Credit Union | HELOC | $100,001 - $250,000 | 2021 | 7.0 | 30 years |

## 9. Gifts and Travel Reimbursements

| # | SOURCE NAME | CITY, STATE | BRIEF DESCRIPTION | VALUE |
|---|---|---|---|---|
| 1 | Paramount | Washington, District of Columbia | Kennedy Center 47th Annual Honors Gala and Reception with a guest | $11,724 |
| 2 | Fox News Media | New York, New York | White House Correspondents' Association Dinner with a guest | $820 |

## Endnotes

| PART | # | ENDNOTE |
|---|---|---|
| 1. | 1 | I am serving as the executor of my father's estate.  He passed away in September 2023. |

Instructions for Part 9

If you need more pages, follow these instructions. Note: You must add pages before entering information.

Note: This is a public form. Do not include account numbers, street addresses, or family members' names. See instructions for required information.

| Filer's Name | Page Number |
|---|---|
| Donald J. Trump | 847 of 847 |

## Part 9: Gifts and Travel Reimbursements

| # | Source Name | City/State | Brief Description | Value |
|---|---|---|---|---|
| 1. | Anthony Constantino/Sticker Mule LLC | Amsterdam, New York | "The Defiance Moment" Sculpture | $250,000.00 |
| 2. | Gayle Benson | New Orleans, Louisiana | Ten (10) Superbowl LIX Tickets | $50,000.00 |
| 3. | France Family | Daytona Beach, Florida | Fifteen (15) Daytona 500 Tickets | $7,500.00 |
| 4. | NCAA | Philadelphia, Pennsylvania | Five (5) NCAA Men's Wrestling Champ Tickets | $1,300.00 |
| 5. | Dana White | Miami, Florida | Fifteen (15) UFC 314 Tickets (Miami) Tickets | $3,750.00 |
| 6. | Dana White | Newark, New Jersey | Fifteen (15) UFC 316 (New Jersey) Tickets | $3,000.00 |
| 7. | Gianni Infantino | Rutherford, New Jersey | Ten (10) Fifa World Cup Final Tickets | $15,000.00 |
| 8. | Rolex | New York, New York | Ten (10) US Open Tickets | $25,000.00 |
| 9. | Hal Steinbrenner | New York, New York | Fifteen (15) Yankees/Tigers MLB Tickets | $3,000.00 |
| 10. | PGA of America | Farmingdale, New York | Fifteen (15) Ryder Cup (Bethpage) Tickets | $11,250.00 |
| 11. | Josh Harris | Landover, Maryland | Fifteen (15) Commanders/Lions NFL Tickets | $2,250.00 |
| 12. | | | | |
| 13. | | | | |
| 14. | | | | |
| 15. | | | | |
| 16. | | | | |
| 17. | | | | |
| 18. | | | | |
| 19. | | | | |
| 20. | | | | |

Instructions for Part 8

If you need more pages, follow these instructions. Note: You must add pages before entering information.

Note: This is a public form. Do not include account numbers, street addresses, or family members' names. See instructions for required information.

| Filer's Name | Page Number |
|---|---|
| Donald J. Trump | 846 of 847 |

## Part 8: Liabilities

| # | Creditor Name | Type | Amount | Year Incurred | Rate | Term |
|---|---|---|---|---|---|---|
| 1. | The Bryn Mawr Trust Company | Seven Springs (mortgage) | $5,000,001 - $25,000,000 | 2000 | 4.50% | Paid Off July 2025 |
| 2. | Ladder Capital Finance LLC | TIHT Commercial NY (mortgage) | $5,000,001 - $25,000,000 | 2016 | 4.05% | Matures in 2026 |
| 3. | Ladder Capital Finance I LLC | 40 Wall Street (mortgage) | Over $50,000,000 | 2015 | 3.665% | Paid Off June 2025 |
| 4. | Professional Bank | 1125 South Ocean Blvd (mortgage) | $5,000,001 - $25,000,000 | 2018 | 4.50% | Paid Off July 2025 |
| 5. | Axos Bank | Trump Tower (mortgage) | Over $50,000,000 | 2022 | 4.25% | Matures in 2032 |
| 6. | Axos Bank | Trump National Doral (mortgage) | Over $50,000,000 | 2022 | 4.90% | Matures in 2032 |
| 7. | E. Jean Carroll | Litigation; stayed pending appeal; bonded | $1,000,001 - $5,000,000 | 2023 | N/A | N/A |
| 8. | E. Jean Carroll | Litigation; stayed pending appeal; bonded | Over $50,000,000 | 2024 | N/A | N/A |
| 9. | New York Attorney General | Litigation; overturned on appeal | Over $50,000,000 | 2024 | N/A | N/A |
| 10. | American Express | Credit Card | $15,001 - $50,000 | 2025 | N/A | Monthly |
| 11. | Charles Schwab Bank | Pledged Asset Line | Over $50,000,000 | 2025 | 3.90% | N/A |
| | | | | | | |

Schedule 1 for Part 2

Note: This is a public form. Do not include account numbers, street addresses, or family member names. See instructions for required information.

| Filer's Name | | | | | | | Page Number |
|---|---|---|---|---|---|---|---|
| Donald J. Trump | | | | | | | Page 22 of 23 |
| **Part 2: Filer's Employment Assets & Income and Retirement Accounts** | | | | | | | |
| # | Description | Underlying Assets and Location | EIF | Value | Income Type | Income Amount | Ownership % |
| 425 | MIDAS TOUCH<br>Publisher: Plata Publishing<br>Value not readily ascertainable<br>(Published 2011) | Underlying Assets: book<br>Location: Jupiter, FL | N/A | | Royalties | $1,000 to $2,500 | |
| 426 | American Broadcasting Com<br>Residual income earned from movies/television (The View)<br>Value not readily ascertainable | Location: Burbank, CA | N/A | | N/A | None (or less than $201) | |
| 427 | WB Studio Enterprises Inc<br>Residual income earned from movies/television (Two Weeks Notice, Suddenly Susan & Fresh Prince of Bel-Air, Ellen Degeneres Show)<br>Value not readily ascertainable | Location: Burbank, CA | N/A | | N/A | None (or less than $201) | |
| 428 | Paramount Picture Corporation<br>Residual income earned from movies/television (Spin City) Individual programs generated less than $200 of income<br>Value not readily ascertainable | Location: Hollywood CA | N/A | | N/A | None (or less than $201) | |
| 429 | Universal City Studios LLC<br>Residual income earned from movies/television Individual programs generated less than $200 of income (Little Rascals and The Associate)<br>Value not readily ascertainable | Location: Jupiter, FL | N/A | | N/A | None (or less than $201) | |
| 430 | Entertainment Partners<br>Residual income earned from movies/television Individual programs generated less than $200 of income (Zoolander, The Nanny, Sex & the City)<br>Value not readily ascertainable | Location: Burbank, CA | N/A | | N/A | $201 to $1,000 | |
| 431 | Legal Settlements | | | | | | |
| 431.1 | Donald J. Trump, et al. v Twitter, Inc and Jack Dorsey; Source: X Corp. | | N/A | | Settlement | $ 8,000,000.00 | |
| 431.2 | Donald J. Trump v. American Broadcasting Companies, Inc. ABC News, Inc and George Stephanopoulos; Source: American Broadcasting Companies, Inc. (net proceeds paid to The Donald J. Trump Presidential Library Foundation, Inc.) | | N/A | | Settlement | $ 16,000,000.00 | |
| 431.3 | Donald J. Trump v. CBS Broadcasting Inc. and CBS Interactive Inc; Source: All defendants (net proceeds paid to The Donald J. Trump Presidential Library Foundation, Inc.) | | N/A | | Settlement | $ 16,000,000.00 | |
| 431.4 | Donald J. Trump, et al. v. Meta Platforms, Inc., et al; Source: Meta Platforms, Inc. (net proceeds paid to The Donald J. Trump Presidential Library Foundation, Inc.) | | N/A | | Settlement | $ 24,500,000.00 | |
| 431.5 | Donald J. Trump et al. v Youtube, LLC and Sundar Pichai; Source Alphabet, Inc. (proceeds paid to The Trust for the National Mall) | | N/A | | Settlement | $ 22,000,000.00 | |
| 432 | Trademarks reported on Exhibit A to Part 2, Pages 1-56. For each reported individual trademark and copyright, the value is not readily ascertainable.* | Trademarks and copyright (see Exhibit A) | N/A | | N/A | $201 to $1,000 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Entities Dissolved 1/1/2025 through 12/31/2025 | | | | | | |
| 433 | DJT Entrepreneur Managing Member LLC | Dissolved: 11/17/2025 | N/A | None (or less than $1,001) | N/A | None (or less than $201) | DJT Holdings LLC: 100% |
| 434 | DJT Entrepreneur Member LLC | Dissolved: 11/17/2025 | N/A | None (or less than $1,001) | N/A | None (or less than $201) | DJT Holdings LLC: 100% |
| 435 | DT Dubai II Golf Manager LLC | Dissolved: 11/17/2025 | N/A | None (or less than $1,001) | N/A | None (or less than $201) | TTTT Venture LLC: 99%; & DT Dubai II Golf Manager Member Corp: 1% |
| 436 | DT Dubai II Golf Manager Member Corp | Dissolved: 11/17/2025 | N/A | None (or less than $1,001) | N/A | None (or less than $201) | DJT Holdings Managing Member LLC: 100% |

PROPUBLICA

Donate



President Donald Trump and First Lady Melania Trump arrive for the 2025 Kennedy Center honors gala. BRENDAN SMIALOWSKI/AFP/GETTY IMAGES

# FCC Officials Took Pricey Gifts From Paramount as the Company Needed Approval for Billion-Dollar Deals



by Corey G. Johnson

July 15, 2026, 5:00 am

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

## Reporting Highlights

- **Expensive Gifts:** Despite regulating broadcast media, FCC commissioners have accepted pricey tickets to the Kennedy Center honors gala from CBS or its parent company, now Paramount.
- **Conflict of Interest:** Ethics experts say that by accepting the gifts, FCC commissioners are compromising the agency's impartiality and should avoid acting on Paramount's pending merger.
- **Mixing Business and Pleasure:** After voting for a Paramount merger, Commissioner Olivia Trusty took tickets worth over $12,000. FCC Chair Brendan Carr has accepted tickets worth at least $63,000.

These highlights were written by the reporters and editors who worked on this story.

The rich and famous who filed into the Kennedy Center's opera house in December were there to enjoy one of the nation's most exclusive celebrations of the performing arts: the center's annual honors gala.

The black-tie event, hosted by President Donald Trump, prioritized tickets to people who donated more than $75,000 to the center. This year, it feted Hollywood icon Sylvester Stallone, the legendary glam rock band Kiss and the Grammy Award-winning disco pioneer Gloria Gaynor.

Among the attendees that evening were two lower-profile government officials whose regulatory decisions had been crucial to the future of the gala's broadcast sponsor, CBS, and its parent company, Paramount.

Five months earlier, Federal Communications Commissioner Olivia Trusty cast a decisive vote approving Paramount's historic $8 billion merger with Skydance Media. Now, the commissioner and a guest enjoyed the star-studded celebration thanks to tickets gifted to her by Paramount

and a guest enjoyed the star-studded celebration thanks to tickets gifted to her by Paramount worth more than $12,000, according to ethics disclosure records obtained by ProPublica.

The other commissioner who approved the merger watched from a prized perch. FCC Chair Brendan Carr and his wife sat in a private skybox with Paramount CEO David Ellison and other executives from Paramount and CBS. Such seats sold for $125,000 a ticket, according to Kennedy Center guidelines.

It's unclear if Paramount gifted Carr the premium seats because the FCC has yet to make public his financial disclosure for last year.

ADVERTISEMENT

**NASA** uses this **pattern test** to identify elite **analytical thinkers.** This is their entry test. How **far** can you get?

**Tap the item that doesn't match**



However, past disclosures show Carr and Trusty are among seven FCC commissioners who have accepted Kennedy gala tickets from CBS or its parent company over the last decade. Ethics experts told ProPublica this poses a blatant conflict of interest since the commission regulates the network. Carr's previous financial statements show he has accepted tickets at least seven times since his 2017 appointment, totaling over $63,000 in gifts.

Last December's ceremony attended by Trusty and Carr took place as Paramount was launching a hostile takeover bid for Warner Bros. Discovery, a move that would later result in a merger agreement that requires FCC approval.

Federal ethics rules ban employees from taking gifts from any entity that does business with, is

regulated by or seeks official action from their agency.

Four ethics experts told ProPublica that by accepting the premium tickets Trusty and Carr compromised the FCC's impartiality and should not take part in any upcoming decision on the merger.

**Do You Know More About This Topic?**

We're still reporting on potential conflicts of interest in the Trump administration. If you know more about this topic, please contact our reporting team.

**Corey G. Johnson**

I welcome tips about ethical conflicts or misdeeds inside the federal bureaucracy. I'm interested in policies, contracts and regulatory issues that affect people's lives. If you have any insights, please reach out via email or Signal.

**Contact Me**

“There’s no way that any top federal regulator should ever, ever accept a gift from a regulated company with interests their work will foreseeably affect,” said Walter Shaub, who led the federal Office of Government Ethics from 2013 to 2017. “The appearance of taking gifts like that is terrible. What’s at stake is nothing less than the public’s trust in government.”

Virginia Canter, who served as an ethics lawyer at the White House, Treasury Department, and Securities and Exchange Commission during the presidencies of George H.W. Bush, Bill Clinton, George W. Bush and Barack Obama, said the commissioners who accepted tickets cannot participate in this matter without damaging the integrity of the government’s decision-making process.

“This is shocking. Pretty disturbing, that’s what I would say. I just don’t understand what they were thinking,” said Canter, who now works as chief counsel for ethics and anti-corruption at the nonpartisan government watchdog group Democracy Defenders Fund.

The FCC’s review of the merger is one of the final hurdles facing a historic $110 billion consolidation of two of the five largest film studios in Hollywood. The deal would unite Paramount Skydance with Warner Bros., bringing under the control of one company Paramount+ and HBO Max streaming services; CBS and CNN; and scores of other major broadcast channels, cable networks, and digital platforms.

The new megacorporation, which could reshape how millions will access news, movies, sports and video games, faces fierce opposition from inside and outside Hollywood. More than 5,000 actors, producers and entertainment workers — including stars such as Robert De Niro, Javier Bardem, Joaquin Phoenix and Glenn Close — signed an open letter decrying how the consolidation would eliminate jobs and compromise “the integrity, independence, and diversity of our industry.”

On Monday, California, New York and 10 other Democratic states filed a lawsuit seeking to block the merger under federal and state anti-monopoly laws.

American and international regulators are evaluating the deal for its potential national security implications and impacts to consumers worldwide. Last week, the British government signaled it planned to investigate whether the new entertainment titan that would emerge from the union would unfairly stifle competition. The FCC’s ongoing review includes examining the Middle Eastern sovereign wealth funds backing the deal, including from Saudi Arabia, Qatar and Abu Dhabi.

The FCC usually has five commissioners — all appointed by the president and confirmed by the Senate to serve five-year terms — but the agency currently has only three. Any vote by the full commission would likely be decided by Republicans Carr and Trusty over Democrat Anna Gomez. Gomez was not at the December 2025 show but has accepted tickets from Paramount in the past. Because the FCC requires a three-commissioner quorum for a vote, any recusal could leave the panel unable to decide on the merger. Carr could decide to ask staff to approve the deal rather than

bring it to a commission vote, but the ethics experts said he should recuse himself from any decisions affecting the Paramount merger.

ADVERTISEMENT




IQ Test

Simple to take, completely private. No complex setups —just fast, confidential results.

Test Library Open

The experts warned the commissioners' gifts might become central in legal challenges and said the Justice Department should investigate potential violations of federal rules or laws.

Neither Carr nor Trusty responded to ProPublica's requests for comment. Gomez said in a statement that she followed agency advice when she attended the event in 2023 and 2024. Her statement did not elaborate or otherwise address why taking gifts from Paramount did not pose a conflict of interest.

An FCC spokesperson said agency ethics officers have for years cleared commissioner appearances, finding it consistent with ethics law.

"FCC Chairs and officials have attended the same event, in the same ways, consistently from the Trump Administration to the Biden Administration to the Obama Administration," the FCC said in a statement. "There has been no change in recent years."

Shaub called the justification outrageous.

"It's no excuse to say that you took the gift because everyone else was doing it or that your agency has had a bad habit of indulging in gift taking for a long time," Shaub said. "That kind of explanation doesn't work for school children, and it sure as hell doesn't work for government officials who are supposed to have better judgment than a fifth grader."





The three members of the Federal Communications Commission at a meeting this year. From the left, Anna Gomez; Brendan Carr, the panel's chair; and Olivia Trusty. AL DRAGO/BLOOMBERG/GETTY IMAGES

---

Despite their oversight role, FCC members have long enjoyed a night out at the Kennedy Center courtesy of CBS or its parent company. Seven of the 10 commissioners who served since 2016 accepted tickets worth more than $260,000, according to a ProPublica analysis of ethics disclosures.

Carr's predecessor, Jessica Rosenworcel, who was appointed FCC chair by President Joe Biden and stepped down in January 2025, attended regularly.

Rosenworcel and several other former commissioners who accepted the tickets did not respond to requests for comment. The one commissioner who didn't accept a single gift, Nathan Simington, said he received the Kennedy Center invites from CBS and Paramount but turned them down because it "wasn't my cup of tea."

A review of 10 years of disclosures shows commissioners accepted paid trips from various sponsors to appear at banquets and speak at conferences. Some of those gifts came from other media companies regulated by the FCC. NBCUniversal, ABC-Disney and Fox News, for instance, paid for commissioners to attend White House Correspondents' Association dinners, records show. The total value of the combined gifts topped $308,000. But the vast majority came from CBS and its parent company.

Melissa Zukerman, Paramount's chief communications officer, said it was a decades-long "CBS practice to invite government officials from both parties" to the Kennedy Center show. She didn't address why the practice continued after new ownership took over last year, the purpose of the gifts or whether the tickets posed a conflict of interest.

Carr, who joined the FCC as a staffer in 2012 and rose to become the agency's general counsel, was appointed to serve as a commissioner by Trump during his first term. Since then, Carr has accepted tickets annually, except when the 2020 event was postponed due to the COVID-19 pandemic, according to his public disclosures.

ADVERTISEMENT
How many animals can you see?


Is It Habit or High IQ?
Simple to take, completely private. No complex setups—just fast, confidential results.
Test Library Open

Carr did not respond to an email request from ProPublica for his latest ethics report, which would indicate whether Paramount also paid for him to attend last December's gala. The FCC referred us to the Office of Government Ethics, which told us that the FCC had not yet provided the disclosure. The FCC did not respond to our subsequent requests for the record.

A 2009 Office of Government Ethics memo gave federal employees the right to attend Kennedy Center events but explicitly said officials cannot accept free attendance "offered by persons other than the Kennedy Center and its trustees, officers and employees." In 2016, the ethics office tightened its gift requirements, warning officials to avoid any appearance "of loss of impartiality."

There is an exemption to the gift rules that allows free entry to gatherings that are widely attended and paid for by third parties, but only if certain conditions are met.

The event must "further agency programs or operations," and the agency's interest in an official attending must outweigh "concern that the employee may be, or may appear to be, improperly influenced in the performance of official duties," according to the federal rules.

As an example, the Office of Government Ethics said an industry-wide seminar attended by more than 100 people could be allowed if the employee's participation would be in the agency's interest. But those attending should "represent a range of persons interested in a given matter" and the event must provide a "structured opportunity" to exchange ideas and views among invitees.

The office clarified in a 2007 memo that performing arts presentations would not count even if they, like the honors gala, have a reception before or afterward at which officials can mingle with other attendees.

Canter, the former White House ethics lawyer, said it would be a "stretch" for the FCC to argue the exemptions apply to the Kennedy Center's annual show, where famous musicians perform and celebrities laud those who are being honored. "It's not what we would consider a widely attended gathering," she said.

Kedric Payne, general counsel and senior director of ethics at the Campaign Legal Center, a nonpartisan watchdog group, noted that federal rules also require agencies to weigh the market value of the attendance, its relevance to the agency, any sensitive pending matters involving the donor and whether accepting free tickets creates an appearance of preferential treatment.

"The ethics rules are designed to prevent this exact situation," he said, adding that it is an "obvious conflict of interest" for an official to "accept expensive gifts from anyone with decisions pending

— accepted Kennedy Center gala tickets from Paramount worth a combined $48,156.

On Jan. 16, 2025, just days before Rosenworcel stepped down from the commission, she announced the agency was dismissing the election complaint against CBS. She and Gomez called the outcome a victory for the First Amendment.

But days later, Carr, the incoming FCC chair, reopened the investigation.

To resolve Trump's lawsuit, CBS agreed to pay the president $16 million, a decision criticized by legal experts who decried Trump's claims as baseless.

Two days after Trump posted on social media that he had received the settlement money, the FCC took up the Paramount-Skydance merger. To meet Carr's demands, Paramount agreed to appoint an independent ombudsperson who would evaluate claims of bias. The company also pledged to eliminate its diversity, equity and inclusion initiatives.

By then, Starks and Simington had unexpectedly stepped down from the commission. Trusty, a Trump appointee, had been confirmed by the Senate the previous month.

Trusty and Carr voted in favor of the merger. Gomez voted against, blasting the approval for requiring "never-before-seen forms of government control over newsroom decisions and editorial judgment."

Experts said that while Trusty had no conflict yet, Carr and Gomez did. The fact that Gomez voted against Paramount did not mean she didn't face a conflict under the rules, Shaub said.

ADVERTISEMENT




IQ Test

Simple to take, completely private. No complex setups —just fast, confidential results.

Test Library

Open >

Federal rules only require those who accept improper gifts to make a prompt reimbursement, but Shaub and the other experts said Carr and Gomez should have abstained from the vote.

"If you repay the face value of the ticket, the gift rules don't require you to recuse — though common sense and any kind of conscience might lead you to recuse voluntarily for the good of the country," Shaub said. "But if you refuse to repay the donor, I don't see how anything short of recusal could remotely remediate the problem."

With the Paramount-Skydance merger greenlit by the FCC, Ellison, the new company's CEO, then set his sights on acquiring Warner Bros. Discovery.

before the agency. This matters because it makes the public question whether official decisions are free from the improper influence of wealthy special interests."

An FCC official familiar with the legal guidance given to the commissioners said they were told the event met the criteria for the "widely attended gathering" exception. (The source was not authorized to talk publicly about agency legal discussions.)

ADVERTISEMENT




IQ Test

Simple to take, completely private. No complex setups —just fast, confidential results.

Test Library Open

Shaub, the former Office of Government Ethics head, disagreed, saying it would be "hard to understand what compelling interest the FCC could think it had in letting its commissioners" attend the gala.

"What possible reason could have outweighed the obvious ethics concerns?" he asked.

Federal rules require written authorization for an official to accept free entry to a widely attended gathering. The FCC did not respond to our requests to provide the authorizations for the Paramount tickets or say who authorized them. Two senior ethics officials at the agency, Kathleen Fulp and Lauren Northrop, did not respond to requests for comment.

---

While December's event came at a particularly sensitive time for Paramount and the FCC, it wasn't the first.

More than a year earlier, in September 2024, Paramount had filed paperwork seeking the commission's approval for its merger with Skydance Media. A month later, the FCC launched an investigation of CBS after a conservative group complained about a "60 Minutes" interview with Democratic presidential candidate Kamala Harris. Trump later filed a lawsuit alleging the network deceptively edited the interview — an accusation CBS denied.

Then in November, less than two weeks after his election victory, Trump declared he would appoint Carr as FCC chair. Almost immediately, Carr accused CBS of biased election coverage and said it would be an obstacle to approving the Paramount-Skydance merger.

That December, Carr and three other commissioners — Rosenworcel, Gomez and Geoffrey Starks

Warner at first rebuffed Paramount's overtures and on Dec. 5 — two days before the Kennedy Center gala — accepted a bid from Netflix to buy its studio and streaming assets. Ellison responded by making numerous calls to administration officials and had a long talk with Trump, according to The Wall Street Journal.

On the night of the gala, Trump told reporters the Netflix deal "could be a problem" and that he planned to get directly involved with the regulatory approval. Inside the Kennedy Center, Carr and his wife sat with Ellison in an exclusive skybox, Bloomberg reported. (Gomez said in her statement to ProPublica that she declined Paramount's "invitation because of serious concerns about press independence connected to conditions Paramount agreed to as part of its merger transaction before the FCC.")

Hours after the gala ended, Paramount announced it was launching its hostile takeover bid of Warner Bros. Discovery.

About three months later, Carr publicly endorsed Paramount over Netflix on CNBC, promising swift approval.

If one or more commissioners choose to abstain from a merger vote because of ethical concerns, what would happen next is unclear. Under federal conflict of interest rules, an agency designee could theoretically permit commissioners to vote after considering several factors, including "the difficulty of reassigning the matter," the nature of the relationship between the commissioners and Paramount, and the "effect that resolution of the matter would have upon the financial interests" of the firm.

Carr could bypass a full commission vote entirely, as he did with the recent acquisition of Tegna by Nexstar Media Group. In that case, Carr delegated authority to FCC staff to approve the takeover.

But any decision on the Paramount deal — whether by the full commission or by staff at the direction of the chair — is likely to be challenged.

Richard Painter, a former White House ethics attorney in the administration of George W. Bush, said while courts often defer to the government's judgment, they also can become skeptical if a regulatory agency is shown to have violated ethics rules.

"A judge may very well say that the merger decision of the FCC isn't worth jack because the process was corrupted," he said.

---

Brandon Roberts contributed reporting.



**Corey G. Johnson**

I am a Pulitzer Prize-winning reporter at ProPublica.

Have a Tip for a Story?

# EXHIBIT 15

Joint press release of Paramount Skydance Corp. and Warner Bros. Discovery, Inc., "Paramount Skydance and Warner Bros. Discovery Announce Anticipated Closing Date of Paramount Merger" (Sept. 30, 2026), as posted at ir.wbd.com.

# Paramount Skydance and Warner Bros. Discovery Announce Anticipated Closing Date of Paramount Merger

SEPTEMBER 30, 2026

Download

NEW YORK, Sept. 30, 2026 /PRNewswire/ -- Paramount Skydance Corporation (NASDAQ: PSKY) ("PSKY") and Warner Bros. Discovery, Inc. (NASDAQ: WBD) ("WBD" or "Warner Bros. Discovery") today announced that the merger (the "Merger") contemplated by the Agreement and Plan of Merger, dated as of February 27, 2026 (the "Merger Agreement"), by and among WBD, PSKY and Prince Sub Inc., is expected to close on October 6, 2026 (the "Anticipated Closing Date"), subject to customary closing conditions.

As previously disclosed, at the effective time of the Merger (the "Effective Time"), each share of WBD common stock issued and outstanding immediately prior to the Effective Time (other than shares of WBD common stock to be canceled for no consideration in accordance with the Merger Agreement or as to which appraisal rights have been properly exercised) will be converted into the right to receive, without interest, an amount in cash equal to (x) $31.00 plus (y) (i) $0.00277778 multiplied by (ii) the number of calendar days elapsed after September 30, 2026 to and including the date on which the closing of the Merger occurs (the "Closing Date"). Accordingly, if the Closing Date occurs on the Anticipated Closing Date, at the Effective Time, each such share of WBD common stock will be converted into the right to receive, without interest, an amount in cash equal to $31.01666668.

**About Warner Bros. Discovery**

Warner Bros. Discovery is a leading global media and entertainment company that creates and distributes the world's most differentiated and complete portfolio of branded content across television, film, streaming and gaming. Warner Bros. Discovery inspires, informs and entertains audiences worldwide through its iconic brands and products including: Discovery Channel, HBO Max, discovery+, CNN, DC, TNT Sports, Eurosport, HBO, HGTV, Food Network, OWN, Investigation Discovery, TLC, Magnolia Network, TNT, TBS, truTV, Travel Channel, Animal Planet, Science Channel, Warner Bros. Motion Picture Group, Warner Bros. Television Group, Warner Bros. Pictures Animation, Warner Bros. Games, New Line Cinema, Cartoon Network, Adult Swim, Turner Classic Movies, Discovery en Español, Hogar de HGTV and others.

**About Paramount, a Skydance Corporation**

Paramount, a Skydance Corporation (Nasdaq: PSKY) is a leading, next-generation global media and entertainment company, comprised of three business segments: Studios, Direct-to-Consumer, and TV Media. The Company's portfolio unites legendary brands, including Paramount Pictures, Paramount Television, CBS, CBS News, CBS Sports, Nickelodeon, MTV, BET, Comedy Central, SHOWTIME®, Paramount+, Pluto TV, Skydance Animation, Film, Television, and Interactive/Games, and the newly established Paramount Sports Entertainment. For more information, please visit www.paramount.com.

**Cautionary Statement Concerning Forward-Looking Statements**

Information set forth in this communication constitute forward-looking statements within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements include, without limitation, statements regarding WBD's expectations, beliefs, intentions or strategies regarding the future, and can be identified by forward-looking words such as "anticipate," "believe," "could," "continue," "estimate," "expect," "intend," "may," "should," "will" and "would" or similar words. These forward-looking statements are based on current expectations, forecasts, and assumptions that involve risks and uncertainties and on information available to Warner Bros. Discovery as of the date hereof.

Forward-looking statements include, without limitation, statements about the benefits of the Merger, future financial and operating results, the combined company's plans, objectives, expectations and intentions, and other statements that are not historical facts. Such statements are based upon the current beliefs and expectations of WBD's management and are subject to significant risks and uncertainties outside of our control. Among the risks and uncertainties that could cause actual results to differ from those described in the forward-looking statements are the following: (1) the completion of the Merger may not occur on the anticipated terms and timing or at all; (2) the occurrence of any event, change or other circumstances that could give rise to the termination of the Merger; (3) risks that any of the closing conditions to the Merger may not be satisfied in a timely manner; (4) risks related to litigation brought in connection with the Merger; (5) risks related to disruption of management time from ongoing business operations due to the Merger; (6) effects of the announcement, pendency or completion of the Merger on the ability of WBD to retain customers and retain and hire key personnel and maintain relationships with suppliers, distributors, advertisers, content providers, vendors and other business partners, and on its operating results and business generally; (7) negative effects of the announcement or the consummation of the Merger on the market price of WBD common stock; (8) risks related to the potential impact of general economic, political and market factors on the companies or the Merger; (9) inherent uncertainties involved in the estimates and assumptions used in the preparation of financial projections; (10) the ability to obtain or consummate financing or refinancing related to the Merger; and (11) the response of WBD or PSKY management to any of the aforementioned factors. WBD's actual results could differ materially from those stated or implied, due to risks and uncertainties associated with its business, which include the risks related to the Merger. Discussions of additional risks and uncertainties are contained in WBD's filings with the Securities and Exchange Commission, including but not limited to WBD's most recent Annual Report on Form 10-K, reports on Form 10-Q and Form 8-K and the definitive proxy statement filed by WBD in connection with the Merger. WBD is not under any obligation, and expressly disclaims any obligation, to update, alter, or otherwise revise any forward-looking statements, whether written or oral, that may be made from time to time, whether as a result of new information, future events, or otherwise, except to the extent required by applicable law. Persons reading this communication are cautioned not to place undue reliance on these forward-looking statements which speak only as of the date hereof.


**WBD Investor Contact:**
Investor.Relations@wbd.com
212-548-5882

**WBD Media Contacts:**
Megan Klein
Megan.Klein@wbd.com
310-210-5018

Joe Libonati
Joe.Libonati@wbd.com
917-287-6763

**Paramount Investor Contacts:**
Kevin Creighton
Kevin.Creighton@paramount.com

Logan Thomas
Logan.Thomas@paramount.com

**Paramount Media Contacts:**
Melissa Zukerman
msz@paramount.com

Laura Watson
Laura.Watson@paramount.com


WARNER BROS. DISCOVERY

View original content to download multimedia:https://www.prnewswire.com/news-releases/paramount-skydance-and-warner-bros-discovery-announce-anticipated-closing-date-of-paramount-merger-302895095.html

SOURCE Warner Bros. Discovery, Inc.

View All News →

# EXHIBIT 16

Matthew Keys, "FCC’s Media Bureau Approves Foreign Bankrolling of Paramount-WBD Merger," The Desk (Sept. 17, 2026) (quoting Statement of Commissioner Anna M. Gomez), offered only to establish the statement made.

TheDesk.net BROADCAST STREAMING ADVERTISING & DATA POLICY & LAW VIDEOS GET OUR NEWSLETTER

Thursday, October 1, 2026 Editorial Standards About Us Pitch Us Submit a Tip

JustAnswer
Call or Chat With
OPEN

# FCC's Media Bureau approves foreign bankrolling of Paramount-WBD merger

By: Matthew Keys » mkeys@thedesk.net • September 17, 2026 Share:




**A billboard for Paramount Plus inside a BART/Muni station in San Francisco, California. (Photo by Matthew Keys for The Desk)**

The Federal Communications Commission (FCC) has approved Paramount's request to allow indirect foreign equity ownership in the company to exceed the 25 percent benchmark normally applied to the U.S. parent companies of broadcast licensees.

In a declaratory ruling released Thursday, the FCC's Media Bureau authorized up to 100 percent aggregate indirect foreign equity ownership in Paramount, subject to agency rules and national security conditions negotiated with the U.S. government.

TheDesk.net

TheDesk.net offers the latest news, analysis and commentary on the business of streaming media, broadcast TV and radio, advertising, measurement, journalism, tech and policy.

**Email:** news@thedesk.net
**Publisher:** Matthew Keys

TheDesk.net appreciates the support of readers who purchase products or services through specific links on our website. Learn more...

Call or Chat With an Exp
Connect One-on-One with an Expert and Get Your Answer in Minutes, 24/7.

Never miss a story

Get free breaking news alerts and twice-weekly digests delivered to your inbox.

The request was made by Paramount last year, shortly after the company announced its intention to acquire rival entertainment company Warner Bros Discovery (WBD). Paramount intends to use foreign investments to help bankroll its acquisition effort, which currently faces a multi-state legal challenge.

Paramount told the FCC that existing and prospective foreign investors are expected to hold approximately 49.5 percent of its equity following the investment.

The ruling specifically approves Saudi Arabia's Public Investment Fund to indirectly hold 15.1 percent of Paramount's equity. Entities connected to Abu Dhabi-based L'Imad Holding were approved for a 12.8 percent interest, while QIA TMT Holding and the Qatar Investment Authority were approved for 10.6 percent.

Each investor also received advance approval to increase its indirect equity stake to as much as 20 percent without obtaining another declaratory ruling.

The shares will be non-voting. Paramount Skydance's Class A shares, which carry all voting rights, will remain controlled by the Ellison family and RedBird Capital Partners. The FCC said the proposed investment does not constitute a transfer of control.

Approval is conditioned on Paramount complying with a September 4 Letter of Agreement reached with federal national security officials. Under that agreement, the foreign investors cannot receive governance or information rights and cannot influence Paramount's content decisions, company management or access non-public data involving U.S. persons.

Paramount must return to the FCC before changing those restrictions or granting the foreign investors voting rights.

Paramount was required to receive approval from the FCC because of rules that limit foreign ownership of companies that hold broadcast TV and radio licenses. Paramount operates

Email Address *

Subscribe!

*We do not share your e-mail address with third parties; you can unsubscribe at any time.*

**Top Stories**



**Judge approves settle clearing Paramount's merger with Warner Br Discovery**

**Dish pulls Scripps-owned W from satellite service**

**Ratings: Football dominates networks, VMAs pull in 8 mi viewers to CBS**

**Hub: Streaming price hikes consumers more-receptive based plans**

**Nashville Predators games to Fox's Atlanta TV station**

**DIRECTV, YouTube TV integ into Live TV menu on Fire TV devices**

**Warner Bros integrates ad p into Mediaocean's Prisma Di**

more than two dozen licensed TV stations through its CBS News & Stations division and is not expected to divest that business through its acquisition of WBD.

The FCC said the arrangement would provide Paramount and its broadcast stations with greater access to capital while maintaining safeguards against foreign influence. The agency rejected objections arguing that the investment could create practical influence over Paramount's broadcast and news operations, concluding that the non-voting structure and government-imposed conditions sufficiently addressed those concerns.

The Media Bureau's approval has already invited criticism from one FCC Commissioner, Anna Gomez, who on Thursday renewed her call for a full commission vote on the matter.

"The FCC just let some of the most repressive governments in the world indirectly control nearly all of a combined Paramount-Warner Bros. An investment this large in one of America's biggest media companies doesn't just buy equity, it secures influence over what gets said and what gets made," Gomez said in a statement e-mailed to *The Desk*.

She continued: "That's why I called for this new and novel issue to go to a full Commission vote given what's at stake. Instead, the FCC snuck this ruling out as a staff-level decision, with no public vote and no accountability for a call of this magnitude."

Start Chatting 1:1 in Minutes
An Expert Will Answer in Minutes. Ask a Question, Ge an Answer ASAP.
JustAnswer
Open

## More Stories

Get our news alerts

- **FCC Chairman Carr doubts antitrust lawsuit against Paramount deal will succeed**
- **Paramount asks judge to toss lawsuit over proposed Warner Bros Discovery merger**
- **Judge issues restraining order blocking Paramount-WBD merger (July 2026)**
- **Paramount weighs independent board over CBS News, CNN concerns**

asktech.support
Call or Chat With an Expert

Anna Gomez (FCC) | Federal Communications Commission (FCC) | Paramount | Warner Bros Discovery



**About the Author:** Matthew Keys

Matthew Keys is the award-winning founder and editor of TheDesk.net, an authoritative voice on broadcast and streaming TV, media and tech. With over ten years of experience, he's a recognized expert in broadcast, streaming, and digital media, with work featured in publications such as StreamTV Insider and Digital Content Next, and past roles at Thomson Reuters and Disney-ABC Television Group.

You are here:

Home » News » Legal News » FCC's Media Bureau approves foreign bankrolling of Paramount-WBD merger

**TheDesk.net**

TheDesk.net offers the latest news and analysis on the business of streaming media, broadcast TV, radio, journalism, tech and policy.

**Email:** news@thedesk.net
**Publisher:** Matthew Keys

## SITE MAP

About Us
Ad Industry
Broadband
Broadcast
Newspapers
Radio
Streaming
Television
Videos
Policy & Law
Social Media
Technology
Exclusive
Reports
Europe & UK
Opinion
E-mail
Newsletter
RSS Feed
Contact

## CONNECT WITH US

SOLANO MEDIA

©2013-2026 Solano Media LLC. All Rights Reserved, except where noted.

Editorial Standards
Privacy Policy / Terms & Conditions
Made in California